UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES : | |
| : | |
| *v.* : | |
| : | Criminal No. 12-0184(RJL) |
| **ALFREDO BELTRÁN LEYVA,** : | |
| : | |
| *Defendant.* : | |

**DEFENDANT'S MOTION TO ENFORCE RULE OF SPECIALTY OR, ALTERNATIVELY, TO LIMIT SCOPE OF CONSPIRACY**

**DEFENDANT** Alfredo Beltrán Leyva ("Beltrán Leyva"), by and through undersigned counsel, respectfully moves this Honorable Court to enforce the Rule of Specialty, or alternatively, to limit the scope of the charged conspiracy. In support of this Motion, defendant states as follows:

**FACTS**

On August 24, 2012, the government filed an "bare bones" indictment charging Mr. Beltrán Leyva with one count of Conspiracy to Distribute 5 or more Kilograms of Cocaine, Fifty Grams or More of Methamphetamine, One Kilogram or More of Heroin and One Thousand Kilograms or More of Marihuana for Importation into the United States Knowing and Intending that said Substances Would be Imported Into the United States, in violation of 21 U.S.C. §§ 959, 960 and 963.[1] The indictment charges a conspiracy "from in or about 2000, and continuing thereafter, up to including" the filing date of the indictment. The indictment further alleges that Mr. Beltrán Leyva conspired with "others known and unknown," in the countries of "Mexico,

---
[1] The indictment also includes a forfeiture allegation.

the United States, and elsewhere" to commit the charged offense.[2] Beyond that boilerplate language, the indictment did not specify any particular activity by Mr. Beltrán Leyva that may be considered part of the conspiracy nor identified any other individuals who may be coconspirators.

Since Mr. Beltrán Leyva has been extradited, the government has disclosed that it intends to try Mr. Beltrán Leyva as being a member of a large-scale conspiracy involving the Mexican "Federation," which is alleged to be composed of the "Sinaloa Cartel" and what the government terms the "Beltrán Leyva Organization." The government further seeks to try him as conspiring with Colombian traffickers, including well-known cooperator Juan Carlos Ramirez Abadía (alias "Chupeta") to import cocaine from Colombia to Mexico. Additionally, the government apparently seeks to associate Mr. Beltrán Leyva with the following seizures of cocaine: a) the seizure of the Lina Maria in 2004; b) the seizure of the San Jose in 2004; c) a seizure in April 2007; d) a seizure in November 2007; and e) a seizure in January 2008.

***The Government's Extradition Request***

Some time after the filing of the indictment, the government submitted a formal extradition request to Mexico seeking Mr. Beltrán Leyva's extradition to the United States. Andrea Goldberg, Assistant Deputy Chief of the Narcotics and Dangerous Drug Section of the Department of Justice submitted a sworn affidavit setting forth the charges against Mr. Beltrán Leyva. *See* Exh. 1 (Affidavit of Andrea Goldbarg). In her affidavit, Ms. Goodbarg sets forth a "Summary of the Facts of the Case," wherein she states:

> 19. Investigation by law enforcement authorities revealed that ALFREDO BELTRAN LEYVA has been involved in the distribution and illegal importation of drugs from Colombia for the ultimate distribution in the United States since

---

[2] Based on the charge in the indictment, a judicial officer of this Court issued a warrant for Mr. Beltrán Leyva's arrest. Mexican authorities had already detained Mr. Beltrán Leyva in 2008.

approximately 2000. ALFREDO BELTRAN LEYVA is a younger brother of Arturo Beltran Leyva, who until his death in 2009 was one of the most prolific drug traffickers in Mexico.

20. ALFREDO BELTRAN LEYVA started working in the Beltran Leyva drug trafficking organization created by his older brothers, Arturo and Hector. ALFREDO BELTRAN LEYVA initially was assigned to coordinate the offloading of ton-quantity shipments of cocaine from Colombia. ALFREDO BELTRAN LEYVA was later promoted to one of Arturo Beltran Leyva's main assistants, in which role he oversaw the shipment of thousands of kilograms of cocaine into the United States and the subsequent distribution of the cocaine for sale in the United States.

