**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 12-CR-184 (RJL)** |
| **v.** | |
| **ALFREDO BELTRAN LEYVA,** | |
| **Defendant.** | |

**GOVERNMENT'S MOTION IN LIMINE TO INTRODUCE**
**OTHER CRIMES EVIDENCE AT TRIAL**

The United States of America, by and through counsel, respectfully moves this Court to admit evidence of other crimes as direct evidence of the multi-year, multi-member, complex international narcotics trafficking conspiracy, as being intrinsic or inextricably intertwined with the charged conspiracy, and also pursuant to Federal Rule of Evidence ("Rule") 404(b).  The Government seeks to admit as inextricably intertwined evidence with the charged conspiracy: (1) evidence of the Defendant and co-conspirator's use of violence and weapons in furtherance of the drug trafficking conspiracy, (2) evidence of the Defendant and co-conspirator's involvement in paying bribes to government officials to further the drug conspiracy, (3) evidence of the Defendant and co-conspirators' trafficking of heroin and marijuana alongside cocaine and methamphetamine, and (4) evidence of the Defendant's involvement in money laundering transactions in furtherance of the drug conspiracy.  Additionally, the Government also seeks to admit evidence of the Defendant's involvement in prior similar drug trafficking pursuant to Federal Rule of Evidence ("Rule") 404(b).  Lastly, should the Court determine that the evidence

1

the Government views as inextricably intertwined is not admissible under this basis, the Government seeks to admit this evidence, in the alternative, pursuant to Rule 404(b).

## I.     THE INSTANT OFFENSE

On August 24, 2014, a federal grand jury returned an indictment charging the Defendant with conspiracy to distribute five kilograms or more of cocaine, fifty grams or more of methamphetamine, one kilograms or more of heroin and one thousand kilograms or more of marijuana for importation into the United States, in violation of 21 U.S.C. §§ 959, 960, and 963. The charged conspiracy occurred between January 2000 and August 2012.  The indictment also carries a criminal forfeiture allegation pursuant to 21 U.S.C. §§ 853 and 970.

On January 28, 2008, the Defendant was arrested by the Mexican Army with eight pistols, one AK-47, and approximately $900,000 in United States currency.  On November 26, 2013, the Mexican government approved the Defendant's extradition to the United States, however, they denied extradition of the Defendant on the charges of conspiracy to distribute one kilogram or more of heroin and 1000 kilograms or more of marijuana.  The Defendant then filed numerous "amparos" (equivalent to an appeal in the United States) which were litigated for the next year.  The Defendant was then extradited to Washington, D.C. on November 15, 2014 and the Defendant made his initial appearance before U.S. Magistrate Judge Alan Kay on November 17, 2014.

The Government anticipates proving at trial that the Defendant was a leader of a large-scale drug trafficking organization ("DTO"), known as the Beltran Leyva DTO, based in Sinaloa, Mexico.  The Beltran Leyva DTO was run by the Beltran Leyva brothers including the

Defendant, Hector Beltran Leyva ("Hector"), and Arturo Beltran Leyva ("Arturo").[1]  The Beltran Leyva DTO had been working with the Sinaloa Cartel since the early 1990s where it existed as an organized crime syndicate, called the "Federation," founded upon longstanding relationships between Mexico's major drug trafficking kingpins including the Defendant, his brothers (Arturo and Hector), Joaquin "Chapo" Guzman Loera, Ignacio "Nacho" Coronel Villareal, and Ismael "El Mayo" Zambada Garcia.  The kingpins operated through cooperative arrangements and close coordination with South American cocaine sources of supply.  Through a network of corrupt police and political contacts, as well as violence, the Beltran Leyva DTO, working within the Federation, directed a large-scale narcotics transportation network involving the use of land, air and sea transportation assets, shipping multi-ton quantities of cocaine from South America to Mexico, and finally into the United States.   The Government intends to show at trial that the Defendant was not only responsible for transporting multi-ton quantities of cocaine from South America, but also diversified into trafficking heroin, methamphetamine and marijuana from Mexico into the United States.

The Government anticipates the evidence at trial will also show that the Beltran Leyva DTO employed "sicarios," or hitmen, who carried out hundreds of acts of violence, including murders, kidnappings, tortures and violent collections of drug debts, at the direction of the DTO. Additionally, it was customary for members of the Beltran Leyva DTO to carry weapons and firearms with them at all times for protection from rival cartels as well as from arrest by law enforcement.

---

[1]      In December 2009, Arturo Beltran Leyva was killed in a shootout with the Mexican military.  In 2014, Hector Beltran Leyva was arrested in Mexico.

Further, the Government anticipates the evidence at trial will show that even while the Defendant was incarcerated in a Mexican jail, the Defendant continued to play a significant role in the decision making of the organization, as well as receiving profits and earnings from the drug sales of the Beltran Leyva DTO.  Additionally, following the Defendant's arrest, the Beltran Leyva DTO splintered off from the Sinaloa Cartel and a war ensued between the Beltran Leyva's DTO and the leaders of the Sinaloa Cartel run by Joaquin "Chapo" Guzman Loera and Ismael "El Mayo" Zambada Garcia, who the Beltran Leyvas blamed for the Defendant's arrest. This war resulted in extreme violence with the murder of thousands of individuals in Mexico, including numerous law enforcement officers and politicians.

In support of these criminal acts noted above, which directly and indirectly facilitated the means and aims of the overall conspiracy, the Government intends to offer additional evidence of other bad acts that are both direct evidence of the Defendant's involvement in the drug distribution conspiracy and inextricably intertwined with this conspiracy.

## II.      THE PROPOSED EVIDENCE

### A.      Evidence of Violence and Use of Weapons

At trial, the Government anticipates introducing direct evidence related to weapons, threats of violence, and actual violence committed by the Defendant and other co-conspirators in furtherance of the DTO's drug trafficking activities.  Such evidence includes testimony from a Government witness who was in charge of the Defendant's personal security in Culiacan, Mexico, to ensure that the Defendant was not arrested or killed by a rival cartel.  The Government anticipates that this witness will testify to his/her first-hand knowledge of the

Defendant regularly carrying a pistol for his protection from arrest or a rival cartel.[2]  Further, this witness observed the Defendant return from meetings with Joaquin "Chapo" Guzman Loera in the mountains of Mexico (as discussed in more detail below), wearing a tactical vest containing grenades.  Additionally, this witness is aware that the Defendant had two groups of armed men in Culiacan, with each group consisting of approximately 100 men who carried various types of high powered weapons, including AK-47s, AR-15s, bazookas and 50-caliber weapons.  These men provided armed protection and support to the Defendant to ensure that the Defendant and his co-conspirators could conduct their drug trafficking activities uninterrupted from law enforcement and rival cartels.  This witness is also aware that the Defendant traveled with at least ten cars filled with gunmen to protect the Defendant from any rival cartels.

The Government also anticipates testimony from additional cooperating witnesses related to the violence between the rival cartels and the Defendant's DTO.  In particular, the Government anticipates testimony that two members of the Defendant's DTO who were the chiefs of "sicarios" (or hitmen), "El Rayito" and "Wacho," were in charge of kidnapping, interrogating and torturing enemies of the Defendant.  These enemies, referred to as "contras," were individuals from Tamaulipas or Nuevo Leon who were believed to be associated with the Zetas Cartel, or individuals from Chihuahua or Navolato who were believed to be associated with Vicente Carillo Fuentes's Juarez Cartel.  The Zetas and Juarez Cartel are both rivals to the Defendant and the Beltran Leyva DTO.  A cooperating witness will testify that he/she was present for meetings that the Defendant conducted every morning in which "El Rayito" and "Wacho" would inform the Defendant of "contras" who were kidnapped, interrogated, and

---

[2]      Several of the Government's cooperating witnesses will also testify that they observed the Defendant routinely carry a weapon.

tortured the night before.  This witness will testify that the Defendant would then give the order to "El Rayito" and "Wacho" to kill those "contras" and make them disappear.

