**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 12-cr-184 (RJL)** |
| **ALFREDO BELTRAN LEYVA,** | |
| **Defendant.** | |

**GOVERNMENT'S MOTION IN LIMINE TO ADMIT OR ALLOW EVIDENCE,
CROSS-EXAMINATION AND LEAD CASE AGENT AT COUNSEL TABLE**

The United States of America, by and through counsel, respectfully requests this Court issue four pre-trial orders related to the trial in the above-captioned case.  First, the Government seeks to introduce drug accounting ledgers at trial as business records or alternatively as co-conspirator statements.  Second, the Government seeks to introduce oral statements from co-conspirators at trial.  Next, the Government seeks to cross-examine any of the Defendant's character witnesses regarding their knowledge of the Defendant's arrest in Mexico.  Lastly, the Government seeks to allow the case agent to sit at counsel table during trial.

I.      **Drug Accounting Ledgers Should be Admitted at Trial as Business Records**

A.      <u>BACKGROUND</u>[1]

On January 16, 2015, the Government produced approximately 1,750 pages of drug accounting ledgers to the Defendant.[2]  The Government seeks to introduce these drug accounting

---

[1]      On June 11, 2015, attorneys for the Government met with counsel for the Defendant to review the contents of the accounting ledgers previously provided to the Defendant during the discovery process. The Government reviewed every single page of this production.  The information included in this section was explained to counsel and the Government highlighted certain entries to counsel that reference the Defendant's DTO's participation in certain cocaine shipments to serve as examples.

[2]      The Government has already produced ledgers to the Defendant from one Colombian DTO (which are the ledgers that the Government seeks to introduce at trial in the instant motion).  However, the Government is in the

ledgers at trial, through the testimony of JR,[3] who was the leader of a Colombian drug trafficking organization (hereinafter "DTO") responsible for supplying Mexican drug cartels, including the Defendant's DTO, with multi-ton quantities of cocaine that were destined for the United States. As discussed in more detail below, while JR did not physically input the data into the ledgers, JR ordered the data to be inputted, and reviewed the data with the inputter to ensure its accuracy. The following information regarding the accounting ledgers will be established at trial through the anticipated testimony of JR:

At JR's direction, two members of JR's DTO (LR and JA) maintained accounting ledgers that detailed the expenditures and income of JR's DTO, including money received from investors in the drug shipments, such as the Defendant.[4] All of the expenditures and income related to the DTO's drug trafficking activities were recorded in a master accounting ledger, referred to as the "Caja Mayor." JR will explain that certain entries in the "Caja Mayor" are directly related to drug trafficking ventures that JR entered into with the Defendant's DTO – e.g., payments made by the Defendant's DTO for cocaine purchased from JR during the dates of the charged conspiracy.

In addition to the "Caja Mayor," the DTO also maintained individual accounting ledgers for the cocaine shipments organized by JR's DTO. These ledgers contain details such as the quantity of cocaine, names of the investors and the person or organization responsible for

---

process of producing additional ledgers from another Colombian DTO. The Government intends to call the author of these additional ledgers to testify about them at trial, therefore does not anticipate any evidentiary issues requiring pre-trial litigation.

[3]       The Government has disclosed the witnesses' full names to defense counsel, but due to the fact that the cases remain under seal in other jurisdiction, the Government respectfully requests that their names not be included in these public filings. The Government is in the process of requesting the unsealing of some of these matters to comply with its obligations under the Jencks Act.

[4]       The accounting ledgers in the possession of the Government do not encompass all of the ledgers ever created on behalf of JR. They are only the accounting ledgers in the Government's possession.

receiving a particular cocaine shipment in Mexico, among other information.  Any data that was entered into these ledgers for the particular shipment was also entered into the "Caja Mayor."  JR will explain some of these ledgers, such ledgers titled "Juanitas 1" through "Juanitas 10," contain information that details the Defendant's DTO's involvement in those cocaine shipments.

Information entered into the accounting ledgers – e.g., the names of the investors – was often written in coded language.  As the leader of the Colombian DTO who ordered the creation of the ledgers, and as someone who personally reviewed them line by line, JR will be able to testify as to the meaning of the coded language.  For example, JR will testify that code names beginning with the letter "O," such as "Olfato" or "Oreste," represented the Beltran Leyva DTO, of which the Defendant was a member.

Prior to each shipment of cocaine that JR's DTO organized, JR would meet with LR to discuss the logistics of the intended shipment, including the anticipated expenses required for the shipment to take place.  Once the cocaine shipment left Colombia, LR or JA would enter the income and expenditure information into the "Caja Mayor" and shipment specific accounting ledgers.  JR would then meet with LR to review the ledger entries line by line for accuracy.  These review meetings occurred for each cocaine shipment until June 2004, when JR fled Colombia to avoid capture by law enforcement.  After June 2004, JR was apprised of the activities of the DTO through intermediaries, including LR, who would send JR written correspondence regarding the financial status of the organization.  Copies of the written correspondence was stored electronically with the accounting ledgers.  JR will further establish that the accounting practices and the maintenance of the ledgers remained the same, even after June 2004.  Furthermore, due to the hierarchy in JR's DTO, any changes to the accounting practices or maintenance of the accounting ledgers could not occur without JR's authorization.

