IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,            )
                                     )
            Plaintiff,               )      CR No. 12-184
                                     )
                                     )      Washington, D.C.
        vs.                          )      December 9, 2014
                                     )      11:39 a.m.
ALFREDO BELTRAN LEYVA,               )
                                     )
            Defendant.               )
_____)


TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          ANDREA GOLDBARG,
                             AMANDA LISKAMM,
                             Assistant United States Attorneys
                             555 4th Street, N.W.
                             Washington, D.C. 20036
                             (202)252-7785


For the Defendant:           A EDUARDO E. BALAREZO
                             Balarezo Law
                             400 5th Street N.W.
                             Suite 300
                             Washington, D.C. 20001
                             (202) 639-0999
                             info@balarezolaw.com


Court Reporter:              William P. Zaremba, RMR, CRR
                             Official Court Reporter
                             U.S. Courthouse
                             333 Constitution Avenue, NW
                             Room 6511
                             Washington, D.C. 20001
                             (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
 1               P R O C E E D I N G S
 2          DEPUTY CLERK:  All rise.  This Honorable Court is
 3   now in session.
 4          Your Honor, we have Criminal Action 12-184,
 5   United States of America versus Alfredo Leyva.
 6          Counsel, please approach the lectern and identify
 7   yourselves for the record.
 8          MS. GOLDBARG:  Andrea Goldbarg and Amanda Liskamm
 9   on behalf of the government.  Good morning, Your Honor.
10          THE COURT:  Welcome back.
11          MS. GOLDBARG:   Thank you.
12          MR. BALAREZO:  Good morning, Your Honor.
13   Eduardo Balarezo on behalf of Mr. Beltran Leyva.
14          And, Your Honor, for the record -- we're always on
15   the record; I hate that expression.
16          THE COURT:  Welcome back.
17          MR. BALAREZO:  His last name is Beltran Leyva.
18   So Beltran is his last name, but Leyva is the mother's last
19   name.
20          THE COURT:  Oh.
21          MR. BALAREZO:  So anyway.
22          THE COURT:  Well, of course, in the caption, it's
23   Leyva is the last name.
24          MR. BALAREZO:  I think the Beltran is in there
25   too, in the indictment.
```

1              THE COURT:  Well, it's in the middle.

2              MR. BALAREZO:  Oh.  Well, that's the last name.

3    I'm just letting the --

4              THE COURT:  Is it a hyphenated name?

5              MR. BALAREZO:  I think they did hyphenate it, yes,

6    Your Honor.  But typically it's Beltran Leyva.

7              Like my name would be Balarezo Antamidano, but I

8    never use the Antamidano, because we just don't.

9              THE COURT:  Well, it's a little complicated to be

10   using both.  So for the moment, I'm just going to -- for the

11   ease of simplicity, I'm just going to go with Leyva.

12             MR. BALAREZO:  That's fine, Your Honor.  I'll let

13   him know.  And he's listening too.

14             THE COURT:  He shouldn't be offended by that.

15             MR. BALAREZO:  He's not.  It's not an offense.

16             THE COURT:  That's the American system.

17             MR. BALAREZO:  That's another discussion,

18   Your Honor.

19             THE COURT:  Well, that's true.  It's --

20             MR. BALAREZO:  Thank you.

21             THE COURT:  You're welcome.

22             All right, counsel.  So it's a status hearing.

23   A couple of issues I think have been resolved.

24             At the last hearing, Mr. Balarezo had made a

25   request that counsel from Mexico, who were in the country

1    and here, be permitted to visit with the Defendant.

2    It was represented that they were members of the bar in

3    Mexico and had an attorney-client relationship with the

4    defendant, and I said that would be permitted that day on

5    the condition that Mr. Balarezo be present.

6              And also that going forward if there was going to

7    be any further permission for them to meet with the

8    defendant, that they had to submit to the Court -- I've not

9    yet received -- written verification from the Mexican

10   authorities that the people in question are, indeed,

11   certified members of the bar, in good standing, of the bar

12   of Mexico; and that I wanted to give some thought to whether

13   or not I would require, on a continuing basis, from

14   Mr. Balarezo to be present when they met with him, mindful,

15   of course, that they are not part of his defense team in

16   this case.

17             They're not criminal defense lawyers who are going

18   to be providing assistance for his defense in this

19   particular case.  My understanding was that they are lawyers

20   for him -- for his interests and his rights in Mexico, not

21   in the United States.

22             Have I misunderstood that, Mr. Balarezo?

23             MR. BALAREZO:  Perhaps I didn't explain.

24             It is correct that the two attorneys that were--

25   or the one attorney, Attorney Mondragon, who was present

1   here at the last hearing, and the other attorney, Delgado,

2   they both represent Mr. Beltran in matters.

3          THE COURT:  No, no, no, we're not going to confuse

4   this record.  It's Mr. Leyva.

5          MR. BALAREZO:  I'm sorry.

6          THE COURT:  We can't have a record that's got

7   different names being thrown around.

8          For the sake of consistency, it's going to be

9   Mr. Leyva.  It will be that way with the jury too, so you

10  might as well get used to it:  Mr. Leyva.

11         MR. BALAREZO:  I will, Your Honor, Mr. Leyva.

12         Those two attorneys represent Mr. Leyva in

13  matters -- in a matter, at least, that's pending in Mexico.

14         THE COURT:  Right.

15         MR. BALAREZO:  They're not U.S. attorneys, they're

16  not barred in any jurisdiction here in the United States.

17         THE COURT:  Right.

18         MR. BALAREZO:  However, to the extent that I need

19  their assistance in my defense of Mr. Leyva in this case,

20  they will be part of that -- I mean, they don't -- they're

21  not my partners or associates, but I would be relying upon

22  them for -- to assist me in defending Mr. Leyva in this

23  matter.  So I would say that they are -- they will at some

24  point form part of the defense team.

25         THE COURT:  Well, that could get a little

1  complicated in terms of discovery in a Protective Order,

2  which is another issue on my things that I need to address

3  today.

4          MR. BALAREZO:  Right.

5          THE COURT:  The current draft that the Court was

6  provided, and, of course, you've seen as well, is --

7  specifically refers to the people who can have access to

8  these documents that are being provided by the government as

9  members of the defense team.  And I, frankly, when I read

10  it, I just assumed, and I guess I shouldn't have, that the

11  defense team would consist of you and people in your firm.

12          If I understand you correctly now, you want to

13  expand that universe to include these Mexican attorneys.

14          MR. BALAREZO:  Well, Your Honor, I mean, as the

15  Court saw, I objected and I opposed the government's motion

16  for the protective order for various reasons, and that, in

17  fact, is one of them.

18          If I were to go out and hire a new investigator or

19  hire somebody, that person would legally be part of the

20  defense team.

21          THE COURT:  All right.

22          MR. BALAREZO:  Same way with these attorneys.

23          And I've done this in other cases.  I have had

24  separate retainer agreements with them where they are hired

25  as counsel in Mexico, they're hired as consultants, they're

1    hired as investigators, sometimes as a paralegal so that

2    they could assist the defense.

3            So as I stand here right now, I don't have that

4    arrangement with them; but I'm certain that if this matter

5    proceeds towards trial, that that would be the situation,

6    because they have --

7            THE COURT:  Are they criminal defense lawyers?

8            MR. BALAREZO:  They're criminal defense attorneys

9    in Mexico, and they do represent Mr. Leyva in a criminal

10   matter in Mexico.

11           So -- and they have -- they have not only

12   knowledge of those events, which my understanding is the

13   events that led up to the Mexican case, I believe the

14   government may try to introduce as possibly 404(b) evidence

15   in a trial in this matter, so it does have some relation.

16           Those individuals, those attorneys have a

17   longstanding relationship with Mr. Leyva; they have

18   extensive knowledge of that history.  So I would absolutely

19   need their assistance if this matter were to go to trial.

20           THE COURT:  Well, you would obviously want to give

21   the government a chance to be heard on this issue in a

22   second here.

23           MR. BALAREZO:  Sure.

24           THE COURT:  I'll cut to the bottom line.

25   The discovery in this case is not going to end up in Mexico;

1   there is no way I'm going to permit that.  And if it should

2   happen, it will be violation of this Court's order, and

3   people are going to start to be held in contempt.

4              MR. BALAREZO:  I understand that.

5              THE COURT:  Yes.  I'm not suggesting that I think

6   you would do that, Mr. Balarezo, but I don't know who these

7   folks are from Mexico.  I don't even know, as of today,

8   whether they're, you know, members of the bar who are in

9   good standing.  I just don't know that.

10             MR. BALAREZO:  One of my -- I can speak to that,

11  Your Honor.

12             THE COURT:  There's no way I'm going to permit

13  them to have the same access to these documents that I

14  permit you or your staff, lawyers, members of the bar, not

15  investigators, you or other members of the bar of this court

16  have access to.

17             So at a minimum, the protective order that's been

18  proposed, if what you're telling me is accurate, and I have

19  no reason to doubt it, that these lawyers from Mexico, once

20  upon showing the Court that they are -- that they're members

21  in good standing of the bar of Mexico, the best they're

22  going to have access to those documents is the same way the

23  defendant does, which is with you present, them looking at

24  it, they can't have a CD of it, they can't keep copies of

25  it.  I am taking no chance, to the extent I can take no

1    chance, those documents are ever going to be out of this

2    country, electronically sent out of the country.

3            In fact, one of the questions I'm going to be

4    asking the government in a second is, why are we doing this

5    electronically at all?  The chances these documents will be

6    sent out of the country electronically obviously are

7    increased to the extent that they're in an electronic

8    format.

9            You know, when I practiced law, 28 years, we

10   didn't do anything in an electronic format.  We did it the

11   old fashioned way:  Paper.  And I'm all for paper, unless

12   it's documents in the tens of thousands, 20,000, 30,000.

13   And I have no reason to think that's the case here.

