IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           )
                                    )
              Plaintiff,            )    CR No. 12-184
                                    )
                                    )    Washington, D.C.
         vs.                        )    January 16, 2015
                                    )    11:43 a.m.
ALFREDO BELTRAN LEYVA,              )
                                    )
              Defendant.            )
_____)


TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:        ANDREA GOLDBARG
                           Assistant United States Attorney
                           555 4th Street, N.W.
                           Washington, D.C. 20036
                           (202) 252-7785


For the Defendant:         A EDUARDO E. BALAREZO
                           Balarezo Law
                           400 5th Street N.W.
                           Suite 300
                           Washington, D.C. 20001
                           (202) 639-0999
                           info@balarezolaw.com



Court Reporter:            William P. Zaremba, RMR, CRR
                           Official Court Reporter
                           U.S. Courthouse
                           333 Constitution Avenue, NW
                           Room 6511
                           Washington, D.C. 20001
                           (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
1                    P R O C E E D I N G S
2              DEPUTY CLERK:  Please be seated and come to order.
3              (Defendant present.)
4              DEPUTY CLERK:  Your Honor, calling Criminal Case
5    Number 12-184, the United States of America v. Alfredo
6    Beltran Leyva.
7              The Defendant is present in the courtroom,
8    Your Honor.
9              The interpreter for these proceedings is
10   Ms. Estrada.  She has been sworn for the record.
11             Counsel, please approach lectern, identify
12   yourself for the record.
13             MS. GOLDBARG:  Good morning, Your Honor.
14   Andrea Goldbarg on behalf of the government.  Also present
15   is Angela Ancalle, paralegal for the government on this
16   case.
17             THE COURT:  Welcome.
18             MR. BALAREZO:  Good morning, Your Honor.
19   Eduardo Balarezo on behalf of Mr. Beltran Leyva.
20             And Happy New Year to you.
21             THE COURT:  Happy New Year, Mr. Balarezo.
22             Before we sit down there, Mr. Balarezo, I got a
23   question for you.
24             MR. BALAREZO:  A question?
25             THE COURT:  I do.
```

1          I got a document the other day from you,

2   I don't have it in front of me, unfortunately, but I'll do

3   it by memory.  It had a list of about seven people that you

4   say are on your trial team?

5          MR. BALAREZO:  That's right.  I filed it two days

6   ago, I believe, Your Honor.

7          THE COURT:  Yeah.

8          MR. BALAREZO:  Does the Court want a copy?

9          THE COURT:  Well, I have it back in my office.

10          MR. BALAREZO:  The Government has a copy; I have

11  my copy.

12          THE COURT:  It appeared at first blush that at

13  least two or three of them aren't people who have worked in

14  your firm.

15          MR. BALAREZO:  Correct.

16          THE COURT:  They're third-party lawyers in this

17  case.

18          MR. BALAREZO:  Correct.

19          THE COURT:  Have they entered appearance in this

20  case?

21          MR. BALAREZO:  They have not entered an appearance

22  in this case, no, that's correct.

23          THE COURT:  Are they planning on doing that?

24          MR. BALAREZO:  If necessary, they will.

25          THE COURT:  What do you mean, if necessary?

1          MR. BALAREZO:  Well, Your Honor, my understanding

2  is that these attorneys can, number one, represent Mr. Leyva

3  in this matter without entering an appearance in the case as

4  Counsel of Record, just like I could be representing

5  somebody in a matter that is not in court, they're still an

6  attorney for the individual.

7          THE COURT:  Uh-huh.

8          MR. BALAREZO:  Number one.

9          Number two, my intention is that if, for example,

10  Mr. Purpura --

11          THE COURT:  Mr. Who?

12          MR. BALAREZO:  Purpura, the second person on

13  the -- William Purpura.

14          THE COURT:  I don't know him.

15          MR. BALAREZO:  He is an attorney in Baltimore.

16  He and I have tried seven or eight cases together of this

17  type.  He and I have tried a capital case in Baltimore.

18  He has tried several cases in this court before Chief Judge

19  Roberts, Judge Collyer.  So he is known to many of your

20  colleagues on the bench.

21          THE COURT:  Okay.

22          MR. BALAREZO:  Mr. Purpura is an attorney whom

23  I work with frequently in matters that do go to trial.

24          Also, Judge Kessler.  He and I tried a case with

25  Judge Kessler.

1          And he would, if this matter were to go to trial,

2     he would be my co-counsel at trial.  So that's why I listed

3     him with his consent in order so that I may be able to

4     discuss some of these matters, and also, if necessary,

5     prepare for trial under the conditions that the Court

6     appears to be ready to impose.

7          Mr. Tun, I think the Court is familiar with

8     Mr. Tun.

9          THE COURT:  Yes, I've had cases with him.

10          MR. BALAREZO:  Same thing with Mr. Tun.  He may

11     not be on the trial team if this matter were to go to trial,

12     but he's another attorney with whom I consult regularly on

13     various matters, strategy, tactics.

14          You know, all these documents are presumably going

15     to be in Spanish, so I don't think he's going to have, need

16     access for them, but he -- him, for example, I put down out

17     of an abundance of caution so that there is no issue about

18     the defense speaking with other parties regarding the

19     discovery, although I don't believe that that is a condition

20     that the Court would impose nor could impose, with all due

21     respect.

22          And then I listed the Mexican attorney, so...

23          THE COURT:  So besides yourself, there's three

24     other members of this bar?

25          MR. BALAREZO:  Two others.  William B. Purpura,

```
 1    the letter B and C, Harry Tun, Esquire, Your Honor.

 2              THE COURT:  And they have attorney -- they've

 3    entered into an attorney-client relationship with your

 4    client?

 5              MR. BALAREZO:  I intend to retain them -- I intend

 6    to retain them on behalf of Mr. Leyva, which is also a

 7    common practice, in my business, at least.

 8              THE COURT:  And you believe under the D.C. ethics

 9    rules that's enough to give them an attorney-client

10    relationship with your client?

11              MR. BALAREZO:  Absolutely, Your Honor.

12    Absolutely.

13              THE COURT:  All right.  The next time we have a

14    hearing, I want the two of them here.

15              MR. BALAREZO:  Okay.

16              THE COURT:  And I want to have a discussion with

17    them about the Court's perspective on the sensitivity of the

18    handling of materials and information regarding this case.

19              MR. BALAREZO:  Right.

20              THE COURT:  Obviously, it's one thing if someone

21    works in someone's law firm, which I kind of assumed might

22    be the case.

