IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      )
                               )
          Plaintiff,           )    CR No. 12-184
                               )
                               )    Washington, D.C.
          vs.                  )    February 20, 2015
                               )    2:44 p.m.
ALFREDO BELTRAN LEYVA,         )
                               )
          Defendant.           )
_____)


TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:       AMANDA LISKAMM
                          ANDREA GOLDBARG
                          Assistant United States Attorney
                          555 4th Street, N.W.
                          Washington, D.C. 20036
                          (202) 252-7785


For the Defendant:        A EDUARDO E. BALAREZO
                          Balarezo Law
                          400 5th Street N.W.
                          Suite 300
                          Washington, D.C. 20001
                          (202) 639-0999
                          info@balarezolaw.com


Court Reporter:           William P. Zaremba, RMR, CRR
                          Official Court Reporter
                          U.S. Courthouse
                          333 Constitution Avenue, NW
                          Room 6511
                          Washington, D.C. 20001
                          (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

```
1                    P R O C E E D I N G S
2              DEPUTY CLERK:  Please be seated and come to order.
3              THE COURT:  Good afternoon.
4              DEPUTY CLERK:  Your Honor, calling Criminal Case
5     No. 12-184, the United States of America v. Alfredo
6     Beltran Leyva.
7              The defendant is present in the courtroom.
8              The interpreters present for these proceedings and
9     have been sworn for the record are Theresa Roman and
10    Theresa Salazar.
11             Counsel, please approach the lectern, identify
12    yourself for the record.
13             MS. LISKAMM:  Good morning, Your Honor.
14    Amanda Liskamm on behalf of the United States.
15             And seated at counsel table with me is
16    Andrea Goldbarg and Angela Ancalle Jimenez.
17             MS. GOLDBARG:  Good afternoon, Your Honor.
18             THE COURT:  Good afternoon.  Welcome.
19             MR. BALAREZO:  Good afternoon, Your Honor.
20    Eduardo Balarezo on behalf of Mr. Beltran Leyva.
21             And at the Court's request, I had
22    Mr. William Purpura and Harry Tun appear today so that the
23    Court can inquire of them with respect to the protective
24    order.
25             THE COURT:  Very good.
```

1            All right.  Well, before we get to that, let's get

2    an update on what's been going on from government's

3    perspective.

4            MS. LISKAMM:  Since our last status conference,

5    Your Honor, the government has been conducting interviews of

6    approximately 18 potential witnesses in an effort to narrow

7    down the government's witness list in preparation for trial.

8            And, additionally, to allay any concern that

9    defense counsel had raised with respect to potential Brady

10   material that may exist.

11           Throughout the course of these interviews, we have

12   uncovered additional seizures that we are doing a further

13   investigation into as to their relevance for trial and

14   requesting additional documentation from foreign countries

15   to obtain those reports.

16           THE COURT:  All right.

17           How about production of any discovery materials

18   since the last hearing?

19           MS. LISKAMM:  We have not produced anything,

20   Your Honor, as we do not have anything in our possession to

21   be produced at this time.

22           We anticipate in the near future having additional

23   ledgers that we'd be seeking to produce subject to the

24   protective order.  And once we receive documentation related

25   to the seizures from the foreign countries, we will produce

1   those to defense counsel.

2           THE COURT:  Remind me as to the ledgers.

3   Does government -- the government know or believe it knows

4   who authored the ledgers?

5           MS. LISKAMM:  Yes, Your Honor.

6           THE COURT:  And has that information been shared

7   with the defense?

8           MS. LISKAMM:  No, Your Honor.

9           THE COURT:  No.  And the reason why it hasn't been

10  shared is?

11          MS. LISKAMM:  I do not believe that that's

12  required under Rule 16, Your Honor.

13          As we indicated in our motion -- our opposition

14  that was filed with respect to defense counsel's motion for

15  relief from the protective order, the ledgers are more akin

16  to Jencks Act material, but we are producing them in an

17  effort to help defense counsel prepare for trial.  And one

18  of the reasons why we are producing them subject to the

19  protective order is to protect the safety and identity of

20  these cooperating witnesses.

21          THE COURT:  Has the government made a decision yet

22  as to whether the person who authored -- is it more than one

23  person or just one person?

24          MS. LISKAMM:  At this point, we've produced

25  ledgers from one individual.

1          THE COURT:  Is there any doubt in the government's

2    mind that he or she, whichever it is, will be a witness in

3    this case?

4          MS. LISKAMM:  Your Honor, we're still determining

5    that, and so we don't have a definitive answer.  If I may

6    have one moment.

7          THE COURT:  Uh-huh.

8          (Pause)

9          MS. LISKAMM:  And, Your Honor, I should note that

10   if we do introduce those ledgers at trial, it would be

11   multiple witnesses who would be testifying as to the

12   contents of those ledgers, so it would not affect just one

13   witness.

14         THE COURT:  Well, I mean, obviously, I don't know

15   enough about the facts.  I mean, I don't think Mr. Balarezo

16   does either, but if government's theory is that the person

17   who authored these ledgers was doing so at the direction of

18   or with the knowledge of, or both, of the defendant, then it

19   would seem to be critical that the defendant be able to not

20   only know that, but be in a position to evaluate the

21   accuracy, completeness, authenticity of these ledgers.

22         Now, on the other hand, if government's position

23   is it has no reason to believe that they were being made at

24   the direction of or with the knowledge of the defendant,

25   that this was just a ledger that some person knowledgeable

1    of this alleged drug operation was making on his own, for

2    his own, whatever, purpose, I mean, whether it was

3    self-protection or leverage or what it was, then that's a

4    different -- that's a certainly a different approach, and

5    creates a different, probably, analysis as to whether or not

6    this information needs to be provided sooner rather than

7    later.

8              I mean, if the person is going to be a witness for

9    the government, then obviously, the Jencks Act will have an

10   impact on that person's -- on the production of that

11   person's name at some point.

12             MS. LISKAMM:  And, Your Honor, the government's

13   theory is not that the defendant had someone author these

14   ledgers on his behalf.

15             So, again, our theory is that these ledgers

16   constitute Jencks Act material.  They were created by the

17   witness who we are still determining if they're going to

18   testify at trial.  And, again, we have produced the ledgers

19   thus far and will continue to produce ledgers in an effort

20   to assist defense counsel to prepare.  But I do not believe

21   that they can be construed as Rule 16 under the theory that

22   defendant had the witness author the ledgers.

23             THE COURT:  Is my recollection correct that --

24   and pardon me if I get it wrong since I just completed the

25   sixth week of an 11-week trial -- have you already

1  represented to this Court that all of your witnesses that

2  you'd be calling are in custody?

3          MS. LISKAMM:  I don't believe that representation

4  has been made.  And I don't -- that is not an accurate

5  statement.

6          THE COURT:  I seem to have a recollection that

7  most of your witnesses are cooperators and that they're in

8  custody.

9          MS. LISKAMM:  There are a large number of

10  witnesses who are -- that we intend call who are cooperators

11  and who are in custody.

12          THE COURT:  And other than that, it's law

13  enforcement folks, is my understanding?

14          MS. LISKAMM:  That's correct, Your Honor.

15          THE COURT:  Well, I have to assume a law

16  enforcement officer isn't the one who authored these logs

17  that you've got here, and these diaries or whatever you want

18  to call them, so that would mean someone in custody.

19  It seems pretty obvious.

20          All right.  I'll hear from Mr. Balarezo.

21          MR. BALAREZO:  Yes, Your Honor.

22          Does the Court wish to hear about anything in

23  particular or just general concerns at this point?

24          THE COURT:  Both is fine.

25          I mean, obviously, you have a motion pending, and

1   I might have a few questions for you on that.

2           MR. BALAREZO:  Your Honor, the motion that is

3   pending was a motion for relief from the protective order

4   and it was, at this point, with respect to the 1,749 pages

5   of ledgers that the government -- or characterized as

6   ledgers.  I didn't bring them with me because of the volume,

7   but basically, it is 1,749 pages of spreadsheets, with about

8   30, 40 lines per page.