21. The investigation by law enforcement authorities revealed that ALFREDO BELTRAN LEYVA created his own alliances and had his own followers, including Fausto Isidro Meza Flores, alias Chapo Isidro and Agustin Flores Apodaca, alias El Niño, alias El Barbon, alias El Ingeniero, alias Agustin Apodaca Flores. After ALFREDO BELTRAN LEYVA's arrest by Mexican authorities in January 2008, he continued to give orders to Fausto Isidro Meza Flores and Agustin Flores Apodaca while he was incarcerated. In addition to carrying out ALFREDO BELTRAN LEYVA'S orders during his incarceration, Fausto Isidro Meza Flores and Agustin Flores Apodaca paid ALFREDO BELTRAN LEYVA part of the proceeds from the Beltran Leyva Organization's sale of cocaine, heroin, methamphetamine, and marijuana in the United States.

22. On September 2, 2010, law enforcement authorities seized 33 pounds of methamphetamine and four kilograms of cocaine in the State of Washington. Laboratory analysis has confirmed that the substances seized on September 2, 2010, were methamphetamine and cocaine. Telephone conversations that were lawfully intercepted and recorded under United States law revealed discussions among members of the Beltran Leyva Organization involving distribution of the Organization's drugs in the United States and the purchase of machineguns and destructive devices to be used in furtherance of the Organization's drug trafficking activities.

Exh. 1 at ¶¶ 19-22. In her affidavit, Ms. Goldbarg also states that she has attached a second affidavit executed by Federal Bureau of Investigation Special Agent Britton Boyd, who "summarizes the investigation of ALFREDO BELTRAN LEYVA's drug trafficking activities and the *evidence that resulted in the indictment of this case*." Exh. 1 at ¶ 23 (emphasis added). She further states that attached to Special Agent Boyd's 'affidavit and made part of this

extradition request are the laboratory reports describing the chemical analyses on the methamphetamine and cocaine seized on September 2, 2010; transcripts of several lawfully recorded telephone conversations in which ALFREDO BELTRAN LEYVA'S employee Agustin Flores Apodaca and his co-conspirators discussed drug trafficking activities and weapons purchases …." *Id*.

For his part, S.A. Boyd summarized the facts supporting the indictment as follows:

> 7. In 2009, federal law enforcement authorities began an investigation into the distribution of illegal drugs in the State of Washington. Specifically, law enforcement authorities focused on the distribution of cocaine, methamphetamine, heroin, and marijuana imported from Mexico and transported to the United States Pacific Northwest Region. During the investigation, law enforcement authorities were able to identify several members of Mexico-based Beltran Leyva Drug Trafficking Organization, specifically, Agustin Flores Apodaca, alias El Niño, alias El Barbon, alias El Ingeniero; Salome Flores Apodaca, alias Pelon, alias Fino; and Fausto Isidro Meza Flores, alias Chapo Isisdro, alias Chapito Isidro. Further investigation revealed that these members still worked for ALFREDO BELTRAN LEYVA. More specifically, the part of the proceeds of the drugs that were being sold in the United States on behalf of Agustin Flores Apodaca, Salome Flores Apodaca, and Fausto Isidro Meza Flores was being shared with ALFREDO BELTRAN LEYVA. In fact, although ALFREDO BELTRAN LEYVA was arrested by law enforcement authorities in January 2008, ALFREDO BELTRAN LEYVA was still giving orders even while incarcerated, and he was still engaged in the distribution of drugs from Mexico into the United States.
>
> 8. In late August 2010, law enforcement authorities were conducting surveillance at a business location related to this investigation in Centralia, Washington, when they observed a brown Chevrolet Impala automobile with Arizona license plates. Further investigation by law enforcement authorities let to a lawful search of the Impala, pursuant to which authorities discovered large quantities of United States currency and ledgers detailing suspected drug transactions.[3]
>
> 9. Based on additional information developed during the investigation, on September 2, 2010, law enforcement authorities lawfully seized 33 plastic-

---

[3] The ledgers seized in Centralia, Washington are not the same ones that are subject to the Court's protective order. The government has not produced any discovery related to that seizure with the exception of the drug analysis reports and photographs of the seized items.