Additionally, the Government anticipates presenting testimony at trial regarding "Los Numeros" group who controlled drug trafficking in Sonora.  This witness is expected to testify that the Defendant's brother, Arturo, instructed the Defendant to bring the boss of Los Numeros to a meeting with Joaquin "Chapo" Guzman Loera, Ismael "El Mayo" Zambada Garcia, and the Defendant.  The boss of Los Numeros was subsequently tied up and beaten to death with a bat while the Defendant watched.  After the boss of Los Numeros was killed, the Defendant took over Los Numeros infrastructure, workers and cross-border narcotics shipment routes (commonly referred to as "crossings").

In addition to the violence related to rival drug trafficking groups detailed above, the Government anticipates testimony from a cooperating witness related to the Defendant's men mistakenly killing two couples in a car believing these individuals to be members of the rival Zetas Cartel.  Three of the individuals died in the car and one woman was taken to a hospital where she was later killed by the Defendant's sicarios.  The cooperating witness will testify that the Defendant told him/her about this incident, and said not to worry about it.

Additionally, the Government anticipates testimony from a cooperating witness at trial regarding the murder of a co-conspirator, Julio Beltran, who worked directly with the Defendant to traffic cocaine.  The Defendant and Julio Beltran were partners in loads of cocaine that were being received in Mexico from Colombia.  Part of one of these loads of cocaine was lost, and Julio Beltran reported that only a small portion of this load of cocaine had been saved.  It was later learned that Julio Beltran had saved a larger portion of the load and hidden it from the other

investors.  The Defendant's brother, Arturo, ordered the Defendant to have Julio Beltran killed, and the Defendant's sicarios carried out the order and killed Julio Beltran.

The Government also anticipates testimony from a cooperating witness that the Defendant routinely sold drugs to gangs and other criminal organization in the United States in exchange for weapons, such as M-16s, grenade launchers, 50-caliber rifles and grenades.  The Defendant would then pass these weapons to his men or his brother, Arturo.

Further, the Government anticipates presenting testimony at trial from a cooperating witness as to the relationship between the DTO's use of public corruption and violence. Specifically, a cooperating witness is expected to testify about a General in the Mexican army who would not accept bribes from the Defendant (as detailed below).  It is anticipated that this witness will testify that the Defendant's initial response to the General's refusal to accept a bribe was to kill the General.  However, the Defendant ultimately ordered dogs to be killed and thrown in front of the military barracks with a "narco" message on them in order to intimidate the General.[3]

Finally, the Government also anticipates testimony from multiple Government witnesses regarding the war that ensued after the Defendant was arrested in 2008.  Namely, these witnesses would testify that the Beltran Leyvas believed that members of the Sinaloa Cartel, (Ismael "El Mayo" Zambada Garcia and Joaquin "Chapo" Guzman Loera) had "set up" the Defendant to be arrested.  This resulted in a split in the Federation that led to the deaths of hundreds of individuals.  Indeed, the Government anticipates testimony from cooperating witnesses as to how

---

[3]     Narco messages are typically messages from a cartel or DTO that accompany a dead body in Mexico. These narco messages are typically part threat and part boast, and allow the drug gangs to deliver their fearsome messages to enemies and society at large. The messages can also serve as a conversation between rivals.

the Defendant's arrest triggered an escalating progression of retaliatory kidnappings and death by both sides of the fractured Federation.[4]

B.   Evidence of Bribes to Government Officials

At trial, the Government intends to introduce evidence of public corruption through bribery as direct evidence of the Defendant's involvement in the charged conspiracy.   Such evidence includes testimony from a cooperating witness regarding bribes paid by the Defendant, or on behalf of the Defendant, to all levels of police and military personnel, namely, the municipal police, state police, Governor of the State, federal highway police, the prosecutor's office and their investigation agency in Culiacan.  This cooperating witness is further anticipated to testify that he/she had a conversation with the Defendant about who else needed to be bribed in order to allow the DTO to operate successfully.  As discussed above, this cooperating witness and the Defendant discussed how a General in the Mexican army would not accept any bribes. The Defendant ordered the cooperating witness to offer this General $3 million which was compiled from $1 million contributions from the Defendant, Joaquin "Chapo" Guzman Loera, and Ismael "El Mayo" Zambada Garcia each.   This $3 million payment was offered to the General as a monthly payment, but the General turned the bribe down and threatened to arrest the next person who offered him a bribe.  As discussed above, the Defendant wanted to kill the General after he turned down the bribe.   However, this cooperating witness informed the Defendant's brother, Arturo, as to what happened with the General, and as Arturo was already bribing and individual with a higher rank in the army than the General, there were no further issues with this General.

---

[4]      The Government has produced discovery to the Defendant of the seizure of several firearms, including eight pistols and one AK-47, from the Defendant in Mexico.  See Bates Numbers ABL 028-050. The Government is in the process of locating witnesses who would be able to testify to this seizure.

The Government anticipates testimony at trial that the Defendant also had direct communication with the state, local, and municipal police who he successfully bribed. While the Defendant did not personally deliver these payments they were done on his behalf and at his instruction. Further, the Defendant would meet directly with police in Culiacan. These bribes also allowed the DTO to operate with impunity. As discussed in more detail below, there was even an individual at the Bogota airport who was bribed to allow money couriers to transport currency into Colombia to facilitate the Defendant and his DTO in investing in loads of cocaine. Co-conspirators were also seen driving around in police patrol cars; the Defendant's brother, Arturo, was escorted by police on a regular basis; and the drugs were even escorted by local police as they were being trafficked through Mexico. The police also turned over "contras" (discussed above) on a regular basis to the Beltran Leyva DTO.

Additionally, the Government also anticipates testimony from a cooperating witness as to bribes the Defendant paid to a high-ranking member of the military to allow the Defendant to cultivate, harvest and sell five to six tons of marijuana during each harvest.

Finally, the Government anticipates a cooperating witness will testify at trial regarding bribes given to prison officials to allow the Defendant to receive drug proceeds while he was incarcerated in Mexico and to allow phones and other contraband to be smuggled into the prison where he was housed.

C.      Evidence of Heroin and Marijuana

As previously stated, the Defendant was indicted for conspiracy to distribute five kilograms or more of cocaine, fifty grams or more of methamphetamine, one kilograms or more of heroin and one thousand kilograms or more of marijuana for importation into the United States, in violation of 21 U.S.C. §§ 959, 960, and 963. When the Mexican Government

approved the Defendant's extradition to the United States on this Indictment, they denied extradition of the Defendant on the charges of conspiracy to distribute one kilogram or more of heroin and 1000 kilograms or more of marijuana.  Despite this finding, the Government seeks to introduce evidence at trial of the Defendant's marijuana and heroin trafficking as being inextricably intertwined with the workings of the Beltran Leyva DTO.  Namely, the Government anticipates that a cooperating witness will testify at trial that the Defendant met with Joaquin "Chapo" Guzman Loera almost weekly for a  period of time in the mountains to discuss marijuana and heroin trafficking.   The Defendant told a cooperating witness that these conversations included transporting marijuana by land due to the large quantity of it, and also using planes to transport "chronic" (high quality marijuana) from Durango (approximately 700 pounds per day).   Further, the Defendant used code words for marijuana and heroin – specifically, heroin was "chiva" and marijuana was "nacional."   The Government further anticipates testimony regarding the relationship between the Defendant and Joaquin "Chapo" Guzman Loera and Ismael "El Mayo" Zambada Garcia, and how in addition to trafficking large quantities of cocaine, they worked together in the heroin and marijuana business.  Lastly, the Government anticipates testimony regarding how the Defendant used the proceeds from his marijuana and heroin trafficking to invest in cocaine loads coming from South America.