3

B.              LEGAL STANDARD

The Government seeks to introduce the drug accounting ledgers through JR as business records at trial.  The drug accounting ledgers satisfy the business record hearsay exception found in Fed. R. Evid. ("Rule") 803(6).  Rule 803(6) provides that the following are not excluded by the hearsay rule, regardless of whether the declarant is available:

> [a] record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

To admit the drug accounting ledgers, the Court must first determine the authenticity of the proposed evidence.  "Authentication is an aspect of relevancy," and "[t]he threshold for the Court's determination of authenticity is not high." United States v. Safavian, 435 F. Supp. 2d 36, 38 (D.D.C. 2006) (citations omitted).  The authenticity of a document is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a).  A document may be properly authenticated through the "testimony of witness with knowledge," Fed. R. Evid. 901(b)(1), but a document may also be authenticated circumstantially by its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics," Fed. R. Evid. 901(b)(4). Under Rule 901(b)(4), "the sum of an evidentiary presentation may well be greater than its constituent parts," and "a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence." United States v. Tann, 425 F. Supp. 2d 26, 35-36 (D.D.C. 2006) (quoting Bourjaily v. United States, 484 U.S. 171, 180 (1987)).  Furthermore, there is a presumption of authenticity "based on the principles underlying Federal Rule of Evidence

803(6)[.]"  Alsabri v. Obama, 764 F. Supp. 2d 60, 66 (D.D.C. 2011) aff'd, 684 F.3d 1298 (D.C. Cir. 2012).

Once the drug accounting ledger's authenticity is determined, two foundational facts must be established, either through a custodian of records or other qualified witness, for a document to be admissible under Rule 803(6): (a) the document must have been made or transmitted by a person with knowledge at or near the time of the incident recorded, and (b) the document must have been kept in the course of a regularly conducted business activity.  In determining whether these foundational facts are established, the court may consider hearsay and other evidence not admissible at trial. See Fed. R. Evid. 104(a), 1101(d)(1); Bourjaily v. United States, 483 U.S. 171, 178-79 (1987).

"To lay an adequate foundation under [Rule 803(6)] the 'custodian [of the records] need not have personal knowledge of the actual creation of the document.'"  United States v. Adefehinti, 510 F.3d 319, 325-36 (D.C. Cir. 2007) (citations omitted); see also United States v. Fahnbulleh, 752 F.3d 470, 479 (D.C. Cir. 2014).  Indeed, there is no requirement under Rule 803(6) that the qualified witness who lays the foundation be the author of the record or be able to personally attest to its accuracy.  See United States v. Smith, 521 F.2d 957, 963 (D.C. Cir. 1975) ("A business record is admissible whether or not the maker is available to take the stand[.]") (footnote omitted) (citations omitted);  see also United States v. Keplinger, 776 F.2d 678, 693 (7th Cir. 1985) ("[T]he business records exception contains no requirement that a 'qualified witness' must have personally participated in the creation or maintenance of a document, . . . nor even know who actually recorded the information . . . ."); see also, e.g., Itel Capital Corp. v. Cups Coal Co., 707 F.2d 1253, 1259 (11th Cir. 1983) ("To be admitted under [Rule 803(6)], the person who actually prepared the

documents need not have testified so long as other circumstantial evidence and testimony suggest their trustworthiness.").

    C.    <u>ARGUMENT</u>

The Government anticipates the evidence at trial will establish that JR is a custodian of the records or is an otherwise qualified witness pursuant to Rule 803(6). Furthermore, the evidence will establish that the drug accounting ledgers were made or transmitted by a person with knowledge at or near the time of the incident recorded, and that the accounting ledgers were kept in the course of a regularly conducted business activity. Therefore, for the reasons set forth below, JR's accounting ledgers should be admitted into evidence under the business record exception to the hearsay rule.

First, as proffered above, the testimony of JR will be sufficient evidence to authenticate the accounting ledgers, which were created at the direction of JR to track the drug trafficking activities of the organization, which was in the business to earn a profit. JR, the leader of a Colombian DTO that supplied the Defendant with cocaine, will testify that JR has personal knowledge of the accounting ledgers, their contents and the process involved in their creation and maintenance, as well as knowledge of the identity of the creators of the documents. The Government will further authenticate the accounting ledgers circumstantially through other evidence, such as seizures of shipments of cocaine by various law enforcement agencies, which the Government's witness will testify correspond to particular shipments detailed in the ledgers.

Next, the Government will establish that the accounting ledgers were created by someone with personal knowledge of the events and information recorded therein. JR will testify that at JR's direction and instruction, the accounting ledgers were created by someone with personal knowledge of the information contained therein, namely, JA and LR, who inputted the information

6

into the accounting ledger. JR will further testify that JA and LR had personal knowledge of the organization's drug trafficking activities because they were members of JR's DTO employed by JR. They were paid for their services and also allowed to invest in the organization's drug shipments. Furthermore, JR will testify that he directed LR to maintain the ledgers in the regular course of the organization's drug trafficking business and that he/she ordered LR to record the information on a laptop computer. JR will further testify that he/she authorized LR to employ JA to assist in the activities LR conducted for the DTO. Based on conversations in furtherance of the conspiracy's main objective, LR informed JR that JA would input information regarding the DTO's accounting, as well as maintain custody of the laptop.

JR will also establish that the information was recorded in the ledgers at or near the time of the occurrence of the event records and that the record was kept in the course of a regularly conducted activity of the DTO. JR will testify that until June 2004 he/she would personally meet with LR on a frequent basis and would review every single entry into the ledgers. JR will testify that a meeting was held after a drug shipment was sent, in order tabulate the actual expenses incurred by the DTO – e.g., cost of fuel for the boats and payments to employees. They also met after drug shipments were sent to account for the actual payments made by investors for their portion of the drugs, including payments received from the Defendant's DTO, which was critical to determine how to distribute the cocaine once it arrived in Mexico. LR or JA then entered the information into the ledgers, and JR would review each line with LR to ensure the accuracy of the ledgers and to scrutinize certain expenses.