14           My guess is, and I'll be asking in a minute what

15   their estimate is, my guess is we might have a thousand

16   documents here.  I doubt we'll even have 2,000, frankly.

17   And if that's the case, my instincts are correct, then paper

18   is fine.  I don't want things in electronic format, because

19   the risk that they will be either accidentally or

20   intentionally sent through the electronic systems out of

21   this country increase immeasurably.  So that's something for

22   both sides to be thinking about here.

23           I am not going to just likely allow discovery to

24   be put in an -- of this sensitivity to be put in electronic

25   format.  This is very -- this is a case that requires,

1   requires, caution by the government and the Court and

2   defense counsel on how this discovery is handled, especially

3   as it relates to anything that might suggest cooperators or

4   people who may be at risk.  You better be very careful about

5   that.

6          MR. BALAREZO:  Your Honor, if I may.

7          THE COURT:  Yes, sir, go ahead.

8          MR. BALAREZO:  I understand the Court's concerns.

9   And with all due respect, though, I think, unless the Court

10  has already decided the Motion for Protective Order --

11         THE COURT:  There's going to be a protective

12  order.  The question is what it looks like.

13         MR. BALAREZO:  Right.

14         The thing is, again, we have issues with it,

15  because --

16         THE COURT:  That's fine.  That's sensible.

17         MR. BALAREZO:  My concerns -- my concerns with the

18  protective order is that I don't believe it's necessary to

19  the extent that the government is requiring it.  They're, in

20  effect, requesting a blanket order -- protection of all the

21  discovery without specifying, as I think the case law

22  requires, the reasons for the protective order.

23  All we heard or all that was mentioned in the case is that

24  witnesses may be in danger, something along those lines.

25  I'm paraphrasing.

1           THE COURT:  Uh-huh.

2           MR. BALAREZO:  There have been no further -- and

3    as far as I know, there wasn't an ex-parte proffer to the

4    Court.  Maybe there was that I don't know about.

5           THE COURT:  Well, there has not been, no.

6           MR. BALAREZO:  But that's all we have.

7           And I'll be quite honest:  That exact same motion

8    was filed in a matter of a Guatemalan defendant in a matter

9    before Judge Kotelly.

10          Judge Kotelly -- and I attached her order, the

11   government's motion and her order.  She said that, as this

12   Court is saying, that a protective order was warranted;

13   however, more information and lesser restrictions were

14   ultimately required, because the Court -- I understand the

15   Court saying that this matter may be sensitive; but, for

16   example, the Court is also saying that the documents

17   themselves should only be in the hands of counsel,

18   attorneys.

19          I understand what the Court is saying; however,

20   that would mean that any time there's anything to be done in

21   Mexico, for example, to interview a witness or interview law

22   enforcement or any other job that would relate to the

23   discovery, that means that an attorney has to be -- has to

24   take not only the time but the expense and all of those

25   things to go to Mexico or some other location to work it.

1          THE COURT:  I would expect you to do that.

2          MR. BALAREZO:  Your Honor, I typically do; but in

3    some of these cases, you know, that's why we have

4    investigators, that's why we send people to -- investigators

5    to find witnesses, to interview people, to locate documents.

6    And if we can't even rely upon an investigator who is part

7    of the defense team to do that kind of work, that is

8    impinging upon my ability to represent Mr. Leyva properly

9    and to the extent that I feel is necessary.

10          THE COURT:  Well, you know, to use an analogy,

11   you're not quite-- you're not in my age category, you're a

12   lot younger than I am.

13          MR. BALAREZO:  I don't know, Your Honor.

14          THE COURT:  I know the prosecutors are too.

15          But when I was a youngster, there used to be

16   these, in the '50s, used to be these World War II movies.

17   And there would be a patrol, a platoon out on a patrol, and

18   invariably someone would yell, mine, or minefield.  Everyone

19   would stop and they'd take out a bayonet, and they'd get

20   down on their knees and they'd start plunging that bayonet

21   into the ground to hear the click, to see if there's a mine

22   in their way, to avoid blowing up.

23          Well, that's kind of where we are.  We're in a

24   minefield here.  There's not going to be any sprinting here.

25   We're going to go very carefully and very slowly.

1          As of this moment, I'm not inclined to let

2    investigators have these documents in their possession.

3    I'm okay with a member of the bar, because you answer to

4    this -- you're an officer of this court, as is any associate

5    in your firm is a member of this bar, and you are directly

6    under my aegis, however you want to put it.

7          And as you're well-aware, you would be, if you

8    were in violation of the court order, you would be

9    sanctionable.

10          MR. BALAREZO:  Of course.  I understand.

11          THE COURT:  It could -- And I know you know that,

12    because you're one of our most experienced and highly

13    regarded criminal defense lawyers.

14          MR. BALAREZO:  Thank you.

15          THE COURT:  So I'm not worried about you; I'm not

16    worried about you.

17          I don't know who might be on your team in your

18    firm, I don't know that.  But I certainly don't know anyone

19    from Mexico.

20          And assuming, for the sake of discussion, these

21    are honorable people who are, you know, in good standing

22    with the bar of Mexico, fine, but they're not under my

23    control.  And I am being very careful and cautious in this

24    case, as I would be in any case of a similar nature.

25          I've had, you know, Operation Conquista not many

1  years ago, 14,000 wiretap conversations, the highest elected

2  official in the history of Colombia, re-extradited to the

3  United States, a senator, an elected senator extradited to

4  this country and tried in this case, in this country, in

5  this courtroom.

6         A very sensitive case.  The case was on the front

7  page of the newspaper in Colombia every single day of the

8  trial.  It was a ten-week trial.  Big case.  So we've

9  handled cases in this courtroom involving foreign countries,

10  extradited officials, high profile in those countries,

11  et cetera, et cetera.

12         This case is, I don't think there's 14,000 wiretap

13  conversations in this case, so we don't have the paper glut

14  that we potentially had in that case.

15         But the point is, we're going carefully here, not

16  taking any chances unnecessarily that might put at risk

17  anyone's life.  And we certainly aren't going to, you know,

18  create situations that cause questions or doubt.  So bear

19  with the Court, as I know you will, Mr. Balarezo, if we go a

20  little slowly on some issues and we do it incrementally.

21         As we go along this path, if you need assistance

22  from the Court, you know full well you can always seek

23  assistance from the Court to, let's say, hypothetically,

24  give an investigator a particular document to bring with him

25  or her to Mexico, okay, we'll deal with that when we have to

1   deal with it.  But in the beginning, we want to go carefully

2   and very, very slowly here.

3           MR. BALAREZO:  Your Honor, I would respectfully

4   suggest, though, that the Court perhaps take a path similar

5   to Judge Colleen Kotelly's, where I believe she had the

6   government basically specify the documents that needed to be

7   protected, and probably for good reason; and also the ones

8   that didn't, because then the other ones that, you know, are

9   just paper with some information can be disclosed to my

10  client so that he can review them.  They're presumably going

11  to be in Spanish; he can review them.

12          THE COURT:  Oh, he's going to see -- he will get

13  to see all the documents, there's no question about that.

14          MR. BALAREZO:  I understand that.

15          THE COURT:  The only issue is whether you have to

16  be present.

17          MR. BALAREZO:  Right.

18          THE COURT:  And whether or not -- well, my

19  experience on letting people have them at the jail is a

20  different issue.

21          MR. BALAREZO:  Well, Your Honor, the thing is,

22  I can't imagine that every piece of paper that the

23  government will produce as discovery is going to need the

24  type of protection that it's seeking.  I just can't imagine

25  that in any version of these events.

1          THE COURT:  That makes sense.

2          MR. BALAREZO:  And the ones that don't need

3    protection, quite frankly, I'd rather not either have myself

4    or anyone working with me, sitting for hours with Mr. Leyva

5    while he reads documents, you know, twiddling our thumbs.

6    That's just an enormous waste of time and resources.

7          So to the extent that there is material that does

8    not need to be protected, I think the government should

9    identify those.

10          THE COURT:  That's a very fair request, that's a

11    very fair request.

12          And I will inquire as to whether or not there's a

13    subgroup of these documents that need protection and a

14    subgroup that doesn't need protection.  And then, you know,

15    we'll leave the burden to the government in the first

16    instance to designate which ones they believe need

17    protection and which ones they don't believe that need

18    protection.

19          That's a fair request, that's a fair request.

20          Anything else on that issue?

21          MR. BALAREZO:  Not on that issue, Your Honor.

22    Thank you.

23          THE COURT:  All right.

24          Let's hear what the government has to say about

25    the protective order.

1          MS. GOLDBARG:   Thank you, Your Honor.

2          The government agrees that a modified version of a

3    protective order in the sense that there are certain

4    documents that probably do not need to be under protective

5    order.

6          For example, the government requested via an MLAT

7    the documents seized at the time of the defendant's arrest

8    in Mexico.  They're in Spanish.  Presumably, he's already

9    received those documents while in custody to Mexico.

10   It doesn't reveal anything sensitive, so the Government

11   would not have any objections to the defendant having those

12   documents or an investigator or whoever Mr. Balarezo felt it

13   was appropriate to have them.

14         The government is anticipating producing

15   discovery, arguably 3500 material, but discovery such as

16   drug ledgers, where those items, the government doesn't

17   think that it will take a lot of digging to figure out who

18   the author of those drug ledgers is, and as such, that would

19   cause a serious risk of harm to not only the author of the

20   drug ledgers, anyone else that might be suspected as

21   cooperating with the government, including their family

22   members, whether they're in the United States, Mexico,

23   Colombia or another country.  So those are the type of

24   documents that we would want to provide to defense counsel

25   to assist him, but we would insist on having a protective