23              But here, these are attorneys, I'm not questioning

24    their ability or their ethics or anything, nothing, I'm not

25    questioning anything about them.  Indeed, I do know Mr. Tun,
```

```
 1   and he's a fine lawyer, and I've had a number of cases with
 2   him.
 3             But I want them to hear firsthand from me how I
 4   feel this case has to be handled with great care and
 5   sensitivity in terms of the information that's being
 6   provided, even though there's a protective order,
 7   I understand -- well, there will be one, hopefully, we'll
 8   get some agreement on this thing.
 9             And, of course, that'll be true also of those
10   Mexican lawyers at the appropriate time.
11             So when we set the next hearing, I'd like the two
12   of them to be here.
13             MR. BALAREZO:  Very well, Your Honor.
14             Should I remain at the lectern or --
15             THE COURT:  Want to give me an update on the
16   protective order?  How's that coming?
17             MR. BALAREZO:  Well, Your Honor, I recently
18   filed -- well, the government recently filed a second motion
19   for protective order to which I filed an opposition.
20   The government filed a third supplemental motion for a
21   protective order on Document 30, I can't see the date here,
22   January the 13th or so, and I filed my opposition to that
23   too, Your Honor.
24             The -- the --
25             THE COURT:  I haven't had a chance to read them
```

1   yet.  I just started a six-week trial on Monday, so...

2              MR. BALAREZO:  I understand, Your Honor.

3              THE COURT:  I'll look at it.

4              MR. BALAREZO:  This is Mr. Beltran's position.

5   The -- and as a legal matter, we believe that the government

6   still has not presented the Court with any facts to support

7   the protective order.  That's just the legal arguments that

8   we made citing the case law, et cetera.

9              THE COURT:  Okay.

10             MR. BALAREZO:  As a practical matter, we object to

11  the protective order.  We're not seeking a protective order.

12  So for the Court to ask Mr. Beltran to agree to language in

13  a protective order which the government is seeking, is not

14  something that we're willing to do at this point.

15             If the government has laid out its position, we've

16  made an opposition, I would respectfully ask the Court to

17  rule on the motion at this point, because I don't see --

18             THE COURT:  Well, I've already told you a number

19  of times, there's going to be a protective order.

20             MR. BALAREZO:  Right.  I understand.

21             THE COURT:  The only question is what the contents

22  of it is.

23             MR. BALAREZO:  I understand.

24             THE COURT:  That's where the only dispute is.

25  There will be one.

1           MR. BALAREZO:  Right.

2           THE COURT:  There's no question about it.

3           MR. BALAREZO:  But I -- what I, as I mentioned

4    last time we were before the Court, I am concerned on a

5    certain level that an agreement by me as his counsel to the

6    protective order may raise any issues later on.  That's why

7    I have set forth Mr. Beltran's position with respect to the

8    opposition.  We're not seeking one, we don't want one, we

9    don't believe that one is necessary on the record.  And I

10   think basically it's teed up for the Court at this point.

11          And so that, you know, we're not trying to -- we

12   want to get moving on this.  We're not trying to belabor the

13   point, but I think -- I just want the Court to understand

14   what our position is.

15          THE COURT:  Yeah.

16          And with regard to the specifics set forth in it,

17   what in particular, what you've just articulated is what

18   I would characterize as an omnibus objection to the whole

19   concept of having one, the circumstances not warranting it,

20   et cetera, et cetera, et cetera.

21          Now, let's, for the sake of discussion, say I

22   don't buy that.  Now we're looking at the details, okay?

23          MR. BALAREZO:  Right.

24          THE COURT:  So tell me, if you will, as to any

25   particular detail in that document, what, if any, objection

1    you have based on law or the Constitution, or whatever,

2    maybe just common sense, that you feel is -- this is not an

3    appropriate requirement or restriction for us to have to

4    operate under, over on the defense team.

5              MR. BALAREZO:  Well, the most disturbing portion

6    that the government suggested was new language which came in

7    the third supplemental motion; and that was language that,

8    quote, the defendant and individuals approved by the Court,

9    unquote, would be restricted from sharing the contents of

10   the materials with anyone other than defense counsel or

11   members of the defense team.

12             THE COURT:  Counsel.

13             MR. BALAREZO:  Now, we're not talking about

14   sharing the materials, we're talking about sharing the

15   content.

16             So the government now is seeking an order

17   prohibiting Mr. Beltran from discussing the language --

18   excuse me, discussing the contents of the discovery with

19   anyone.  We're not talking about just with his lawyers,

20   you know, which, obviously, they can't do.  But I think that

21   infringes upon his First Amendment right to free speech,

22   number one.

23             Number two, the restrictions upon individuals

24   approved by the Court, presumably that would refer to our

25   paralegals or investigators who, presumably, as members of

1    the defense team, would have access to the material --

2              THE COURT:  Yeah --

3              MR. BALAREZO:  -- at some point.

4              THE COURT:  -- they would.

5              MR. BALAREZO:  It would prevent them from doing

6    their job.

7              For example, again, an investigator who may have

8    to go to Mexico, or an investigator I may have to hire in

9    Mexico to look for something or talk to someone, can't talk

10   to that someone about what it is they want to talk to them

11   about.  It just makes no sense.  It's like it's -- it's a

12   gag order that the government is seeking to impose upon the

13   defense.

14             They don't want us to -- they don't want us to

15   share the documents with anyone else, they don't want us to

16   talk about the content of the documents with anyone else.

17   So now we have -- we're like the three monkeys around here.

18   We've got hear no evil, see no evil, speak no evil.

19   It's untenable for us to be able to defend Mr. Leyva in this

20   case.

21             THE COURT:  That makes no sense, so we're going to

22   have to hear what the Government has got to say.

23             But I have no problem, zero, with you're not being

24   able to Xerox them, give them to someone else, other than

25   counsel in the case, and the defendant -- can be reviewed

1    with the defendant.  I have no problem with that at all.

2    Of course, you can't give the defendant a copy of them --

3              MR. BALAREZO:  Right.

4              THE COURT:  -- because he can't have them at the

5    jail, to say the least.

6              MR. BALAREZO:  And just so the Court is aware.

7              THE COURT:  You're not objecting to that, frankly.

8    That's not --

9              MR. BALAREZO:  Well, I did object to that

10   initially, because as I said to the Court previously, my

11   practice, typically in cases, even in federal cases with the

12   U.S. Attorney's Office or other offices, is if there's a

13   voluminous discovery, is to provide copies of client-related

14   material to the client so that the client can review them.

15             THE COURT:  Yeah.

16             MR. BALAREZO:  And I understand the Court already

17   explained.  So I've lodged my objection.

18             THE COURT:  Yeah.

19             MR. BALAREZO:  And, you know, we can move on.

20             THE COURT:  Yeah.  We just can't, in this case,

21   have that approach, which probably is workable in 85, 90

22   percent of the cases.

23             MR. BALAREZO:  Right.

24             THE COURT:  But not in this case because of the

25   circumstances that I've already put on the record and are of

1   grave concern to the Court that have occurred in Mexico in

2   the aftermath of his being taken into custody and being sent

3   to the United States at some point.

4         So you and the other counsel and, of course,

5   Mexican counsel at some point are going to be able to not

6   only review them and discuss them among yourselves, but

7   review them and discuss them with your client, of course.

8         MR. BALAREZO:  And, Your Honor, just so the Court

9   is aware, so far we've gotten, as I mentioned in one of my

10   latest filings, 74 pages of material that was related to

11   Mr. Beltran's arrest in Mexico in 2008.  And the bulk of the

12   material was photographs of weapons that were supposedly

13   seized, funds that were supposedly seized.

14         THE COURT:  Uh-huh.

15         MR. BALAREZO:  There was no factual information,

16   for example, what I could tell, a report of this is what

17   happened at the time of the arrest, and X, Y, and Z took

18   place.  None of that was there.

19         But just so the Court is aware how I'm treating

20   this at this point, I have reviewed those materials with

21   Mr. Beltran while I was there at the jail with him.

22   I have not -- and that material was produced, is not

23   protected material.  I have not even produced that to anyone

24   until we resolve this issue, although the government

25   considers it non-protected, I just don't want to have any

 1   issues.

 2           I understand the Court's concerns, but again, I

 3   still believe that the government has not set -- made a

 4   record of the necessity, but we've talked about that.

 5           But I understand the Court's concern, I'm trying

 6   to abide by it, but I'm also trying to do my job.  And the

 7   restrictions that the government seeks to impose upon me are

 8   really going to hamper my ability to do that.

 9           THE COURT:  Well, obviously, the restriction that

10   I want to hear the government's position on in a minute is

11   not being able to discuss content with third parties.

12   I'm a little hard-pressed to understand how you could

13   prepare a defense in this case, especially when you have

14   potential witnesses in Mexico.

15           It's one thing to not be able to give them the

16   documents or even review them, review with them the

17   documents.  But to not be able to discuss the contents of

18   the documents with those people, I don't know how you can

19   prepare a defense realistically, unless you can do that.

20   I just -- maybe they have a theory on that, I don't have.

21           MR. BALAREZO:  I'd like to hear it, although it

22   really isn't their business how I conduct my defense.

23           THE COURT:  No.

24           MR. BALAREZO:  But I agree.  I can't do it,

25   Your Honor.

 1             THE COURT:  It's not your -- that's right.

 2    It's not -- it's not their concern how you construct your

 3    defense, but it seems like an unfair restriction in your

 4    ability to assemble your defense.  So I'll invite them to --

 5             MR. BALAREZO:  Would the Court like me to address

 6    all my issues or come back?

 7             THE COURT:  Well, if you want to go on to your

 8    next one, go ahead.

 9             MR. BALAREZO:  Your Honor, I also filed two

10    additional motions.  One was a motion to compel discovery of

11    the presumptively non-protected discovery.

12             THE COURT:  I thought we were producing that.

13             MR. BALAREZO:  Your Honor, all we had received to

14    date was discovery that was, I think, faxed to me, as the

15    government represented to you at the last hearing, I believe

16    on December the 10th, the day after the hearing.

17             THE COURT:  Uh-huh.

18             MR. BALAREZO:  And that was 74 pages of, again,

19    documents related solely to the detention of Mr. Beltran in

20    Mexico in 2008, photographs, multiple copies of the same

21    documents.  So out of the 74, perhaps you have half that

22    were individual documents.  And there was nothing there.

23             I mean, we know he was arrested in 2008.

24    But there was no documentation, again, no police report or

25    anything else detailing any facts of the issue.  It's just,

1    you know, documents were transmitted from one office to

2    another.  These are pictures, and that was it.

3           Quite frankly from our point of view, it's totally

4    useless and completely insufficient for us to be able to

5    prepare.

6           Now, that was over a month ago.  And the

7    government has already proffered -- or represented to the

8    Court that not all the material is protected.  So where is

9    it?

10          I did speak with Ms. Goldbarg this morning and

11   she'll explain to the Court why, perhaps, we don't have that

12   material.

13          But I will also -- I will also concede that the

14   government did provide discovery this morning, apparently

15   non-protected material.  One is in a CD ROM, which

16   apparently contains five videos which obviously I haven't

17   been able to review yet.  And also various photographs that

18   I will not share with the Court at this point, but they're

19   basically humiliating photographs of my client as he was

20   handed over by the Mexicans to the DEA on the day of his

21   extradition, which again, don't enlighten me as to any

22   issues with respect to the merits of the case.

23          And, you know, we're still waiting.  We --

24   Mr. Beltran has asserted his right to a speedy trial.

25   We still do so.  We're spinning our wheels right now,

1   because we don't know what the government has, and they're

2   not producing it.  So I ask the Court to compel the

3   government to produce the discovery that at least in their

4   opinion at this point is non-protected, although an order

5   has not been issued yet.

6           The second motion that we filed was a motion,

7   again, to compel disclosure of Brady evidence.

8           And, Your Honor, as I mentioned previously --

9           THE COURT:  Have you asked them if there is any

10  Brady evidence?

11          MR. BALAREZO:  I have.

12          In my discovery letter, I made very specific Brady

13  requests.  I personally requested material, and the

14  government has -- I believe the government will say that

15  they don't believe that what I'm requesting is Brady

16  material.

17          But what is in the motion is that the government

18  has previously specified a seizure in Tampico, Mexico, the

19  Port of Tampico, of approximately 11 or 12 tons of cocaine

20  in 2007 that they will somehow seek to attribute to

21  Mr. Beltran and will probably seek to introduce evidence of

22  at trial.

23          My understanding from other matters and just

24  general knowledge of the business, I suppose, is that some

25  of these loads were previously attributed by either the

 1  Mexican Government or the United States Government to other

 2  individuals.

 3          THE COURT:  Is Beltran really his last name?

 4          MR. BALAREZO:  Beltran is his last name,

 5  Your Honor.

 6          THE COURT:  Then why don't we change the

 7  caption --

 8          MR. BALAREZO:  That's what I --

 9          THE COURT:  -- because the record has to be kept

10  clear.

11          If his really last name is Beltran, then I think

12  the record, caption should be changed to the United States

13  versus Alfredo Beltran.

14          MR. BALAREZO:  Well, Your Honor, the caption,

15  I think, is Beltran Leyva.  His name is Beltran Leyva.

16  Beltran is his -- the convention is Beltran is his father's

17  last name, Leyva is his mother's last name.  That's how it's

18  done in Latin America.

19          THE COURT:  But I don't want a record that's all

20  messed up.

21          MR. BALAREZO:  I refer to him as Mr. Beltran.

22  That's his name.

23          That's like, as I said last time, my last name is

24  Balarezo.  I don't use my other name, I never use it,

25  because it's not done here, so...