9           THE COURT:  How does it -- how does it compare to

10  one of my notebooks in this --

11          MR. BALAREZO:  There's about four or five of

12  those, Your Honor.

13          THE COURT:  -- 11-week trial that I'm on.

14          MR. BALAREZO:  It's a box.  It's a banker's box

15  with about four or five folders of that size.

16          THE COURT:  Okay.

17          MR. BALAREZO:  I have reviewed them, I have

18  reviewed those documents with Mr. Leyva.

19          Now you have me calling him the wrong name.

20  Mr. Beltran Leyva.

21          And by ourselves we cannot make neither heads nor

22  tails.

23          The reason I am seeking relief from the

24  protective order, as I noted, is that --

25          THE COURT:  Hold on now, Mr. Balarezo.

1          Keep in mind, government has made two

2    representations today that are at least of concern to the

3    Court.  They're not sure they want to use these ledgers.

4          MR. BALAREZO:  Okay.

5          THE COURT:  And they're not sure they want to use,

6    as a witness, the person who offered them.  They're trying

7    to figure that out.

8          MR. BALAREZO:  Uh-huh.

9          THE COURT:  And they have produced them to you in

10   advance to spare time and move things along expeditiously,

11   because you've obviously indicated on the record that you

12   want to have a trial earlier than -- sooner than later,

13   right?  So in order to accommodate getting you up to speed,

14   they're giving you this information earlier rather than

15   later so that you have time to get the assistance of

16   whatever assistance you need to sort of, you know, go

17   through them.

18          They've just represented, the second thing they

19   represented today that I think is important is that they --

20   their theory is, and they do not believe that these ledgers

21   were either produced at the direction of your client or with

22   the knowledge of your client.

23          MR. BALAREZO:  That's correct.

24          THE COURT:  So this is some third party, acting on

25   his own, if this is accurate, acting on his own, creating

1   ledgers on his own, which, frankly, may never be admissible

2   in evidence, ever.

3          They don't know if they want to admit it; but even

4   if they want to admit it, the Court might not allow it in

5   against your client.

6          So there's an awful lot of unknowns here to base a

7   motion for leave of the Protective Order on.

8          MR. BALAREZO:  Your Honor, we respectfully

9   disagree.

10          First of all, there may be a lot of unknowns to

11   government; but to my client, there's an absolute unknown.

12   He was indicted in 2012.  He was brought here three months

13   ago.  To date, the discovery that we had received is

14   completely useless to the defense.

15          The only thing of any consequence that we have

16   received, and the government believes it's of consequence,

17   otherwise it would not have requested it be produced under

18   the protective order, is those 1750 pages.

19          With respect to the first representation that the

20   Court said that the government is not sure whether or not

21   they will use the ledgers or bring as a witness the author

22   of the ledgers, that's, quite frankly -- that's the

23   government's concern.  It's not the defense's concern,

24   because we have the ledgers.  We have to assume that the

25   possibility exists that they will be used, and I have to

1    make use of my time in a way that I can represent my client.

2    And the way the protective order is currently structured,

3    I can't do anything with those documents for the reasons

4    stated in the motion.

5           Government's opposition to my motion made it

6    plainly -- made it very plain that the reason they want the

7    documents under the protective order is so that defense

8    cannot ascertain the author or the people who have anything

9    to do with those protective orders.

10          I'm not asking the government for the government's

11   witness list.  I'm only asking to be allowed to do my job to

12   defend my client.  The government cannot prevent me from

13   investigating the case.  The government cannot prevent me

14   from trying to find out who witnesses are.  It's as if in a

15   homicide case or a robbery case out on the street, the

16   government tells the Court, Judge, we don't want the defense

17   going out and canvassing for witnesses, because they'll find

18   out who our witnesses are.  They can't do that.  And with

19   all due respect, I don't believe that the Court can prevent

20   the defense from doing that kind of investigation.

21          Now, I understand the Court has issued the

22   protective order.  We respectfully disagree with it for the

23   reasons that we have stated, in particular that the

24   government has absolutely failed to articulate any reasons

25   for it besides saying that there are security concerns.

1   The government cites security concerns in every case, but

2   that's not a reason for a protective order.

3           Now, with respect to the documents that are in

4   issue, the so-called ledgers, as I said, I can't take them

5   out of the country, I personally can't take them out of the

6   country.  I can't send them to anyone else out of the

7   country.  I can't show them to anyone who has any knowledge

8   of these events or of the drug business or anything of that

9   nature, because --

10          THE COURT:  I haven't seen the ledgers, so I'm at

11  a huge disadvantage to you and the government.

12          MR. BALAREZO:  Sure.

13          THE COURT:  What kind of detail is in them?

14          MR. BALAREZO:  Your Honor, from memory --

15          THE COURT:  I assume they're in Spanish?

16          MR. BALAREZO:  They're in Spanish.

17          There are details in there, sales of cars, sales

18  of properties, expenses.

19          I can -- I will be frank with the Court.

20  I did not review every page in detail, because it's a

21  useless and futile endeavor.  But the bulk of what I saw

22  does not stand out, you know, 2,000 kilos, Alfredo Beltran

23  Leyva.  That kind of information is not there.  So it's not

24  evident on its face that these are drug ledgers.  They could

25  be, quite frankly, look like ledgers from a business, sales

1  of property, sales of goods, all kinds of things of that

2  nature.

3  Now, if the government is going to seek to use

4  these documents at trial, they're obviously going to have to

5  bring the author to testify; otherwise, I can't see the

6  admissibility.

7  THE COURT:  I don't see how they can get it in,

8  otherwise.  I see what you're saying.

9  MR. BALAREZO:  Right.

10  So -- but I don't have the luxury of waiting for

11  the government to make a decision about how they're going to

12  present the case so that I can start preparing my defense of

13  my client.

14  With respect to the second representation that

15  Mr. Leyva or at least that it's the government's theory that

16  Mr. Beltran did not author or direct the production of these

17  ledgers, the effect is the same.

18  The government has some witnesses or a witness,

19  presumably, who will testify, if they decide to put him on,

20  that Mr. Beltran had something to do with drug deals which

21  are reflected in the ledgers.

22  For the same reasons --

23  THE COURT:  But you just said, did I misunderstand

24  you?  You just said that you can't tell from looking at the

25  face of the ledgers that they relate to drug deals.

1    It could be the ledgers for an auto dealership, it could be

2    the ledgers for, you know, a Walmart franchise or something

3    like that.  You can't tell from the face of it --

4             MR. BALAREZO:  Right.

5             THE COURT:  -- that it relates to drug deals,

6    unless there's some code language being used which you

7    apparently can't decipher on your own.

8             MR. BALAREZO:  And that's even more reason for the

9    defense to be allowed to share the material, if you will, or

10   the contents thereof with other individuals.

11            Your Honor, I am not an expert on drug ledgers.

12   The government itself is saying that my client has nothing

13   to do with the ledgers, didn't direct them, didn't make

14   them.  So I have to be able to do something.

15            I have ideas.

16            THE COURT:  Well, I have to tell you,

17   Mr. Balarezo, in light of that representation the

18   government's made to me today, which I was frankly surprised

19   to learn.

20            MR. BALAREZO:  Which one, Your Honor, the first or

21   the second?

22            THE COURT:  The second one.

23            MR. BALAREZO:  Okay.

24            THE COURT:  That I'm having a hard time

25   understanding how they have any evidentiary value at all.

1          And I'll give the government, of course, an

2  opportunity, the question is when, but I'll give them an

3  opportunity to convince the Court that these have any

4  evidentiary value and that they are usable against this

5  defendant, but I would say at this point, it's very

6  questionable whether they are usable against this defendant.

7          MR. BALAREZO:  Well, Your Honor, my concern is

8  that the government will make some proffer later on when

9  it's a little late for me to do it.  Now, I --

10          THE COURT:  I assure you that won't happen,

11  Mr. Balarezo.

12          If that's the kind of thing happened on the eve of

13  trial, guess what, the trial will be moved back.

14          MR. BALAREZO:  The trial will what?

15          THE COURT:  Will be moved back.  You will not be

16  prejudiced.