4

> wrapped, cylindrical packages containing a total of approximately 33 pounds of methamphetamine and four plastic-wrapped, square-shaped packages containing approximately four kilograms of cocaine, along with a firearm, ammunition, and drug paraphernalia, at a warehouse located in Centralia, Washington. Samples of the seized drugs were sent to the United States Drug Enforcement Western Laboratory in San Francisco, California for analysis and were confirmed to be methamphetamine and cocaine. A certified copy of the laboratory report detailing the results of the chemical analysis is attached to this affidavit and marked as Attachment D-1. Photographs of the packages of methamphetamine and cocaine that were seized on September 2, 2010, are attached to this affidavit and marked as Attachment D-2.
>
> 10.    Following the September 2, 2010 drug seizure, law enforcement authorities lawfully recorded telephone conversations between Agustin Flores Apodaca, and another man involved in the Beltran Leyva Organization's drug trafficking activities in the United States. Law enforcement authorities played audio recordings of some of these conversations for a Cooperating Witness (hereinafter "Witness One") who personally knows Agustin Flores Apodaca, Salome Flores Apodaca, and Fausto Isidro Meza Flores, and other members of the Beltran Leyva Organization. Based on Witness One's familiarity with the Beltran Leyva Organization and its members, Witness One was able to identify in these audio recordings the voices of Agustin Flores Apodaca, Salome Flores Apodaca, and Fausto Isidro Meza Flores and further was able to interpret the meaning of several portions of these conversations in which the participants spoke in coded and cryptic language.

Exh. 2 (Affidavit of Special Agent Britton Boyd) at ¶ 7 – 10. In the subsequent paragraphs 11 through 14, Agent Boyd summarizes the intercepted telephone conversations. *See* Exh. 2 at ¶ 11 – 14.

   Agent Boyd then continues:

> 15.    On September 14, 2010, law enforcement authorities in Arizona observed the same brown Chevrolet Impala, from which law enforcement authorities in the State of Washington lawfully seized United States currency and ledgers of suspected drug transactions in late August 2010, being driven by Salome Flores Apodaca. Law enforcement authorities followed the Impala to a location where they observed Salome Flores Apodaca meet with several other men. According to Witness One, who was present at the meeting, Salome Flores Apodaca discussed selling over 30 pounds of methamphetamine and four kilograms of cocaine. Based on my knowledge of this investigation, I believe that Salome Flores Apodaca was attempting to sell the supply of methamphetamine and cocaine, that,

unbeknownst to him, was seized by law enforcement authorities on September 2, 2010.

16.     Law enforcement authorities then followed Salome Flores Apodaca as he left the meeting.  Salome Flores Apodaca was accompanied by another man, who law enforcement observed getting into a different car than the brown Impala, in which Salome Flores Apodaca drove away from the meeting.  Law enforcement authorities followed the other man's car and eventually conducted a lawful stop of this other car, which led to the arrest of the other man for possession of illegal drugs.

17.     The above-stated summary of the events on September 8, 2010 was confirmed by Witness One in this case, who has also stated that Salome Flores Apodaca later called him/her and said that one of his workers had been arrested in Arizona, related to this drug transaction.

18.     This investigation also revealed that Fausto Isidro Meza Flores, in participation with ALFREDO BELTRAN LEYVA, was attempting to import ton quantities of marijuana from Mexico into the United States.  A Cooperating Witness (hereinafter "Witness Two") engaged in an attempted drug transaction involving approximately 2,800 kilograms of marijuana that were to be imported from Mexico into the United States.

19.     Witness Two had several face-to-face meetings with Agustin Flores Apodaca and Fausto Isidro Meza Flores to negotiate the marijuana transaction.  During these conversations, Agustin Flores Apodaca told Witness Two that he (Agustin Flores Apodaca) and Fausto Isidro Meza Flores were still loyal to ALFREDO BELTRAN LEYVA.  In fact, Witness Two overheard a conversation in which Agustin Flores Apodaca told someone on the telephone that the orders he (Agustin Flores Apodaca) was providing came directly from ALFREDO BELTRAN LEYVA.  This conversation occurred in the summer 2011, over three years after ALFREDO BELTRAN LEYVA was arrested by law enforcement authorities.  Around the same time as this telephone conversation, Agustin Flores Apodaca told Witness Two that they (Agustin Flores Apodaca and Fausto Isidro Meza Flores) were still giving part of the proceeds from the drug sales they conducted in the United States to ALFREDO BELTRAN LEYVA.