     D.     <u>Evidence of Money Laundering</u>

The Government intends to introduce other evidence of the drug trafficking conspiracy related to the direct and intrinsic money laundering activities of the DTO.   Such evidence includes testimony regarding the morning meetings that the Defendant conducted (as discussed above).  During those morning meetings, the Defendant would check in with the "plaza bosses"[5]

---

[5]     A plaza boss is typically the lead representative of a cartel in a particular region or town.

located at the Mexico/United States border to coordinate planes that were leaving with loads of cocaine and planes that were returning with drug proceeds in United States currency.  The United States currency was stored at two different stash houses.

The Government anticipates a cooperating witness will testify at trial as to how the Defendant spent the proceeds of his drug trafficking activities.   Namely, the Defendant purchased vehicles, ranches and dancing horses, among other items.

Further, the Government anticipates a cooperating witness will testify at trial that the Defendant (and his brothers) would invest in loads of cocaine from Colombia.  The Government anticipates a cooperating witness will testify at trial that the Defendant and his DTO would send United States currency to Colombia in bulk on container ships, in vehicles, and individuals would smuggle cash onto flights from Mexico to Bogota.  Indeed, as discussed above, there was an individual at the Bogota airport who was being bribed to allow these individuals to smuggle the cash into Colombia.  The Colombians would pay the Defendant and his DTO a 10% fee to launder the drug proceeds.  Then storefronts in Bogota were used to further launder these funds. Therefore, the money sent to Colombia was used to purchase the cocaine sent from Colombia.

The Government also anticipates a cooperating witness will testify at trial that when the United States currency was in Mexico, the smaller bills were changed out for larger bills to facilitate the transportation of this currency south.   Indeed, the Defendant would charge Colombians a higher fee to convert $20 bills to $100 bills.

Additionally, the Government intends to introduce drug ledgers into evidence at trial as more fully detailed in the Government's Motion in limine to Admit/Allow Evidence, Cross-

Examination and Lead Case Agent at Counsel Table.[6]   The Government anticipates several cooperating witnesses testifying as to the significance of the drug ledgers including the large cocaine shipments that were sent to Mexico and then the United States, as well as the large sums of money that were coming back to Mexico and then down to Colombia.

Lastly, a cooperating witness is expected to testify that he/she helped the Defendant bring proceeds from the Defendant's marijuana trafficking from Mazatlan to Mexico City, and these proceeds were then invested in future cocaine loads from Colombia.[7]

### E.   Evidence of Prior Drug Trafficking Conspiracy

At trial, the Government intends to introduce evidence, through eyewitness testimony, of the Defendant's narcotics trafficking prior to January 2000 as "other crimes" evidence pursuant to Federal Rule of Evidence 404(b).   Specifically, the Government anticipates introducing evidence at trial that beginning in approximately 1990 and continuing until the beginning of the charged conspiracy, the Defendant worked with co-conspirators in Mexico and Colombia to traffic cocaine.   Beginning in approximately 1990, the Defendant and his DTO used airplanes to fly loads of cocaine from Colombia to landing fields in Nayarit, Durango, Sonora, and Sinaloa, Mexico.   Once the planes landed in Mexico, the Defendant's DTO was responsible for transporting the cocaine to the United States for further distribution.   The Defendant's DTO would charge the Colombians 30-43% to transport the cocaine to the United States.   The

---

[6]      The Government has already produced ledgers to the Defendant from one Colombian DTO, however, the Government is in the process of producing additional ledgers from another Colombian DTO.  The Government intends to call the author of these additional ledgers to testify about them at trial.

[7]      The Government has produced discovery to the Defendant of the seizure of approximately $900,000 in United States currency from the Defendant in Mexico at the time of his arrest.  See Bates Numbers ABL 028-050. The Government is in the process of locating witnesses who would be able to testify to this seizure.

Defendant's DTO was also paid to bring the proceeds from the sale of the cocaine (in United States currency) back from the United States to Mexico.

In approximately 1994, increased law enforcement detection forced the Federation to switch transportation methods to maritime drug shipments.  At this point, the Defendant and his DTO took a much more active role in the transportation of cocaine from Colombia to Mexico. The nature, scope, and time frame of the Defendant's criminal activities are similar to and immediately pre-dated the acts of the charged conspiracy.  Accordingly, this evidence should be admitted as evidence of common scheme or plan, knowledge, intent and absence of mistake pursuant to Federal Rule of Evidence 404(b).

## III.    INEXTRICABLY INTERTWINED EVIDENCE SHOULD BE ADMITTED

A.    <u>Legal Standard</u>

Rule 404(b) of the Federal Rules of Evidence provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b) (2011).

Rule 404(b) "excludes only evidence 'extrinsic' or 'extraneous' to the crimes charged, not evidence that is 'intrinsic' or 'inextricably intertwined.'" <u>United States v. Allen</u>, 960 F.2d 1055, 1058 (D.C. Cir. 1992), <u>cert. denied</u>, 506 U.S. 881 (1992); <u>see also</u> <u>United States v. Gartmon</u>, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (holding evidence that defendant charged with

fraud had threatened a co-conspirator not "other crimes evidence" but instead "inextricably intertwined" with charged offense).

> This Circuit defined intrinsic "other crimes" evidence this way:

> Evidence of criminal activity other than the charged offense is not considered extrinsic if it is an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, if it was inextricably intertwined with the evidence regarding the charged offense, or it is necessary to complete the story of the crime of trial . . .

United States v. Badru, 97 F.3d 1471, 1474 (D.C. Cir. 1996), cert. denied, 520 U.S. 1150 (1997) (citing United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983)).

Intrinsic evidence is admissible as direct evidence of the crimes charged and not subject to analysis under Federal Rule of Evidence 404(b).  Because intrinsic evidence, "by its very nature, does not involve *other* crimes, wrongs or bad acts…there is no concern that it might be used as improper character evidence," United States v. Lerma-Plata, 919 F. Supp. 2d 152, 156 (D.D.C. 2013), and therefore, Rule 404(b) does not apply.

As a practical matter, "[w]hen evidence is 'inextricably intertwined' with the charged crime [or intrinsic], courts typically treat it as the same crime," United States v. Bowie, 232 F.3d 923, 928 (D.C. Cir. 2000), and admit such evidence.  The D.C. Circuit has explicitly recognized "that evidence can be intrinsic to the crimes charged."  United States v. Sitzmann, 856 F. Supp. 2d 55, 59 (D.D.C. 2012).  According to the Bowie court, "(at least) two types of evidence may be properly considered 'intrinsic,' that is, not subject to Rule 404(b): (1) evidence 'of an act that is part of the charged offense'; and (2) evidence of 'some uncharged acts performed contemporaneously with the charged crime…[that] facilitate the commission of the charged crime.'"  Lerma-Plata, 919 F. Supp. 2d at 156 (quoting Bowie, 232 F.3d at 929).