That JR suggested changes to the information contained in the ledgers or that the information entered into the ledgers was provided by JR or another co-conspirator, is not detrimental. The drug accounting ledgers remain "excepted from the hearsay rule provided 'both

the source and the recorder of the information, as well as every other participant in the chain producing the record, are acting in the regular course of business[.]'" United States v. Gurr, 471 F.3d 144, 152 (D.C. Cir. 2006) (internal quotation omitted). But see United States v. Patrick, 959 F.2d 991, 1001 (D.C. Cir. 1992) (holding that Rule 803(6) does not allow the admission of business record when the source of information is an outsider, unless it was standard practice to verify the information provided by an outsider). As described above, JR's testimony at trial will establish that all participants in the creation of the ledgers were acting in the regular course of business.

After the ledgers were reviewed for accuracy, JR would authorize the payment of the profits. JR will further testify that these meetings and the corresponding entries in the ledgers were made at or near the time the drug shipments occurred.

Although JR cannot specifically identify which entries in the ledgers were made by JA and which were made by LR, this is not fatal to their introduction as business records pursuant to Rule 803(6). The Government is not required to establish when and by whom the document was created. "[S]uch a requirement would eviscerate the business records exception, since no document could be admitted unless the preparer (and possibly others involved in the information-gathering process) personally testified as to its creation." Keplinger, 776 F.2d at 693; see also United States v. Jones, 554 F.2d 251, 252 (5th Cir.), cert. denied, 434 U.S. 866 (1977) ("It is not essential that the offering witness be the recorder or even be certain of who recorded the item. It is sufficient that the witness be able to identify the record as authentic and specify that it was made and preserved in the regular course of business.") (citations omitted).

JR will testify that after June 2004, he/she left Colombia and went into hiding to evade law enforcement. He will further testify that from mid-2004 on, he did not personally meet with LR or other members of the conspiracy to discuss the information that was entered in the ledgers, nor

did he review the ledgers line by line with LR (as he did before fleeing Colombia). However, JR will testify that JR remained familiar with the business practices of his DTO, which he maintained control of through intermediaries, and that the DTO continued to maintain the ledgers in the manner in which they were maintained prior to his departure from Colombia. JR will also testify that he would arrange to have certain ledgers sent to him via couriers, including the Juanita ledgers, which as described above contained detail information regarding payments and investments pertaining to drug shipments that involved the Defendant's DTO.

The fact that JR was no longer intimately involved in the creation of the ledgers after mid-2004 does not disqualify him as a "qualified witness" who is able to introduce the ledgers pursuant to Rule 803(6). "The phrase 'other qualified witness' is given a very broad interpretation .... In fact, the witness need not even be an employee of the record-keeping entity as long as the witness understands the entity's record-keeping system." Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 803.08(8)(a) (Mark S. Brodin, ed., Matthew Bender 2d ed. 2015). See United States v. Franco, 874 F.2d 1136, 1139-40 (7th Cir. 1989) (holding that narcotics agent qualified to testify about record-keeping practices of a money-exchange for purposes of Rule 803(6)); United States v. Hathaway, 798 F.2d 902, 905-07 (6th Cir. 1986) (finding that FBI agent could provide foundation testimony for admission of company records under Rule 803(6) because of the agent's familiarity with the record keeping system); United States v. Draiman, 784 F.2d 248, 256 (7th Cir. 1986) (holding that accountant who was not an employee of the company whose accounts were at issue could testify as to the preparation of the company's accounts).

Thus, the proponent of the evidence must simply offer a witness "with knowledge of the procedures governing the creation and maintenance of the type of records sought to be admitted." Keplinger, 776 F.2d at 694; see also United States v. Ray, 920 F.2d 562, 565–566 (9th Cir. 1990)

(holding that records were admissible under Rule 803(6) where a welfare fraud investigator testified about contents of defendant's welfare file where investigator was familiar with filing and reporting requirements and forms used, even though she did not record information and was not custodian); United States v. Franco, 874 F.2d 1136, 1139 (7th Cir. 1989) ("The witness 'need only be someone with knowledge of the procedure governing the creation and maintenance of the type of records sought to be admitted.'"); U.S. v. Miller, 771 F.2d 1219, 1237 (9th Cir. 1985) (finding where documents are stored in computer, computer programmer need not testify; foundation for computer printout may be established by anyone who has knowledge of the particular record system even if unfamiliar with distinctions between "menus," "databases" and computer "code"). As the leader of his own DTO, JR implemented the business practices of the DTO, as described above, to include the practice of maintaining ledgers to account for the DTO's profits and expenditures. Therefore, as someone with knowledge of the procedures used to create and maintain the ledgers, JR is a person qualified to testify about the contents of the ledgers, even those created after mid-2004.

Finally, the fact that the ledgers detail the transactions of an illicit drug trafficking business does not disqualify their introduction pursuant to Rule 803(6). The circuit courts have consistently held that records of illegal activities are admissible under Rule 803(6) as long as the foundational requirements are met. In United States v. Foster, the court admitted drug ledgers under the business record exception of Rule 803(6). 711 F.2d 871 (9th Cir. 1983). In Foster, the ledgers contained records of drug transactions that implicated the defendant. Id. at 882. A witness testified that she kept a record of her larger drug transactions and that it was her regular practice to enter the amounts of drugs sold on a particular day and the amount of money she received for those drugs. Id. The testimony further revealed that the information was recorded contemporaneously

and that it was relied upon by the recorder. Id.  Despite the fact that the ledger was incomplete and that the entries were out of sequence, the court held that the ledger was admissible pursuant to Rule 803(6) as a business record.  Id.; see also United States v. Cooper, 868 F.2d 1505, 1514 (6th Cir. 1989) (holding that log book of sham prescriptions kept contemporaneously with the creation of the sham prescriptions was admissible pursuant to Rule 803(6)); United States v. Lizotte, 856 F.2d 341, 344 (1st Cir. 1988) (holding that drug ledger made contemporaneously with drug sales was admissible under Rule 803(6)); United States v. Cohen, 384 F.2d 699, 700–01 (2d. Cir. 1967) (holding that bookkeeper's list of union bribes was admissible as a business record).