```
 1    order that those documents would be only in Mr. Balarezo's

 2    care and custody.

 3              THE COURT:  So those could be segregated as if --

 4              MS. GOLDBARG:  Yes.

 5              THE COURT:  -- that needs coverage under the

 6    protective order.

 7              MS. GOLDBARG:  Correct, Your Honor.

 8              THE COURT:  Indeed, you could even stamp them

 9    protective order or something like that to make it clear.

10              MS. GOLDBARG:  I believe Ms. Liskamm and I are

11    both of the preference to actually print things out and

12    provide hard copies.  We have been forced somewhat to do it

13    electronically, because that just seems to be easier for

14    everyone.  The government is more than happy and would

15    prefer --

16              THE COURT:  You're in an old-school courtroom now.

17    I do it old school.

18              MS. GOLDBARG:  So do I.

19              So we would prefer if we could print it out, and

20    that would give us the luxury of stamping those documents

21    that are under protective order.

22              The government would also ensure that when we

23    provide the discovery, the letter would clarify also by

24    Bates stamp number, which documents --

25              THE COURT:  Good.  I like Bates stamps.
```

1          MS. GOLDBARG:  -- follow under -- everything will

2     be Bates stamped -- follow -- what Bates stamp numbers will

3     follow under the protective order per our suggestion, and

4     not --

5              And we've had the --

6          THE COURT:  Give me a rough idea, what kind of

7     volume are we looking at here?

8          MS. GOLDBARG:  I think the Court was accurate in

9     the low thousands.  Drug ledgers, we've got a substantial

10    number of drug ledgers, detailed, and for several years.

11    So I think that's --

12         THE COURT:  That's not that many then.

13         MS. GOLDBARG:  No.  I think the government is more

14    than happy to print those out.

15         THE COURT:  In my Fannie Mae case, we had

16    30 million documents.

17         MS. GOLDBARG:  We're not even close to that,

18    Your Honor.

19         THE COURT:  Not in that category.

20         MS. GOLDBARG:  No.  And we specifically,

21    Ms. Liskamm and I have had the joy of working with

22    Mr. Balarezo before on a case also --

23         THE COURT:  He's good.

24         MS. GOLDBARG:  -- almost proceeding to trial.

25    And it's been our experience that a lot of times we can try

 1   and discuss these matters beforehand and resolve them.

 2          If Mr. Balarezo has a specific problem with a

 3   document that we're seeking to have protective order, we can

 4   discuss it and obviously try to resolve it ourselves.

 5   And if it can't be resolved, I'm sure Mr. Balarezo will not

 6   be shy about bringing that matter to the Court's attention.

 7          THE COURT:  He's never been shy.

 8          MS. GOLDBARG:  No, he's hasn't.  He's not a

 9   wallflower.

10          THE COURT:  He's never been shy.

11          MS. GOLDBARG:  So I think that addresses both the

12   concerns with regards to the manner in which it would be

13   produced and our agreement that it should be, we can

14   segregate those under the protective order, and those that

15   are not.

16          THE COURT:  All right.

17          So why don't you re-draft it, talk to

18   Mr. Balarezo, see if you can come up with some language

19   consistent with these discussions today that everyone's

20   comfortable with.  We'll have two categories:  Those that

21   the government designates to be covered by the protective

22   order, and those that are produced that are not so

23   designated.

24          All productions will be in paper.  We're not going

25   to have any electronic productions here.

1          And we're going to limit access, at least

2     initially, to the documents produced to counsel of record in

3     the case, which is Mr. Balarezo.

4          And is anyone in your firm working on this case,

5     Mr. Balarezo, any lawyers?

6          MR. BALAREZO:  Not at this time, Your Honor,

7     because I don't know the extent to what's coming, so...

8          THE COURT:  Okay.

9          MR. BALAREZO:  I will inform either the Court or

10    the government.

11         THE COURT:  All right.  Very good.

12         But, you know, at some point, Mr. Balarezo, I'm

13    going to want a list from you of -- I want you to be keeping

14    a list of who in your firm that works for you you think

15    needs to be able to see these documents or handle them or

16    have access to them.  So it could be a secretary, it could

17    be an associate, whatever.  It could be an investigator.

18    But it has to be someone who's under your umbrella and that

19    works for you and who answers to you, at least for now.

20         And in terms of anyone else getting these

21    documents, again, like I said, I'm going slowly here as to

22    how far beyond that I'll go.

23         Now, once I've received, assuming I'm going to get

24    some type of official document that these two lawyers -- is

25    that them sitting out there today?