```
 1              THE COURT:  We can't have a record that's all
 2    confused on this issue, just can't.
 3              MR. BALAREZO:  I could say Beltran Leyva if the
 4    Court prefers because that's how the caption reads.
 5              (Pause)
 6              MR. BALAREZO:  Beltran Leyva, Your Honor.
 7              I just asked my client what's his last name.
 8    He said Beltran Leyva.
 9              (Pause)
10              MR. BALAREZO:  And I apologize.  I know the Court
11    had previously, I mentioned -- asked me to say Leyva, but
12    I just --
13              THE COURT:  In our country, it's just too
14    complicated.  You're going to try this case using two last
15    names?
16              MR. BALAREZO:  I could do just Beltran,
17    Your Honor.  It's already in the caption, so it's not, I
18    don't think the caption would have to be changed.
19              I've had two prior clients that have the same --
20    both names were the same, it made it easier, but that's not
21    the case here.  Torres Torres, for example.
22              THE COURT:  It just seems unnecessarily cumbersome
23    to have a case where you use two last names.
24              I mean, in the caption, the last name is Leyva.
25    And I'm thinking way down the road, of course, to a time
```

1   when a trial is going on and it's constantly Mr. Beltran

2   Leyva, Mr. Beltran Leyva, Mr. Beltran Leyva, the

3   court reporter has to do two last names, the jury has to

4   hear two last names all the time, the witnesses.

5          MR. BALAREZO:  Your Honor, what I suggest --

6          THE COURT:  I'll give some thought to it.

7          I mean, to me, it doesn't make a lot of sense at

8   all, frankly.

9          MR. BALAREZO:  Your Honor, if I could make a

10   suggestion.

11          I'm looking for the indictment.  The caption of

12   the indictment is United States of America versus Alfredo

13   Beltran Leyva.  I would ask for the Court's approval of my

14   using Beltran when we discuss my client.  I don't think he

15   has any objection to that.

16          THE DEFENDANT:  No, no.

17          MR. BALAREZO:  And if this matter were to go to

18   trial, for example, the indictment is still Beltran Leyva.

19   We could just explain to the jury that it's Beltran Leyva,

20   but we will refer to him as Beltran.  I -- but that's way

21   down the line, so.

22          THE COURT:  All right.  Well, it's something to

23   think about.

24          MR. BALAREZO:  Thank you, Your Honor.

25          So, Your Honor, if can I continue with respect to

1   the Brady motion, as I said, my experience in just

2   knowledge, general knowledge, is that a couple of these

3   loads in particular have been attributed to other groups

4   and/or individuals.

5          In this particular case, the government had

6   previously told me on various occasions that the Tampico

7   seizure, which, as I mentioned, was about 12 tons of cocaine

8   in 2007, is -- the government will seek to attribute to

9   Mr. Beltran.

10          I, in looking at some of my files and in just

11   doing literally a two-minute Google search for the Tampico

12   seizure, I came up with a Mexican media report indicating

13   that the PGR, which is the -- well, it's the

14   Attorney General's Office, I won't say the Spanish, it's --

15   the Attorney General's Office in Mexico attributed that load

16   to the Gulf cartel and not the, quote/unquote, Beltran Leyva

17   cartel.

18          So our position is that, to the extent that the

19   government is in possession of information which would

20   indicate that any of these seizures that it seeks to

21   attribute to Mr. Beltran has either been attributed to other

22   people, other people have been prosecuted for or anything

23   like that, that it squarely falls within the ambit of Brady

24   and its progeny in that it could either be exculpatory,

25   helpful to the defense, helpful for impeachment or for

1   various reasons, and it should turn it over.

2   My understanding from my discussions with the government

3   this morning is that it will oppose that because its

4   position is that that material is not Brady.

5           I will also inform the Court that I have requested

6   information such as that in various other cases subject to

7   Brady and it has been produced because the courts considered

8   it to be Brady material.

9           So that's what I have at this point.

10          THE COURT:  How is it being attributed to your

11  client again?  He's not being charged with it, is he?

12          MR. BALAREZO:  That particular load?

13          THE COURT:  Yeah.

14          MR. BALAREZO:  Well, given that we don't have all

15  the information, my understanding is that the government --

16          THE COURT:  I mean, in this case here.

17          MR. BALAREZO:  In this case.

18          My understanding is that the government will seek

19  to introduce evidence of that seizure and cooperator

20  testimony with respect to that seizure to either indicate

21  that my client was an owner and/or investor in that

22  particular load, and that presumably that cocaine from that

23  load was destined for the United States.

24          THE COURT:  Well, what's the basis to believe that

25  they are going to do that, attribute it to your client?

1        MR. BALAREZO:  Personal discussions with the

2   prosecution.

3        THE COURT:  Oh, okay.

4        MR. BALAREZO:  And this morning, I -- another load

5   was mentioned, there was a load that was seized in

6   Manzanillo, M-a-n-z-a-n-i-l-l-o, the Port of Manzanillo in

7   Mexico, I don't recall the year, but there was a larger

8   seizure; and that the government may seek to attribute that

9   to my client as well.  But I have specific knowledge from --

10  of that particular seizure that I know the government,

11  another office of the government previously sought to

12  attribute it to, at least part of it to another client of

13  mine, number one.

14        And I believe that I had -- I did receive some

15  discovery with respect to that seizure in the other case.

16  I haven't looked at it yet, and there were multiple

17  individuals that were supposedly involved in that load, and

18  I can -- I'm 99.99 percent sure that Alfredo Beltran's name

19  was nowhere in those reports.

20        So that's the kind of information that I've been

21  seeking and that I think that the government needs to turn

22  over so that I can represent my client, and we believe that

23  it falls squarely within Brady.

24        THE COURT:  All right.

25        MR. BALAREZO:  Thank you, Your Honor.

1          MS. GOLDBARG:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MS. GOLDBARG:  I'll try to address these in turn.

4          With regards to the government's production of

5     discovery not subject to the protective order, we did

6     provide some documents today.  As we're getting them,

7     we will, and we are aiming to produce them on a rolling

8     basis.  The doors are blocking it.  We have a box of over a

9     thousand pages that we would like to produce, but only

10    subject to the protective order.

11         With regards to the protective order, at the last

12    status conference, I believe the government attempted to do

13    another joint protective order with defense counsel.

14         I think defense counsel has made it clear that he

15    will not be joining in the motion and that he will, I'm

16    assuming, respect any court order, which is why the

17    government filed a third protective order and not as a joint

18    protective order.

19         The language that defense counsel raised with

20    regards to defendant and individuals approved by the Court

21    to view the material, that language, we -- the government

22    asserted after discussions with the Court.

23         I don't know if the Court recalls where, obviously

24    the Court has expressed concern in terms of how this

25    material is going to be used and who's going to have access

1   to it.

2          The defense counsel made a representation that

3   perhaps he would want -- the defendant would want to share

4   this information with his brother, Hector, who is

5   incarcerated in Mexico.  The Court had some concerns about

6   that, so there was discussion between the Court and defense

7   counsel about submitting a list of names as to who defense

8   counsel would want to share the information with.

9          In response to that, the defendant did file his

10  notice of filing with names, which is Docket Entry No. 34.

11  We didn't see the defendant's brother's name on there;

12  we didn't see anyone else on there.  That language was

13  included at the Court's instructions.

14         We're producing things; we're ready to produce

15  things.  We do feel strongly that this information should

16  not leave the United States, should not be left with the

17  defendant in his jail cell; that we don't want to interfere

18  in his ability to represent his case, but again, when

19  defense counsel raised the issue of sharing the content of

20  this information with his brother and other people in

21  Mexico, the Court did express concerns with that, so this

22  language was added.

23         THE COURT:  Well, I think -- I don't have the

24  transcript in front me.  I think what I was concerned about

25  when we discussed it at that time was the idea of somehow

1    enabling his brother to see these documents down in Mexico.

2            MS. GOLDBARG:  Which, if the defendant sees them

3    and gets on the phone and calls his brother, he'd be able to

4    say, I saw ledgers, and these are all the names that I got

5    from it.

6            I don't know.  I don't -- I mean, again, I do

7    understand the Court's concern; the government shares the

8    concerns.  I'm not sure if there's really going to be any

9    way for us to prevent that.

10           But again, the reason that it was included in this

11   language was at, what we believe was the Court's

12   instructions.  If we got that wrong, you know, I take full

13   responsibility for that.

14           THE COURT:  Yeah.  I think it's -- I think the

15   practical realty is this:  While the Court can and should be

16   careful, as should the government, on who can have access to

17   these documents, obviously, the defendant can have access,

18   he can see them and review them.

19           MS. GOLDBARG:  Okay.  Absolutely.

20           THE COURT:  And he can't keep copies of them in

21   the jail, but he can review them with his counsel and with

22   his counsel's aides, staff.

23           MS. GOLDBARG:  Correct.

24           THE COURT:  Whatever.  And that's perfectly fine.