17          MR. BALAREZO:  Well, my client will be prejudiced,

18  Your Honor, because he will continue to be detained.

19  He is asserting his speedy trial rights, and that's what

20  we're trying to get to.

21          THE COURT:  We're going to have to figure out when

22  the point of no return is then, aren't we?

23          MR. BALAREZO:  Well, Your Honor, not to speak for

24  the government, but I suspect what is going to happen here,

25  what they're going to try to do is, they have witnesses to

1    one of these many drug seizures that the government still

2    hasn't identified for the defense, and they're going to put

3    in witnesses who say Mr. Beltran had something to do with

4    these seizures or the loads.

5            THE COURT:  Uh-huh.

6            MR. BALAREZO:  And that these ledgers reflect

7    records of his involvement in the loads.  That doesn't mean

8    that he directed them or that he made them.  It fits in.

9    And I'm certain that's what they're going to try to do.

10           Even so, that's even more reason for me to try to

11   find out what these ledgers reflect.  I have 1,700 pages,

12   Judge, that I can't do anything with.  And if they're not

13   relevant, then why are they on their protective order?

14           THE COURT:  Well, we don't want to conflate two

15   different things here.  One is to figure out what they are

16   on their face, and two is to figure out who authored them

17   and at whose direction they were being made.  And those are

18   two different things.  At some point, they intersect,

19   clearly.

20           But at this point, my primary concern is that your

21   representation to the Court that you can't, from looking at

22   these on their face, you can't determine what they concern.

23           MR. BALAREZO:  That's the problem, Your Honor.

24           I mean, the government is representing that these

25   are drug ledgers.  They obviously have some information not

1    available to the defense at this point that they're drug

2    ledgers --

3              THE COURT:  Uh-huh.

4              MR. BALAREZO:  -- that I cannot on their face

5    identify what they refer to or my client can't.

6              I think that that makes the point of why the

7    defense needs more access or more latitude with respect to

8    the materials so that we can try to find out what it is.

9              THE COURT:  Uh-huh.

10             MR. BALAREZO:  It is not the defense's job to wait

11   for the government to make a decision about whether or not

12   they want to use something.  It is not the defense's job to

13   wait and pick up the crumbs that the government decides it

14   wants to throw our way.  I have a job to do, Your Honor.

15             THE COURT:  That's not going to happen.

16             MR. BALAREZO:  It is happening, Your Honor.

17             THE COURT:  No, it isn't.  The trial date hasn't

18   been set yet.  Believe me, it's not going to happen.

19             What's your other issue?

20             MR. BALAREZO:  The other issue, Your Honor, is

21   just basically the lack of discovery, still, in this matter.

22             If I may have a second.

23             The government's first production was December the

24   10th, and it was but a half-inch stack of paper.

25             And as I previously mentioned, the overwhelming

1    majority of these pages, I think it's 80 or 90 pages, deal

2    with Mr. Beltran's arrest in Mexico, which the government,

3    I believe at the last hearing, indicated it did not -- would

4    not seek to introduce any evidence of that at trial.

5    So obviously, these documents then are irrelevant.

6            There are -- of these pages, there are about two

7    or three individual pages.  And I'm trying to pull one up

8    for the Court.

9            Can I turn the ELMO on, Your Honor?

10           THE COURT:  Yeah.  You can just tell me what it

11   says.  You don't need to do that.

12           MR. BALAREZO:  It's a DEA form dated October 2004,

13   which mentions a seizure of 10,500 kilograms of cocaine from

14   the fishing vessel, San Jose, in the eastern Pacific Ocean.

15           THE COURT:  Ten thousand kilograms?

16           MR. BALAREZO:  Ten thousand five hundred

17   kilograms.

18           Obviously, it does not mention anything with

19   respect to my client, doesn't mention anything else except

20   that that quantity of cocaine was seized.

21           According to the government, that is sufficient

22   disclosure of the type of seizures that it's going to try to

23   attribute to Mr. Beltran.  There were two other documents of

24   the same type, which the government claims is the discovery.

25           We have not received any documentation with

1  respect to the seizures, we have not received any videos

2  with respect to the seizures.  The Coast Guard and the

3  military usually videotape these types of seizures.

4  We haven't received anything except this one document for

5  seizure.

6          It talks about that there's more than ten.

7  You know, I don't know how many exactly, different seizures.

8  We haven't gotten anything.  I'm asking for at least give me

9  a list of the seizures that you think are attributable to my

10  client.  I haven't even gotten that.

11          The government is saying we need to get these

12  documents from Mexico.  Well, the problem here is,

13  Your Honor, that, as I said, they indicted Mr. Leyva,

14  Mr. Beltran in 2012.  He got here three months ago.

15  We've gotten nothing.

16          Other discovery, we have a disk with five videos.

17  These are about ten-second video clips of Mr. Beltran being

18  walked to an airplane, presumably in Mexico, to be shipped

19  here, and the airplane taxiing and the runway.  Really,

20  really useful material.

21          And then, Your Honor, this is the most, quite

22  frankly, I don't know what the point of this is.  This is

23  discovery that we're getting from the government.  And I'll

24  make a record of it's documentation of Mr. Beltran in his

25  underwear in an airplane or a hangar when he's being turned

 1   over to the DEA.  I don't understand.

 2           We got the ledgers, which we've talked about.

 3   And then about two weeks ago, I got a folder with --

 4           THE COURT:  There's no statements of the

 5   defendant.

 6           MR. BALAREZO:  Nothing, apparently.

 7           THE COURT:  Nothing oral or in writing?

 8           MR. BALAREZO:  Not -- I've asked for it, I haven't

 9   received anything.

10           THE COURT:  Apparently, they don't have any.

11           MR. BALAREZO:  If they don't have it, that's fine.

12           But, you know, my client is charged with being a

13   leader of a large Mexican cartel.  We don't -- I don't have

14   anything yet; three months into this, I don't have any

15   discovery that would allow me to advise my client properly;

16   that will allow him to determine whether or not he wants to

17   plead.

18           And at this point, he doesn't want to plead

19   because he doesn't -- why should he plead, there's no

20   evidence in the case.  We don't have it.

21           And if it's a cooperator case, which we believe it

22   is, and government did previously say that all the

23   cooperators were detained, then when we get the Jencks,

24   that's the case.  So, you know, let's get to trial, Jencks.

25           That seizures happen in Mexico is of no moment to

1  us.  Seizures happen.  The problem is how is this man

2  connected to those seizures, and that's what the government

3  doesn't have, and that's what the cooperators are going to

4  provide.

5          So all of this right now, quite frankly, to us, is

6  churning the waters, mucking the facts, and trying to delay

7  a trial date for Mr. Beltran while the government makes its

8  case, which is why it's interviewing witnesses now.

9          They were in Miami last week interviewing people,

10  seeking witnesses.  They're trying to build a case now, and

11  that's the problem.  That's not what the Speedy Trial Act

12  was meant to do, that's not what this Court should allow the

13  Government to do.  If they have a case against them, they

14  indicted him, presumably they thought they could convict

15  him, then let's go to trial, that's what my client wants.

16          He is asserting his rights to a speedy trial, and

17  we would like a trial date scheduled, Your Honor.

18          THE COURT:  All right.

19          MS. LISKAMM:  Your Honor, turning back to defense

20  counsel's statements about his motion for a protective

21  order.  In the motion itself, the defendant acknowledges

22  that the parameters of the protective order allow him to do

23  some investigation.  His complaints in his motion stem from

24  the inconvenience of people having to travel either into the

25  United States or into Mexico.

1       While the government is sympathetic to this

2   inconvenience, as the government has repeatedly pointed out

3   to the Court and the Court has acknowledged at numerous

4   prior hearings, there are serious safety concerns in this

5   case.  Inconvenience of travel to a foreign country does not

6   outweigh the concerns that the government has put forth to

7   the Court to the potential witnesses in this case.

8       Additionally, the parameters of the protective

9   order don't hamper defense counsel so that he is the only

10  person who's allowed to view the protected material.

11  The parameters of the protective order clearly state that

12  members of his defense team and those authorized by the

13  Court are allowed to view the documents.

14      That allows defense counsel latitude to work with

15  who he wishes to in order to accomplish whatever goals he

16  may have in investigating this case.