20.     The investigation revealed another witness, Alejandro Tascon, who was a Colombian drug trafficker that spent many years working fro the Beltran Leyva brothers.  Tascon began his work for the Beltran Leyva Organization assigned to Hector Beltran Leyva, but he eventually moved to a position where he worked for Julio Beltran Quintero and ALFREDO BELTRAN LEYVA.  Tascon worked for Julio Beltran Quintero and ALFREDO BELTRAN LEYVA from 2000 until Julio Beltran Quintero's death in 2005.  During this time period, Tascon assisted Julio Beltran Quintero and ALFREDO BELTRAN LEYVA in processing tens of

thousands of kilograms of cocaine that the Beltran Leyva Organization received from Colombia.

21.     When Julio Beltran Quintero was murdered in 2005, Tascon went to work exclusively for Arturo Beltran Leyva, although Arturo Beltran Leyva told Tascon directly that his brother, ALFREDO BELTRAN LEYVA, was receiving part of the drugs that Tascon was providing. During the time that Tascon worked for Arturo Beltran Leyva and ALFREDO, he coordinated the delivery of thousands of kilograms of cocaine from Colombia for the Beltran Leyva Organization.

Exh. 2 at ¶ 15 – 21.

On November 26, 2013, the Mexican "Secretaría de Relaciones Exteriores" (Ministry of Foreign Affairs) issued a 214-page "Acuerdo de Extradición" (Extradition Agreement) wherein the Mexican government analyzed the United States government's request for Mr. Beltrán Leyva's extradition and set forth the conditions under which Mr. Beltrán Leyva was being extradited pursuant to the Treaty of Extradition Between the United Mexican States and the United States of America. *See* Exh. 3 – Extradition Agreement.[4]

After analyzing the documentation provided by the United States in its request for extradition, the Ministry of Foreign Affairs declared:

> For the reasons of fact and law mentioned above, the Ministry of Foreign Affairs believes that all the documentation described above, has the legal force to consider it as authentic, since it meets the legal requirements set forth in Article 10, paragraphs 5 and 6 of the applicable bilateral extradition treaty because it contains the seal of the State Department and the respective signatures. Similarly, these documents were legalized by the functionary authorized by this Ministry of Foreign Affairs to deal with the affairs of the United Mexican States in the place where they were issued, and were transmitted via diplomatic channels and translated to the Spanish language. Moreover, the Ministry believes that what is contained in them is true and therefore sufficient grounds to initiate criminal proceedings against the required party, because they are, once analyzed by this Ministry of Foreign Affairs as a whole and on their own, sufficient to demonstrate evidence to support this conclusion, and have sufficient legal force in accordance with the provisions of articles 280, 281, 285, 288 and 289 of the Federal Code of

---

[4] The Extradition Agreement is in the Spanish language. Relevant parts have been translated for the Court's convenience.

>Criminal Procedure, in accordance with Article 10, paragraph 3, subsection b) of the Extradition Treaty between the United Mexican States and the United States of America, **only with respect to the facts alleged by the requiring government that occurred on September 2, 2010**, consisting that on that date United States law enforcement authorities **legally seized 33 cylindrical packages wrapped in plastic, containing a total of about 33 pounds of methamphetamine and four square plastic wrapped bundles containing approximately four kilograms of cocaine**, plus a firearm, ammunition and drug paraphernalia in a warehouse located in Centralia, Washington, United States of America; this in relation to the conspiracy charged against the required party in which are also involved MEZA FLORES FAUSTO ISIDRO, and SALOME AGUSTIN FLORES surname Apodaca, JOAQUIN BELTRAN QUINTERO (deceased), to conduct operations for cocaine and methamphetamine trafficking to the United States of America, for later distribution in that country. This, on the grounds that the requesting State did not provide any element of proof in relation to the drugs heroin and marihuana, therefore, the international extradition of ALFREDO BELTRAN LEYVA, alias "MOCHOMO" can proceed for him to be tried on the imputed charge for the substances of **cocaine** and **methamphetamine**.