14

The D.C. Circuit also acknowledged that there are even "several forms of 'other crimes' evidence . . . [that] are not considered extrinsic within the meaning of Rule 404(b)." <u>Badru</u>, 97 F.3d at 1474.  For instance, evidence of uncharged crimes may be intrinsic if it "arose out of the same series of transactions as the charged offense…or it is necessary to complete the story of the crime on trial." <u>Weeks</u>, 716 F.2d at 832.  Thus, "[a]s long as evidence of the uncharged criminal conduct is offered as direct evidence of a fact in issue and not as circumstantial evidence of the character of the accused, it is admissible independent of its superficial similarity to that which would be considered evidence of 'other crimes' under Rule 404(b)." <u>United States v. Gray</u>, 292 F. Supp. 2d 71, 77-78 (D.D.C. 2003) (citing <u>Badru</u>, 97 F.3d at 1475) (citing 22 Charles A. Wright and Kenneth W. Graham, Jr., Federal Practice and Procedure § 5239 at 450 (1978)).

B.     Argument

The Government's proffered evidence should be admitted as inextricably intertwined with the charged conspiracy.  This evidence arose out of the same series of transactions as the charged offense and is necessary to complete the story of the drug trafficking conspiracy.  Here, violence, bribery, marijuana and heroin trafficking, and money laundering are all part and parcel of the charged drug trafficking conspiracy.   They are further acts that were performed contemporaneously with the charged offense.  As such they should be admitted as intrinsic evidence.

Namely, in order for the DTO to effectively run its operation of trafficking narcotics from South America to Mexico and into the United States, the Defendant and co-conspirators paid foreign government officials to provide information to the DTO about rival cartels, to avoid law enforcement detection, and to avoid interference with the movement of narcotics.  Further, in order to ward off competition, protect the narcotics, and to maintain stability within the DTO, the

Defendant and co-conspirators utilized threats of violence, actual violence and possessed weapons to further their operation of trafficking narcotics.

Moreover, in addition to trafficking multi-ton quantities of cocaine and methamphetamine, the Defendant and his co-conspirators were involved in trafficking multi-tonnage quantities of heroin and marijuana.  The proceeds from the marijuana and heroin sales were then invested into future shipments of cocaine for the DTO (commonly referred to as "loads").  Lastly, as narcotics were being trafficking during the course of this conspiracy, the Defendant and his co-conspirators were involved in laundering millions of dollars that constituted payment for and proceeds from the cocaine trafficking.  These inextricably intertwined laundering activities directly supported the efforts of the DTO as it took large sums of money to keep the multi-member, multi-national illegal operation running for as long and as successful as it was.

### 1.      Possession of Weapons, Threats of Violence and Actual Violence

As detailed above, the Government intends to introduce evidence that the Defendant and other co-conspirators routinely possessed weapons, threatened violence and committed violent acts in furtherance of the conspiracy.  Namely, the weapons were possessed to protect members of the DTO from rival cartels and law enforcement, as well as to protect the cocaine, methamphetamine, marijuana and heroin, worth millions of dollars, itself.  The acts of violence were also necessary to maintain territory and drug trafficking routes within Mexico; ward off rival cartels, detection, seizure and prosecution from law enforcement; and assure order and discipline within the DTO.  The evidence of the acts of violence committed against rival drug cartels, as well as the war that broke out after the Defendant was arrested, should likewise be admitted as intrinsic evidence regarding the charged conspiracy.

16

Other courts in this Circuit have ruled similarly on this matter.  For instance, in <u>United States v. Gooch</u>, 514 F. Supp. 2d 63, 70 (D.D.C. 2007), <u>aff'd</u>, 665 F.3d 1318 (D.C. Cir. 2012), a case charging the Defendant with participation in narcotics and racketeering conspiracies run by a group known as the "M Street Crew," the court admitted evidence of various uncharged incidents that took place during the time frame of the relevant conspiracies, including the Defendant's uncharged assault on a police officer which occurred while the Defendant's co-conspirators freed him from an attempted arrest, because such evidence "demonstrated [the defendant's] position in the M Street Crew and was intrinsic to the charged conspiracies."

Likewise here, the Defendant's violent acts demonstrate his membership within the DTO, his leadership position in the DTO and a more complete picture of how this DTO operates.  This evidence also demonstrates that the acts were committed to facilitate the commission of the charged conspiracy in this case and to support their drug trafficking activities.  Moreover, as this conduct occurred within the timeframe of the charged conspiracy, it arose out of the same series of transactions and is intrinsic or inextricably intertwined with the crime itself.  For the foregoing reasons, this evidence should be admitted as direct proof of the conspiracy.

## 2.    The Payment of Bribes to Public Officials

The Government intends to introduce evidence that the Defendant and co-conspirators paid bribes to public officials in furtherance of the conspiracy and therefore as direct evidence of the charged conspiracy.  A drug trafficking organization and conspiracy this large, sophisticated and lasting this long was only successful as long as it could avoid law enforcement detection and seizure of its numerous, large, multi-million dollar narcotics shipments and the arrests and prosecutions of its members.  In order to successfully avoid law enforcement, payment of bribes to government officials was necessary and vital to the successful carrying out of the drug

trafficking conspiracy.   Further, the conspiracy was only successful if the members of the conspiracy avoided arrest and prosecution in order to continue in their roles within the conspiracy or being encouraged to cooperate against other members of the DTO.   If one of the members of the conspiracy, especially the Defendant or one of the Defendant's brothers was arrested, it would strike a damaging blow to the successful operation of the conspiracy. Therefore, the Defendant's bribe payments to government officials were necessary to the normal daily operation of the DTO.   Thus, evidence of these bribery payments are inextricably intertwined with the evidence regarding the charged conspiracy, and are necessary to complete the story of this complex and sophisticated DTO and its related criminal acts in further of the overall means and methods of the charged conspiracy.   Further this evidence should be admitted as acts that facilitated the commission of the charged conspiracy.

In United States v. Senffner, 280 F.3d 755, 764 (7th Cir. 2002), the court disagreed with the limits placed on inextricably intertwined evidence.   "[W]e do not believe that we must more narrowly tailor the inextricably intertwined doctrine to save Rule 404(b) or better service its purpose. The doctrine itself is already a narrow one, and any perceived over-inclusiveness in the doctrine as we define it is inconsequential, because Rule 403 (like Rule 404(b)) protects against the unnecessarily prejudicial presentation of barely probative evidence." Id. at 765.   The court goes on to uphold the admission of evidence of bribe payments as it showed how the criminal enterprise began and developed throughout the life of the investment fraud scheme.   Id. Likewise, here evidence of bribery to police, military and government officials is inextricably intertwined with the drug trafficking conspiracy and shows how the Defendant's criminal enterprise operated with impunity from law enforcement.

3.      **Evidence of Heroin and Marijuana Trafficking**

The Government intends to introduce evidence of the Defendant's trafficking of marijuana and heroin with co-conspirators at trial, despite the extradition decision of the Mexican government, as it is inextricably intertwined in the charged conspiracy. Indeed, the Defendant was investing the proceeds from this marijuana and heroin trafficking into loads of cocaine from Colombia. Further, the individuals that the Defendant was working with to traffic cocaine to the United States, Joaquin "Chapo" Guzman Loera and Ismael "El Mayo" Zambada Garcia, are the same individuals that the Defendant was trafficking heroin and marijuana into the United States with.