As in Foster, the fact that the ledgers in the instant case are records of an illegal business, does not make them inadmissible pursuant to Rule 803(6).  Like the witness in Foster, JR will establish that the ledgers were created in the regular course of the DTO's business and that they were created at or near the time of the occurrence of the events recorded in the ledgers. Furthermore, JR will establish that the DTO relied on the ledgers to maintain the drug trafficking activities of the organization.  As in Foster, the fact that the ledgers in the Government's possession are not the complete set of ledgers created by the organization, see fn. 2, supra, also does not disqualify their admissibility under Rule 803(6).

For the foregoing reasons, the Government respectfully moves for admission of the drug accounting ledgers at trial pursuant to Fed. R. Evid. 803(6) as business records.

## II.     Co-Conspirators' Statements Should be Admitted at Trial

### A.     BACKGROUND

The Government seeks to introduce certain statements at trial that were made by the Defendant's co-conspirators during the course of and in the furtherance of the conspiracy, of which

the Defendant was a member, pursuant to Fed. Rule Evid. 801(d)(2)(E).[5]  The following are specific examples of oral statements made by non-testifying co-conspirators that the Government seeks to introduce at trial:

      1.      A cooperating witness will testify that Ismael "El Mayo" Zambada Garcia told the cooperating witness that the Beltran Leyva brothers (including the Defendant) initially worked under Joaquin "Chapo" Guzman Loera, but when Joaquin "Chapo" Guzman Loera  was incarcerated, the Beltran Leyva brothers start to build their own drug trafficking business.  Further, Ismael "El Mayo" Zambada Garcia told the cooperating witness that Ismael "El Mayo" Zambada Garcia had loaned money to the Beltran Leyvas (including the Defendant) to assist them in building their own drug trafficking business in approximately 1996.

      2.      Multiple cooperating witnesses will testify that on several occasions throughout the course of the conspiracy, Arturo Beltran Leyva (the Defendant's brother) stated that the Defendant worked in drug trafficking activities with his brothers (Arturo Beltran Leyva and Hector Beltran Leyva) and the Defendant specifically invested in cocaine loads with Arturo Beltran Leyva.

      3.      Multiple cooperating witnesses will testify that on several occasions throughout the course of the conspiracy, Arturo Beltran Leyva (the Defendant's brother) stated that cocaine shipments received by the Beltran Leyvas were to be sent to the Defendant in Culiacan.  Arturo Beltran Leyva further stated that if loads of cocaine were seized south of Guadalajara, Arturo Beltran Leyva was responsible for the loss.[6]  However, if loads of cocaine were seized between Guadalajara and the United States, the Defendant was responsible for the loss.  Arturo Beltran Leyva also informed several cooperating witnesses that the Defendant was in charge of managing and running Culiacan for Arturo Beltran Leyva as the "plaza boss."[7]

      4.      More than one cooperating witness will testify that Arturo Beltran Leyva told the cooperating witnesses that the Defendant was in charge of the production of crystal methamphetamine in northern Sinaloa, with an individual named "Chapo Isidro."

---

[5]      The Government hereby incorporates the factual background in the Government's Motion in Limine to Introduce Other Crimes Evidence at Trial to provide further detail of the conspiracy.

[6]      The Government anticipates the evidence at trial will show that a "loss" is what members of the DTO referred to when a shipment of cocaine was seized by law enforcement, lost a sea, or stolen by a rival cartel.

[7]      A plaza boss is typically the lead representative of a cartel in a particular region or town.

5.      Multiple cooperating witnesses will testify that representatives of the Beltran Leyva's Organization in Colombia informed the cooperating witnesses that when loads of cocaine were being sent to the Beltran Leyvas, this included all three brothers – Arturo Beltran Leyva, the Defendant and Hector Beltran Leyva.

6.      At least one cooperating witness will testify that he/she was told by Arturo Beltran Leyva that Arturo Beltran Leyva ordered that Julio Beltran be killed, and Arturo Beltran Leyva ordered the Defendant to carry the murder out.  This witness was further told by Arturo Beltran Leyva that the Defendant's men killed Julio Beltran.

7.      A cooperating witness will testify that Joaquin "Chapo" Guzman Loera told the cooperating witness that the Defendant passed messages regarding drug trafficking activities between Arturo Beltran Leyva and Joaquin "Chapo" Guzman Loera.

8.      A cooperating witness will testify that Joaquin "Chapo" Guzman Loera told the cooperating witness that the Defendant would handle the marijuana aspect of the DTO and that the Defendant had the ability to cross marijuana into the United States through the Nogales region.

9.      More than one cooperating witness will testify that Arturo Beltran Leyva and Joaquin "Chapo" Guzman Loera  stated that the Defendant worked with Joaquin "Chapo" Guzman Loera  and Ismael "El Mayo" Zambada Garcia to grow heroin and marijuana in Mexico and traffic the heroin and marijuana into the United States.

10.      A cooperating witness will testify that Ismael "El Mayo" Zambada Garcia identified to the cooperating witness all of the major drug traffickers in the Mexican State of Sinaloa, and that Ismael "El Mayo" Zambada Garcia included the Defendant, stating that the Defendant had been involved in drug trafficking since he was 17 or 18 years old.

11.      A cooperating witness will testify that the Defendant engaged in meetings every morning during which he met with "El Rayito" and "Wacho" and the cooperating witness.   "El Rayito" and "Wacho" told the Defendant and the cooperating witness about individuals who had been kidnapped, interrogated and tortured from the day before.[8]

12.      A cooperating witness will testify that Ismael "El Mayo" Zambada Garcia told the cooperating witness that the Defendant was responsible for transporting all of the Beltran Leyva's cocaine from Mexico City to the state of

---

[8]      Further details of these meetings can be found in the Government's Motion in Limine to Admit Other Crimes Evidence at Trial.