```
1              MR. BALAREZO:  No, Your Honor.

2              THE COURT:  I see two people.

3              MR. BALAREZO:  No, these are not attorneys.

4              THE COURT:  Are they friends of the family or

5     something?

6              MR. BALAREZO:  They're related to Mr. Beltran

7     Leyva.

8              THE COURT:  Relatives?

9              MR. BALAREZO:  Yes.

10             THE COURT:  Okay.

11             So once I get an official document as to those

12    lawyers in Mexico, I'm also going to want a document, a

13    separate document, signed by your client, that they have an

14    attorney-client relationship.

15             MR. BALAREZO:  Sure.

16             THE COURT:  I'm going to want that too.

17             And I'll want to have that part of the record in

18    this case, that there is an ongoing attorney-client relation

19    between them.

20             Then I will let them have access to these

21    documents to look at them.  But at least initially under

22    your supervision; and then beyond that, we'll deal with it

23    as we go along here.

24             I'm glad to hear the volume is not crazy large,

25    and it's a manageable amount.  That's good to hear.
```

1          MR. BALAREZO:  Your Honor, this might be

2    self-evident, but the Court's indicating that it wants the

3    discovery produced in paper, but I understand that there may

4    be some types of recordings, which obviously cannot be --

5          THE COURT:  That's different.

6          MR. BALAREZO:  Okay.

7          THE COURT:  I didn't know -- are there tape --

8    ma'am, are there wiretaps or recordings or are there

9    videotape recordings that you can let me know if that

10   exists?

11         MS. GOLDBARG:  Your Honor, if there are, we don't

12   believe it's going to be in the thousands.  It might be

13   barely in the double digits.  I would have to just verify

14   with certain Coast Guard seizures whether or not there were

15   videos taken of seizures at high seas and so forth.

16         THE COURT:  Okay.  So --

17         MS. GOLDBARG:  And obviously, that we would

18   produce in its original format.

19         THE COURT:  If there are -- well, let's start with

20   a basic question.  Are there wiretap conversations?

21         MS. GOLDBARG:  Not that we're aware of at this

22   time, Your Honor.  Not in the United States.  And there's

23   been no positive response from foreign governments that

24   there had been.

25         THE COURT:  Okay.

1          Now, in terms of videotapes within the

2    United States, are there any of those, to your knowledge?

3          MS. GOLDBARG:  Specifically with this defendant,

4    no.

5          Are there videotapes of evidence that might

6    corroborate certain witnesses?  There may be.

7          THE COURT:  Okay.

8          MS. GOLDBARG:  But those would probably be

9    produced pursuant to 3500 material --

10         THE COURT:  Okay.

11         MS. GOLDBARG:  -- as opposed to Rule 16 discovery.

12         THE COURT:  So this may be a little bit premature

13   then.  But obviously, to the extent there are videotapes or

14   audiotapes that might become discoverable material, those

15   will have to be produced in a video format or the audio

16   format.  But there also should be a transcription of those

17   too --

18         MS. GOLDBARG:  Yes, Your Honor.

19         THE COURT:  -- in paper.

20         MS. GOLDBARG:  Absolutely.

21         MR. BALAREZO:  Your Honor, I apologize.

22   One of the things that kind of just caught my attention was

23   the government is saying that there may be some videos that

24   relate to other individuals but not directly to my client,

25   and that those videos may be provided as 3500, rather

1 than -- or Jencks Act, rather than a Rule 16 material.

2 I'm struggling to see how that would be, unless it's a video

3 of the other individuals making a statement, I can see where

4 that may fall under Jencks.  But if it's just a video of a

5 seizure or something else, I don't see why the government

6 would be withholding that to produce at a later date,

7 pursuant to the Jencks Act, rather than produce it --

8    THE COURT:  I don't think they were saying that,

9 but --

10    MR. BALAREZO:  Is that --

11    MS. GOLDBARG:  That's not what I meant.  If I did,

12 I apologize for my lack of clarity.

13    If there are videos relating to events that the

14 government would seek to introduce in its case in chief that

15 would be produced.

16    There are instances in which people that we

17 believe that we will call to testify in support of the

18 government's case-in-chief, there may be recordings with

19 regard to their statements, which would, the government

20 would argue, clearly qualify as their statements pursuant to

21 the Jencks Act.  So those would be produced closer to --

22    THE COURT:  You know we're a long way from

23 producing Jencks material.

24    MS. GOLDBARG:  Exactly.

25    THE COURT:  Obviously, if you have any Brady

1    material, Giglio material, that's now, that's not down the

2    road.

3          MR. BALAREZO:  And, Your Honor, with respect to

4    Brady, I'm not aware specifically of any Brady material as I

5    stand here.

6          But to the extent that the government is going to

7    present evidence of any seizures, or other events that they

8    will seek to associate with Mr. Leyva, events and seizures,

9    I'm thinking the government's mentioned a seizure in

10   Tampico, Mexico, I don't know what the quantity was.

11         THE COURT:  Yeah.

12         MR. BALAREZO:  But to the extent that there any

13   seizures or anything like that that the government is going

14   to seek to associate with my client, I ask that, under

15   Brady, that the government produce any and all material that

16   they have; that those seizures or those drugs, or whatever

17   was seized, have been attributed to either other

18   organizations, other individuals, because I've had that

19   experience in other cases where a seizure happens in Mexico

20   of a ton of coke, and, you know, it's -- the Mexicans

21   associate it with one group, and then the DA comes in and

22   associates it with another group.  So I think that that will

23   be exculpatory and/or at least helpful to the defense under

24   Brady and its progeny, and I think that the government

25   should have to produce that, that material now.

1          MS. GOLDBARG:  Your Honor, that was also a similar

2    request that defense counsel made in the trial that we

3    had -- or the matter that we had before Judge Kollar-Kotelly

4    in which the government objected because -- and we never got

5    that issue resolved.

6          We've had many discussions about this, and we

7    believe that we understand what defense counsel is asking

8    for, and we will do our best to comply with -- I'm sorry,

9    we will do our best to comply with his requests.

10         I don't know if this is something that would be

11   better by motion, because, again, the government's not

12   necessarily sure -- I believe that Mr. Balarezo is arguing

13   that, let's say, he mentioned Tampico.  There was a seizure

14   in 2007 of approximately 10,000 kilos of cocaine in Tampico,

15   Mexico.  There are various different persons who the

16   government would state were investors or owned those drugs,

17   one of them being the defendant.

18         I think the defendant is -- defense counsel is

19   arguing that if there are other people that were also

20   investors in that load or also attributed to being owners of

21   those drugs, that is somehow exculpatory.  That wouldn't be

22   the government's position.  It would be that in a load of

23   that size, there tend to be many investors, both in

24   Colombia, Central America, as well as Mexico.

25         But we've been through this issue before, and I

1   think that we can try and resolve it.  And if there are

2   issues, then we can bring it to the Court's attention.

3           THE COURT:  I think in the first instance, let's

4   see if you can get this resolved just by working together.

5   You've done it before, and I have no reason to doubt that

6   you can talk it through at least.  And then if you can't

7   reach a resolution, then you can seek assistance from the

8   Court.  That's perfectly fine.

9           I'm more interested at this point in getting the

10  pipeline rolling, getting the discovery, to the extent we

11  can on a rolling basis, into Mr. Balarezo's hands and give

12  him a chance to review it, discuss it with his client.

13  And I'm sure as we move along this path, people will, you

14  know, issues will arise and you'll try to work them out.

15          MS. GOLDBARG:  Absolutely, Your Honor.