25           MS. GOLDBARG:  Correct.

1          THE COURT:  To the extent he can recall what he

2     saw when he reviewed it with his counsel, like you -- well,

3     like you say, maybe a relatively short time after he's

4     finished reviewing them with counsel, he could go and make a

5     phone call to Mexico, yes.  But he'd be acting under those

6     circumstances based on his recollection, depending upon, you

7     know, I don't know if he has a photographic memory or not.

8     I have no idea, obviously.

9          But I think as a practical matter, Mr. Balarezo

10    and his team, so to speak, might have to go to Mexico and

11    make inquiries.

12         MS. GOLDBARG:  Correct.

13         THE COURT:  Now, I've already said they can't take

14    the documents to Mexico or copies of them; they can't bring

15    them to Mexico.

16         But I think they've got to be able to make

17    inquiries down there to try to help come up with their

18    defense and what their defense will be in this particular

19    case.

20         So I -- I think prohibiting a discussion of the

21    contents of what's in the documents by Mr. Balarezo or his

22    team, either here in the United States or down in Mexico,

23    is probably unduly restrictive for the purposes of putting

24    together his defense under the circumstances.

25         Now, if that's true, and I think it probably is,

1    then certainly if the defendant can recall what he saw when

2    he reviewed it with his counsel and he has a question or

3    more than one question he wants to -- he wants to discuss

4    with his brother or family member or, I don't know, child or

5    whatever, then, you know, I think that's just, again, a

6    logical extension of the defense's attempt to try to put

7    together their defense in the case.

8              He could, of course, have his counsel ask the

9    question of his brother.  He could have his investigator ask

10   the same question of his brother.  So why can't he ask the

11   question of his brother.

12             Now, if the time were to come, hypothetically,

13   where the government had some information, and it may now or

14   it may not, I don't know, but if they had some information

15   in their possession which falls under the Rule 16 umbrella,

16   that you believe providing that to anyone other than the

17   defendant himself might put someone somewhere at risk of

18   their life, then I think we'd have to discuss that as to how

19   that could be treated maybe differently.  I don't know.

20   I just don't know enough about this case to know if there's

21   that kind of information already in this discovery or --

22             MS. GOLDBARG:  It's not in this discovery at this

23   point in time, Your Honor.

24             I think we are definitely going to have those

25   issues when we get to the point of 3500 material and witness

1    lists and so forth.  But, again, I don't -- I don't think

2    that -- I don't think we're there yet.  Again, the language

3    was included.

4            I know that the Court, and I think our intentions

5    was to reach an agreement as to what would be contained in

6    the protective order.  I understand and I respect defense

7    counsel's legal, you know, and positional objection to, as

8    you call it, the omnibus objections to the protective order.

9            THE COURT:  Yeah.

10           MS. GOLDBARG:  So that's why in our attempts, you

11   know, I don't think we're ever going to get Mr. Balarezo to

12   agree to any of the contents.

13           So I believe -- and, again, I think it suits his

14   right and he should be doing that.  I think that what's

15   going to come down to it is that the Court is simply going

16   to have to order it.  If the Court would like to fashion a

17   protective order or have us --

18           THE COURT:  Well, I'm looking at the January 13

19   iteration.  Is that the most recent one?

20           MS. GOLDBARG:  That's Docket Entry No. 30.

21   That's our third supplemental motion, and we did attach a

22   proposed order to that, so.

23           (Pause)

24           THE COURT:  So, Mr. Balarezo, as I understand it,

25   you're -- other than your omnibus objection, obviously, your

other objection that you were concerned about was paragraph

F that says defendant and individuals approved by the Court

may view the protected discovery, only for the purpose of

assisting the defense case, but may not share the contents

of the materials with anyone other than defense counsel or

members of the defense team.

MR. BALAREZO:  Right.

THE COURT:  So if we --

MR. BALAREZO:  That's not the only objection,

you're right, Your Honor.

THE COURT:  Hold on, hold on.  I understand.

(Pause)

THE COURT:  So if that phrase were to be taken out

of, let's say that's paragraph F.  So the first sentence

would end after the word "case, defense of the case."

And then pick it up with, "the defendant without

approval of the Court will not retain custody of any of the

protected discovery."

And then in paragraph G, they took out "disclosed"

and changed that to "provided to."

"The protected discovery will not be provided to

anyone who is not assigned to and directly involved in

preparation of the defense in the case."

MR. BALAREZO:  And that, of course, just means the

actual documents that I received cannot be given.

1                THE COURT:  Physically.

2                MR. BALAREZO:  Right, I understand, not the

3    contents.

4                THE COURT:  Right.

5                (Pause)

6                THE COURT:  Yeah.

7                So what if we just made those two changes?

8    So in paragraph F, the first sentence would end after the

9    word -- after the phrase, "defense of this case," period.

10               And then paragraph G, the word "disclosed" would

11   be stricken and the substitute would be "provided."

12   So it would read, "The protected discovery will not be

13   provided to anyone who is not assigned to and directly

14   involved in the preparation of the defense in this case."

15               Would that help solve that particular -- it won't

16   solve the omnibus problem, I understand that, but would it

17   at least help address the issue that you additionally

18   raised?

19               MR. BALAREZO:  It does, Your Honor.

20               If we go to paragraph E.

21               THE COURT:  E, all right.

22               MR. BALAREZO:  E.  Which reads, "Only the

23   defendant, defense counsel and members of the defense team

24   may view the discovery."

25               THE COURT:  All right.

1          MR. BALAREZO:  "However, should defense counsel

2    wish to have other individuals view the discovery for the

3    purposes of assisting in the defense of this case, defense

4    counsel shall submit their names to the Court in order for

5    the Court to approve them prior to the viewing of the

6    discovery."

7          That -- I'm sorry?

8          (Defense counsel and Defendant conferred

9       off the record.)

10         MR. BALAREZO:  "The individual shall sign the

11   acknowledgment form described in paragraph J below prior

12   viewing -- prior to viewing the discovery."

13         THE COURT:  That's actually physically viewing it.

14         MR. BALAREZO:  Right.

15         THE COURT:  That's not having a discussion on

16   content.

17         MR. BALAREZO:  Right.  No, I understand it.

18         But I thought that that was -- and I don't have

19   the other -- the previous orders, but my understanding was

20   that obviously the Court nor the Government want us to

21   provide copies.  I don't have an issue with that.

22   But now we can't even show a copy to other individuals.

23         Is that what the government is --

24         THE COURT:  Unless you want to add them to the

25   list.

1          So, for example, if, let's say your

2     investigator -- well, first of all, we'll start with what's

3     an easy example.

4          Your investigator goes to Mexico, he can't bring

5     any discovery down there.

6          MR. BALAREZO:  I understand.

7          THE COURT:  He can't take anything with him,

8     either on a computer or in hard copy or anything.  He cannot

9     do that.

10         MR. BALAREZO:  Well, we can -- let's talk about in

11    the United States.  My understanding is that the government

12    will maybe, correct me if I'm wrong, that there were some

13    relatively small seizures, 20, 30 kilos, somewhere in the

14    United States.

15         THE COURT:  Okay.

16         MR. BALAREZO:  And, for example, if they are

17    witnesses.

18         THE COURT:  Arizona or something or --

19         MR. BALAREZO:  Somewhere, yeah, I forgot the

20    place.

21         THE COURT:  Yeah, I think it was Arizona for some

22    reason.  I don't know why.

23         MR. BALAREZO:  So basically, what -- as I

24    understand it now, we can't show any potential witnesses or

25    anyone that we may wish to contact with respect to that

1    seizure any of the discovery.

2           For example, if there's a picture of 20 kilos,

3    I can't say, hey, you know, have you seen these before, are

4    these the ones that were -- it's hamstringing the defense,

5    Your Honor.

6           I mean, you know, providing, giving copies, I can

7    understand without conceding, but now, you know, not being

8    able to show a document is almost the same as not being able

9    to discuss the contents of the documents.

10          MS. GOLDBARG:  May I clarify, Your Honor?

11          In the example that defense counsel just gave, the

12   government would not consider that to be documents that are

13   subject to the protective order.  Photos of a seizure -- and

14   I believe that we produced them.  If we haven't, they will

15   be produced with regard to that seizure.

16          THE COURT:  Uh-huh.

17          MS. GOLDBARG:  But that's not something that the

18   government -- again, a photo of, you know, 30 kilos of

19   cocaine would not be subject to the protective order and

20   will be produced as such if it hasn't already.  We have

21   produced photos and lab reports of other seizures.

22          The documents that we're talking about that are

23   subject to the protective order, the box that we have of

24   over a thousand pages that we can produce today --

25          THE COURT:  Ledgers.

1          MS. GOLDBARG:  Ledgers.

2          And they have persons' names on them, they have

3    identifications, they have information that, looking through

4    them, the right person with enough time and resources could

5    attempt to identify who was the author of those ledgers.