17      THE COURT:  Now, as to the two Mexican attorneys

18  that he has represented to the Court that he wants to have

19  on his team, you've indicated you want to file under seal ex

20  parte some information with the Court relating to those two

21  attorneys that, I believe, the way you put it in your

22  pleading was that would be the basis for you to object to

23  them having access to the information or words to that

24  effect.

25      MS. LISKAMM:  Yes.

1       Your Honor, as I understand it now, the Court has

2   not approved -- and there's actually, I believe three

3   Mexican attorneys.  The Court has not approved their viewing

4   of the protected material.  And so we have submitted --

5       THE COURT:  Well, I hadn't approved it because I

6   hadn't received verification that they were members of the

7   bar in good standing in Mexico.  That was the holdup there.

8       Now you're telling me you have new information

9   that you want, and I've signed an order saying you can file

10  it under seal ex parte.

11      MS. LISKAMM:  Thank you, Your Honor.

12      THE COURT:  I'll take a look at it, obviously.

13  I don't know what it is.  But if -- again, I don't know what

14  it is.  But obviously, if there's a basis to have concerns

15  about those attorneys' trustworthiness or reliability as it

16  relates to this information, well, then, we'll have to deal

17  with that.

18      MS. LISKAMM:  And the Court -- the government

19  would request that the Court have an opportunity to view the

20  ex-parte filing; and then if the Court wishes to further

21  discuss this, the government would be happy to do so.

22      THE COURT:  Sure.

23      MS. LISKAMM:  With respect to the discovery in

24  this case, I believe from day one, the government has made

25  clear that this is not a document-heavy case; that this is a

1    cooperator-heavy case.

2         I believe at one of the first status conferences,

3    the Court inquired with the government as to how many

4    potential witnesses they were, how many were law

5    enforcement, how many were potential cooperators and

6    whatnot.  So I think everyone's been on the same page since

7    day one about that.  So the government is not playing hide

8    the ball or anything or trying to delay the defendant's

9    right to a speedy trial in any way whatsoever.

10        In fact, the reason why the government has been

11   diligently going through and interviewing the 18 witnesses

12   that we have since the last status conference is, one, to

13   whittle down our witness list so we're not dealing with

14   months-and-months-long trial, but also in response to

15   defense counsel's motion accusing the government of hiding

16   Brady material with respect to who is responsible for these

17   seizures.

18        Going along with that, defense counsel has

19   requested a list of seizures that the government intends to

20   introduce at trial.  We have produced four -- documents

21   related to four seizures thus far.  We have not identified

22   other seizures and given discovery to defense counsel for

23   two reasons.  One, we don't have the documents; and, two, we

24   want to be sure that these seizures can be attributed to the

25   defendant so that we're not misquoted in future filings

1   about seizures that may or may not be related to the

2   defendant.  So we're trying to make sure that we have our

3   facts straight before we produce this stuff to defense

4   counsel, so they don't end up in filings.

5           For clarification purposes, we have produced

6   photographs of some of the seizures that have already been

7   produced to defense counsel.  We've been alerted today that

8   the photographs that defense counsel has are black-and-white

9   copies because defense counsel asked for us to fax them to

10  him.  He's asked for original copies, which we will produce

11  to defense counsel next week, as soon as we have an

12  opportunity to make color copies of them.

13          We have no videos in our possession to produce to

14  defense counsel.

15          And we are making requests from the foreign

16  countries to get the additional documentation.

17          And just for classification --

18          THE COURT:  Well, where did these four seizures

19  take place?

20          MS. LISKAMM:  I believe two of them are maritime

21  seizures.

22          And I don't recall the facts, I apologize,

23  Your Honor, of the other two seizures.  I know one occurred

24  in 2007, and one occurred in 2008.

25          THE COURT:  Did they occur in the United States?

1           MS. LISKAMM:  No.

2           THE COURT:  In Mexico?

3           MS. LISKAMM:  If I may have a moment?

4           (Pause)

5           MS. LISKAMM:  I stand corrected.  All four of the

6    seizures are maritime seizures.  Three of them were done by

7    the United States, and one by the Colombians.

8           And just for classification purposes, the

9    documents that we're requesting are not being requested from

10   Mexico, they're being requested from other foreign

11   countries.

12          And just -- sorry.

13          THE COURT:  Well, what I was going to say is,

14   I mean, obviously, the sooner that Mr. Balarezo has whatever

15   information is available in written form or video form or

16   whatever form of that kind with regard to these four

17   seizures, the sooner he'll be able to do whatever diligence,

18   due diligence he has to do to try to ascertain what, if any,

19   defense theories would be appropriate and successful,

20   potentially, on behalf of his client.  So the sooner he gets

21   that information, the better.

22          As far as the ledgers go, it's clearly, especially

23   now that I've learned that these were not ledgers that were

24   done at the -- either by the defendant or at his

25   direction -- and clearly, it's important in evaluating these

1    ledgers to have -- for him to have knowledge of who authored

2    them.

3         If that person is in custody, I don't see how that

4    person, if that person is in custody in the federal system,

5    is it any greater risk if it be known that he authored these

6    ledgers, than if it not be known that he offered these

7    ledgers, because he is or she, I'm assuming it's a he, he is

8    going to be a witness in this case, apparently.

9         MS. LISKAMM:  And, Your Honor, the safety and

10   security that the government has concerns about not only

11   apply to the cooperating witnesses but their family members

12   who are potentially not in the United States as well.

13   So there are security concerns that go beyond just the

14   potential cooperating witnesses in this case.  So premature

15   disclosure of these cooperators' names would create

16   serious -- has the potential of creating serious safety

17   concerns.

18        THE COURT:  Well, I appreciate that.  But I think

19   you must also appreciate that there has to be a point of no

20   return here, where Mr. Balarezo knows the name of the author

21   of these ledgers, assuming you're going to try to use them.

22        If you decide you're not going to use them, then

23   obviously it would be better he know that sooner rather than

24   later so he doesn't have to have the anxiety of that hanging

25   over his head and waste a lot of time trying to figure out

1   what's in these 1,800 pages of ledgers.  I don't want him

2   wasting time on that, and I certainly don't want him wasting

3   his client's money on that either.  So I'm willing to give

4   you a little more time to figure out the answer to the

5   question.

6          Are you going to use these ledgers -- are you

7   going to seek to use these ledgers and/or are you going to

8   seek to have this witness testify on your behalf?  If that

9   makes sense.

10         But it's not going to -- you're not going to have

11  until a week before trial to answer that question, because

12  Mr. Balarezo has got to do his -- if you're going to seek to

13  use these or you're going to seek to have as a witness the

14  person who authored these, he has to do his due diligence,

15  and I can't put him in a position on the eve of trial where

16  he's being forced to do that due diligence.  So it sounds to

17  me like there's -- 1,800 pages is pretty extensive by any

18  standard, and it takes time to weed one's way through that.

19         And then, of course, depending upon who the author

20  of those ledgers are, it's going to take him time to look

21  into who that person is, what that person's relationship

22  was, if any, with the defendant, what interactions, if any,

23  that person had with the defendant.

24         There's a lot of things he's got to sort of look

25  into and then do follow-up investigating about.  And that's

1   going to take him well over a month.

2          So you've got the problem of he's going to need to

3   know well over a month before trial who the author -- if you

4   want to use these ledgers, who the authors of these ledgers

5   are.

6          Do you think you can live with that?

7          MS. LISKAMM:  Is the Court asking if the

8   government can live with a month before trial disclosing

9   who --

10          THE COURT:  More than a month before trial.

11   We haven't set a trial date yet.  The earliest I told you I

12   could do this trial was the summer.  But the summer right

13   now is three month away, isn't it?  Basically.  I mean,

14   March, April, May, okay, four months away.  So he's going to

15   need to know at least well over a month before that, maybe

16   two months out.

17          So if the trial were say in June, hypothetically,

18   he's going to need to know in April at the latest, if you

19   wish to use it, which, of course, is separate from the

20   consideration of whether you'd be successful in getting it

21   in.  I don't know what objections he might have to it once

22   he knows.  You know, there may be relevance questions, there

23   may be other issues, I mean, I don't know.  I don't know

24   enough about it.