Exh. 3 at 55 – 57 (emphasis in original).[5]

In its analysis of whether Mr. Beltrán Leyva can be extradited while he has charges pending in Mexico, the Ministry of Foreign Affairs declared that:

>With regard to the previously described, in that appeal resolution dated June 10, 2008, noted in criminal matter 487/2008, initated by virtue of the appeal lodged against the consitucional deadline dated 29 January 2008, noted in criminal matter 387/2012-VI-A, before the Sixth District Judge for Penal Matters in the State of Jalisco against ALFREDO BELTRAN LEYVA alias "MOCHOMO", is which the requeted party is accused with respect to a criminal organization that is known since the year 1996 to January 2008, the date on which he was arrested by Mexican authorities, in which he participated with his brother Arturo Beltran Leyva, alias Barbas or Barbitas and others, for which this Ministry considers that only the first part of the facts mentioned by the United States authorities in its request for extradition filed against ALFREDO BELTRAN LEYVA alias "MOCHOMO", refers to this criminal organization to point out the following:
>
>>Investigation by law enforcement authorities revealed that ALFREDO BELTRAN LEYVA has been involved in the distribution and illegal importation of drugs from Colombia for the ultimate distribution in the United States since approximately 2000.

---

[5] Due to the length of the Extradition Agreement, only the relevant pages are attached. If the Court wishes to see the entire document, Counsel can provide a copy to Chambers.

>ALFREDO BELTRAN LEYVA is a younger brother of Arturo Beltran Leyva, who until his death in 2009 was one of the most prolific drug traffickers in Mexico. ALFREDO BELTRAN LEYVA started working in the Beltran Leyva drug trafficking organization created by his older brothers, Arturo and Hector.
>
>ALFREDO BELTRAN LEYVA initially was assigned to coordinate the offloading of ton-quantity shipments of cocaine from Colombia. ALFREDO BELTRAN LEYVA was later promoted to one of Arturo Beltran Leyva's main assistants, in which role he oversaw the shipment of thousands of kilograms of cocaine into the United States and the subsequent distribution of the cocaine for sale in the United States.
>
>*For this reason, the extradition of the requested party is not appropriate to be criminally prosecuted for having organized from 1996 to January 2008, in a criminal organization led by Joaquin Guzman Loera, alias El Chapo Guzman, Arturo Beltran Leyva, alias El Barbas or El Barbitas or Alfa, Hector Beltran Leyva, alias El H, Ismael Zambada Garcia, alias El Mayo Zambada, Juan Jose Esparragoza Moreno, alias El Azul,* who have ties to the Sinaloa and Juarez Cartels, dedicated to receive shipments of drugs from Colombia and if lost, coordinate their search and location to be recovered, guarding their transfer to the northern border of the Mexican Republic for later introduction into the United States of America, for its commercialization, by virtue that he is already being prosecuted for his participation in this criminal organization for the period of time indicated in the criminal case number 387/2012-VI-A, which is before the Sixth District Judge for Federal Criminal Proceedings in the State of Jalisco.

Exh. 3 at 155 – 156 (emphasis added).

## ARGUMENT

***The Expected Prosecution Will Violate the Rule of Specialty***

Under the international law "rule of specialty, the United States as the requesting party is bound to try a defendant only for those offenses as to which the extraditing nation agreed to extradite. *United States v. Carvajal*, 924 F. Supp.2d 219, 248 (D.D.C. 2013) (Collyer, J.) (citing *Berenguer v. Vance,* 473 F.Supp. 1195, 1197 (D.D.C. 1979) (describing the rule as having "long been recognized" in the United States and citing, *inter alia, United States v. Rauscher,* 119

U.S. 407, 415–30 (1886)). The rule of specialty "stands for the proposition that the requesting state, which secures the surrender of a person, can prosecute that person only for the offense for which he or she was surrendered by the requested state or else must allow that person an opportunity to leave the prosecuting state to which he or she had been surrendered." *United States v. Gallo-Chamorro* (*Gallo-Chamorro I*), 48 F.3d 502, 504 (11th Cir. 1995) (quoting *United States v. Herbage,* 850 F.2d 1463, 1465 (11th Cir. 1988)). The rule is grounded in concerns of international comity. *Gallo-Chamorro v. United States* (*Gallo-Chamorro II*), 233 F.3d 1298, 1305 (11th Cir. 2000). As the Court in Gallo Chamorro II explained, "[b]ecause the surrender of the defendant requires the cooperation of the surrendering state, preservation of the institution of extradition requires that the petitioning state live up to whatever promises it made in order to obtain extradition." *Id.*