The Rule of Specialty historically limits the charges that a Defendant may face to those charges for which his or her extradition has been authorized by the foreign country. See Johnson v. Browne, 205 U.S. 309 (1907); see also Factor v. Laubenheimer, 290 U.S. 276 (1933). However, courts have consistently allowed evidence outside of the foreign government's extradition order to be admitted at trial. The rule of specialty is "not violated by the admission of evidence of crimes for which a defendant was not extradited if that evidence is relevant to the crime charged." United States v. Garcia, 208 F.3d 1258, 1261 (11th Cir. 2000). Further, courts have established that the rule of specialty "does not alter existing rules of evidence or procedure." United States v. Thirion, 813 F.2d 146, 153 (8th Cir. 1987). See also United States v. Flores, 538 F.2d 939, 944 (2d Cir. 1976) (finding the rule of specialty does not regulate the scope of proof admissible in the judicial forum of the requisitioning state). This type of evidence has been allowed routinely in this Circuit as well. In United States v. Lopesierra-Gutierrez, 708 F.3d 193, 206 (D.C. Cir. 2013) the Court stated "[t]he doctrine of specialty governs prosecutions, not evidence." See also United States v. Gaviria, 116 F.3d 1498, 1532 (D.C. Cir. 1997)

(admitting evidence of distribution of heroin when the defendant was only charged with the distribution of cocaine because it showed the relationships among the parties and was intrinsic to the cocaine conspiracy). As the evidence of marijuana and heroin trafficking is clearly relevant and intrinsic to this conspiracy (especially in light of the fact that it was charged in the indictment) it should be admitted at trial.

Additionally, the Defendant is charged in the same conspiracy with heroin and marijuana, in addition to the cocaine and methamphetamine. The evidence of the Defendant's involvement with trafficking heroin and marijuana shows the scope of the Defendant's involvement in the conspiracy and also proves his intent to traffic narcotics. The fact that the Mexican government did not approve the Defendant's extradition for heroin and marijuana is not dispositive over whether the Government should be allowed to introduce evidence related to these drugs at trial. See United States v. Lehder-Rivas, 955 F.2d 1510 (11th Cir. 1992) (finding that the rule of specialty is not violated when evidence is properly admitted under the inextricably intertwined doctrine "to reflect the scope of the conspiracies, to prove intent, and to aid the jury in determining the nature of the offenses charged").

Additionally, "[i]t is clear . . . that even as the specialty doctrine has been defined and broadened in this century, it has never been construed to permit foreign intrusion into the evidentiary or procedural rules of the requisitioning state, as distinguished from limiting the jurisdiction of domestic courts to 'try or punish the fugitive for any crimes committed before the extradition, except the crimes for which he was extradited.'" Flores, 538 F.2d at 944. The Court in Flores goes on to state "[w]here, as here, a defendant is indicted and tried for the precise offense contained in the foreign extradition order (a criminal conspiracy during the period from September 3, 1970, to April 30, 1971), the doctrine does not authorize us to disregard normal

evidentiary rules followed by this forum." Id. at 944-45.  Likewise in this case, the Government

seeks to try the Defendant for the offense contained in the extradition order – conspiracy to

traffic narcotics into the United States.  The Government is merely seeking to introduce evidence

that is inextricably intertwined in this conspiracy (the Defendant's marijuana and heroin

trafficking) consistent with normal evidentiary rules.  As such, this evidence should be admitted

at trial.

### 4.      Evidence of Money Laundering

"Evidence of an uncharged offense arising out of the same transactions as the offense

charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b)."  United

States v. Morrow, No. CRIMA 04355CKK, 2005 WL 3159572, *6 (D.D.C. Apr. 7, 2005)

(Kollar-Kotelly, J.) (slip op.) (citing United States v. Krout, 66 F.3d 1420, 1425 (5th Cir. 1995)).

The anticipated testimony from cooperating witnesses detailed above reveals that the Defendant

conspired with others to launder drug proceeds through the use of planes, boats, vehicles and

individuals smuggling currency into Mexico and Colombia.   The Defendant and his DTO's

involvement in laundering drug proceeds is inextricably intertwined with the charged drug-

trafficking conspiracy.

Further, as discussed in the Government's Motion in limine to Admit/Allow Evidence,

Cross-Examination and Lead Case Agent at Counsel Table, the Government anticipates

introducing drug accounting ledgers at trial.  The recorded transactions within the ledger are

contemporaneous with the DTO's operation and distribution of cocaine.  Moreover, these

documents identify members of the conspiracy, as well as define their roles and the structure of

the conspiracy.  Removing these ledgers, or portions of them, would not portray an accurate

picture of the manner and means by which the DTO carried out the drug conspiracy and would

not paint an accurate picture of the Defendant and/or co-conspirators' involvement in the conspiracy.

Evidence from these ledgers and co-conspirator testimony will clearly show the Defendant and other co-conspirators laundered money from the United States to Mexico and Colombia.  The crime of money laundering facilitated the commission of the charged drug trafficking conspiracy.  "'An act that is alleged to have been done in the furtherance of the alleged conspiracy…is not an 'other act' within the meaning of Rule 404(b); it is part of the very act charged.'" Id. (citing United States v. Concepcion, 983 F.2d 369, 392 (2d. Cir. 1992). Moreover, D.C. courts have previously found that an "alleged conspiracy to launder money…is properly intrinsic to the charged drug conspiracy as contemporaneous acts that facilitated the commission of the charged offense." Lerma-Plata, 919 F. Supp. 2d at 158.  The proposed evidence involves acts of money laundering that are inextricably intertwined with the manner and means used by the DTO to carry out the charged drug conspiracy.  The financing of drug transactions and the movement of money – according to this Court in Lerma-Plata, "the very nuts-and-bolts of any drug trafficking operation" are "contemporaneous conduct designed to facilitate and advance the goals of [the organization and] the charged conspiracy," id, and are additionally part and parcel to the crime charged.  Such steps would facilitate the commission of the charged crimes; are acts conducted in furtherance and during the drug conspiracy; and are vital to its survival.  Accordingly, the proposed evidence should be admitted as direct proof of the charged conspiracy.[8]  Therefore, this evidence should be admissible at trial as inextricably intertwined evidence.

---

[8]       It should be noted that there is a criminal forfeiture allegation in the charged Indictment, and as such, evidence of the Defendant's and the DTO's finances and assets should be admitted at trial to avoid having to present a bifurcated criminal forfeiture phase of the trial.

## IV.    EVIDENCE THAT SHOULD BE ADMITTED PURSUANT TO RULE 404(B)

In addition to the evidence cited above, the Government seeks to introduce other evidence of the Defendant's drug trafficking activities that predates the charged conspiracy pursuant to Rule 404(b).    Additionally, should the Court determine that the evidence the Government views as inextricably intertwined is not admissible under this theory, the Government seeks to admit this evidence, in the alternative, pursuant to Rule 404(b).