Sinaloa and then on to the United States.  Ismael "El Mayo" Zambada Garcia further told this cooperating witness that Arturo Beltran Leyva put the Defendant in charge of crossing the cocaine into the United States through the Mexican state of Sonora after the Beltran Leyvas' relationship with another crosser in the region deteriorated due to the fighting between the Beltran Leyva's DTO and the Zetas Cartel.

13.     At least one cooperating witness will testify that he learned from Arturo Beltran Leyva and other family members of the Defendant, that the Defendant's drug trafficking business was uninterrupted when he was arrested in Mexico in 2008.  This cooperating witness was also told by Arturo Beltran Leyva and other family members of the Defendant, that "Chapo Isidro" took over the Defendant's workers, but the Defendant was still receiving proceeds from the trafficking activities while in custody.

Furthermore, should the Court deny the Government's motion to introduce the drug accounting ledgers that belong to JR as business records, the Government, in the alternative, seeks to introduce the ledgers as co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E).  As discussed below, the Government submits that the proffered evidence at trial will establish that the oral statements and the drug accounting ledgers meet the requirements set forth in Rule 801(d)(2)(E), and therefore, should be admitted at trial.

B.     LEGAL STANDARD

The Government seeks to introduce co-conspirator statements at trial pursuant to an exception to the hearsay rule.  Rule 801(d)(2)(E) provides that "a statement is not hearsay…if it is offered against a party and…was made by a co-conspirator of a party during the course and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  To admit such statements, a district court must find by a preponderance of the evidence that: (1) a conspiracy existed, (2) that the Defendant and the declarant were involved in the conspiracy and (3) that the statement was made in furtherance thereof.  Bourjaily, 483 U.S. at 175-176.  See also United States v. Brockenborrugh, 575 F.3d 726, 735 (D.C. Cir. 2009); United States v. Gewin, 471 F.3d 197, 201 (D.C. Cir. 2006).

The D.C. Circuit additionally requires the Government to offer independent evidence of the conspiracy apart from the statement; however, the content of the statement itself can also be considered in determining whether such independent evidence exists.  Id.  See also Gewin, 471 F.3d at 201; United States v. Gatling, 96 F.3d 1511, 1520 (D.C. Cir. 1996); United States v. Beckham, 968 F.2d 47, 50-51 (D.C. Cir. 1992); United States v. Washington, 952 F.2d 1402, 1407 (D.C. Cir. 1991), cert. denied, 503 U.S. 1009 (1992).

There is no requirement that the Government prove the preliminary facts of the conspiracy prior to disclosing the co-conspirators' statements at trial.  See United States v. Carson, 455 F.3d 336, 365 n.26 (D.C. Cir. 2006).  "A court can preliminarily admit hearsay statements of co-conspirators, subject to connection through proof of conspiracy."  Gewin, 471 F.3d at 201.  See United States v. White, 116 F.3d 903, 915 (D.C. Cir. 1997); United States v. Perholtz, 842 F.2d 343, 356; United States v. Jackson, 627 F.2d 1198, 1218 (D.C. Cir. 1980).  In fact, courts routinely admit such evidence "to avoid what otherwise would become a separate trial on the issue of admissibility."  United States v. Gannt, 617 F.2d 831, 845 (D.C. Cir. 1980), abrogated on other grounds by In Re Sealed Case, 99 F.3d 1175, 1178 (D.C. Cir. 1996).

It is common practice for courts in the D.C. Circuit to admit co-conspirators' statements conditionally, subject to connection, at the close of the Government's case.  See United States v. Loza, 763 F. Supp. 2d 108, 112 (D.D.C. 2011); Brockenborrough, 575 F.3d at 735; United States v. Brodie, 326 F. Supp. 2d 83, 89-90 (D.D.C. 2004); United States v. Cooper, 91 F. Supp. 2d 60, 78 (D.D.C. 2000).  Moreover, Federal Rule of Evidence 104(b) expressly provides that "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment

15

of the condition." Accord <u>Brodie</u>, 326 F. Supp. 2d at 89 (citing Rule 104(b) in denying a defense

motion for a pretrial hearing on the admissibility of co-conspirator statements).

B.      <u>ARGUMENT</u>

1.      **<u>The Government's Proffered Oral Statements Should Be Admitted</u>**

The oral statements from co-conspirators should be admitted in this case pursuant to Federal

Rule of Evidence 801(d)(2)(E) because the Government will satisfy the three prongs laid out in

<u>Bourjaily</u>.  First, the Government proffers that a conspiracy existed in which the Defendant, his

brothers, members of the Federation and other drug traffickers in Colombia, Mexico and elsewhere

were working together to traffic cocaine, heroin, methamphetamine and marijuana to the United

States.  This conspiracy will be evidenced at trial through the testimony of cooperating witnesses

who were part of the conspiracy and through evidence of drug seizures in Colombia, Mexico, and

the United States.  This clearly satisfies the first prong by more than a preponderance of evidence.