16          THE COURT:  Now, which gets me to the next

17  point -- well, unless Mr. Balarezo has another point.

18          MR. BALAREZO:  Nothing else on that issue.

19          THE COURT:  Mr. Balarezo, I think, made a good

20  point in his pleading, he made a lot of good points.

21  But one of the good points he made was that he doesn't

22  believe, at this point with this record, it's necessary or

23  appropriate yet for the Court to designate this case as a

24  complex case for the purposes of Speedy Trial Act.

25          I must say based on what I've heard so far, prior

 1    to today and today, I'm not -- I really don't believe it is

 2    yet reached the point where it would qualify for that kind

 3    of designation.

 4         Like I said, an example a minute ago, Operation

 5    Conquista, 14,000 wiretapped conversations is a massive

 6    amount of information.  There were videotapes, there were

 7    all kinds of things in that case.  Obviously, I had to

 8    designate that case, and I did, as a complex case.

 9         I haven't heard yet anything that would warrant a

10    similar status for this case.  It may turn out that it does

11    at some point, but as of now, I certainly haven't heard

12    anything that would warrant it.

13         MS. GOLDBARG:  May I respond?

14         THE COURT:  Of course.

15         MS. GOLDBARG:  The basis for the government's

16    request that this be designated a complex case obviously is

17    not on an extraordinary number of foreign wiretaps that

18    would require translation and would be extremely time

19    consuming.  And as we've stated before, the amount of

20    physical documentary discovery is in the low thousands,

21    which I believe is manageable.

22         This is a case that covers a conspiracy, and I

23    think it's the nature of the case for which the government's

24    requesting that it be designated as complex.  It covers over

25    a decade of conduct that spans several countries, including

1    Colombia, several in Central America, Mexico, the

2    United States.  The government would anticipate filing a

3    404(b) motion to not only encompass the drug trafficking

4    that this defendant engaged in, but what the drug

5    trafficking organization as a whole engaged in, which

6    includes issues of corruption, issues of money laundering,

7    issues of violence.

8              THE COURT:  Now, hold on a second now.

9              MS. GOLDBARG:  Yes.

10             THE COURT:  I take your point, it's a good point,

11   but Mr. Balarezo made an interesting and important point,

12   I think, in his pleading, which is that the indictment in

13   this case came down in '12, over 24 months ago.  I think it

14   was February of '12, off the top of my head, but I can't

15   remember exactly.

16             MR. BALAREZO:  August.

17             THE COURT:  Was it August?  So over 24 months.

18             But my point is, it was over 24 months ago the

19   grand jury issued its indictment in this case.

20             MS. GOLDBARG:  Correct.

21             THE COURT:  And so, I mean, the government has had

22   a long time, in other words, extradition, I understand that,

23   but whatever.  But the point is when the government put its

24   evidence before the grand jury for the purposes of the

25   indictment --

1           MS. GOLDBARG:  Correct.

2           THE COURT:  -- it had its evidence that it was

3    relying upon, and, of course, as we all know, under the law,

4    you can't continue the grand jury investigation after the

5    indictment has been issued.

6           So, you know, I'm having a hard time understanding

7    how we're in a position with this case two years after the

8    fact, after the indictment, where there's even a chance

9    we're going to need to have to designate this as complex.

10   I'm just not sure why we're going to need to do that.

11          MS. GOLDBARG:  I think, Your Honor, that when we

12   get to the point in which the government is required to

13   produce material pursuant to the Jencks Act, that is going

14   to be an immediate indication as to the complexity.

15          The number of witnesses the government anticipates

16   calling is in the double digits.  Many of them are not in

17   the District, many of them belong -- are witnesses who have

18   cooperated with other jurisdictions within the

19   United States.

20          THE COURT:  What does double digits mean, 20, 30,

21   10?  I mean, double digits doesn't tell me much.

22          MS. GOLDBARG:  North of 25.

23          THE COURT:  Okay.

24          MS. GOLDBARG:  There are also foreign witnesses.

25   There are events and seizures that happened in foreign

1  countries where we do have the evidence and we will be

2  producing it; however, we -- immediately after the

3  government sought the indictment of the defendant, the

4  government submitted a request for a provisional arrest

5  warrant to Mexico, as well as the extradition request.

6          There was a lot of doubt as to whether or not

7  we would even get the defendant.  And so for us to arrange

8  to have witnesses from foreign countries that are officials

9  of foreign countries come and testify to the United States,

10  that can be a laborious process.  We have to --

11          THE COURT:  All right.  Give me a little insight

12  here.  I'm not asking you to give me names, just trying to

13  get some big-picture sense of things here.  Twenty-five,

14  roughly, 25 witnesses.  How many of them are Americans?

15          MS. GOLDBARG:  Americans or in the United States?

16          THE COURT:  All right.  We'll start with

17  Americans.

18          MS. GOLDBARG:  Americans in the United States,

19  I would say, and I don't mean to be vague, Your Honor, I'm

20  just trying to think about where --

21          THE COURT:  I'm not asking you names.  Half a

22  dozen?

23          MS. GOLDBARG:  Probably, let's say ten.

24          THE COURT:  Ten, roughly.  Okay.

25          MS. GOLDBARG:  And those I would consider would be

1   law enforcement witnesses that we would easily have access

2   to.

3           THE COURT:  Most of those would be law enforcement

4   folks, right.

5           MS. GOLDBARG:  Yes.  That would not be a problem.

6           THE COURT:  All right.  Now, of the remaining

7   roughly 15, how many of those are Americans but not in the

8   United States?

9           MS. GOLDBARG:  Not a significant amount.  Nothing

10  that --

11          THE COURT:  Two or three?

12          MS. GOLDBARG:  Maybe.

13          THE COURT:  Okay.  And they, I assume they'd be

14  law enforcement as well?

15          MS. GOLDBARG:  Correct.  That would be stationed

16  abroad, yes.

17          THE COURT:  All right.

18          MS. GOLDBARG:  I may need to modify my number

19  northward.

20          THE COURT:  All right.  I'm just trying to get a

21  rough idea here.

22          MS. GOLDBARG:  Yes, Your Honor.

23          THE COURT:  So that's about half the witnesses so

24  far.

25          MS. GOLDBARG:  I'm going to have to revise the --

1  cooperators alone, I --

2          THE COURT:  Let's say cooperators are foreigners,

3  right?

4          MS. GOLDBARG:  Foreigners in the United States.

5          THE COURT:  Okay.  Some are in U.S., right?

6  And some are not.

7          MS. GOLDBARG:  I would say there would probably be

8  approximately somewhere between 20 and 25 that are in the

9  United States.

10          THE COURT:  Okay, 20 to 25 in the U.S.

11          MS. GOLDBARG:  Correct.

12          THE COURT:  And those out of the U.S. would be,

13  again, roughly, six?

14          MS. GOLDBARG:  Yep, that's a good number.

15  Assuming I'm not going to be held to these.

16          THE COURT:  No, no.  This is an estimate.

17          MS. GOLDBARG:  Thank you.

18          THE COURT:  I mean, obviously, if the estimate is

19  going to be 60, then we've got a problem.

20          MS. GOLDBARG:  I'm doing my best effort.

21          THE COURT:  But, I mean, if, six is a rough

22  estimate, it's four or seven, I mean, come on, it doesn't

23  matter.  So if -- the point of this exercise --

24          MS. GOLDBARG:  There's one additional, I'm sorry,

25  Your Honor, I didn't mean to interrupt.

1          THE COURT:  Go ahead.

2          MS. GOLDBARG:  There's one additional number, and

3   that would be foreign law enforcement, and that's where we

4   are going to have some of the issues as well.

5          Those that did seizures in foreign countries, they

6   did the lab reports in foreign countries, that number we're

7   looking probably somewhere between 10 and 15 as well.

8   Those are the ones that are time consuming.  Those are the

9   ones that we have to make official requests to the foreign