6    And that information is also 3500 material, but that could

7    also cause potential harm to the person, the potential

8    author of those ledgers.

9          THE COURT:  And it sounds like, correct me if I'm

10   wrong, it sounds like that kind of information is not the

11   kind of information you'd be going out to Arizona to show

12   someone, because these were created in Mexico.

13         MS. GOLDBARG:  Mexico and countries further south.

14         THE COURT:  And countries further south.

15         MR. BALAREZO:  Well, Your Honor, see, that's --

16   and this is the reason for my objection, period.

17         Speaking of these ledgers that I have never seen,

18   from what I understand, there will be no restriction upon my

19   speaking to anyone anywhere in the world in saying I have

20   2,000 or a thousand pages of ledgers, and page 39 of the

21   ledger says, you know, Jose shipped X to Juan.

22   Am I correct?  I will be able to do that?  Because that's

23   contents of the supposedly protected discovery.

24         THE COURT:  Okay.  You can ask questions about

25   content.

1          MR. BALAREZO:  Right.

2          Now, the government, though, wants me to not be

3    able to take, you know, however many pages of the ledger and

4    speak to Jose and say, Jose, you know, what can you make of

5    this for me?  These are ledgers that --

6          THE COURT:  That would entail taking those out of

7    the United States.

8          MR. BALAREZO:  Well, Your Honor -- and, again,

9    that is why then the defense is being hampered.

10          I am not an expert in drug ledgers.  My client,

11   I believe, is not the individual that the government is

12   going to say created the ledgers.  So my client can look at

13   this and say, well, you know, it says this, I don't know.

14   But I can -- I can talk --

15          The thing is, Your Honor, if I'm doing my job, I

16   would want to speak to someone who has knowledge of these

17   things and show him the ledger and say, what can you tell me

18   about this.

19          THE COURT:  All right.

20          MR. BALAREZO:  What can I do?

21          THE COURT:  All right, we're going to shortcut

22   this, all right.

23          We're going to make these changes that I just

24   suggested.  We're going to finalize the order; I'm going to

25   issue the order.

1          They're going to produce a thousand pages of

2    documents in a box pursuant to this order.  You will have

3    these restrictions on you until such time as we discuss

4    possibly amending them or changing them, after you've had a

5    better chance to review them and know.  I mean, the

6    hypothetical you're posing may not be something you actually

7    really need to do.  It's too early to know the answer to

8    that question.

9          You don't have a, by your own admission, you don't

10   have that sufficient familiarity with what's in those

11   records over there that that lady has got on her cart, that

12   a thousand pages of stuff or thousands of pages,

13   I don't know how many it is, but it's a box full of paper

14   over there.

15         And I think it's, at this point, it's more

16   important to get it into your possession, albeit maybe a

17   little more restrictively than you might desire, but at

18   least you've got it, and it's under a protective order.

19   And then as you start reviewing it and conceptualizing what

20   you need to do, we can revisit some of these issues.

21         MR. BALAREZO:  Your Honor, again, I'll obviously

22   defer to the Court's ruling, but I think the government

23   crystallized the issue when it said, if someone with

24   sufficient knowledge of these -- of this information were to

25   see the documents, they would be able to, perhaps, identify

1   the people, and, according to the government, harm could

2   come to these individuals.

3         I look at these things and say if I could show it

4   to someone with sufficient knowledge of these materials and

5   they can identify people, I'm doing my job, which is to find

6   out, you know, who wrote this, who could be a prospective

7   witness against my client.  I mean, that's a basic defense

8   function.

9         And what the government wants and that the Court

10  seems ready to impose is an extreme restriction on what the

11  defense can do.

12        THE COURT:  Well --

13        MR. BALAREZO:  I'm basically being told that I can

14  review the documents with my client and a couple other

15  lawyers, but I can't really do much else with it.

16        THE COURT:  Well, no.  I said you can discuss the

17  contents of it with third parties in and outside of the

18  United States.  I said you could do that.

19        Now, that's more than you could do before you went

20  to this courtroom today, is it not?

21        MR. BALAREZO:  Well, I don't think the Court ever

22  restricted the discussion of the contents, so I would

23  respectfully disagree with that, but --

24        THE COURT:  The language I just struck from the

25  protective order, which the government put in there thinking

1   that that was something I wanted, was in there prior to your

2   entering the courtroom today.  It's not in there anymore.

3             MR. BALAREZO:  What I would ask then, Your Honor,

4   if the government has a document here, can they produce them

5   to me today?  I will abide by --

6             THE COURT:  I think the lady sitting in the

7   audience has them.

8             MR. BALAREZO:  All right.

9             MS. GOLDBARG:  The government was about to offer

10  that, as long as defense counsel acknowledges on the Court

11  that these are the terms of the protective order.

12  The government does not need -- and obviously with the

13  Court's authorization, the government is happy to drop this

14  box off to defense counsel so we don't have to take them

15  back to our office.

16            THE COURT:  Yeah.

17            So I mean, the only changes that are being made

18  here are to paragraph F and paragraph G of the Protective --

19  of the January 13th version, which is document 30-1.

20            And in paragraph F, in fact, if you have it there,

21  you can hand -- you can do -- do it -- yeah.

22            MR. BALAREZO:  We've got it.

23            THE COURT:  You can get it.  Both initial, both of

24  you initial it.

25            MR. BALAREZO:  Is this going to be the order?

1           THE COURT:  Well, we're going to have to get it

2    fixed up so it's nice and neat, but, I mean, this is for the

3    purposes of today's production.

4           MR. BALAREZO:  And, Your Honor, I, at the Court's

5    direction, I will initial page 2 of 3 of the government's --

6           THE COURT:  The only reason why you're initialing

7    it is to initial -- you're initialing the changes that are

8    being made.  You're acknowledging that those are the changes

9    that are being made here in the courtroom.

10          MR. BALAREZO:  That I'm not consenting to.

11   I still object to the changes.

12          THE COURT:  Of course you're not.

13          The record couldn't be clearer, Mr. Balarezo.

14          MR. BALAREZO:  All right.

15          THE COURT:  It couldn't.

16          MR. BALAREZO:  I just hate signing something that

17   I don't agree with, but okay.

18          THE COURT:  Well, it couldn't be clearer that

19   you're objecting, you have an omnibus objection, for

20   starters.

21          MR. BALAREZO:  Three.

22          MS. GOLDBARG:  Your Honor, the government will,

23   when I get back to my office, I'll makes those changes.

24          Would you -- I don't think I can file this with

25   the clerk's Office if there's not an accompanying motion.

1  So I don't know if you want me to, perhaps, fax the changes

2  to --

3             MR. BALAREZO:  E-mail.

4             MS. GOLDBARG:  Or e-mail.  I'm sorry, we don't

5  fax -- e-mail them to chambers.  And then if the Court wants

6  to issue that as an order or if you'd like us --

7             THE COURT:  Yeah.  I will sign it when it comes

8  back to me today in an amended form so that it's sign-able.

9             MS. GOLDBARG:  That's -- is e-mail, is e-mail, is

10 the Court amenable with?

11            THE COURT:  Yeah.

12            MS. GOLDBARG:  Okay.

13            THE COURT:  Coordinate with my law clerk.

14            MS. GOLDBARG:  Yes, Your Honor.

15            The only thing is, pursuant to the order and the

16 government anticipating this might have been a resolution,

17 is that we did, also per the Court's instructions, draft an

18 acknowledgment order.  And we've asked -- and, again, if

19 defense counsel wants to sign the acknowledgment order as

20 well as the defendant, defense counsel can walk out with the

21 box.

22            THE COURT:  You mean acknowledge that he's

23 reviewed the terms?

24            MS. GOLDBARG:  Correct.

25            (Pause)

1        MR. BALAREZO:  I have reviewed the acknowledgment

2   form, Your Honor.

3        MS. GOLDBARG:  And we would ask that he sign it,

4   as well as the defendant.

5        THE COURT:  That you acknowledge it and agree to

6   comply with the terms.  That's what the purpose of that's

7   for.

8        That is separate and independent from your

9   objections.  The Court ordered the protective order.

10        MR. BALAREZO:  Right.

11        THE COURT:  All you're doing here is acknowledging

12   you've reviewed the terms of it and you are agreeing to

13   abide by it.

14        MR. BALAREZO:  Yep.

15        Your Honor, I -- and I hope the Court doesn't

16   think that I'm trying to be difficult, but --

17        THE COURT:  No.  I think you're being

18   unnecessarily combative.

19        MR. BALAREZO:  Not yet, Your Honor.  Not with the

20   Court, well, of course.

21        I'll make my record and then I'll sign the form.

22        THE COURT:  You've made your record.

23        MR. BALAREZO:  The thing is, what the Court has

24   already --

25        THE COURT:  The Court issued a protective order.

1          MR. BALAREZO:  Right.

2          THE COURT:  Nobody can --

3          MR. BALAREZO:  Right.

4          THE COURT:  -- have access to the documents that

5     doesn't acknowledge that they've read it and that they are

6     going to comply with it.

7          MR. BALAREZO:  Your Honor, I don't have an issue

8     with giving this to Purpura and to Tun and to whoever else

9     the Court would say is a -- but as a -- on a personal level,

10    I find it -- I find it insulting that as an officer of the

11    Court, I have to sign a letter acknowledging that I read an

12    order that the Court has issued.  The Court has issued an