25          So I think the government should spend some time

1    over the next week -- till our next hearing, which should be

2    hopefully in the near future, thinking through how this is

3    going to proceed, because if this is going to be evidence

4    that's critical to the government's case, Mr. Balarezo and

5    his team are going to need time to parse it out and figure

6    out what, if any, inculpating value it has against his

7    client, or what defenses might be appropriate.

8            And that's -- you're going to have to reveal that

9    months in advance of trial, months, which means you're going

10   to have to be prepared to provide whatever protection you

11   think needs to be provided in Mexico and in the

12   United States to the extent it's two countries, months in

13   advance of trial, months.  Do you read me loud and clear?

14           MS. LISKAMM:  Understood, Your Honor.

15           THE COURT:  So I'm not telling you you've got to

16   tell him today, but that point in time is not that far away.

17   We're, you know, here we are, it's almost March, it's a week

18   away, March is a week away.

19           And if I hear you correctly, you don't have any

20   other major collection of documents right now that you plan

21   on using in the case.

22           MS. LISKAMM:  And, Your Honor, just to clarify, we

23   have -- are seeking additional documents related to

24   additional seizures that we have learned of through our

25   interviews with these 18 witnesses, and we are in the

1    process of making requests to foreign countries in order to

2    obtain copies -- yes, I guess they are copies of the

3    documentation through the proper channels.

4         THE COURT:  Well, Mr. Balarezo, Mr. Balarezo makes

5    a good point when he says the seizures on the high seas.

6         The maritime seizures by U.S. authorities are

7    generally tape recorded, videotaped, and reports are

8    written, ledgers are compiled, you know, things like that.

9         So you've indicated the three of the four seizures

10   to date that you're aware of or that you've, you know,

11   thinking of using were by U.S. authorities.  So there must

12   be that kind of evidence out there somewhere.

13        MS. LISKAMM:  Your Honor, we will confirm again

14   that we have everything from those seizures and make sure

15   that if they do exist, that we produce them to defense

16   counsel.

17        THE COURT:  Well, why don't we -- why don't we set

18   some dates then so we'll give you a couple weeks to get to

19   the bottom of that.

20        And when we reconvene in a couple of weeks, I'll

21   need to get an update on where that stands, because I'd like

22   Mr. Balarezo, in the next couple weeks, to finally get the

23   seizure related information of the -- at least the three.

24        Now, Colombia is a little harder to get because

25   it's a foreign government.  I understand how that could be a

 1   little tougher to get that information on an expedited

 2   basis.

 3          But certainly, I assume you've taken the necessary

 4   steps, diplomatic channels, appropriate diplomatic channels

 5   to gain access to the Colombian information to the extent

 6   that there is any.  I don't know if they have a procedural

 7   process that's akin to the one used by U.S. Coast Guard or

 8   U.S. law enforcement authorities.  I don't know if they do

 9   it quite the same way in Colombia.  Probably not, but...

10          MS. LISKAMM:  And we've made the appropriate

11   requests through the appropriate channels for documentation

12   down there, some of which we've received already and have

13   produced to defense counsel, and some of which we are still

14   in the process of requesting based on this new information.

15          THE COURT:  Uh-huh.

16          Now, these cooperators that you're trying to prune

17   down from 18 to some smaller number.

18          MS. LISKAMM:  And if I can just -- I can just

19   classify, Your Honor, there's actually more than 18.

20          We probably have at least 20 more interviews to do

21   after this.  We're trying to cut the witness list down;

22   I think we were at somewhere between 40 and 50.

23          At that last status conference, we went through

24   our witnesses and we're trying to cut that down so that

25   this isn't a several months' long trial.

1          THE COURT:  Well, 40 or 50, though, was

2    cooperators and known cooperators, right?

3          MS. LISKAMM:  Yes, Your Honor.

4          THE COURT:  So of the 40 or 50, my understanding

5    was only 20 or less were cooperators?

6          MS. LISKAMM:  I don't recall what the numbers were

7    at the last hearing, Your Honor.

8          I know that we've met with approximately 18 --

9    we've met with 18 so far, and we estimate about 20 more

10   interviews to be conducted in the next few weeks.

11         THE COURT:  So let's assume for the sake of

12   discussion, you have a universe of 40 potential cooperators,

13   but you don't intend to call 40 witnesses.

14         MS. LISKAMM:  That's correct, Your Honor.

15         THE COURT:  All right.

16         So it would seem to me that any efforts you can

17   make to narrow that list is actually in everyone's interest

18   here.

19         But, you know, dumping on Mr. Balarezo the week

20   before trial Jencks material for 20 cooperators is not fair

21   play.  So I don't think that's going to happen either.

22         So you're going to have to provide Jencks material

23   sooner, as a practical matter, to enable him to get ready

24   for trial.  And so that means you're going to have to take

25   whatever steps necessary prior to trial to secure those who

1  you have concerns might be in jeopardy.

2          Now, the people who are incarcerated, I assume

3  they're secure.  I understand within prison systems, people

4  can be at greater jeopardy or less jeopardy at any point in

5  time.  But prison systems who are informed of what the

6  situation is have means and methods to put people in a safer

7  location than they otherwise might be.  That doesn't mean

8  everyone goes to the Super Max in Colorado.

9          But on the other hand, there are facilities in the

10  United States where a person is going to be even safer than

11  they might be in the place that they are initially housed,

12  you know.

13          If they're in -- I'm just making up an example.

14  If they're in Atlanta, then maybe you send them to Marion.

15  If they're in Marion, maybe you send them to Super Max,

16  I don't know.

17          I mean, there's all kind of gradations of security

18  within the federal system, Super Max and Colorado being

19  obviously the most extreme in one direction.  But there are,

20  you know, there are all variations down from there.

21          So since I don't know who any of these folks are

22  or what kind of security precautions have been taken, I'm in

23  no position to even hypothesize as to what options might be

24  out there.

25          But I do know that there are ways within the

1   federal prison system to put people in safer conditions to

2   guard against any type of nefarious conduct.  So you need to

3   be taking those steps now in advance, because if we're going

4   to try this this summer, that's only months away, it's not

5   far away.

6            And the estimate we talked about before was a

7   three month trial, because it's four days a week.  So that's

8   basically 16 trial days a month.  So we're talking 48 trial

9   days.  And if each cooperator is a half a day or a day,

10  cross is usually about the same, that's two days per

11  cooperator.  If you do 18 cooperators, that's 36 days.

12  You can use up those 48 days pretty fast.  That's without

13  any law enforcement people.  So it won't be fair to

14  Mr. Balarezo and his team for him to get all that stuff on

15  the eve of trial.  So he's got to -- he can't prepare a

16  defense that way.

17           So submit your under seal ex parte, your concerns

18  about the two lawyers, and when we reconvene in two weeks,

19  I'm going to set a hearing in two weeks.

20           All right, hold on now.  I spoke too soon.

21           Three weeks.  I can't do it the 6th, but I can do

22  it the 13th.

23           Are you available the 13th, Mr. Balarezo?

24           MR. BALAREZO:  I am, Your Honor.

25           THE COURT:  One of the government will be present

1  the 13th?

2          MS. LISKAMM:  Yes, Your Honor.

3          THE COURT:  All right.  So let --

4          MR. BALAREZO:  Your Honor --

5          THE COURT:  Go ahead.

6          MR. BALAREZO:  -- I'm aware the Court said it

7  couldn't do it on the 6th.  Is it possible on the 5th or is

8  the Court still in trial?  That's a long trial, that's

9  right.

10         THE COURT:  That's a very --

11         MR. BALAREZO:  The 13th is fine.

12         THE COURT:  It's a very long trial.

13         MR. BALAREZO:  What time, Your Honor?

14         THE COURT:  11:30.

15         MR. BALAREZO:  11:30?

16         THE COURT:  So why don't you take the necessary

17  steps on the government's side to figure out what your

18  thinking is with regard to using these ledgers, whether you

19  intend to try to use them, which is a separate issue from

20  whether you'll be able to use them, that's a separate issue,

21  and what your thinking is on the soonest you can provide

22  Mr. Balarezo, in your judgment, the name of the author.

23  Assuming there's only one author, I have no reason to think

24  there's more than one author, the author of these ledgers,

25  who did this at his own, apparently, his own initiative.