The Supreme Court first recognized the doctrine of specialty in *United States v. Rauscher,* 119 U.S. 407 (1886). Great Britain surrendered William Rauscher, the second mate on an American ship, to the United States on a charge of murder. The United States, however, tried and convicted him of a charge of infliction of cruel and unusual punishment. The extradition treaty listed murder as an extraditable offense, but did not contain the crime for which the court convicted Rauscher. *Rauscher,* 119 U.S. at 411. Great Britain had not specifically objected to Rauscher's trial on the cruel and unusual punishment charge. The Court, however, inferred that Great Britain would object to Rauscher's prosecution on the charge of infliction of cruel and unusual punishment based on that country's previous refusal to surrender a fugitive within its borders in the absence of a pledge from the United States that it would not try him for any other offense than that for which it had demanded him. *Rauscher,* 119 U.S. at 415. The Court held that because Rauscher had been brought within the jurisdiction of the court under an

extradition treaty, he could only be tried for one of the offenses described in the treaty and for the offense with which he had been charged in the extradition proceeding. *Rauscher,* 119 U.S. at 430.

In *Rauscher,* the Court drew a distinction between this country's treatment of a treaty and other countries in which a treaty is essentially a contract between two nations. Under our Constitution, the Court explained, a treaty is the law of the land and the equivalent of an act of the legislature. *Rauscher,* 119 U.S. at 418. The Court's opinion suggests that the rights described in the treaty are conferred on both the extradited individual and the respective governments. The Court stated:

> *[A] treaty may also contain provisions which confer certain rights upon the citizens* or subjects of one of the nations residing in the territorial limits of the other, which partake of the nature of municipal law, and *which are capable of enforcement as between private parties in the courts of the country*.... The Constitution of the United States places such provisions as these in the same category as other laws of Congress, by its declaration that "This Constitution and the laws made in pursuance thereof, and all treaties made or which shall be made under authority of the United States, shall be the supreme law of the land." A treaty, then, is a law of the land, as an Act of Congress is, whenever its provisions prescribe a rule by which *the rights of the private citizen or subject may be determined.* And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a statute.

*Rauscher,* 119 U.S. at 418–19 (quoting *Chew Heong v. United States,* 112 U.S. 536, 540, 565 (1884)) (emphasis added). Moreover, the Court asserted that it was "impossible to conceive" of an exercise of jurisdiction which could ignore the principle of specialty and not implicate a "*fraud upon the rights of the party extradited and of bad faith to the country which permitted his extradition.*" *Rauscher,* 119 U.S. at 422, 7 S.Ct. at 242 (emphasis added). Finally, the Court concluded that the rule of specialty is "conclusive upon the judiciary of the right conferred upon

11

persons brought from a foreign country into this [country] under such proceedings." *Rauscher,* 119 U.S. at 424.

Mexico extradited Mr. Beltrán Leyva pursuant to the Extradition Treaty Between the United States of America and Mexico. *See* Extradition Treaty, May 4, 1978, 31 U.S.T. 5059. The Treaty, in Article 17, Rule of Specialty, states in relevant part that:

> A person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted ….

*Id.* art. 17. Mr. Beltrán Leyva has a constitutionally protected right to invoke the rule of specialty's protection. *United States v. Sensi*, 664 F. Supp. 566 (D.D.C. 1987), *aff'd*, 879 F.2d 888 (DC Cir. 1989). In *Sensi*, the defendant was extradited from the United Kingdom for transportation of stolen property. Prior to trial, the government filed additional charges including mail fraud and possession of stolen securities. The defendant claimed that the new charges violated the doctrine of specialty and the government argued that the defendant had no rights under the treaty to challenge the extradition. The court rejected the government's argument, reasoning that although the treaty in question was a contract between sovereign governments, it also constituted the supreme law of the United States. The court found that placing the defendant on trial for non-extradited charges would not only violate the treaty, but also the defendant's personal rights.