A.  Legal Standard

Rule 404(b) permits the admission of "evidence of other crimes, wrongs, or acts" to prove a material issue other than character, such as "motive, opportunity, intent, preparation, plan, knowledge, identity and absence of mistake or accident." Fed. R. Evid. 404(b).  "Under the law of this circuit, 'Rule 404(b) is a rule of inclusion rather than exclusion'…and it is 'quite permissive,' excluding evidence only if it is offered for the sole purpose of proving that a person's actions conformed to his or her character."  United States v. Long, 328 F.3d 655, 660-61 (D.C. Cir. 2003) (quoting Bowie, 232 F.3d at 923) (citations and quotations omitted).  The Rule lists several permissible purposes of other crimes – e.g., to prove "motive, opportunity, intent, preparation, plan, knowledge, identity and absence of mistake or accident;" however, this list is "not exhaustive." United States v. Miller, 895 F.2d 1431, 1435 (D.C. Cir. 1990). "[T]he Government need not show that the evidence is being offered for one of the purposes specifically enumerated in the rule," Lerma-Plata, 919 F. Supp. 2d at 155.  As the D.C. Circuit noted, "in some cases '[e]xtrinsic acts evidence may be critical…especially when th[e] issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." United States v. Brown, 597 F.3d 399, 404 (D.C. Cir. 2009) (quoting Huddleston v. United States, 485 U.S. 681, 685 (1988)).  Even a collateral showing of character

is insufficient to bar the evidence.  "True, the evidence may tend to show that [the defendant] is a person of bad character, but Rule 404(b) does not thereby render it inadmissible…under Rule 404[b], '*any* purpose for which bad acts evidence is introduced is a proper purpose so long as the evidence is not offered <u>solely</u> to prove character.'"  <u>United States v. Cassell</u>, 292 F.3d 788, 795 (D.C. Cir. 2002) (quoting <u>Miller</u>, 895 F.2d at 1436) (emphasis added).

This Circuit has accepted a two-pronged test for determining whether evidence of prior crimes is admissible under 404(b).[9]  First, the evidence must be "probative of a material issue other than character."  <u>See</u> <u>Miller</u>, 895 F.2d at 1435 (quoting <u>Huddleston</u>, 485 U.S. at 686)).  Second, the evidence is subject to the balancing test of Federal Rule of Evidence 403, so that it is inadmissible only if the prejudicial effect, or to a lesser extent the effect of any other consideration under Rule 403, of admitting the evidence substantially outweighs its probative value.  <u>See</u> <u>id</u>.  Even so, these considerations "[g]enerally . . . do not flatly prohibit the introduction of such evidence but instead limit the purpose for which it may be introduced."  <u>Huddleston</u>, 485 U.S. at 687.

In assessing the relevance of other acts evidence under the first prong, the court "neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence.  The court simply examines all the evidence in the case and decides whether the jury could reasonably find the conditional fact . . . by a preponderance of the evidence."  <u>Id.</u> at 690.  As to the probative value of such evidence, the court should consider "the similarity of the bad act with the charged offense, the time separating the two events, and the

---

[9]     The <u>Miller</u> Court notes that "[t]his two-step analysis—certification of a 'proper' and relevant purpose under Rule 404(b), followed by the weighing of probity and prejudice under Rule 403—is firmly rooted in the law of this circuit." <u>Miller</u>, 895 F.2d at 1435 (citing <u>United States v. Manner</u>, 887 F.2d 317, 321 (D.C. Cir.1989), <u>cert. denied</u> 493 U.S. 1062 (1990) and <u>United States v. Lavelle</u>, 751 F.2d 1266, 1275 (D.C. Cir. 1985), cert. denied, 474 U.S. 817 (1985)).

prosecution's need for the evidence." United States v. Lavelle, 751 F.2d 1266, 1277 (D.C. Cir.), cert. denied, 474 U.S. 817 (1985) (citations and footnote omitted), abrogated on other grounds by Huddleston, 485 U.S. at 687 n.5.

As to the second prong, "the relevant inquiry…is whether the probative value of evidence is 'substantially outweighed' by a danger of unfair prejudice." Lerma-Plata, 919 F. Supp. 2d at 159. This Circuit has noted that it is not enough that the evidence is simply prejudicial; the prejudice must be "unfair." See Cassell, 292 F.3d at 796 (quoting Dollar v. Long Mf'g, N.C., Inc., 561 F.2d 613, 618 (5th Cir. 1977) ("Virtually all evidence is prejudicial or it isn't material. The prejudice must be unfair"); Sitzmann, 856 F. Supp. 2d at 61-62 ("the test under Rule 403 is 'unfair prejudice,' not just any prejudice or harm to the defense.")) For evidence to be unfairly prejudicial within the meaning of the Rule, it must have "'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" Old Chief v. United States, 519 U.S. 172, 180 (1997) (quoting Advisory Committee Notes on Fed. R. Evid. 403).

Furthermore, Rule 403 strongly favors admission of 404(b) evidence. "Rule 403 tilts, as do the rules as a whole, toward the admission of evidence in close cases, even when other crimes evidence is involved." United States v. Douglas, 482 F.3d 591, 600 (D.C. Cir. 2007) (citing Cassell, 292 F.3d at 795) (internal quotation marks omitted). "In determining whether 'the probative value is substantially outweighed by the danger of unfair prejudice' it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." United States v. Harrison, 679 F.2d 942, 948 (D.C. Cir. 1982) (quoting United States v. Day, 591 F.2d 861, 878 (D.C. Cir. 1978)).

The D.C. Circuit has consistently minimized the risk of potential prejudice not by exclusion, but by issuing limiting instructions to the jury.  See, e.g., Cassell, 292 F.3d at 796 (emphasizing the significance of the district court's instructions to jury to "consider the evidence for the limited and proper purposes"); Douglas, 482 F.3d at 601 (same); Pettiford, 517 F.3d at 590 (same); United States v. Crowder, 141 F.3d 1202, 1210 (D.C. Cir. 1998) (en banc) (Crowder II) (stating that mitigating instructions to jury enter into the Rule 403 balancing analysis); United States v. Mitchell, 49 F.3d 769 (D.C. Cir. 1995) (stating that limiting instructions concerning other crimes evidence may guard against improper inferences).  "[I]t is the law, pure and simple, that jury instructions can sufficiently protect a defendant's interest in being free from undue prejudice."  United States v. Perholtz, 842 F.2d 343, 361 (D.C. Cir.), cert. denied, 488 U.S. 821 (1988) (citation omitted).

B.    Argument

1.    **Evidence of Similar Prior Drug Trafficking Conspiracy**

Evidence of the Defendant's prior drug trafficking activities that pre-date 2000 should be admitted as evidence of a common scheme or plan, intent and knowledge pursuant to Federal Rule of Evidence 404(b).  Here, the Government's proposed evidence would show that the Defendant was involved in a cocaine trafficking scheme in which he worked with co-conspirators to have cocaine-laden airplanes travel from Colombia to land on Mexican landing strips.  This conduct occurred from approximately 1990 until 1994 when the Defendant's DTO switched to maritime drug trafficking.  The maritime drug trafficking continued from approximately 1994 to January 2000 (the beginning of the charged conspiracy).  Similarly, in the charged conspiracy, the Defendant's DTO coordinated shipments of cocaine on go-fast boats, fishing boats, container ships and other methods of maritime drug trafficking.  This evidence