It is clear that the evidence the Government proffers will show at trial, beyond a

preponderance, that the Defendant and the declarants were part of the same conspiracy.  First, the

Defendant's brother, Arturo, and the Defendant were members of the same conspiracy.  Indeed,

the evidence will show their direct involvement in this conspiracy.  Further, as explained in more

detail in the Government's Motion <u>in Limine</u> to Introduce Other Crimes Evidence at Trial, Joaquin

"Chapo" Guzman Loera  and Ismael "El Mayo" Zambada Garcia, as heads of the Sinaloa Cartel,

were also members of this conspiracy.  Evidence at trial will also show their direct involvement in

the conspiracy.  Indeed, the Beltran Leyva DTO had been working with the Sinaloa Cartel since

the 1990s where it existed as an organized crime syndicate, called the "Federation," founded upon

longstanding relationships between Mexico's major drug trafficking kingpins.  They operated

through cooperative arrangements and close coordination with South American cocaine sources

16

of supply.    Further, the Government proffers that a cooperating witness will also establish that "El Rayito" and "Wacho" were also members of the conspiracy.  The testimony will prove that "El Rayito" and "Wacho" were the head "sicarios" or hitmen for the Defendant.  As such, these individuals were responsible for protecting the Defendant from rival cartels and arrest by law enforcement.  Therefore, the declarants of these oral statements are all members of the conspiracy, and thus the second prong has been satisfied.

To satisfy the third prong, the Government asserts that these statements were made in furtherance of the conspiracy.  Most courts, to include those in the District of Columbia, have interpreted the "in furtherance of" requirement broadly.  For example, all statements are admissible if they can "reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." United States v. Tarantino, 846 F.2d 1384, 1412 (D.C. Cir. 1988).  See also United States v. Snider, 720 F.2d 985, 992 (8th Cir. 1983), cert. denied, 465 U.S. 1107, 104 S.Ct. 1613, 80 L.Ed.2d 142 (1984); United States v. Patton, 594 F.2d 444, 447 (5th Cir. 1979).  The evidence of co-conspirators statements that the Government is seeking to admit satisfies this low threshold and therefore, the court should admit the statements provisionally, consistent with common practice in this jurisdiction.    These statements directly show the Defendant's knowledge, intent, role and participation in the conspiracy.   Namely, they illustrate how the Defendant was in charge of trafficking the cocaine loads through Mexico into the United States.  These statements further show how the Defendant was responsible for the marijuana production and trafficking for the DTO.  These statements further show that the Defendant engaged in violence and supports other evidence that he also engaged in other unlawful narco-corruption as part of, and in furtherance of, the drug trafficking conspiracy.  Furthermore, as is required by this Circuit, the Government will

also establish an independent basis for evidence of the conspiracy apart through testimony from cooperators who were apart of the conspiracy and evidence of drug seizures.

### 2.     The Drug Accounting Ledgers Should Be Admitted

As detailed above, the Government believes that the drug accounting ledgers should be admitted as business records.  Alternatively, the accounting ledgers should be admitted as co-conspirator statements in this case pursuant to Federal Rule of Evidence 801(d)(2)(E).  The circuit courts have consistently accepted drug ledgers as statements made in the course of and in furtherance of a conspiracy.  See United States v. Donovan, 55 Fed. App'x 16, 22 (2d Cir. 2003) (explaining that the ledger was made during the conspiracy and furthered the operations and efficiency of the conspiracy thus it was admissible as a coconspirator's statements); United States v. Thornton, 197 F.3d 241, 251 (7th Cir. 1999) (finding that ledgers were tools of the drug trade that constituted statements made by coconspirators during the course and in furtherance of the conspiracy), cert. denied, 120 S. Ct. 1427 (2000); United States v. Gil, 58 F.3d 1414, 1420 (9th Cir.) (finding that the author of drug ledger sufficiently identified to admit ledger as coconspirator's statement), cert. denied, 516 U.S. 969 (1995); United States v. Alosa, 14 F.3d 693, 696 (1st Cir. 1994) (holding that a drug ledger was admissible to show character and use of place where they are found); United States v. Arce, 997 F.2d 1123, 1128 (5th Cir. 1993) (stating that ledgers were properly admitted where entries matched known drug transactions); and United States v. Smith, 893 F.2d 1573, 1578 (9th Cir. 1990) (holding drug ledger admissible where evidence sufficiently identified coconspirator as author).

The Government will also satisfy the three prongs laid out in Bourjaily, with respect to the accounting ledgers.  First, as previously stated, the Government will prove at trial that a conspiracy existed in which the Defendant, his brothers, members of their DTO and other drug traffickers in

Colombia, Mexico and elsewhere were working together to traffic cocaine into to the United States.  This conspiracy will be evidenced at trial through the testimony of cooperating witnesses who were part of the conspiracy and through evidence of cocaine seizures in Colombia and Mexico.  This clearly satisfies the first prong by more than a preponderance of evidence.

Second, as detailed above, JR will establish that the Defendant and the author(s) of the ledgers were part of the same conspiracy.  JR will testify that the Defendant was an investor in cocaine shipments organized by JR and members of his DTO, including JA and LR, and that drug shipments sent to the Defendant and his DTO are detailed in the ledgers.  While JR was not always present when the ledgers were being authored and cannot always say with specificity which portions of the ledgers were authored by JA or LR, a party offering an out-of-court statement need not identify the declarant in order to establish that the declarant is a member of the conspiracy.  See United States v. El-Mezain, 664 F.3d 467, 505 (5th Cir. 2011) ("The failure of a document to identify the declarant is not fatal to admissibility under Rule 801(d)(2)(E), however, if the facts and circumstances surrounding the making of the statement indicate that the speaker is a member of the conspiracy or joint venture"); United States v. Ayala, 601 F.3d 256, 268 (4th Cir. 2010) ("Regarding the first requirement [of Rule 801(d)(2)(E)], it is not necessary for the offering party to identify the declarant by name . . . .  Instead, the offering party need only show that the unknown declarant was more likely than not a conspirator" (internal quotations and citations omitted)); United States v. Fierro, 38 F.3d 761, 773 (5th Cir. 1994) (". . . identification of the declarant - such as the author of a drug ledger - is not always necessary for the admission of a co-conspirator statement."); United States v. Breitkreutz, 977 F.2d 214, 219 (6th Cir. 1992) ("We do not think that the precise identity of a declarant is necessarily required for admission under Rule 801(d)(2)(E)"); United States v. Cruz, 910 F.2d 1072 (3d Cir. 1990) (holding that district court

properly admitted statement of unidentified declarant under Rule 801(d)(2)(E)); United States v. Helmel, 769 F.2d 1306, 1313 (8th Cir. 1985) ("[W]e do not believe that positive proof of the declarant's identity, through handwriting analysis or otherwise, is necessarily essential to the invocation of [Rule 801(d)(2)(E)]").