10  government.  And we have to ensure that they have passports,

11  and we have to ensure that they get the proper visa

12  paperwork and so forth.

13         I know that defense counsel has kindly agreed to

14  stipulate to everything.  We would -- we will be --

15         THE COURT:  He is.

16         MS. GOLDBARG:  We will be responding, relying on

17  Old Chief, so.  But that's another figure to take into

18  consideration.

19         THE COURT:  So let's -- the two categories that

20  you've put your finger on are one of the two categories that

21  I have concerns about.

22         A foreign law enforcement official for whom

23  logistics have to be -- logistical steps have to be made,

24  and that takes time and whatever.  And based on your

25  description of this case, I assume some of them are from

1  Mexico and some are not from Mexico.

2          MS. GOLDBARG:  Absolutely correct, Your Honor.

3          THE COURT:  All right.  Now -- okay, let's put

4  that aside for a second.

5          Out of U.S. cooperators, the estimate was -- the

6  guesstimate was six, okay.  My concern about those is a

7  little different.  The concern about those is they're in

8  custody in foreign countries, some may be, some may not be.

9          MS. GOLDBARG:  We wouldn't -- we have no intention

10  of calling any witnesses that are in custody in foreign

11  countries.

12          THE COURT:  Okay.  Well, that makes that a little

13  easier then, because that sometimes is extremely complicated

14  with foreign law enforcement and government officials.

15  So okay, that takes that off the table.

16          So the out-of-U.S. cooperators, at least to your

17  knowledge, are not in custody in a foreign country?

18          MS. GOLDBARG:  Correct.

19          THE COURT:  Okay.  And the ones who are

20  cooperating in the U.S., which you guesstimated 20 to 25,

21  how many would you guesstimate of those are in custody?

22          MS. GOLDBARG:  Twenty to 25.  And some of them are

23  in --

24          THE COURT:  Facilities that it takes a while to

25  coordinate getting them here.

1          MS. GOLDBARG:  That would be a fair way to say it,

2   Your Honor.

3          THE COURT:  There are.

4          There are some facilities that it takes --

5   actually it takes months of lead time to coordinate their

6   transportation, their transferal here and housing here;

7   it has to be worked out in advance obviously so it doesn't

8   just happen.  You know, the judge picks up the phone and

9   tells, hey, send this guy out here.  That's not the way it

10  works.

11         MS. GOLDBARG:  That's correct, Your Honor.

12         THE COURT:  So all right.  This gives me at least

13  some sense of the scope of the potential complexity that we

14  might have down the road.  I understand.

15         And also, also -- it also gives me a sense of what

16  might be the duration of the trial.

17         MS. GOLDBARG:  Yes, Your Honor.

18         THE COURT:  I mean, if the witnesses are somewhere

19  in the -- north of 30, and I'm being conservative based on

20  your description, this could be a two- to three-month event

21  that pretty easily, with translators, it slows everything

22  down, as you know.

23         MS. GOLDBARG:  Yes.

24         THE COURT:  And obviously, we're going to have a

25  translator, so...

1          MS. GOLDBARG:  It would also depend on

2    Mr. Balarezo's cross-examinations as well.

3          THE COURT:  He's pretty succinct.

4          Are most of the witnesses English speakers or not?

5          MS. GOLDBARG:  No, Your Honor.

6          THE COURT:  Well, then, it will be two months.

7    I'm thinking two to three months.

8          MS. GOLDBARG:  Yes, Your Honor.

9          THE COURT:  Now, Balarezo has got a very busy

10   trial schedule.

11         MR. BALAREZO:  Actually, I have all the time in

12   the world, Your Honor.

13         THE COURT:  You've been pleading them left and

14   right, huh, Eduardo?

15         MR. BALAREZO:  They've gotten a trial, so I have

16   to do that.

17         THE COURT:  All right.  You want to try this in

18   the spring?

19         MR. BALAREZO:  I think my calendar says I would

20   like to try it as soon as possible, hopefully within the 70

21   days, but I can understand the situation.

22         THE COURT:  Well, there's going to be motions,

23   obviously.  And I can't ask you what motions you're going to

24   file until you've had a chance to look at the discovery.

25         MR. BALAREZO:  That's right.

1          THE COURT:  We're going to get you the discovery,

2    we're working on that right now.

3          And obviously, it should be obvious, I'm not going

4    to grant the motion to send this case back to someone else

5    because at this point I don't think I have a basis to do so.

6          So I'm in agreement with him at the moment.

7    If such time comes where I think it's appropriate, then I'd

8    revisit the issue; but as of now, I don't have a basis,

9    I don't believe, to send this case back to some other judge.

10          I agree with Mr. Balarezo's analysis:  It's not a

11    related case at this point based on my knowledge of this

12    case.  But I don't have a basis to think otherwise.

13          I don't have a lot of details.  The indictment is

14    pretty succinct and pretty narrow in terms of information,

15    it's not what you referred to in the vernacular as a

16    speaking indictment, and it's not a speaking indictment.

17          MS. GOLDBARG:  It is not.

18          THE COURT:  There's not a lot there.

19          MR. BALAREZO:  I think they call it a mute

20    indictment.

21          THE COURT:  A mute indictment.

22          MS. GOLDBARG:  Simplistic.  Essential.

23          THE COURT:  Yeah.  So --

24          MS. GOLDBARG:  Legally sufficient.

25          THE COURT:  So we've got a pretty -- we've got a

1  pretty narrow field of knowledge, at least I do, as to

2  what's going on here.

3          MS. GOLDBARG:  The government did try to provide a

4  little more detail to the Court in its motion for pretrial

5  detention, which we're hoping provided a little bit more of

6  a background, as well as the complex case.

7          THE COURT:  I know I've reviewed it, but that's a

8  while ago.  I have to go back and look at that a little bit

9  more.

10         But based on what I know at the moment, I just

11  don't have a basis, I don't believe, to send this back in a

12  related case to Judge Howell, so I'm not going to do it.

13         MR. BALAREZO:  Your Honor, can I just note

14  something with respect to the government's motion for

15  complex-case designation?

16         THE COURT:  I haven't ruled on that one yet.

17         MR. BALAREZO:  I understand.

18         THE COURT:  As of now, I don't see how I could.

19  I mean, frankly, it may be, though, down the road, that it

20  might be appropriate to do it.  But at the moment, I don't

21  see any basis to do that.

22         MR. BALAREZO:  That just may be one of those

23  situations where I have nothing to say on the matter.

24         THE COURT:  Yeah.  I think at the moment,

25  Mr. Balarezo, I'm not granting it.

1          MR. BALAREZO:  That's fine.

2          THE COURT:  I'm leaving open the possibility I

3   might need to do it down the road because of other issues

4   and added complexity.

5          I'm anticipating, based on what counsel for the

6   government just told me, that she's going to be filing

7   motions, at least one motion, I think she said, a 404(b)

8   motion in the near future, which will toll, obviously, toll

9   the statute.

10         And once we can get you some evidence, obviously

11  you're going to review it, and then I'm going to have a

12  hearing, after you've had a chance to review it, to see what

13  motions you're planning on filing and then have a schedule

14  for filing the motion.

15         MR. BALAREZO:  Your Honor, I understand that.

16  And whatever motions that the government files, if there's

17  any objections to be made, obviously, I'll file my

18  opposition as soon as possible.  And I would just ask, of

19  course, the Court to resolve the issues as expeditiously as

20  it can.

21         THE COURT:  I will.

22         MR. BALAREZO:  Because I understand the tolling,

23  the motions will toll the speedy trial, but I also don't --

24  and I'm not suggesting that the government would do it, but

25  I'm also concerned that motions will be filed just to toll

1    the clock, given the government's request, and I think my

2    client deserves his day in court, and that's where we're

3    headed to.

4              THE COURT:  I agree with that completely,

5    especially since he's outside the United States, not in his

6    home country.  And obviously, the Court wants to be as