13    order, I will abide by it.  That's my issue with this.

14    It's --

15         THE COURT:  You know, my father used to have an

16    expression, God rest his soul, because I'm half Irish,

17    although it may not appear that way, and he would say, when

18    I'd get frustrated or upset about it, he'd say, "Hey, don't

19    get your Irish up."

20         So in your case, I'll say, hey, don't get your

21    Hispanic up.

22         MR. BALAREZO:  Ecuadorian, Your Honor.

23         THE COURT:  Whatever the equivalent thereof is.

24    R-e-l-a-x.  R-e-l-a-x.  No one is -- nobody, nobody is

25    accusing you of, in any way, shape or form, doing anything

1  inappropriate or anything.  You've made your record, you've

2  made your record.

3            MS. GOLDBARG:  Now, to further move things along,

4  they're -- defense counsel --

5            THE COURT:  Hungry, huh, hungry.

6            MS. GOLDBARG:  No, Your Honor, actually.

7            The government would ask if the Court could set a

8  scheduling order.  We would like to respond to his request

9  for Brady.  This is an issue that the government, when we

10 raised it the last time --

11           THE COURT:  Well, I was going to get to that Brady

12 next, because I think he's making some good points.

13           Now, obviously, I want to hear from the

14 government, obviously.

15           MS. GOLDBARG:  We'd like to have an opportunity to

16 brief this issue, because --

17           THE COURT:  Sure, of course.

18           MS. GOLDBARG:  -- there are certain -- again, as

19 we discussed, in the world of international drug

20 trafficking, if there is a container with 10,000 kilograms

21 of cocaine leaving from a source of supply country such

22 as --

23           THE COURT:  Ten thousand kilos or tons?

24           MS. GOLDBARG:  Ten thousand kilograms, which is

25 ten tons.

1          MR. BALAREZO:  Same thing.

2          MS. GOLDBARG:  Ten tons.

3          THE COURT:  Wait a minute.

4          Whoa, whoa, whoa.  A kilogram equals a ton?

5          MS. GOLDBARG:  No.

6          MR. BALAREZO:  No.

7          MS. GOLDBARG:  Ten thousand kilos --

8          MR. BALAREZO:  Two pounds is ten tons.

9          MS. GOLDBARG:  Is ten tons.  10,000 kilograms is

10   ten tons of cocaine.  It's a lot.  I have a different word.

11          THE COURT:  That's a lot.

12          MS. GOLDBARG:  It's a different word that I use,

13   but I don't think that's allowed in court.  It's a

14   tremendous amount of cocaine.

15          The cost associated with it -- and I believe this

16   is what's going to be part of the evidence that we see as

17   this case progresses to trial.

18          To put that load together, there are a lot of

19   people that are involved.  There are sources of supply,

20   there are the producers, there are the transporters, there

21   are the mid-level transporters, there are the people

22   receiving, there are the people that are investing, there

23   are the people that are investing on behalf of the

24   investors.

25          The reason that the government wants a little bit

1    of time to research this is that, understanding defense

2    counsel's position, let's assume there were a hundred people

3    that were investors or involved in this specific load.

4    If one of them was arrested and didn't name the defendant,

5    this defendant, Mr. Balarezo would argue that that's

6    exculpatory information.  I don't believe that that's

7    accurate; I don't think that's what the case law says.

8    I don't think it's also what we're arguing as well, so

9    I would like to have the opportunity to brief that aspect.

10            THE COURT:  Sure, How much time do you need?

11   Is ten days enough?

12            MS. GOLDBARG:  That's perfectly fine.

13            THE COURT:  Okay.  Well, let's say ten days then

14   from today.  Let's -- today's the -- today's the 16th.

15            MS. GOLDBARG:  Maybe just --

16            THE COURT:  The 26th's a Monday.

17            MS. GOLDBARG:  Just due to schedule, could we

18   possibly have until the 30th to file?

19            THE COURT:  Yeah, that's fine.

20            MR. BALAREZO:  Your Honor, can I consult really

21   quick, while the schedule --

22            (Pause)

23            MR. BALAREZO:  Your Honor, I will raise the issue

24   once we do the schedule.

25            THE COURT:  Okay.  Well, we do have a holiday in

1    there, so the 30th is fine.

2            MS. GOLDBARG:   The government will file its

3    objection by January 30th.

4            THE COURT:   Mr. Balarezo can do a reply, if he

5    wants, by the following Friday, the 6th.

6            I want to look at it before I set a hearing,

7    I mean, you know.

8            MS. GOLDBARG:   Absolutely.   And then --

9            THE COURT:   And I'll probably set a status hearing

10   anyway, just to have a status just to make sure we're --

11           MS. GOLDBARG:   And understanding defense counsel's

12   position, and I think difficulty with where we are with the

13   discovery, one of the things that the government has been

14   doing is, again, we're dealing with probably one of the

15   longest standing cartels in Mexico.   There have been many

16   offices in this -- U.S. Attorney's Offices in this country

17   that have done investigations; there's a lot of information.

18   We are trying to make sure that we're providing and culling

19   down the amount of information to that that is specifically

20   pertinent to this defendant, not just, you know, the

21   Sinaloa Cartel as a whole.

22           I said to Mr. Balarezo this morning, I was the one

23   that mentioned the Tampico seizure, I may have been

24   misspoken, I may have misspoken about that, and I discussed

25   that with Mr. Balarezo.

1          In order to assist him, what I would like to do is

2    to -- and then what I intend to do is to provide a list to

3    defense counsel with seizures that we, at this point in

4    time, will intend to introduce at trial that we believe that

5    there will be testimony and, hopefully, evidence that

6    will -- we will be using against this defendant.

7          So we've got -- again, one of the things that

8    we've been doing, you know, over the last -- since, you

9    know, the last is going back over all the information that

10   we have, and, again, culling down.

11         If we were to present everything that the

12   U.S. Government had against the Sinaloa Cartel, this would

13   be a two-year trial.  That's not what anyone's interested in

14   doing.  We do want to make this much more focused, so --

15         THE COURT:  I'll take judicial notice of that.

16         MS. GOLDBARG:  So, again, so as I said to

17   Mr. Balarezo this morning, I believe, and I'm bad with -- my

18   memory can be faulty at times, but I think there may have

19   been around, at this point in time, ten international

20   seizures that we believe that we will be seeking to

21   introduce against this defendant.

22         So I'm going to provide him with information,

23   locations, approximation of dates, approximation of how many

24   thousands of kilos are involved in that seizure.  And that

25   way that the defense counsel can speak to the defendant and

1    start gathering information on that.  A lot of the

2    underlying information regarding how or what information

3    specifically people are going to say about that will show up

4    in 3500 material.  But I believe Mr. Balarezo indicated that

5    that would assist him, so we will take all that and

6    hopefully get that to him next week.

7         As we start getting the information with photos

8    and lab -- excuse me, lab reports, we will be turning that

9    over.  We don't believe that's going to be subject to the

10   protective order.  We will be turning that over as soon as

11   we get it.  So we are, again, trying to -- trying to move

12   things along.

13        If I may say one thing regarding the name,

14   Your Honor, Mr. -- the Defendant's name.

15        THE COURT:  Well, it just occurred to me, if the

16   evidence in this case, which I'm kind of thinking is going

17   to sound like it's going to be referred to as the Beltran

18   Leyva Cartel, whatever, then I think we've got to use both

19   names, because that's -- if that's what the evidence is

20   likely to look like or sound like, whether it be testimonial

21   or documentary, I think I capitulate.  I think we're going

22   to have to use both names.

23        MS. GOLDBARG:  I was just going to say,

24   Your Honor, the witnesses that we anticipate that we're

25   going to be calling that know the defendant know him as

1   Beltran Leyva, and I'm afraid that, even calling him Beltran

2   or calling him Leyva will cause confusion on the part of the

3   jury.

4              THE COURT:  All right.  So we're going to have to

5   just, yeah, yeah.  I'm starting to sense that now, so, in

6   the words of Emily Litella, never mind.

7              MS. GOLDBARG:  Thank you, Your Honor.

8              THE COURT:  Never mind.

9              MS. GOLDBARG:  At the last status conference, the

10  Court did instruct the government to inquire with the

11  Department of Justice people in Mexico regarding the two

12  Mexican attorneys that we knew about.  I will state that in

13  the defendant's filing, Docket Entry No. 34, which is the

14  list of names, the person listed as F, Yvonne Alejandra

15  Ramos Sandoval, that's the first time the government saw her

16  name, so we're seeking to get information on that.

17             I can report to the Court that according to the

18  Secretary of Public Education Records, both of the other

19  individuals that are in D and E, Juan Manuel Delgado

20  Gonzalez, and Juan Ramon Mandragon Solis, they are

21  registered lawyers with the Secretary of Public Education,

22  with no negative entries that would prevent them from

23  practicing law in Mexico.

24             THE COURT:  Okay.

25             MS. GOLDBARG:  There's also been information from

1   the equivalent of the Mexican State Department indicating

2   that these two attorneys, their names, the male attorneys,

3   did represent and made appearances on the defendant's behalf

4   with regards to his extradition to the United States, and

5   they filed many, they're called amparos, A-m-p-a-r-o,

6   there's no literal translation, but it's similar to a habeas

7   appeal preventing --

8           THE COURT:  I got you, okay.

9           MS. GOLDBARG:  -- his extradition.  So that's the

10  information that we've gotten with regard to those two.

11          Again, we just got the name of this female