1  Because, again, I'm not going to let that be dumped on him

2  the week or two before trial, it's not possible.

3          All right.  Now, you had other concerns about --

4  you have the two lawyers' concerns, we've addressed those.

5  They're going to submit a document to me or documents to me

6  to look at, and I might have to have a hearing with them

7  about that.  I don't even know what they're going to submit,

8  so...

9          MR. BALAREZO:  Your Honor, I wasn't aware that

10  something had been filed by the government until the --

11  until I came to the courtroom.  I wasn't in the office this

12  morning.  They did provide me a copy, and I do object to the

13  ex-parte nature of the filing.

14          This is not now about the supposed and

15  non-specific security concerns raised by my client now, this

16  is about his Mexican attorneys, whom they themselves

17  verified are members of the bar.  I think at the last

18  hearing they indicated that the two male lawyers were

19  members in good standing of the bar in Mexico, who now the

20  government has some apparent problem with their being able

21  to assist Mr. Beltran in his defense.

22          So I do object.  I think it's something that the

23  Court should have the input of the defense in, and, again,

24  not just take the government's unsupported assertions about

25  these individuals.  So we do object to that.

1              Something that, excuse me, that the government

2      mentioned with respect to -- at least as I understand, let

3      me put it that way, the government doesn't seem to have any

4      documentary evidence at this point to turn over.  I find it

5      disingenuous, quite frankly, that three months after

6      Mr. Beltran gets to the United States, that the government

7      doesn't even have any documentation with respect to the

8      three seizures by U.S. law enforcement, presumably the

9      Coast Guard.  That's not Mexico or Colombia.  They could get

10     that information, should have had it by now.

11             And one comment that draws my attention is that

12     they want to make sure that they have all of the documents.

13     Well, that's not material at this point.  If they have the

14     documents, they should turn them over.  If they get more

15     later, they should turn them over then.

16             THE COURT:  Quite frankly, expecting her to tell

17     me two weeks from now that they have the documents from

18     those three seizures and they're ready to produced.

19     That's what I'm hoping is going to happen two weeks from

20     now.

21             MR. BALAREZO:  Yeah.  I would hope so too.

22             And then, Your Honor, the only other remaining

23     issue would be with respect to Mr. Purpura and Mr. Tun.

24             As I mentioned in that filing on ECF previously,

25     No. 34, I listed the defense team at the Court's direction.

1   I listed myself, Mr. Purpura and Mr. Tun.  Neither one of

2   them has entered an appearance in the matter, A, because we

3   don't feel that it's necessary at this point, because they

4   are not representing Mr. Beltran before this Court at this

5   point.  They will be consulting with me and assisting me in

6   preparations.  And if the matter does go to trial, I expect

7   that both of them will be entering appearances so they can

8   appear before the Court at that time.

9        But the Court did require me to -- request of me

10  to have them present so that the Court can discuss the

11  protective order with them.  I think they've both read the

12  protective order, and they're here for the Court's inquiry.

13       THE COURT:  So how does the attorney-client -- how

14  will the attorney-client privilege apply to their conduct

15  and actions?

16       MR. BALAREZO:  The attorney-client privilege

17  applies.  There's -- I don't think there's any doubt about

18  that, Your Honor.

19       This is -- the example I could give to the Court

20  is:  I hire a lawyer to represent me in drafting a will,

21  the matter never goes to court, the will is drafted, there's

22  no appearances that need to be filed, but there's no doubt

23  that the attorney-client privilege with respect to me and

24  the wills and estates lawyer that I retained applies.

25       THE COURT:  But in that hypothetical, you're the

1    client.

2            MR. BALAREZO:  Correct.

3            In this hypothetical, Mr. Beltran Leyva is the

4    client.

5            THE COURT:  Well, but there's no attorney-client

6    relationship as far as I can tell between him and them.

7            MR. BALAREZO:  Oh, absolutely, Your Honor.

8            Number one --

9            THE COURT:  You're the one with the

10   attorney-client relationship with him.

11           MR. BALAREZO:  Right.

12           THE COURT:  These folks are working.  If they're

13   on your staff, they're working for you.

14           MR. BALAREZO:  Right.

15           THE COURT:  Then the attorney-client privilege

16   that you enjoy with Mr. Beltran Leyva might apply to them.

17           MR. BALAREZO:  Your Honor, I don't think --

18           THE COURT:  And apparently, they're not doing

19   that.

20           MR. BALAREZO:  Your Honor, two things:

21   Number one, I don't think that the attorney-client privilege

22   is an issue if I were to retain them to work with me on the

23   matter.  I am confident that there's no attorney-client

24   privilege or issue with respect to the attorney-client

25   privilege.

1            If the Court has a concern, they can -- I could --

2            THE COURT:  Put it in writing.

3            MR. BALAREZO:  Not even in writing.  I'll have

4     them get an OFAT license and enter an appearance on his

5     behalf.

6            But I really do not think, and I'll check with the

7     bar again, I don't think it's necessary, Your Honor.  They,

8     the client here is Mr. Beltran Leyva, not me.

9     I'm a conduit, and that's -- that's really all I can say.

10    I'm confident that there's no issue with respect to that.

11           Either way, both Mr. Tun, as you know, you've

12    known him, I believe, for a long time.  Mr. Purpura is --

13    has appeared before many of the Court's colleagues in this

14    courthouse.  They, in my opinion, are of the highest

15    integrity, and I believe they're fully aware of what their

16    responsibilities and obligations to the client are.

17    So I would not have brought them on if I had any concerns

18    about the integrity of either one of them.

19           THE COURT:  Well, they can come up.

20           Welcome, counsel.

21           MR. PURPURA:  Your Honor, it's a pleasure to be

22    here.  William Purpura.

23           THE COURT:  Welcome, welcome.

24           MR. PURPURA:  Thank you.

25           THE COURT:  Nice to have you here, sir.

```
1                MR. TUN:  Good afternoon, Your Honor.

2                THE COURT:  Mr. Tun.

3                MR. TUN:  Pleasure to see you again, Your Honor.

4                THE COURT:  Big fan of your bow tie collection.

5   I see you haven't let me down today.  It's wonderful.

6                So, counsel, how do you view the attorney-client

7   privileges as it relates to each of you individually?

8   Is it a privilege that you're flying, so-to-speak, under

9   Mr. --

10               MR. TUN:  Balarezo.

11               THE COURT:  -- under his privilege, or do you have

12  a direct attorney-client relationship with Mr. Beltran

13  Leyva?

14               MR. PURPURA:  Your Honor, I think to answer that,

15  I believe that the attorney-client privilege is through

16  Mr. Balarezo.  He represents Mr. Beltran at this time.

17  We are on board at this point, hopefully, to review any

18  materials which are necessary to aid any way we can

19  Mr. Balarezo in the representation of Mr. Beltran.

20               If this case does proceed to trial, obviously,

21  we would enter our appearances at that point and be ready to

22  go to trial, keep this train on the tracks, we hope.

23               THE COURT:  All right.

24               Mr. Tun, do you view it the same way?

25               MR. TUN:  Yes, Your Honor.
```

1          MR. PURPURA:  And we'd be glad to put that in

2    writing.  I think the Court mentioned that before.

3          THE COURT:  Yeah.  I think it might be good to

4    have, just for the record, a letter between each of you

5    individually and Mr. Balarezo expressing the concepts that

6    you've just laid out there and certainly --

7          MR. BALAREZO:  Your Honor, to the extent that the

8    letters are in effect part of the defense, I would ask then

9    to file those ex parte, because, quite frankly, I don't

10   believe that the government would have any issue in that

11   matter.

12         THE COURT:  That's fine.  I don't think the

13   government -- does the government have any objection to this

14   arrangement?