In this case, the United States charged Mr. Beltrán Leyva with one count of Conspiracy to Distribute 5 or more Kilograms of Cocaine, Fifty Grams or More of Methamphetamine, One Kilogram or More of Heroin and One Thousand Kilograms or More of Marihuana for Importation into the United States Knowing and Intending that said substances Would be Imported Into the United States. It supported its request for extradition with affidavits

by both Ms. Goldbarg and Agent Boyd that specifically alleged a conspiracy between Mr. Beltrán Leyva and Agustin Flores Apodaca, Salome Flores Apodaca and Fausto Isidro Meza Flores to import narcotics into the United States that resulted in the importation of 33 pounds of methamphetamine and 4 kilograms of cocaine into the State of Washington.  In fact, Ms. Goldbarg represents to the government of Mexico, that the Affidavit executed by Agent Boyd "summarizes the investigation of ALFREDO BELTRAN LEYVA's drug trafficking activities and the *evidence that resulted in the indictment of this case*."  Exh. 1 at ¶ 23 (emphasis added).

As a result of the government's factual representations, the Government of Mexico granted the request for extradition with certain specific conditions, including that Mr. Beltrán Leyva could only be tried for a conspiracy involving cocaine and methamphetamine and denying extradition for a conspiracy involving heroin and marijuana.  The Government of Mexico also specifically denied extradition for a conspiracy from the period 1996 to January 2008.  Thus, the government can only try Mr. Beltrán Leyva for offenses that took place from February 2008 to August 24, 2012, the date of the indictment.  Finally, the Government of Mexico specifically conditioned Mr. Beltrán Leyva's extradition "only with respect to the facts alleged by the requiring government that occurred on September 2, 2010, consisting that on that date United States law enforcement authorities legally seized 33 cylindrical packages wrapped in plastic, containing a total of about 33 pounds of methamphetamine and four square plastic wrapped bundles containing approximately four kilograms of cocaine …."  Exh. 2 at ¶ 9.

If this Court were to allow the government to proceed to trial alleging Mr. Beltrán Leyva's participation in a wide-ranging conspiracy involving the "Federation" rather than the specific conspiracy limited to the facts described above, the rule of specialty will be violated.

13

Although the actual charge being tried might be the same, the government would in effect be trying Mr. Beltrán Leyva for a different conspiracy.  The Mexican government's intent to only grant extradition based on these specific alleged facts is supported by Article 17 of the Extradition Treaty, which reads, "If in the course of the procedure, the classification of the offense is changed for which the person requested requested was extradited, he shall be tried and sentenced on the condition that the offense, in its new legal form . . .  a) is based on the same group of facts establised in the request for extradition and in the documents presented in its support; …."  Exh. 4, Extradition Treaty, Art. 17(2)(a).  Here, the government is attempting to pull a bait and switch by requesting Mr. Beltrán Leyva's extradition for a conspiracy based on specific facts and then try him for a separate and much larger conspiracy.

***The Court Should Limit the Scope of the Conspiracy***

Alternatively, Mr. Beltrán Leyva respectfully requests that this Court limit the government's trial evidence of conspiracy to the facts allowed by the extradition to "the facts alleged by the requiring government that occurred on September 2, 2010, consisting that on that date United States law enforcement authorities legally seized 33 cylindrical packages wrapped in plastic, containing a total of about 33 pounds of methamphetamine and four square plastic wrapped bundles containing approximately four kilograms of cocaine …," Exh. 3 at 55 – 57; to only cocaine and methamphetamine, *Id.* and to the time frame from January 2008 to the date of the indictment.  *Id.* at 155 – 156.

14

   WHEREFORE, for all the foregoing reasons and any that may become apparent to the Court, Mr. Beltrán Leyva respectfully requests that this motion be **GRANTED**.

Dated: Washington, DC  
   June 19, 2015

Respectfully submitted,

**BALAREZO LAW**

By:   /s/  
_____  
A. Eduardo Balarezo  
Bar No. 462659  
400 Fifth Street, N.W.  
Suite 300  
Washington, D.C. 20001  
(202) 639-0999 (tel)  
(202) 639-0899 (fax)  
filings@balarezolaw.com

*Counsel for Alfredo Beltrán Leyva*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 19th day of May 2015, I caused a true and correct copy of the foregoing Defendant's Motion to Enforce Rule of Specialty or, Alternatively, to Limit Scope of Conspiracy to be delivered via Electronic Case Filing to the Parties in this case.

/s/
_____
A. Eduardo Balarezo