26

shows the Defendant's involvement in a common scheme or plan to traffic cocaine on the open seas from Colombia to Mexico.  Although in relation to a racketeering charge, in <u>United States v. Rhodes</u>, 779 F.2d 1019 (4th Cir. 1985) the court determined that evidence can be admitted under Rule 404(b) for the purpose of showing that the Defendant continued to engage in a criminal enterprise, namely drug trafficking.  There, the court admitted evidence of the defendant's cocaine and marijuana convictions under Rule 404(b) to show the defendant continued to engage in a criminal enterprise.  Likewise, in the Ninth Circuit, in <u>United States v. Lester</u>, 749 F.2d 1288, 1298 (9th Cir. 1984), the court held that evidence of a co-conspirator's narcotics operation and defendants' connection to it was relevant proof of plan or scheme of the conspiracy. Furthermore, in that case, no limiting instruction was required to admit evidence relevant to show defendants' knowledge, motive, or intent: "The law is clear that a defendant may be convicted of the substantive acts of his coconspirators, as long as those acts are 'committed pursuant to and in furtherance of the conspiracy.'" <u>United States v. Reed</u>, 726 F.2d 570, 580 (9th Cir.1984) (quoting <u>United States v. Beecroft</u>, 608 F.2d 753, 757 (9th Cir.1979)); <u>e.g.</u>, <u>United States v. Arbelaez</u>, 719 F.2d 1453, 1459 (9th Cir.1983), <u>cert. denied</u>, 467 U.S. 1255 (1984).

Further, in <u>United States v. Sitzmann</u>, 856 F. Supp. 2d 55, 62-63 (D.D.C. 2012), the court was persuaded that in a drug conspiracy case, probative other crimes evidence which goes to the defendant's knowledge, intent, absence of mistake or accident, should be admitted. <u>See</u> <u>United States v. Bowie</u>, 232 F.3d at 930 ("Intent and knowledge are ... well-established non-propensity purposes for admitting evidence of prior crimes or acts."); <u>United States v. Mitchell</u>, 49 F.3d 769, 775 (D.C. Cir. 1995) ("[W]e have frequently upheld the admission of evidence regarding other drug transactions as relevant to intent in a charged drug transaction."). In addition, other crimes evidence that is probative with respect to opportunity or preparation also should be

admitted. <u>See</u>, <u>e.g.</u>, <u>United States v. Street</u>, 531 F.3d 703, 708–09 (8th Cir. 2008) (affirming admission of evidence of defendant's prior abuse of another individual, in part because it demonstrated opportunity and plan with respect to charged crime); <u>United States v. McCarty</u>, 36 F.3d 1349, 1354–55 (5th Cir. 1994) (affirming admission of evidence of prior burglaries through which defendant obtained guns in preparation for use in charged robberies).

It is well-established that intent may be inferred by the repetition of similar acts and thus courts regularly admit evidence of the commission of similar crimes to prove intent. <u>See</u>, <u>e.g.</u>, <u>United States v. Douglas</u>, 482 F.3d 591, 596-597 (D.C. Cir. 2007) (holding that evidence that [the defendant] previously possessed and distributed crack cocaine to an undercover police officer has a tendency to make "it more probable," both that he knew the nature of the substance that he was charged with possessing and that he intended to distribute it.); <u>United States v. Latney</u>, 108 F.3d 1446, 1449-50 (D.C. Cir. 1997) (finding that the admission of prior drug sales to establish intent); <u>United States v. Crum</u>, 57 F.3d 1071, 1995 WL 364142, at *1-2 (6th Cir. 1995) (unpublished) (upholding admission of prior bribe to prove intent in bribery prosecution); <u>United States v. Zedner</u>, 401 F.3d 36, 49-50 (2d Cir. 2005) (holding in prosecution for defrauding a financial institution evidence of two prior episodes where the defendant committed mortgage fraud were admitted to prove defendant's "financial sophistication, his ability to execute complex schemes, and his ability to form intent to defraud.").  If other crimes evidence is offered to show intent, "[w]hat matters is that the evidence be relevant to show a pattern of operation that would suggest intent and that tends to undermine the defendant's innocent explanation." <u>United States v. Long</u>, 328 F.3d 655, 661 (D.C. Cir. 2003) (citation and internal quotation marks omitted).   In cases charging narcotic violations, evidence of prior drug transactions are relevant and admissible as evidence of a criminal defendant's intent, knowledge,

a common scheme or plan, and absence of mistake.  United States v. Huff, 959 F.2d 731, 736-37 (8th Cir. 1992) (holding evidence of defendant's prior cocaine transaction was relevant to prove intent and common scheme or plan); United States v. Jones, 248 F.3d 671, 675 (7th Cir. 2001) (finding prior drug distribution is relevant to prove intent to distribute drugs and knowledge that a particular substance is a narcotic drug); United States v. Ono, 918 F.2d 1462 (9th Cir. 1990) (holding prior drug conviction relevant to show intent and knowledge).

Likewise, evidence of the commission of similar crimes is also regularly admitted to prove knowledge and absence of mistake.  See, e.g., United States v. Johnson, 970 F.2d 907, 913-14 (D.C. Cir. 1992) (finding admission of two prior moneygram frauds to establish knowledge and participation in charged moneygram fraud scheme); United States v. Brown, 597 F.3d 399, 404-405 (D.C. Cir. 2010) (upholding admission of other crimes evidence regarding recent use of fraudulent financial documents in fraud prosecution to demonstrate knowledge, motive, and absence of mistake or accident); United States v. Wilson, 31 F.3d 510, 515 (7th Cir. 1994) (admitting evidence of other drug activity because it "tend[ed] to show that [the defendant] was familiar with the cocaine business and was not some innocent bystander mistakenly caught up in an overzealous law enforcement"); United States v. Leahy, 82 F.3d 624, 636 (5th Cir. 1996) (finding in prosecution for conspiracy to defraud the United States, other instances of submitting false invoices admitted to prove intent and negate mistake); United States v. Perholtz, 842 F.2d 343, 358 (D.C. Cir.) (per curiam) (holding in an appeal from convictions for several schemes to fraudulently procure U.S. Postal Service contracts, the court upheld the admission of evidence that was "highly probative of efforts to further an ongoing scheme to defraud and demonstrate[d] conscious awareness of guilt on the part of the defendants"), cert. denied, 488 U.S. 821 (1988).

The proffered evidence is probative of the Defendant's motive, knowledge and absence of mistake regarding the instant offense.  As a result, the evidence renders it substantially more probable that the Defendant had the requisite intent to participate in the charged drug trafficking scheme.  See United States v. Bussey, 432 F.2d 1330 (D.C. Cir. 1970) (where the Government seeks to introduce evidence of prior offenses to prove identity and that prior and subsequent offenses are so nearly identical in method as to mark them as handiwork of accused, such evidence should be part of the government's case-in-chief.)  Moreover, the Government submits that the proffered evidence is also admissible as interrelated background evidence of the drug trafficking laundering conspiracy.  Specifically, the above-mentioned drug trafficking events occurred immediately preceding the time period as the charged crime, it involves the substantially the same individuals as the charged crime and involves similar acts as the charged offense. The proffered evidence completes the narrative in that it "adds context and dimension to the Government's proof of the charges" and assists the jury in understanding the relationship" between the Defendant and other co-conspirators, as well as their positions within the DTO. This Circuit in Bowie, 232 F.3d at 929, held that the rule prohibiting admission of "other acts" evidence for purpose of proving person's character in order to show action in conformity therewith does not apply to evidence that constitutes the very crime being prosecuted, or to evidence of acts that are performed contemporaneously with the charged crime and facilitate the commission of that crime, as such evidence is not offered only to show person's character, but evidence does not constitute part of the crime just because it either "completes the story" or "explains the circumstances" of the offense.  See also Fed. R. Evid. 401.