Therefore, as made clear in the cases above, statements of these unidentified declarants are admissible so long as the circumstances surrounding the statements demonstrate that the declarant is a member of the conspiracy. In the instant case, even though JR does not know which co-conspirator made each entry in the ledger, the ledgers speak for themselves in establishing that the author of the ledgers was a member of the conspiracy. They detail the narcotics related transactions, including expenditures and profits, of the DTO and were made at the direction of the leader of the DTO to aid in the furtherance the drug trafficking conspiracy.[9] Furthermore, as detailed above, the ledgers specifically detail drug transactions involving the Defendant's DTO.

Finally, as detailed above, JR's testimony will establish that the ledgers were made by JA and LR in the furtherance of the conspiracy. With respect to the third requirement, "[s]tatements are made in furtherance of a conspiracy if they can reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." United States v. Miller, 738 F.3d 361, 374 (D.C. Cir. 2013). Moreover, "[s]uch statements include those that keep a coconspirator updated on the status of the business, motivate a coconspirator's continued participation, or provide background information on key conspiracy members." Id. In the instant case, the ledgers helped account for necessary expenditures made in the normal course of sending drug shipments from Colombia to

---

[9]     As discussed above, these ledgers also indicate that the shipments of cocaine were being received by the Defendant's DTO and other members of the Federation as part of this conspiracy.

Mexico, the division of the cocaine amongst various investors, and payments made by the various investors for the shipments, among other things.  Furthermore, they helped keep JR apprised of the transactions of the organization, especially after 2004 when he fled from Colombia and went into hiding.  As noted above, during JR's time in exile, the ledgers were used to provide updates to JR as to the status of the organization's drug trafficking activities.  In fact, the evidence will demonstrate the that activities of the organization were so well documented that written correspondence sent to JR during his time in exile was also recorded within the accounting ledgers.  Lastly, the Government proffers to the Court that it is confident that it will prove the existence of a conspiracy and the connection necessary to admit co-conspirator statements unconditionally during trial.  If the Government fails to prove the necessary factual predicate for admissibility, "the court may either declare a mistrial or strike and instruct the jury to disregard any admissible statements."  <u>Loza</u>, 763 F. Supp. 2d at 112; <u>see also</u> <u>Jackson</u>, 627 F.2d at 1218-19; <u>Gannt</u>, 617 F.2d at 845; <u>White</u>, 116 F.3d at 915.

For the foregoing reasons, and in accordance with the governing practice in this jurisdiction, the Government respectfully moves for admission of the co-conspirator statements at trial, consistent with Federal Rule of Evidence 801(d)(2)(E).

## III.   The Court Should Permit the Government to Cross-Examine the Defendant's Character Witnesses Regarding Their Knowledge of the Defendant's Activities

### A.   <u>Applicable Law</u>

The Government seeks permission to cross-examine any of Defendant's character witnesses, who might be called, regarding their knowledge of the Defendant's activities.  Rule 405(a) permits cross-examination of character witnesses regarding their knowledge of specific instances of a Defendant's conduct in order to help the jury determine how much weight to accord

the character testimony. Fed. R. Evid. 405(a).  Further, the Federal Rules of Evidence state that "[e]vidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same" is admissible, Fed. R. Evid. 404(a)(1), and may be made by "testimony as to reputation or ... in the form of an opinion," Fed. R. Evid. 405(a).  On cross-examination regarding reputation or opinion, "inquiry is allowable into relevant specific instances of conduct."  Id.

"Once a defendant offers character testimony, the prosecution is afforded substantial latitude to rebut such evidence." United States v. Reich, 479 F.3d 179, 190 (2d Cir. 2007) (quoting United States v. Russo, 110 F.3d 948, 952-53 (2d Cir. 1997)); see also United States v. Wooden, 420 F.2d 251 (D.C. Cir. 1969) (stating a witness who testifies to good reputation of a defendant may be asked on cross-examination if he has heard of certain arrests or convictions of the defendant, as such questions go to reliability of witness).  Indeed, where a witness is testifying as to the good reputation of a defendant in the community, the prosecutor may inquire as to the witness' knowledge of prior offenses of the defendant since such knowledge bears on the credibility or reliability of the witness's assertion.  United States v. Bermudez, 526 F.2d 89 (2d Cir. 1975).

In a criminal prosecution, the only admissible evidence of good character is what people generally, who know the accused, think about him, and hence a prosecuting attorney may ask if the character witness has heard of conduct negating a favorable reputation.  See Stewart v. United States, 104 F.2d 234 (D.C. Cir. 1939).  Further, a witness who testifies to good reputation of a defendant may be asked on cross-examination if he has heard of certain arrests or convictions of the defendant, as such questions go to reliability of witness.  See Wooden, 420 F.2d at 251.