7    protective as possible of his time in jail, his freedom.

8              So start with the good news, Mr. Balarezo.

9    I've got a five-week trial scheduled starting the middle of

10   January.  When that trial is done, I don't have a trial

11   scheduled the rest of the year.  So if you want to try this

12   case in the spring, you know, maybe leaving in due time for

13   things like motions and hearings and complexities that are

14   going to arise, I think we could start this trial in the

15   spring.

16             MR. BALAREZO:  Spring being?

17             THE COURT:  April, March, April, maybe, something

18   in that time frame.

19             I've got a bunch of civil cases likely to go to

20   trial, but they always get bumped for criminal cases.

21             MR. BALAREZO:  As they should.

22             THE COURT:  And they know that, of course.  I just

23   tell them go mediate or something.

24             But, you know, I think we could -- I think I could

25   see -- and this would be, of the criminal cases I have

1   pending right now, this would get the highest priority, for

2   the reasons I've just stated, you know.

3   So I mean, I think we could try this case in the

4   spring.  I'm not prepared today to say, okay, block the

5   month of April, May and June, but, you know, it might

6   take -- if it's 30-plus witnesses and it's in Spanish, it's

7   going to take at least two months.  I don't see any way it's

8   going to be less than two months.

9   And I'm not even counting on what case you might

10  want to pup on.  I'm talking about just getting through

11  their case, the government's case.  You're looking at a

12  two-month trial probably minimum.  Probably, right?  I mean,

13  I don't think I'm exaggerating this to say that.  I think

14  it's a two-month trial minimum.  It could even be a

15  three-month trial, maybe even a four.

16  MR. BALAREZO:  And that's assuming the government

17  calls all the witnesses that they list.

18  THE COURT:  Well, that's true, too.

19  They may change their mind and decide, you know,

20  my experience has been -- and I've had, I think, five or six

21  trials that have been over two months long.  My last one was

22  four and a half months.  But that was six defendants, 18

23  weeks.  That was just two years ago.  I've experienced some

24  long trials, and I'm sure it's been years, so less is more.

25  The government has to be careful about over-trying

1   its case, and you have to be careful about

2   over-cross-examining.  I think both sides have to be careful

3   about that.  Less is usually more, especially for jurors,

4   so.  You'll hear that theme more than once before you're

5   done in this room.

6        MR. BALAREZO:  I remember, Your Honor, I tried my

7   first federal case with you, I think.

8        THE COURT:  I know you did.  You have a good track

9   record in this courtroom.

10       What else do we need to talk about?

11       MR. BALAREZO:  Well, Your Honor, for -- I think

12  more importantly for us is we'd like to have discovery as

13  soon as possible.  I understand it's going to be on a

14  rolling basis, but we --

15       THE COURT:  Well, I think step one is protective

16  order.  I'm expecting to receive within the next couple of

17  days a revised, proposed, hopefully, jointly proposed

18  protective order.  If it's something everyone agrees to,

19  I can sign it, and you're off to the races, as far as I'm

20  concerned.

21       I'm going to set, for control purposes, a status

22  hearing, you know, a couple weeks out so that we can just

23  see how things are going.  But I'm expecting to receive in

24  the mail, so to speak, in the next couple of days, a revised

25  protective order.  And, you know, I'm hoping -- here, I'll

1    tell you what.  I'll set a hearing for the 23rd of December.

2    I hope you're not going on any fancy vacations there,

3    Mr. Balarezo.  I know I'm not.

4              MR. BALAREZO:  I'm not.  I'm a man of the people.

5              THE COURT:  That's what I like about you.

6              All right.  So the 23rd at 2:30, a status.

7    Just see how things are progressing on the discovery front,

8    make sure everything is rolling.

9              We want that -- we want that discovery rolling in

10   because, you know, sometime in January, I'm going to have to

11   put to you the question, what motions do you need to file,

12   and you're going to need to see the stuff in order to answer

13   that question.

14             MR. BALAREZO:  I understand.

15             THE COURT:  2:30?

16             MR. BALAREZO:  That's fine, Your Honor.

17             THE COURT:  The 23rd?

18             MS. GOLDBARG:  That's fine, Your Honor.

19             THE COURT:  All right.

20             MR. BALAREZO:  Your Honor --

21             THE COURT:  Yes, sir.

22             MR. BALAREZO:  -- I understand that the government

23   does have discovery today, but it's in electronic form.

24   So based on the Court's concerns, it won't be turned over to

25   me.

1          THE COURT:  Yeah.

2          MR. BALAREZO:  I would ask that whatever that

3    discover is, if it could be produced as soon as possible,

4    I would abide by the most restrictive conditions until we

5    agree to a joint protective order.

6          THE COURT:  Well, hopefully, they're going to be

7    giving you non-protective order materials.

8          MR. BALAREZO:  I don't know.

9          THE COURT:  So we won't have the issue as to

10   those.

11         MS. GOLDBARG:  The government will simply have to

12   take the CDs and print out, just print out the documents

13   that we feel would not fall underneath the protective order.

14   We can arrange with defense counsel to have those produced.

15   And we're hoping that -- what day is today?

16         MR. BALAREZO:  Tuesday.

17         THE COURT:  Tuesday.

18         MS. GOLDBARG:  Hopefully within, either this

19   evening or tomorrow, we could provide to defense counsel a

20   revised protective order and get it to the Court by the end

21   of the week.

22         THE COURT:  Sounds good.

23         MS. GOLDBARG:  And, again, we will start Bates

24   stamp numbering and printing.

25         MR. BALAREZO:  That's what I'm saying.

1          I appreciate that, but what I'm saying, though, is

2  if they can get it to me this afternoon, I will abide by,

3  again, the most restrictive condition that the Court

4  until -- meaning that I will not share with anyone except my

5  client, and I won't give it to him, I would --

6          THE COURT:  He can't keep them.

7          MR. BALAREZO:  Right.  I would speak to him;

8  I would review it with him.  I just want to see what's there

9  so that we can get this moving, given --

10          THE COURT:  I had a shocking revelation a few

11  years ago in my MS-13 murder, racketeering trial when one of

12  my defense counsel informed the Court that the discovery in

13  that case he had left with his client at the jailhouse.

14  I might add, a client whose cell had been searched earlier,

15  and they found a bootlegged copy of the cell assignments of

16  all inmates at the D.C. jail.  So we're not going to have

17  that problem in this case or any of my other cases, I might

18  add.

19          MR. BALAREZO:  I was involved in that case, but

20  that was not me.

21          THE COURT:  You had nothing to do with that.

22          MR. BALAREZO:  Ms. Goldbarg is aware.

23          THE COURT:  But we are not going to have that

24  problem ever again.  So he can look at it in your presence,

25  take it back.

1          MR. BALAREZO:  That's fine, Your Honor.

2          And the reason I'm making that request is because

3    I was hoping to visit him for tomorrow for a good part of

4    the day.  So I'd like to, if possible, I'd like to make good

5    use of my time so he can --

6          THE COURT:  They'll do their best to get you

7    stuff.

8          MS. GOLDBARG:  The likelihood of us being able to

9    produce it today is going to be low, given that we have

10   commitments until --

11         THE COURT:  Try to get it to him by noon tomorrow.

12         MS. GOLDBARG:  Yes, Your Honor.

13         THE COURT:  Then he can take it with him and go

14   over to the jail and go over the non-protective order stuff

15   that you have available already.

16         MS. GOLDBARG:  Yes, sir.

17         THE COURT:  Get it to him.  That would be good.

18   Mr. Balarezo is a reasonable man.

19         MR. BALAREZO:  I try.

20         THE COURT:  At least in my experience.  I'll tell

21   him when he's not.

22         MR. BALAREZO:  I don't think Ms. Goldbarg would

23   agree, but...

24         MS. GOLDBARG:  Depends on the day.

25         THE COURT:  I'm not shy either.  I'll tell him