12  attorney, and we're making the same inquiries, and we will

13  notify the Court as soon as we get that information.

14          THE COURT:  All right.

15          MS. GOLDBARG:  So the Court did instruct us to do

16  that.  And I think that catches us up to speed on

17  everything.

18          THE COURT:  What else?

19          I think it's probably premature to be setting any

20  motions schedule.  I think we've got to get these

21  preliminary issues worked out on the discovery, whatever.

22  I mean, Mr. Balarezo is going to need some time to review

23  this stuff.

24          I mean, the box that you have here today, I think

25  has a thousand or more pages of documents.  He's going to

1   need time to discuss it with his client; he's going to need

2   time to look at it.  So I think it's premature to be setting

3   a motions schedule in this case right now.

4           But at the next status hearing, I'll inquire as to

5   whether -- which will probably be, you know, in February, if

6   he's had a chance to review whatever's been produced at that

7   point and what his preliminary thinking is about what

8   motions he thinks he might want to file.

9           MR. BALAREZO:  Your Honor, again, my understanding

10  from the government's representations is that there probably

11  will not be any motions to suppress in this case.  I won't

12  have a basis.  There's no seizures, I think, made from my

13  client, maybe except for the things in Mexico, but I think

14  there would be some issues there, the guns and those kinds

15  of things.

16          There's been no interception, so there wouldn't be

17  any motions to try to suppress a wiretap.  I understand my

18  client has not made any statements.

19          I suspect the majority of the motions, if I file

20  any, would be legal issues, motions in limine, and things of

21  that nature.  So I don't think that the motions practice is

22  going to be extensive in this particular matter.

23          We are still hopeful that the Court is seeking to

24  let us have a trial in this matter.

25          THE COURT:  Well, yeah, I would.

1          MR. BALAREZO:  Soon.

2          THE COURT:  I would hope --

3          MR. BALAREZO:  Like we said, in the spring

4     sometime.

5          THE COURT:  I would hope by -- certainly, I'd like

6     to think maybe in the later part of the spring we could

7     start.  I don't know how long the trial would be, but

8     I think the guesstimates were ten weeks, eight weeks, maybe

9     a little longer.  I don't know.

10          MR. BALAREZO:  No.

11          MS. GOLDBARG:  At the last status conference, the

12     Court did indicate, given some of the issues and where we

13     were, that spring was not and we were discussing the end of

14     summer.  But, again.

15          MR. BALAREZO:  End of summer, no.

16          THE COURT:  Well, let's put it this way:

17     We're not yet quite there.

18          Here's the good news:  We are not in a situation

19     we were in years ago in this courthouse, I'm happy to

20     report, and, you know, I have a six-week trial that's just

21     started, and it might take seven, it might take five,

22     I don't know, but the estimate is six, you all know how

23     inaccurate estimates can be, I mean, estimates are hard to

24     do, frankly, but -- so, you know, I'm pretty tied up for the

25     next couple months, two to three months.

1            But if the circumstances and the issues are such

2    that we can start it in the late spring, like May or early

3    June or something like that, then I don't see any reason why

4    we shouldn't, because I don't have a trial at the moment,

5    a criminal trial.  Civil trials we can move them around

6    whenever we want.  They don't get the priority of criminal

7    trials, obviously.  But I don't have -- at the moment, I

8    don't have another criminal trial scheduled for the late

9    spring, early summer.

10           So, you know, if we can get the case into a

11   posture where we could start the trial in late May, early

12   June, in that time frame -- and I'm assuming it's going to

13   take two -- roughly two months, maybe a little longer, maybe

14   a little less, I mean, I don't know.  You need to look at

15   this discovery, you know.

16           So it's -- I'm in my own mind budgeting

17   hypothetically two months, but maybe it will be longer,

18   maybe it will be shorter.

19           MR. BALAREZO:  Your Honor, again -- and I'm not

20   being flip and I'm not being presumptuous, but the -- the

21   issues that will matter to me would be presented when the

22   Jencks is presented, because that is going to be the trial

23   is the cooperative testimony.

24           As I've said previously --

25           THE COURT:  And roughly how many of those are

1    estimated, cooperators, three, six, I don't remember.

2    I can't remember the number.

3              MR. BALAREZO:  They're all lining up already.

4    They're beating the bushes for more.

5              MS. GOLDBARG:  It will be double digits,

6    Your Honor.

7              THE COURT:  Okay.

8              MS. GOLDBARG:  Again, it's --

9              THE COURT:  So let's assume, just make a number

10   up.

11             MS. GOLDBARG:  Twenty.

12             THE COURT:  Okay.  So let's say 20.  So it's 20

13   cooperators, and then how many law enforcement folks?

14             MS. GOLDBARG:  The -- I ask the Court not to hold

15   me to any of the numbers, because they --

16             THE COURT:  No, I'm not holding.

17             MS. GOLDBARG:  -- will fluctuate.

18             I'm trying to be as overly inclusive so that the

19   Court has the information to know with its scheduling and

20   also not trying to, you know --

21             THE COURT:  No.

22             MS. GOLDBARG:  If I were to put on 20 cooperators,

23   I wouldn't be doing my -- I don't think I'd be being

24   responsible, I don't -- this is not a case that needs to be

25   over-tried.  But there are law enforcement officers, foreign

1   law enforcement officers.  I think that the last time that I

2   tried to make a guesstimate of this, I was somewhere

3   probably around 50, 60 witnesses total.  Again, some of them

4   may be --

5          THE COURT:  Well, a 50-witness trial is not an

6   eight-week trial; that's longer.  I'm not being critical,

7   I'm just saying.

8          MS. GOLDBARG:  I'm giving the --

9          THE COURT:  We can't try this case in two months

10  with 50 witnesses, there's no way.  I'm not even counting a

11  defense being put on.  I just -- I'm assuming just the

12  government's case, it's going to take -- because we do four

13  days a week; we don't do Friday.  I've got all these other

14  cases I've got to deal with on Fridays.  So at a four-day

15  week clip, 50 witnesses -- well, even if it's 30, it would

16  be tough to do that in two months.  It may be doable; it may

17  be doable.

18         MR. BALAREZO:  A month?

19         Your Honor, we -- Ms. Goldbarg is familiar with

20  the case I tried with Mr. Purpura in the Eastern District of

21  New York and a very similar case.  Ms. Goldbarg's former

22  home.

23         MS. GOLDBARG:  Yes.

24         MR. BALAREZO:  Very similar case, and it took a

25  month.

1              THE COURT:  Well, for the government to put in its

2    case?

3              MR. BALAREZO:  Uh-huh.  No defense case.  It was

4    straight cooperators.  I think 15 cooperators testified.

5              THE COURT:  All right.  Well, maybe it can be done

6    in a month, I don't know.

7              MR. BALAREZO:  And, Your Honor, as I said, I'm --

8              THE COURT:  It's going to be in Spanish, right?

9              MR. BALAREZO:  Right.

10             THE COURT:  Right.  That slows it down a little

11   bit, obviously.

12             MR. BALAREZO:  We both talk fast.  But -- and

13   again, I'm not being --

14             MS. GOLDBARG:  Your Honor, there was a week,

15   what -- how long was the first trial?  Was it the same?

16             MR. BALAREZO:  I think it was the same.

17             MS. GOLDBARG:  It was the same.

18             MR. BALAREZO:  It was a re-trial, so...

19             THE COURT:  So just out of curiosity, you know --

20   you know the discovery better than Mr. Balarezo knows it.

21   But are we going to have e-mail and texts in this case?

22             MS. GOLDBARG:  No.

23             THE COURT:  Thank God.  My six-week trial --

24             MR. BALAREZO:  E-mails.

25             THE COURT:  -- the government wants to put in 700

1    to a thousand texts.  And the texts, each message, each

2    message is unintelligible to a person who doesn't know

3    there's code words in it, there's slang in it.  And then on

4    a message-by-message basis, there's idiosyncratic shorthand

5    that you'd only really understand if you've had a texting

6    relationship between the defendant and the person who it's

7    being sent to, which, in many cases, is another defendant.

8    So neither one can take the stand.

9         So we've just spent four days, and we're going to

10   spend more next week trying to figure out how you can put

11   these in, because the government needs two to three

12   witnesses per text to explain it to the jury.  It's a

13   nightmare.

14        MS. GOLDBARG:  Your Honor, I don't foresee that

15   being --

16        THE COURT:  It's a nightmare.

17        MS. GOLDBARG:  Where I do foresee us having some

18   issues simply with regard to the timing, and we had

19   discussed this previously.  There are several witnesses that

20   the government would intend to call, a lot of them are in

21   locations that are not in the D.C. area, a lot of them are

22   in locations where --

23        THE COURT:  Logistics issue.

24        MS. GOLDBARG:  They're logistic.  And there are,

25   I mean --

1           THE COURT:  Okay.

2           MS. GOLDBARG:  There might be --

3           THE COURT:  We need to take time to figure that

4    out.

5           MS. GOLDBARG:  There are two prosecutors on the

6    case.  There's a need to go and start, you know, basically

7    traveling the country to start preparing those witnesses.

8           We also have to coordinate with other U.S.

9    Attorney's Offices for those witnesses that we are borrowing

10   from other districts to get their 3500 material.

11          And so we're starting that process, but it's --

12   I mean, the government still feels that this is a complex

13   case.  The defendant was, you know, was in charge of an

14   organization that -- and it's an expansive period of time as

15   well.  So we're starting.