15         MS. LISKAMM:  No, Your Honor.

16         THE COURT:  Very good.  I didn't think you would.

17         So at least we'll have that buttoned down,

18   God forbid we need to deal with that issue at a later time.

19   But it's good to have it buttoned down, you know.

20         Now, the other thing is the protective order.

21   You're both have read it, correct?

22         MR. TUN:  Yes, Your Honor.

23         MR. PURPURA:  Yes.

24         THE COURT:  So you weren't here for the earlier

25   discussions obviously, but I'm sure Mr. Balarezo filled you

1    in on them.

2            MR. TUN:  Absolutely, Your Honor.

3            THE COURT:  The Court, you know, has concerns that

4    it's expressed on the record about witness protection and

5    things of that kind, and it has to be -- it has to balance,

6    you know, obviously, the constitutional rights of the

7    defendant and the procedural approach to defending the

8    defendant that are provided under the Federal Rules of

9    Criminal Procedure with, to the extent possible, protecting

10   witnesses in the situation that could be in jeopardy, even

11   those who are incarcerated, because, as the three of you are

12   well-aware, and the Court's well-aware, that even those who

13   are incarcerated can be in jeopardy.

14           It's just as simple as that, whether it be the

15   D.C. jail or whether it be Marion, they can be in jeopardy

16   once it's known that they're going to be a cooperator, and

17   once it's known that they're going to be possibly a witness

18   against somebody in a criminal case.  So I'm just stating

19   the obvious here.  There's nothing shocking about that.

20           So it's a balancing, and as we go along, the Court

21   will have to make those decisions after hearing from both

22   sides, counsel on both sides.

23           So it's really important that the protective order

24   be complied with to the fullest extent possible.

25           And as Mr. Balarezo has pointed out, this court,

```
 1   not me personally, but this court has had lots of experience

 2   dealing with Mr. Purpura, and I've had personal experience

 3   dealing with Mr. Tun, it's been a pleasure too, I might add,

 4   over many years.  So I have full faith that they will be in

 5   compliance with this protective order, and, of course, all

 6   the ethical rules of the bar.

 7              MR. TUN:  Absolutely, Your Honor.

 8              THE COURT:  So I'm not concerned about that.

 9              MR. PURPURA:  Thank you, Your Honor.

10              THE COURT:  I don't have any concern about that.

11              But anyway, so why don't you continue with your

12   good auspices, whatever you're doing it to help Mr. Balarezo

13   out, and we'll try to deal with some of these other issues.

14              MR. PURPURA:  And we will sign the protective

15   order.  I understand that Mr. Balarezo signed it, I think,

16   over an objection to the protective order, and --

17              THE COURT:  Well, he has a -- well, I think he has

18   a -- it's not a constitutional in the sense of the

19   U.S. Constitution, I think it's his personal constitution

20   that he doesn't like protective orders.  I think he just has

21   some kind of like a natural hesitancy about them.

22              But in this case, this is one of those unusual

23   cases where the Court at least believes it's clearly

24   necessary and appropriate.

25              MR. PURPURA:  Very good.  We will sign,
```

1    Your Honor.

2              MR. TUN:  We'll sign, Your Honor.

3              THE COURT:  Very good.  Thank you, counsel.

4              MR. PURPURA:  Thank you.

5              THE COURT:  Thanks for coming also.

6              MR. TUN:  Thank you, Your Honor.  Pleasure to see

7    you.

8              THE COURT:  You're always welcome here, so have a

9    good day.

10             MR. PURPURA:  Thank you.

11             MR. BALAREZO:  And, Your Honor, just so the Court

12   is aware, as of today, neither Mr. Tun or Mr. Purpura have

13   reviewed any of the material because it's under the

14   protective order.  I suspect that from now on, they will be

15   able to do so.

16             THE COURT:  Yes.

17             MR. BALAREZO:  Obviously when the government

18   produces something of value, they would have something to do

19   to assist me.  But as of now, I'll have them stand down.

20             THE COURT:  But I'm not going to require the

21   government to produce three sets, just one set.

22             MR. BALAREZO:  We understand.

23             THE COURT:  That goes to you.

24             And I'm looking, frankly, to you to be the safe

25   keeper of that set of documents.  And if, God forbid, there

1   were any inappropriate Xeroxing or forwarding of any

2   documents, you would be the one I would be holding

3   responsible for it.

4            MR. BALAREZO:  I understand.

5            THE COURT:  And obviously, both of these very

6   seasoned counsel know that, you know, you're the one who's

7   in the line of fire.  And it's incumbent upon them to be of

8   assistance to you to make sure nothing untoward occurs, and

9   I have every confidence that they will try to do that.

10           MR. BALAREZO:  As do I, Your Honor.

11           THE COURT:  But the bottom line, though, is that

12  the Court has to hold someone ultimately responsible for the

13  defense team, and that's -- you get to wear the --

14           MR. BALAREZO:  The buck stops here.

15           THE COURT:  Okay.  Very good.

16           So let's see where things go in the next two

17  weeks.  Some of the revelations that have occurred today

18  were a little surprising to me from the government, and it

19  raises some questions in my own mind as to how anything can

20  really proceed without your knowledge of who authored these

21  things and how you can really effectively make use of them

22  without knowing who authored them.

23           And so as a practical matter, I mean, I think if

24  they intend to use these, I'm not making any rulings today,

25  but if they intend to use these ultimately, Mr. Balarezo,

1    they're going to have to provide you that information sooner

2    rather than later, because you need time to run some of

3    these rabbits to ground.

4            MR. BALAREZO:  Your Honor, and I fully obviously

5    understand and appreciate the Court's ruling on that, but,

6    as it stands, am I still prohibited from doing the things

7    that I've suggested I should be able to do with the ledgers

8    under the current protective order?

9            THE COURT:  Well, be specific.

10           MR. BALAREZO:  I can't share them -- I mean, the

11   government suggested that I could share them with Mr. Tun

12   and Mr. Purpura.  They have no knowledge of these things, so

13   obviously that doesn't help me.

14           I need -- what I want to be able to do is to, at

15   the very least, show the material, I'm not making copies and

16   distributing around Mexico, but at least show the material

17   to other individuals who may be able to assist me with

18   making sense.

19           THE COURT:  Well, are these people part of your

20   defense team?

21           MR. BALAREZO:  No, Your Honor.  That's -- and

22   that's the problem, also, because under the protective

23   order, if I were to show it to or want to show it to someone

24   else, let's say Chappo in Mexico, whoever that may be,

25   I have to ask for the Court's permission.  The Court

1    presumably wouldn't know who Chappo is, would come to the

2    government and say, who's Chappo, and then the government

3    would know a possible witness, and that's not something that

4    the government is entitled to know.  So that's --

5           THE COURT:  I understand that.  That makes good

6    sense.

7           MR. BALAREZO:  I was kidding about Chappo.

8           And she got all excited, but sorry.

9           Anyone.  Anyone in Mexico or any other country.

10          And that's a problem.  Right now, I can't do

11   anything with the material.

12          THE COURT:  Well, let me -- I'll tell you what.

13   There's going to be, hopefully, some real progress in the

14   next two weeks here with regard to these ledgers and in

15   regard to other things as well, I might add.  But let me

16   just make an observation here.

17          It's been my experience not only as a judge for

18   now 13 years but before that as a criminal defense counsel

19   and before that as a prosecutor, so I'm going back now to

20   1983, that's a long time ago, 31 years ago -- and during

21   that time, I was one of those three, a prosecutor, defense

22   counsel, judge.

23          It was always my experience that it was in the

24   government's interest and the defense's interest, but in the

25   government's interest for the defense to know what it was

1    facing, because when the defense knew what it was facing,

2    that was when they were in the best position to evaluate

3    whether it made sense to go to trial or made sense to enter

4    a plea.  That's when they knew.  So keeping the defense in

5    the dark is actually not in the government's interest, it's

6    actually not in the government's interest, if the Government

7    wants a resolution short of a trial.

8              I've never known a prosecutor who didn't want to

9    get a plea if they could get one.  I mean, that's -- it

10   saves a lot of time, expense and risk.  I mean, God knows,

11   there are many judges, myself included, who love to have a

12   trial every now and then.  A three-month trial is a bit of a

13   burden.