Further, as the Defense is anticipated to argue the Defendant had no knowledge and/or involvement in the drug trafficking activities, evidence of a similar prior drug trafficking

conspiracy involvement and acts is crucial to the Government's case to negate such an argument. Accordingly, this evidence should be admitted as proper Rule 404(b) evidence.

### 2. Evidence of Bribery Payments, Weapons, Violence Other Drug Trafficking and Money Laundering

As previously discussed above, evidence of violence, bribery, other drug trafficking and money laundering should be admitted as inextricably intertwined with the charged conspiracy. However, the Government also moves, alternatively, to admit the evidence of weapons and violence, bribery payments, marijuana and heroin trafficking, and money laundering pursuant to Federal Rule of Evidence 404(b).

Evidence of the Defendant's and co-conspirators' payments to police and government officials, possession of weapons, trafficking of marijuana and heroin, and acts of violence are all highly relevant and probative to prove the Defendant's leadership role in the conspiracy, his knowledge of the conspiracy and absence of mistake within the conspiracy. Furthermore, as mentioned above, such evidence also provides context and background to the jury to explain the sophisticated and complex nature and scope of how the DTO and conspiracy operated so successfully and for so long.

In United States v. Larrahondo, 885 F. Supp. 2d 209, 213, 226 (D.D.C. 2012) Judge Bates allowed the Government to admit evidence of bribery to show the defendant's involvement in a drug trafficking conspiracy, when the crime of bribery was not charged. Judge Bates allowed the Government to admit this evidence under Rule 404(b) as it completes the story and explains the circumstances of the events within the conspiracy. Likewise here, the Government seeks to admit evidence of public corruption and bribery to complete the story of how this DTO

operated.  Namely, how the DTO was able to operate with impunity throughout Mexico due to the bribes to police, military and government officials.

Further, this Circuit has allowed evidence of violence or weapons pursuant to Rule 404(b).  In <u>United States v. Morrow</u>, 2005 WL 3159572 *78-82 (D.D.C. Apr. 7, 2005), the court allowed evidence of weapons to show association and identity pursuant to Rule 404(b) in a bank robbery trial.  Further, in <u>United States v. Burwell</u>, 642 F.3d 1062, 1067 (D.C. Cir. 2011), the court upheld the introduction of evidence of a carjacking (using guns), stolen cars, the use of false names, as well as cultivation and distribution of marijuana pursuant to Rule 404(b).

The D.C. Circuit has long-held that crimes that involve a conspiracy charge "increase the probativeness of Rule 404(b) evidence."  <u>Manner</u>, 887 F.2d at 322 (citing to <u>United States v. Sampol</u>, 636 F.2d 621, 659 n. 23 (D.C. Cir. 1980)).  <u>See</u> <u>Mathis</u>, 216 F.3d at 26 ("In a conspiracy prosecution, the Government is usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to explain to the jury how the illegal relationship between the participants in the crime developed") (internal quotation marks and citation omitted).

Further, the prosecution satisfies its burden in part, under Rule 404(b), by "identifying a legitimate purpose" for which the other crimes evidence could be used.  <u>United States v. Manner</u>, 887 F.2d 317, 321 (D.C. Cir. 1984).  Here, evidence of money laundering is probative of several issues, specifically (1) the Defendant's intent to distribute narcotics and to make profits from such illegal and dangerous activity; (2) the Defendant's knowledge that he was engaged in the distribution of narcotics and the manner and means by which he intended to follow through with the conspiracy; (3) the identity of members of the conspiracy; and (4) that the Defendant shared

the common plan to carry out their various intertwined drug trafficking and related criminal activities. Therefore, this evidence should be admitted pursuant to Rule 404(b).

### 3. The Proposed Evidence is Not Prejudicial under Rule 403

Lastly with respect to Rule 403, all aforementioned evidence should be admissible because the probative value of the evidence substantially outweighs any prejudicial effect to the Defendant on three separate grounds. The danger that this Court must weigh is not the danger that the other crimes evidence will weaken the Defendant's defense, but rather the danger that the jury will misuse the evidence by inferring that, merely because the Defendant engaged in these prior bad acts, he was prone to commit the crime charged. See United States v. Mitchell, 49 F.3d 769, 777 (D.C. Cir.), cert. denied, 516 U.S. 926 (1995). The law in this Circuit is clear that in balancing the probativeness and prejudice of other crimes, "it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged." United States v. Harrison, 679 F.2d 942, 948 (D.C. Cir. 1982) (quoting United States v. Day, 591 F.2d 861, 878 (D.C. Cir. 1978)).

First, the evidence, "by its very nature, could not lead to a fair inference that Defendant is 'prone' to commit the crime charges because the evidence…[is in itself] to be part and parcel to the crime charged." Lerma-Plata, 919 F. Supp. 2d at 160. Second and to reiterate from above, should the Court find that the evidence is not "part and parcel to the crime, "it is a sound rule that the balance should generally be struck in favor of admission," Harrison, 679 F.2d at 948 (quoting Day, 591 F.2d at 878), when the evidence, as it does here, indicates a close relationship to the event charged. Third, the extent of any prejudice, or the potential misuse of such evidence by the jury, will effectively be eliminated by curative instructions by the Court before or immediately after the introduction of this evidence at trial and during the final instructions to the jury.

Furthermore, because it is common practice for courts to admit evidence of co-conspirator statements provisionally, under Rule 801(d)(2)(E), as discussed in the Government's Motion <u>in limine</u> to Admit/Allow Evidence, Cross-Examination and Lead Case Agent at Counsel Table, the Defendant will likely suffer no discernible prejudice with respect to the last two categories of evidence.  Thus, for the foregoing reasons, all evidence is not unduly prejudicial.

Additionally, it is anticipated that much of the proposed evidence will be introduced at trial through cooperating witnesses who were co-conspirators with the Defendant.   The Government anticipates that, both on direct examination and cross examination, testimony will be elicited from these cooperating witnesses as to "bad acts" committed by the cooperating witnesses themselves as well as other members of this conspiracy – namely, bribery payments, weapons, threats, violence, trafficking of marijuana and heroin, and money laundering.   This testimony is anticipated due to the integral nature these "bad acts" played in the functioning of the charged conspiracy.   Indeed, as discussed above, the bribery payments, weapons, threats, violence and money laundering were all part and parcel of how this DTO operated successfully.  As such, evidence of the Defendant's involvement in these "bad acts" would not be unduly prejudicial as the Defendant was engaged in, not to mention lead and directed, at least during part of the conspiracy, the same activity with these co-conspirators.   Accordingly, the evidence should be admitted at trial.

**V.      Conclusion**

For the foregoing reasons, in accordance with the governing and long-standing practice in this jurisdiction, the Government respectfully moves, that the Court admit the proposed evidence as inextricably intertwined with the charged conspiracy and pursuant to Federal Rule of Evidence 404(b).

Respectfully Submitted,

ARTHUR G. WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice

By:      ____/s/_____
Amanda N. Liskamm
Andrea Goldbarg
Adrian Rosales
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division,
United States Department of Justice
145 N Street, NE
East Wing, Second Floor
Washington, D.C. 20530
Tel: 202-616-1576
Amanda.Liskamm@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via the CM/ECF system, to counsel of record for the defendants, this 19th day of June 2015.

_/s/_____

Amanda N. Liskamm
Andrea Goldbarg
Adrian Rosales
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
Department of Justice