While the government may not ask "guilt-assuming hypotheticals" – e.g., would the witness's opinion change if she or he knew a defendant was guilty of the charged crime – the

witness may be asked whether specific instances of uncharged conduct would change his or her opinion of the defendant's character.  See Michelson v. United States, 335 U.S. 469 (1948) (stating there is considerable latitude to ask character witnesses about the state of their knowledge of defendant's background and experience as they bear upon his reputation for honesty and integrity). Additionally, the Government must have a good-faith basis for the questions, and the inquiry is also subject to analysis under Rule 403. See United States v. Wells, 525 F.2d 974 (5th Cir. 1976).[10]

> B.  Analysis

In this case, if the Defendant presents witnesses to testify about his good reputation, the Government should be permitted to ask them if they are aware that the Defendant was arrested in Mexico with firearms and a substantial sum of United States currency and whether their opinion of the Defendant's character would change if they knew about this arrest or any subsequent charges or prosecutions brought against him.  The Government does not seek to introduce any evidence regarding violence, racketeering or gang-related activity.  Instead, the proposed limited inquiry regarding the Defendant's arrest in Mexico will help the jury assess what weight, if any, to give the character witnesses' testimony. Fed. R. Evid. 405(a).

Further, the Government has a good-faith basis to believe that the Defendant was arrested in Mexico with these items.  Indeed, the Government has produced photographs in discovery of the items seized by the Mexican authorities from the Defendant during his arrest in Mexico. Therefore, cross-examining the Defendant's character witnesses regarding the defendant's arrest is not speculative or in bad faith.

---

[10]     It should be noted that if the Defendant does call character witnesses, the Government will seek to call rebuttal character witnesses.  See United States v. James, 555 F.2d 992 (D.C. Cir. 1977) (stating that the price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him.)

Finally, a limiting instruction regarding the proper use of the narrow cross-examination will negate any unfair prejudice to the Defendant. See United States v. Birney, 686 F.2d 102, 108 (2d Cir. 1982) (trial court instructed jury regarding proper use of cross-examination testimony). Therefore, the Court should permit cross-examination of the Defendant's character witnesses regarding his arrest in Mexico.

**IV.   The Lead Agents Should Be Allowed to Be Seated at Counsel Table During Trial**

Lastly, the Government seeks the Court's authorization to allow the lead case agents to sit at Counsel Table during the trial.  The Federal Rules of Evidence speak directly to this issue. Federal Rule of Evidence 615 codifies what is generally known as "The Rule on/of Witnesses" or "The Rule of Sequestration" requiring witnesses be excluded from trial proceedings so that they cannot hear the testimony of other witnesses.  However, Rule 615 also delineates four separate exceptions to the general rule.  The Government submits that the lead investigative agent, a special agent for the Federal Bureau of Investigation ("FBI"), meets at least one of these exceptions, and as such, should be permitted to be seated at the Government's counsel table throughout the trial.

First, they are "an officer or employee of a party which is not a natural person," and by this pleading is "designated as its representative by its attorney."  In this context, the pertinent party to this litigation is the Federal Government, and as an FBI agent, is an employee of such.  The Federal Government's attorney in this matter is the United States Department of Justice, and as such the undersigned designate the FBI special agent as the Government's representatives.  Fed. R. Evid. 615(2).

This exception to the general rule against a witness being present at trial applies to investigative agents, such as federal agents and police detectives.  Fed. R. Evid. 615 (advisory notes).  See United States v. Farnham, 791 F.2d 331, 334-35 (4th Cir. 1986) (stating that under

Rule 615(2) a district court may allow the Government's investigating agent to remain in the courtroom throughout the proceedings, even if he is expected to testify).  This exception to the rule does not require the Government to establish that the agent's presence is essential to the presentation of the case; that requirement applies solely to the third exception listed in the rule. The Government, therefore, may have an investigative agent present in the courtroom, even if the agent will testify.

This Circuit has addressed this issue.  In United States v. Sullivan, this Circuit ruled that the Government may designate a law enforcement officer to remain in the courtroom as the Government's representative. 56 F.3d 1532 (D.C. Cir. 1995); see United States v. Eiland, 2006 WL 516743, (D.D.C., March 2, 2006) .

Numerous other courts have issued similar rulings.  See, e.g., United States v. Phibbs, 999 F.2d 1053, 1072-73 (6th Cir. 1993) ("Rule 615(2) allows the Government to have any law enforcement officer it wants at its counsel table."), cert. denied, 510 U.S. 1119 (1994); United States v. Rivera, 971 F.2d 876, 889 (2d Cir. 1992); United States v. Adamo, 882 F.2d 1218, 1235 (7th Cir. 1989); United States v. Parodi, 703 F.2d 768 (4th Cir. 1983); United States v. Perry, 643 F.2d 38 (2d Cir. 1981), cert. denied, 454 U.S. 835 (1981).  Furthermore, the decision to allow more than one law enforcement officer to remain in the courtroom as the Government's representative is within the discretion of the trial court.  See United States v. Alvarado, 647 F.2d 537, 540 (5th Cir. 1981).

Accordingly, the Government respectfully requests that this Court allow the FBI special agent to sit at counsel table during the course of the trial in this matter.

**VI.      Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court grant the

Government's motion <u>in limine</u> and issue four pre-trial orders, consistent with the Government's

analysis and arguments noted above, related to the trial in the above-captioned case.


                                        Respectfully Submitted,

                                        ARTHUR G. WYATT, Chief
                                        Narcotic and Dangerous Drug Section
                                        Criminal Division
                                        United States Department of Justice


                            By:        _____/s/_____
                                        Adrian Rosales
                                        Amanda N. Liskamm
                                        Andrea Goldbarg
                                        Trial Attorneys
                                        Narcotic and Dangerous Drug Section
                                        Criminal Division,
                                        United States Department of Justice
                                        145 N Street, NE
                                        East Wing, Second Floor
                                        Washington, D.C. 20530
                                        Tel: 202-598-2281
                                        Adrian.Rosales@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via the CM/ECF system, to counsel of record for the Defendant, this 19th day of June, 2015.

_____/s/_____
Adrian Rosales
Amanda N. Liskamm
Andrea Goldbarg
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
Department of Justice