```
 1   when he's not being reasonable.  I'll tell you when you're
 2   not being reasonable.
 3              MS. GOLDBARG:  Absolutely.
 4              THE COURT:  Any other issues?  Mr. Balarezo?
 5              MR. BALAREZO:  I think that resolves all three
 6   motions that were pending, or at least addresses the three
 7   motions that were pending.
 8              Your Honor, with respect to the Mexican lawyers,
 9   as I said, I think Attorney Delgado will be in the country
10   shortly, and I expect that he will provide me the
11   documentation.  We haven't forgotten and we're not --
12   we will provide it to the Court as soon as I get it.
13              THE COURT:  I know.  Believe me, my dealings with
14   bar associations has been that they're invariably slow.
15              And we're now approaching, as you well know -- I'm
16   sure you're well-aware, we're now approaching the season
17   where in certain foreign countries, I'm not quite sure about
18   Mexico, but in Colombia, I know, in the season running up to
19   Christmas and during Christmas --
20              MR. BALAREZO:  There's nothing.
21              THE COURT:  Shut down.
22              MS. GOLDBARG:  This is the last week that you can
23   pretty much get anything done in Mexico.
24              THE COURT:  Shut down.
25              So if they want to get access to this defendant,
```

1    they've got to come up with the goods, and they've got to

2    come up with them soon.

3              And I want government to see them too.

4    I don't want there to be any issue here about whether they

5    are appropriate documentation, et cetera, because

6    I don't really want to have a hearing on that if I can avoid

7    it.  I want everyone to be on the same page.

8              And, you know, as of now, until going forward, if

9    I approve them seeing him, because I've seen all the

10   documentation and whatever, I want you present.

11             MR. BALAREZO:  That's fine, Your Honor.

12             THE COURT:  I want you present.

13             All right.  Anything else for the government?

14             MS. GOLDBARG:  Not on the government's side.

15   Thank you very much, Your Honor.

16             MR. BALAREZO:  Your Honor, there is, but I'd like

17   to approach and it will be very brief, ex parte, very brief.

18             THE COURT:  About this case?

19             MR. BALAREZO:  About this case.

20             THE COURT:  All right.

21             Can you turn that up a little and make that a

22   little louder, please.

23             (Bench conference)

24             (Thereupon, sealed proceedings were held and are

25   under a separate transcript cover.)

1          (Open court)

2          THE COURT:  All right.  Very good.  Anything else

3    for the government?

4          MS. GOLDBARG:  Yes, Your Honor.

5          The defendant made his initial appearance in the

6    United States on the 17th of November.  My understanding of

7    the record is that none of the time has been excluded,

8    therefore would be counted against speedy trial.  And the

9    government would request that based on the motions filed by

10   the government, we understand that the Court ruled on one of

11   the motions, the motion to transfer has been denied,

12   I believe.  The Motion for Protective Order is, I think that

13   would still be pending?

14         THE COURT:  Well, it's kind of up in the air until

15   we get it worked out.  But it's being granted in part and

16   denied in part.  Granted in part in that I believe a

17   protective order is appropriate, denied in part to the

18   extent that it applies to every single piece of paper.

19   So I think we should have, you know, an understanding that

20   some paper doesn't have to be covered by the protective

21   order, some can be.  And then the details as to how it's

22   structured is just in question.

23         And then I already granted Defendant's Motion to

24   Strike the Appearances of Zapp and Rocha, that's already

25   been granted.

1          And I've denied, as of today, the government's

2     motion for a complex case status.

3          So all of those motions have been filed and ruled

4     on today.

5          So as far as the Court's concerned, the

6     Speedy Trial Act is tolled from the time those motions were

7     filed and today.

8          MS. GOLDBARG:  And the government, based on the

9     pending discovery, the government would ask in the interest

10    of justice and to allow defense counsel sufficient time to

11    receive and to review discovery that the Court would toll

12    speedy trial from today's date until the next status

13    conference, which the Court has set for December 23rd.

14         MR. BALAREZO:  Your Honor, I object to the extent

15    that it's -- if the government is requesting time to produce

16    the material, that's one thing, but to the extent that

17    they're requesting time for me to be able to review it,

18    I object.  I'll review it in the time that I have.

19         I would object to any further tolling of the

20    speedy trial at this time, obviously pending any additional

21    motions or a decision by the Court that the case is complex.

22         THE COURT:  All right.

23         So -- well, there's still a motion pending for a

24    protective order.  I haven't ruled on that finally.  So that

25    would be tolling the statute between now and the 23rd.

1          I expect by the 23rd of the month, we will have

2     resolved this issue on the protective order.  And so

3     I don't think it will be necessary, but, you know, to have

4     that motion pending at that point.  So between now and the

5     23rd, that motion that pretrial has been tolled until such

6     time as this is resolved.

7          MS. GOLDBARG:  Thank you, Your Honor.

8          MR. BALAREZO:  And, Your Honor, I'll just add to

9     that, I would suggest, and I'll speak with Ms. Goldbarg

10    about this, that whatever joint submission we make to the

11    Court should be along the lines of what was ultimately

12    ordered by Judge Kotelly in exactly a similar situation.

13          If I could just hold one second.

14          (Pause)

15          MR. BALAREZO:  Your Honor, I apologize.

16    We'll discuss it.  I'd still suggest that Judge Kotelly's

17    final order is appropriate with -- but with the limitations

18    that this Court has imposed on access.

19          THE COURT:  I always look carefully at whatever

20    Judge Kotelly does.  She's highly regarded by me and others

21    too.  But whether I'll agree with it completely or not, I

22    don't know yet.

23          MR. BALAREZO:  Right.

24          THE COURT:  I have to wait and see.

25          But I will hope that maybe you'll come up with a

1   version of that that's agreeable to both sides, and I'll

2   take, you know, I'll sign it, that way it will be easy,

3   but...

4            MR. BALAREZO:  I'm available 24 hours a day to the

5   government to discuss this, Your Honor, so there's no

6   further delay or tolling of the statute.

7            THE COURT:  Make sure Tim has both your cell phone

8   numbers in case I need to reach you.

9            MS. GOLDBARG:  Thank you, Your Honor.

10           MR. BALAREZO:  Thank you, Your Honor.

11           THE COURT:  All right.  All set?

12           MS. GOLDBARG:  Nothing further for the government.

13  Thank you, Your Honor.

14           THE COURT:  Have a good day.

15           MR. BALAREZO:  Thank you, Your Honor.

16           DEPUTY CLERK:  All rise.  This Honorable Court now

17  stands in recess until the return of Court.

18           (Proceedings concluded at 12:44 p.m.)

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date:_March 23, 2015_____   /S/__William P. Zaremba_____

                           William P. Zaremba, RMR, CRR