16          THE COURT:  Okay.

17          MS. GOLDBARG:  We're going to try to be as quick

18   as possible.

19          THE COURT:  Well, I think there's reason to think

20   that you, as of today, there's reason to think we can get

21   this case, this trial going in late May, early June.

22   And if it can be done in a month, all the much better.

23   But certainly, it sounds like it could be done in two months

24   or less.  That's what it sounds like.

25          MR. BALAREZO:  We think so, Your Honor.

1          Your Honor, as I was about to say, though -- and,

2    again, I'm not trying to be flip, but we are prepared to

3    stipulate to a lot of the evidence.  I know the government

4    will want to present whatever they want to present, but, you

5    know, I don't -- we don't care if there were seizures in

6    Mexico.  That's not really the issue.  It's what did my

7    client have to do with it and was it coming here.

8    So you know.

9          THE COURT:  That's fine.

10         Well, you know, look, if you guys can work things

11   out, I'm all for working things out, believe me.

12         MS. GOLDBARG:  We've had this -- I think that we

13   mentioned this last time.

14         We had this similar issue in the case that almost

15   went to trial before Judge Kollar-Kotelly.  We would rely on

16   Old Chief.  I mean, there are certain things that we would

17   want to -- but, again, I think that both sides have

18   sufficient experience doing these types of cases.

19         THE COURT:  The two of you had a case in front of

20   Kotelly like this?

21         MS. GOLDBARG:  Yeah.

22         THE COURT:  Oh.

23         MS. GOLDBARG:  Almost went to trial; it did not.

24         THE COURT:  Oh, it didn't go to trial?

25         MR. BALAREZO:  It would have if I -- someone had

1   listened to me, but I didn't -- that's off the record,

2   Your Honor.

3           There was other counsel involved, let me put it

4   that way.

5           MS. GOLDBARG:  It may still.  It may still.

6           THE COURT:  All right.

7           So why don't -- I'm going to just set a status so

8   that we have -- we have a -- I want to give Mr. Balarezo a

9   chance to -- I want to read the pleadings on the motion that

10  he's filed and the responses and the reply, and then I want

11  to give him a chance to review the discovery that he's

12  getting.

13          So let's set it for February.  Let's see, the

14  reply is due the 6th, give you two weeks.  So how about

15  Friday, the 20th of February, at 11:30, counsel?

16          MR. BALAREZO:  The 20th?

17          THE COURT:  Friday, the 20th of February.

18          MR. BALAREZO:  What time, Your Honor?

19          THE COURT:  11:30 a.m.

20          MR. BALAREZO:  This thing's not working for some

21  reason.

22          Your Honor, I --

23          THE COURT:  Is that bad?

24          MR. BALAREZO:  I have a matter in District Court

25  in Baltimore at 10:30 that morning.

 1              THE COURT:  Okay.  Want to do it in the afternoon?

 2              MR. BALAREZO:  We could do it --

 3              THE COURT:  Three?

 4              MR. BALAREZO:  Would 1:00 or so be available?

 5              THE COURT:  1:00 wouldn't be available, but we

 6    could do 2:30.

 7              MR. BALAREZO:  Noon?  2:30?

 8              I'm loathe to schedule anything on a Friday

 9    afternoon around here.  If that's the only time, Your Honor.

10              THE COURT:  Why?  Traffic?

11              MR. BALAREZO:  Childcare issues.

12              THE COURT:  Mr. Balarezo, we'll get you out of

13    here fast.

14              MR. BALAREZO:  All right.

15              Early, as early afternoon as possible, Your Honor.

16              THE COURT:  All right.  Well, we'll say right now

17    2:30.

18              MR. BALAREZO:  Sure.

19              THE COURT:  If I can move it back, we'll move it

20    back.

21              MS. GOLDBARG:  At 2:30 p.m., Your Honor?

22              THE COURT:  Yes.  On Friday, the 20th.  All right.

23              MS. GOLDBARG:  The last thing that the government

24    would ask, Your Honor, is --

25              THE COURT:  Yes.

1          MS. GOLDBARG:  -- at the last status conference,

2    time was excluded based on the pending motions.

3    The government would --

4          THE COURT:  It's still pending.  Motions are still

5    pending, right?

6          MS. GOLDBARG:  Correct.

7          So the government would, once again, ask that the

8    time between today and the next status conference be

9    excluded for pending motions, defense counsel will object,

10   and the government would ask again that it be designated a

11   complex case for speedy trial purposes, but that's where we

12   are.

13         THE COURT:  Well, you have a motion pending to

14   that effect, right?

15         MS. GOLDBARG:  Yes, we do.

16         THE COURT:  Yeah.

17         MR. BALAREZO:  I thought that was overruled.

18         MS. GOLDBARG:  No.  The Court -- no.  The Court,

19   I believe, ruled, denied the government's request for

20   transfer.

21         I don't know if the Court definitively ruled on

22   the complex case.  I believe the Court stated that at that

23   point in time, it couldn't rule on it, but I don't know if

24   it was an actual -- I don't know if it was actually denied.

25         The Brady motion that's pending is also something

1   that --

2          THE COURT:  I think the speedy trial clock has

3   lapsed anyway because of the -- there's three or four

4   motions pending, including the most recent motion by

5   Mr. Balarezo.

6          So at this point, I mean, the speedy trial clock

7   is not running, hasn't been running for a while, actually.

8          So I mean, obviously if defendant wants to agree

9   to with, we can belts and suspenders between now and the

10  20th, but...

11         MR. BALAREZO:  I don't think there's a need for

12  that, Your Honor.

13         THE COURT:  I don't either.

14         I mean, I just think at this point, the speedy

15  trial clock isn't running at all because of all these

16  motions pending.

17         And I think based on the increasing knowledge I'm

18  gaining about the complexity of the case in terms of the

19  location of witnesses, the location of events outside the

20  United States, the need for the government to assemble

21  materials from various locations, I'm definitely moving more

22  in the direction of declaring it a complex case for the

23  purposes of the Speedy Trial Act.

24         I'm going to go back and look at that motion,

25  frankly.  I haven't focused on it in a long time.

1          MS. GOLDBARG:  The government would appreciate

2     that.

3          THE COURT:  As I said, there's a lot --

4          MR. BALAREZO:  Your Honor, we would point out

5     again, when the Court reviews it, to pay particular

6     attention to the issue that this case was indicted over two

7     years ago, and Mr. Beltran has been detained since 2008 on a

8     matter that the government will, I believe, seek to make a

9     part of this case.  So obviously we have an interest in

10    getting the trial as soon as possible.

11         THE COURT:  Well, no.

12         Look, I mean, I think we're absolutely all on the

13    same page here.  I mean, it may have been indicted X number

14    of years ago, but, you know, his initial appearance in this

15    courtroom was in November of '14 --

16         MR. BALAREZO:  No.  I understand.

17         THE COURT:  -- which is only a couple months ago.

18         MS. GOLDBARG:  Correct.

19         THE COURT:  And this Court is moving at what it

20    believes to be, I know I could be accused of being

21    self-serving here, but expeditiously.

22         And if we're going to have a trial in late May,

23    early June, by the standards of this courthouse, that is,

24    from initial appearance to trial, that is very quick.

25    I think even you would take judicial notice of that,

1    Mr. Balarezo.

2              MR. BALAREZO:  Well, given that I'm not a judicial

3    officer, I won't, but I would take counsel notice.

4              I would ask this Court to follow the practice of

5    the Eastern District, Your Honor.

6              THE COURT:  Oh, the rocket docket.

7              MS. GOLDBARG:  The District of?

8              MR. BALAREZO:  Virginia.

9              THE COURT:  The rocket docket.  That's --

10             MR. BALAREZO:  Yes, Your Honor.

11             THE COURT:  Well, that's, of course, that's a

12   beast unto its own.  That's a unique animal.  We can't --

13   frankly, we don't have the culture in this district to do

14   that.

15             MR. BALAREZO:  I wish we did sometimes.

16             THE COURT:  I know.

17             But, you know, the one criminal case I tried over

18   there, I can tell you as a criminal defense lawyer back in

19   my youth, it was a tough way to be a defense counsel.

20   It was great for prosecutors.  But for defense counsel,

21   their system, such as it is, is really hard on defense

22   counsel, at least I found that.

23             MR. BALAREZO:  Right.

24             THE COURT:  And it was a trial that went for a

25   week, which by their standards is huge.  I was getting, you

1   know, whipped on.  And the prosecutor was too, to do it in a

2   week.

3           In this courthouse, that trial was at least two

4   weeks, probably three weeks.  It was just (indicating).

5   We were just -- we were constantly being, you know, flogged

6   by the judge.  And it was -- I think in hindsight -- it was

7   a long time ago.  That was eight weeks from arraignment to

8   trial.

9           MR. BALAREZO:  Speedy trial lives.

10          THE COURT:  So, you know, you're going to get a

11  trial.  Sure, you're going to get a trial pretty darn

12  quickly, actually.

13          So I think now at this point it's more a question

14  of, okay, make sure everything's lined up, you got what you

15  need under the Rule 16, and they got the protections they

16  need to make sure we don't have any unfortunate incidents,

17  and let's go to trial.

18          MR. BALAREZO:  Thank you, Your Honor.

19          MS. GOLDBARG:  Thank you, Your Honor.

20          THE COURT:  All right.  Have a good day, everyone.

21          MR. BALAREZO:  Thank you.  You too.

22          THE COURT:  Yep.

23          DEPUTY CLERK:  All rise.  This Honorable Court now

24  stands in recess until the return of Court.

25          (Proceedings concluded at 1:01 p.m.)

C E R T I F I C A T E

   I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

Date: March 23, 2015_____  /S/__William P. Zaremba_____

          William P. Zaremba, RMR, CRR