14             MR. BALAREZO:  Defense lawyers too, Your Honor.

15             THE COURT:  Yeah, that's right.

16             And a three-month trial is not one you're running

17   around dying to get a three-month trial every now and then,

18   because that's a lot of -- that's a lot of work, that's a

19   lot of pressure and a lot of hard work for a long period of

20   time.  And I say that, you know, being exhausted after six

21   weeks of what's looking like 10 to 12 -- 11-week trial right

22   now that I'm in.

23             But be that as it may, I think it's in both sides'

24   interest, both, for the government and the defense, for the

25   government to make sure the defense is educated and knows

1   what it's facing, and that means giving it detail.

2           You've got to give explanation to it.  They have

3   to know what they're facing here, because it's only in that

4   process that they're in a position to really evaluate the

5   realistic sense of going to trial or not going to trial and

6   whether it makes sense to go to trial or not go to trial.

7           And I appreciate that there will be security

8   concerns and the government has to be concerned about those,

9   as does the Court, et cetera, but this is a balancing, this

10  is a balancing.

11          The government wants a successful prosecution,

12  whether it comes in the form of a plea or a trial that

13  results in a conviction; and the defense wants a successful

14  resolution, however they define that, in the interest of

15  their client.  It could be through a trial that results in

16  an acquittal possibly or a hung jury or it could be in a

17  form of a plea.

18          But each side has in it has its own interests, and

19  the best way to discern how to resolve this is for the

20  government to share, to the fullest extent possible, its

21  knowledge of the strength of its case, not its evaluation of

22  the case, but what the evidence is in its case against the

23  defense.

24          So I encourage, encourage the government to think

25  that through and in that spirit share information with the

1  defense that'll enable it to see what it's facing so that it

2  can figure out how to proceed to resolve this case.

3          MR. BALAREZO:  Thank you, Your Honor.  Appreciate

4  that.

5          THE COURT:  Stating the obvious.

6          MR. BALAREZO:  I agree, thank you.

7          THE COURT:  All right.

8          MS. LISKAMM:  Your Honor, a few things.

9  In response to Your Honor's comments about early disclosure

10  so that the defense is aware of what's going on, the

11  government did offer to do a reverse proffer at the outset

12  of this case, and that offer was turned down.

13  So the government is attempting to make as much available to

14  defense counsel so that he can adequately prepare for trial

15  and evaluate the case, while also --

16          THE COURT:  What's a reverse proffer?

17          MS. LISKAMM:  Where the government lays out the

18  evidence that it would present at trial to defense counsel

19  and the defendant.

20          THE COURT:  And the defendant himself?

21          MS. LISKAMM:  That's correct, Your Honor.

22          THE COURT:  Is this some new technique that you

23  guys have been using over at the Narcotic and Dangerous Drug

24  Section?

25          MS. LISKAMM:  We've done it on a multitude of

1    cases.

2              THE COURT:  Okay.

3              MS. LISKAMM:  And I know that other districts do

4    it as well.

5              So that's in an effort to assist the defense in

6    evaluating the case.  That offer was made and rejected.

7              With respect to --

8              THE COURT:  Was there any reason given why it was

9    rejected?

10             MS. LISKAMM:  No, Your Honor.

11             With respect to the two --

12             THE COURT:  How long ago was that?

13             MS. LISKAMM:  At the outset of the case.

14             THE COURT:  Three months ago.

15             MS. LISKAMM:  In, I believe, I don't recall when

16   the defendant first appeared, but I believe it was November,

17   that's when it occurred.

18             With respect to the two counsel who are present

19   today, they, just to put on the record, they did sign the

20   acknowledgment form so that the Court is aware of that.

21             And then lastly with respect to the ex parte that

22   the Court granted the government the ability to file, I just

23   wanted to inquire whether the Court wanted a courtesy copy

24   today, we have one in court, or if you prefer us to just

25   wait.

1          THE COURT:  If you have it today, I'll take it,

2     yeah, sure.

3          MS. LISKAMM:  Okay.  Perfect.  Thank you,

4     Your Honor.

5          THE COURT:  You can give it to my deputy clerk,

6     that would be fine.

7          Well --

8          MS. LISKAMM:  Thank you, Your Honor.

9          THE COURT:  -- is there any reason you can state

10     for why you're not in the mood for a reverse proffer?

11     I mean, it doesn't cost you anything, I don't think.

12          MR. BALAREZO:  Your Honor, absolutely.  It is not

13     a new technique.  Maybe since the Court came on to the

14     bench, it has developed more, but I've had several.

15     I've actually had one with the government here in another

16     case that's pending now before Judge Kotelly.  To be quite

17     frank with you, it's an utter and complete waste of time.

18          The reverse proffer is me and my client, the

19     prosecution, an agent or two telling the client we have

20     witnesses who say you did X, Y and Z, and this is why you

21     should plead guilty.

22          There will be no presentation of evidence, there

23     will be no documentation shown.  If they had it to show the

24     reverse proffer, I would suspect they would have produced it

25     by now.  There will not be any identification of witnesses.

1  I would be no better off had I gone then than I am right

2  now.  And that's -- and that's from experience.

3         THE COURT:  That's different than what I assumed

4  it would be, because when I was a prosecutor years ago in

5  the Justice Department's Tax Division Criminal Section,

6  we did open-file discovery, and I would meet with defense

7  counsel well -- right after indictment, I mean, like the

8  week after indictment, and say, okay, here's the discovery,

9  here it is in these boxes, let me give you an overview of

10 the case, here's the witnesses that are coming against your

11 client.

12         Now, these are criminal tax.  It's not

13 international narcotics distribution, I'll be the first to

14 admit, they're not exactly the same.

15         But we would lay out the cards so that defense

16 counsel knew here's what you're facing, here's the evidence

17 against you, here are the exhibits, look it over.  If you've

18 got questions, ask them, and go talk to your client; and, of

19 course, 95 percent of the time it resulted in a plea or

20 more.

21         MR. BALAREZO:  Your Honor, my experience, it's not

22 like that.  And the other one that I did with the government

23 in that other case, it was not like that.

24         And if the government is suggesting that that's

25 what they're going to do in this case, I'll be there this

1   afternoon or Monday morning, I'll be there over the weekend,

2   but that's not what they're going to do.

3           So the offer of a reverse proffer is illusory,

4   it's a waste of time.

5           THE COURT:  All right.

6           Well, we'll give the government a chance over the

7   next two weeks to think about if there may be a variation on

8   a reverse proffer that they think might be more helpful to

9   the defense, that they might want to engage in down the

10  road, and thereby move this case forward more expeditiously

11  and all that.

12          So think about that, and -- but bear in mind, as I

13  said before, a point of no return will be established in

14  this case.  And at that point, and it will not be weeks

15  before the trial, it will be months.  It will be a month

16  plus, maybe two months, where Mr. Balarezo and his team are

17  going to need to have this stuff and this information in

18  order to prepare a defense.

19          And the government's not going to have the luxury

20  of, well, we're going to dole it out the Thursday before the

21  witness takes the stand or we're going to dole it out.

22  You can't do that in this kind of case.  Too complicated.

23  It's international.  Too many moving parts.  We've got

24  lawyers in the United States who might need to travel to

25  Mexico or Colombia to meet with people and do interviews,

 1   and that can't be done the week before trial.  It's just not

 2   possible.  It can't be done.  So we have to be pragmatic

 3   about this.  And that means it's going to be weeks or months

 4   before trial when we're going to reach that point of no

 5   return.

 6         And the government has to put up or, you know,

 7   move the trial, got to move the trial, because I can't put

 8   this defense team in that position of a last-minute slipshod

 9   defense evaluation.  It's just not fair, it's just not fair.

10   So we won't have that.

11         So it's a lot to think about.  Welcome aboard.

12         MR. TUN:  Thank you, Your Honor.

13         THE COURT:  Have a great weekend.

14         DEPUTY CLERK:  All rise.  This Honorable Court now

15   stands in recess until return of Court.

16         (Proceedings concluded at 3:52 p.m.)

C E R T I F I C A T E

        I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: March 23, 2015_____   /S/__William P. Zaremba_____

                       William P. Zaremba, RMR, CRR