**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| **v.** | : | **Criminal No.12-0184(RJL)** |
| | : | **Sentencing:  July 20, 2016** |
| **ALFREDO BELTRÀN LEYVA,** | : | |
| | : | |
| *Defendant.* | : | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Alfredo Beltrán Leyva ("Beltrán Leyva), by and through his undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing.  Mr. Beltrán Leyva will come before the Court on July 20, 2013, for sentencing after pleading guilty to the one count charged in the indictment, Conspiracy to Distribute Five Kilograms or More of Cocaine and 50 Grams or More of Methamphetamine for Importation Into the United States in violation of 21 U.S.C. §§ 959, 960 & 963.  For the reasons set forth below, Mr. Beltrán Leyva respectfully requests that the Honorable Court reject the government's request for sentence of life in prison and sentence him to a term of 25 years.

## OBJECTIONS TO THE PRESENTENCE REPORT

Mr. Beltrán Leyva has reviewed the pre-sentence report ("PSR") and has several objections as described to the PSR writer.

## BACKGROUND

On August 24, 2012, the government filed a "bare bones" indictment charging Mr. Beltrán Leyva with one count of Conspiracy to Distribute 5 or more Kilograms of Cocaine, Fifty Grams or More of Methamphetamine, One Kilogram or More of Heroin and One Thousand Kilograms or More of Marihuana for Importation into the United States, in violation of 21

U.S.C. §§ 959, 960 and 963.[1]  The indictment charged a conspiracy "from in or about 2000, and

continuing thereafter, up to including" the filing date of the indictment.  The indictment further

alleged that Mr. Beltrán Leyva conspired with "others known and unknown," in the countries of

"Mexico, the United States, and elsewhere" to commit the charged offense.[2]  Beyond that

boilerplate language, the indictment did not specify any particular activity by Mr. Beltrán Leyva

that may be considered part of the conspiracy nor identified any other individuals who may have

been coconspirators.

### The Government's Extradition Request

Sometime after the filing of the indictment, the government submitted a formal

request to Mexico seeking Mr. Beltrán Leyva's extradition to the United States.  Andrea

Goldberg, Assistant Deputy Chief of the Narcotics and Dangerous Drug Section of the

Department of Justice, submitted a sworn affidavit setting forth the charges against Mr. Beltrán

Leyva.[3]  In her affidavit, Ms. Goldbarg set forth a "Summary of the Facts of the Case," wherein

she stated:

> 19.    Investigation by law enforcement authorities revealed that ALFREDO
> BELTRAN LEYVA has been involved in the distribution and illegal importation
> of drugs from Colombia for the ultimate distribution in the United States since
> approximately 2000.  ALFREDO BELTRAN LEYVA is a younger brother of
> Arturo Beltran Leyva, who until his death in 2009 was one of the most prolific
> drug traffickers in Mexico.
>
> 20.    ALFREDO BELTRAN LEYVA started working in the Beltran Leyva
> drug trafficking organization created by his older brothers, Arturo and Hector.
> ALFREDO BELTRAN LEYVA initially was assigned to coordinate the
> offloading of ton-quantity shipments of cocaine from Colombia.  ALFREDO
> BELTRAN LEYVA was later promoted to one of Arturo Beltran Leyva's main
> assistants, in which role he oversaw the shipment of thousands of kilograms of

---

[1]    The indictment also includes a forfeiture allegation.  The government has since moved to dismiss the heroin
and marijuana portions of the indictment.

[2]    Based on the charge in the indictment, a judicial officer of this Court issued a warrant for Mr. Beltrán
Leyva's arrest.  Mexican authorities had already detained Mr. Beltrán Leyva in 2008.

[3]    *See* Exh. 1 (Affidavit of Andrea Goldbarg).

cocaine into the United States and the subsequent distribution of the cocaine for sale in the United States.

21.     The investigation by law enforcement authorities revealed that ALFREDO BELTRAN LEYVA created his own alliances and had his own followers, including  Fausto Isidro Meza Flores, alias Chapo Isidro and Agustin Flores Apodaca, alias El Niño, alias El Barbon, alias El Ingeniero, alias Agustin Apodaca Flores.  After ALFREDO BELTRAN LEYVA's arrest by Mexican authorities in January 2008, he continued to give orders to Fausto Isidro Meza Flores and Agustin Flores Apodaca while he was incarcerated.  In addition to carrying out ALFREDO BELTRAN LEYVA'S orders during his incarceration, Fausto Isidro Meza Flores and Agustin Flores Apodaca paid ALFREDO BELTRAN LEYVA part of the proceeds from the Beltran Leyva Organization's sale of cocaine, heroin, methamphetamine, and marijuana in the United States.

22.     On September 2, 2010, law enforcement authorities seized 33 pounds of methamphetamine and four kilograms of cocaine in the State of Washington. Laboratory analysis has confirmed that the substances seized on September 2, 2010, were methamphetamine and cocaine.  Telephone conversations that were lawfully intercepted and recorded under United States law revealed discussions among members of the Beltran Leyva Organization involving distribution of the Organization's drugs in the United States and the purchase of machineguns and destructive devices to be used in furtherance of the Organization's drug trafficking activities.[4]

In her affidavit, Ms. Goldbarg also stated that she had attached a second affidavit executed by

Federal Bureau of Investigation Special Agent Britton Boyd, who "summarizes the investigation

of ALFREDO BELTRAN LEYVA's drug trafficking activities and the *evidence that resulted in

the indictment of this case*."[5]  She further states that attached to Special Agent Boyd's "affidavit

and made part of this extradition request are the laboratory reports describing the chemical

analyses on the methamphetamine and cocaine seized on September 2, 2010; transcripts of

several lawfully recorded telephone conversations in which ALFREDO BELTRAN LEYVA'S

employee Agustin Flores Apodaca and his co-conspirators discussed drug trafficking activities

and weapons purchases …."[6]

---

[4]      Exh. 1 at ¶¶ 19-22.
[5]      Exh. 1 at ¶ 23 (emphasis added).
[6]      *Id.*

For his part, S.A. Boyd summarized the facts supporting the indictment as

follows:

7.      In 2009, federal law enforcement authorities began an investigation into the distribution of illegal drugs in the State of Washington.  Specifically, law enforcement authorities focused on the distribution of cocaine, methamphetamine, heroin, and marijuana imported from Mexico and transported to the United States Pacific Northwest Region.  During the investigation, law enforcement authorities were able to identify several members of Mexico-based Beltran Leyva Drug Trafficking Organization, specifically, Agustin Flores Apodaca, alias El Niño, alias El Barbon, alias El Ingeniero; Salome Flores Apodaca, alias Pelon, alias Fino; and Fausto Isidro Meza Flores, alias Chapo Isisdro, alias Chapito Isidro.  Further investigation revealed that these members still worked for ALFREDO BELTRAN LEYVA.  More specifically, the part of the proceeds of the drugs that were being sold in the United States on behalf of Agustin Flores Apodaca, Salome Flores Apodaca, and Fausto Isidro Meza Flores was being shared with ALFREDO BELTRAN LEYVA.  In fact, although ALFREDO BELTRAN LEYVA was arrested by law enforcement authorities in January 2008, ALFREDO BELTRAN LEYVA was still giving orders even while incarcerated, and he was still engaged in the distribution of drugs from Mexico into the United States.

8.      In late August 2010, law enforcement authorities were conducting surveillance at a business location related to this investigation in Centralia, Washington, when they observed a brown Chevrolet Impala automobile with Arizona license plates.  Further investigation by law enforcement authorities let to a lawful search of the Impala, pursuant to which authorities discovered large quantities of United States currency and ledgers detailing suspected drug transactions.[7]

9.      Based on additional information developed during the investigation, on September 2, 2010, law enforcement authorities lawfully seized 33 plastic-wrapped, cylindrical packages containing a total of approximately 33 pounds of methamphetamine and four plastic-wrapped, square-shaped packages containing approximately four kilograms of cocaine, along with a firearm, ammunition, and drug paraphernalia, at a warehouse located in Centralia, Washington.  Samples of the seized drugs were sent to the United States Drug Enforcement Western Laboratory in San Francisco, California for analysis and were confirmed to be methamphetamine and cocaine.  A certified copy of the laboratory report detailing the results of the chemical analysis is attached to this affidavit and marked as Attachment D-1.  Photographs of the packages of methamphetamine and cocaine that were seized on September 2, 2010, are attached to this affidavit and marked as Attachment D-2.

---

[7]     The ledgers seized in Centralia, Washington are not the same ones that are subject to the Court's protective order.  The government has not produced any discovery related to that seizure with the exception of the drug analysis reports and photographs of the seized items.

10.     Following the September 2, 2010 drug seizure, law enforcement authorities lawfully recorded telephone conversations between Agustin Flores Apodaca, and another man involved in the Beltran Leyva Organization's drug trafficking activities in the United States.  Law enforcement authorities played audio recordings of some of these conversations for a Cooperating Witness (hereinafter "Witness One") who personally knows Agustin Flores Apodaca, Salome Flores Apodaca, and Fausto Isidro Meza Flores, and other members of the Beltran Leyva Organization.  Based on Witness One's familiarity with the Beltran Leyva Organization and its members, Witness One was able to identify in these audio recordings the voices of Agustin Flores Apodaca, Salome Flores Apodaca, and Fausto Isidro Meza Flores and further was able to interpret the meaning of several portions of these conversations in which the participants spoke in coded and cryptic language.[8]

In the subsequent paragraphs 11 through 14, Agent Boyd summarizes the intercepted telephone conversations.[9]

Agent Boyd then continues:

15.     On September 14, 2010, law enforcement authorities in Arizona observed the same brown Chevrolet Impala, from which law enforcement authorities in the State of Washington lawfully seized United States currency and ledgers of suspected drug transactions in late August 2010, being driven by Salome Flores Apodaca.  Law enforcement authorities followed the Impala to a location where they observed Salome Flores Apodaca meet with several other men.  According to Witness One, who was present at the meeting, Salome Flores Apodaca discussed selling over 30 pounds of methamphetamine and four kilograms of cocaine. Based on my knowledge of this investigation, I believe that Salome Flores Apodaca was attempting to sell the supply of methamphetamine and cocaine, that, unbeknownst to him, was seized by law enforcement authorities on September 2, 2010.

16.     Law enforcement authorities then followed Salome Flores Apodaca as he left the meeting.  Salome Flores Apodaca was accompanied by another man, who law enforcement observed getting into a different car than the brown Impala, in which Salome Flores Apodaca drove away from the meeting.  Law enforcement authorities followed the other man's car and eventually conducted a lawful stop of this other car, which led to the arrest of the other man for possession of illegal drugs.

17.     The above-stated summary of the events on September 8, 2010 was confirmed by Witness One in this case, who has also stated that Salome Flores

---

[8]     Exh. 2 (Affidavit of Special Agent Britton Boyd) at ¶ 7 – 10.

[9]     *See* Exh. 2 at ¶ 11 – 14.

Apodaca later called him/her and said that one of his workers had been arrested in Arizona, related to this drug transaction.

18.     This investigation also revealed that Fausto Isidro Meza Flores, in participation with ALFREDO BELTRAN LEYVA, was attempting to import ton quantities of marijuana from Mexico into the United States.  A Cooperating Witness (hereinafter "Witness Two") engaged in an attempted drug transaction involving approximately 2,800 kilograms of marijuana that were to be imported from Mexico into the United States.

19.     Witness Two had several face-to-face meetings with Agustin Flores Apodaca and Fausto Isidro Meza Flores to negotiate the marijuana transaction. During these conversations, Agustin Flores Apodaca told Witness Two that he (Agustin Flores Apodaca) and Fausto Isidro Meza Flores were still loyal to ALFREDO BELTRAN LEYVA.  In fact, Witness Two overheard a conversation in which Agustin Flores Apodaca told someone on the telephone that the orders he (Agustin Flores Apodaca) was providing came directly from ALFREDO BELTRAN LEYVA.  This conversation occurred in the summer 2011, over three years after ALFREDO BELTRAN LEYVA was arrested by law enforcement authorities.  Around the same time as this telephone conversation, Agustin Flores Apodaca told Witness Two that they (Agustin Flores Apodaca and Fausto Isidro Meza Flores) were still giving part of the proceeds from the drug sales they conducted in the United States to ALFREDO BELTRAN LEYVA.

20.     The investigation revealed another witness, Alejandro Tascon, who was a Colombian drug trafficker that spent many years working fro the Beltran Leyva brothers.  Tascon began his work for the Beltran Leyva Organization assigned to Hector Beltran Leyva, but he eventually moved to a position where he worked for Julio Beltran Quintero and ALFREDO BELTRAN LEYVA.  Tascon worked for Julio Beltran Quintero and ALFREDO BELTRAN LEYVA from 2000 until Julio Beltran Quintero's death in 2005.  During this time period, Tascon assisted Julio Beltran Quintero and ALFREDO BELTRAN LEYVA in processing tens of thousands of kilograms of cocaine that the Beltran Leyva Organization received from Colombia.

21.     When Julio Beltran Quintero was murdered in 2005, Tascon went to work exclusively for Arturo Beltran Leyva, although Arturo Beltran Leyva told Tascon directly that his brother, ALFREDO BELTRAN LEYVA, was receiving part of the drugs that Tascon was providing.  During the time that Tascon worked for Arturo Beltran Leyva and ALFREDO, he coordinated the delivery of thousands of kilograms of cocaine from Colombia for the Beltran Leyva Organization.[10]

On November 26, 2013, the Mexican "Secretaría de Relaciones Exteriores"

(Ministry of Foreign Affairs) issued a 214-page "Acuerdo de Extradición" (Extradition

---

[10]     Exh. 2 at ¶ 15 – 21.

Agreement) wherein the Mexican government analyzed the United States government's request for Mr. Beltrán Leyva's extradition and set forth the conditions under which Mr. Beltrán Leyva was being extradited pursuant to the Treaty of Extradition Between the United Mexican States and the United States of America.[11]  Mr. Beltrán Leyva was extradited to the United States on November 15, 2014.

Mr. Beltrán Leyva's understanding, as well as that of his Mexican attorneys, was that he being extradited to face charges related to the drug seizures in Washington State.[12] However, after Mr. Beltrán Leyva's extradition, the government disclosed that it intended to try Mr. Beltrán Leyva as being a member of a large-scale conspiracy involving the Mexican "Federation," which is alleged to be composed of the "Sinaloa Cartel" and what the government terms the "Beltrán Leyva Organization."[13]  The government further sought to try him as conspiring with Colombian traffickers to import cocaine from Colombia to Mexico.  Finally, the government sought to associate Mr. Beltrán Leyva with multiple seizures of cocaine loads.  It was understood from early on that the government's evidence consisted principally of cooperator testimony.  Based on the information available to him concerning the government's evidence, Mr. Beltrán Leyva decided to exercise his constitutional right to trial.

During the pendency of this case, the government filed various motions where it claims it set forth other crimes evidence against Mr. Beltrán Leyva.  The week before the scheduled start of trial, the government proffered to the Court the expected testimony of various witnesses, including cooperators.  Considering the new information available to him and that a

---

[11]     *See* Exh. 3 – Extradition Agreement. The Extradition Agreement is in the Spanish language.  Relevant parts have been translated for the Court's convenience.

[12]     As the Court is aware, he was actively litigating this issue up until the Court denied the motion shortly before trial.

[13]     The Court subsequently narrowed the scope of the conspiracy that could be tried.

guilty verdict at trial would most likely mean a life sentence, Mr. Beltrán Leyva made the extraordinary decision to plead guilty without any benefit of an agreement with the government.

The government now seeks to have the Court sentence Mr. Beltrán Leyva to life in prison based largely on the representations in its various motions and the "proffer" provided prior to the scheduled trial.  The Court should reject that government's request and sentence Mr. Beltrán Leyva to 25 years.  In sum, the Court should not rely solely upon the government's self-serving and non-objective recitation of the facts it believes it would have proven at trial.

## STATUTORY AND GUIDELINE ANALYSIS

The offense of conviction carries a mandatory minimum term of 10 years and a maximum of life imprisonment, along with at least 5 years of supervised release and a fine of up to $10,000,000.

Appendix A to the United States Sentencing Guidelines states that U.S.S.G. § 2D1.1(a)(3) and (c)(1) are the applicable guidelines for a violation of 21 U.S.C. §§ 959, 960 and 963.  This Guideline provides for a base offense level of 38.  The PSR calculated and the government requests that the Court find the Guidelines as follows:

| | |
|---|---|
| Base Offense Level | 38 |
| Adjustment for Role in Offense (leader/organizer) | +4 |
| Specific Offense Characteristic (firearms possessed) | +2 |
| Adjustment for violence | +2 |
| Adjustment for bribery | +2 |
| Adjustment for direct involvement | +2 |
| Total Offense Level | 50 |
| Adjustment for acceptance of responsibility | -3 |

Adjusted offense level                                        47

According the to Chapter 5, Part A, comment n.2, "in rare cases, … [a]n offense level of more than 43 is to be treated as an offense level of 43.  There is no dispute that Mr. Beltrán Leyva's criminal history category is I.  Pursuant to the Sentencing Table, an offense level of 43 with a criminal history category of I corresponds to a term of imprisonment of life.  Mr. Beltrán Leyva objects to the PSR's and government's upward adjustments in their totality.

### *No basis on the current record to support a 12-level enhancement*

In support of its request for a life sentence, the government relies upon the "information contained in the PSR (which merely parrots information provided by the government) as well as "evidence proffered" in various motions filed.[14]  The government further asserts that at trial it would have presented witnesses that claim to have seen Mr. Beltrán Leyva engaged in multiple criminal acts during and in furtherance of the charged conspiracy and claims that an evidentiary hearing is unnecessary in this case based on the facts before the Court.[15]  The government's assertion ignores that there *are no facts* before this Court.  All that exists in the record is the government's self-serving and summary recitations of what biased government cooperators would have said at trial.  There is no specificity with respect to dates, times, locations.  There is no sworn testimony or statements from these witnesses.

The local jury instructions warn that the testimony of cooperators should be "considered with caution."[16]  The government's proposal that the Court accept blindly its "proffer" of what these witnesses would have said is untenable.  Mr. Beltrán Leyva concedes that the Court may consider hearsay evidence at sentencing; however, that evidence must have some

---

[14]     Gov. Memo. at 3-4.
[15]     *Id.* n.2.
[16]     *See, e.g.,* Red Book Instructions 2.22, 2.22a, 2.24.

indicia of reliability to support it.[17]   The Commentary to Guideline § 6A1.3 specifically states

that

> Although lengthy sentencing hearings seldom should be necessary, disputes about sentencing factors must be resolved with care. *When a dispute exists about any factor important to the sentencing determination, the court must ensure that the parties have an adequate opportunity to present relevant information.* Written statements of counsel or affidavits of witnesses may be adequate under many circumstances. *An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues.* The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.

> In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. *Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy.* Reliable hearsay evidence may be considered. Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means. *Unreliable allegations shall not be considered.*

> The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.[18]

On the record before it, the Court cannot make a determination as to the

applicability of the various enhancements sought by the government.  The government's various

"proffers" are plainly insufficient because the Court cannot make a finding of reliability based

solely on them. At the very least, the Court should hold an evidentiary hearing where the

government has the burden of producing reliable evidence upon which the Court can find, or not,

by a preponderance of the evidence whether the enhancements apply.[19]

---

[17]     *See United States v. Bras*, 483 F.3d 103, 108 (D.C. Cir. 2007).

[18]     U.S.S.G. § 6A1.3 (Commentary) (emphasis added; citations omitted).

[19]     *See United States v. Jimenez Martinez*, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of *affidavit* on which the district court relied at sentencing); *United States v. Roberts*, 14 F.3d 502, 521(10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity). *See also United States v. Bras*,

To the extent the Court requires the government to put on witnesses to support the enhancements Mr. Beltrán Leyva requests that the Court hear from the cooperators themselves rather than from an agent who will give selective testimony of events of which he has no first-hand knowledge and which is based on his reading of various reports.  Mr. Beltrán Leyva also requests that the government produce any *Jencks* (18 U.S.C. § 3500) material relevant to the testimony.  Without testimony to support the enhancements, Mr. Beltrán Leyva will be not be able to properly defend himself at sentencing and the Court will not be able to make a determination as to the applicability of those enhancements sought by the government.

### *Acceptance of responsibility*

The Court has informed Mr. Beltrán Leyva that it has a policy of not granting a downward adjustment for acceptance of responsibility for a late plea.  Both the PSR and the government believe that the downward adjustment is applicable in this case and Mr. Beltrán Leyva believes that he has met requirements for the adjustment.

Under U.S.S.G. §3E1.1(a), "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."  "If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level."[20]

---

483 F.3d 103 (D.C. Cir. 2007) (sentencing court conducted two-day hearing to determine amount of loss for guideline purposes); *United States v. Hart*, 324 F.3d 740 (D.C. Cir. 2003) (sentencing court held evidentiary hearing to determine applicability of enhancements).

[20] U.S.S.G. §3E1.1(b).

Furthermore, the Application Notes to U.S.S.G. §3E1.1 states in relevant part

1. In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:

(A)  truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true or has acted in a manner inconsistent with acceptance of responsibility; . . .[21]

At the plea hearing, the Court placed Mr. Beltrán Leyva under oath and engaged in the following colloquy:

THE COURT: Thank you.  You can come back up, Mr. Balarezo, with your client.

Now, Mr. Beltrán Leyva, you've heard the government's summary of what it would have proved if this case had gone to trial. Let me ask you a few brief questions with regard to that summary.

First, between 2000 and 2012, did you unlawfully, knowingly and intentionally combine, conspire, confederate and agree, together with other co-conspirators, to unlawfully, knowingly, and intentionally distribute  5 kilograms or more of a mixture or substance containing a detectable amount of cocaine, which is a narcotic drug and controlled substance, intending or knowing that such cocaine would be unlawfully imported into the United States in violation of Title 21 United States Code?

Did you do that?

THE INTERPRETER: Yes, Your Honor. I would help my brother, [Arturo]. And I conspired with my brother, [Arturo].

THE COURT: Okay.

Let me ask you this second: Between 2000 and 2012, did you unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree, together with other coconspirators, to unlawfully, knowingly and intentionally distribute

---

[21]     U.S.S.G. §3E1.1 (Application Note 1A).

50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, which is a narcotic drug and controlled substance, intending and knowing that such methamphetamine would be unlawfully imported into the United States in violation of Title 21 United States Code?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay.  A little more specifically, let me ask you this:

Between 2000 and your arrest on January 2008 by Mexican authorities, were you not one of the leaders of the Beltran Leyva organization?

THE DEFENDANT: No, sir.

THE COURT: You were not a leader?  Were you a member of the organization?

THE DEFENDANT: I was a member of the Beltran Leyva organization.

THE COURT: All right.

MR. BALAREZO: Your Honor, if I just may interject for one second.

THE COURT: No. This is -- no.

MR. BALAREZO: Very well.

THE COURT: Now, let me ask you this: During that time between 2000 and your arrest in 2008, did that organization that you're a member of, to your knowledge, help to finance shipments from Colombia, of cocaine, which were transported to Mexico, with the intention of them later being transported through Mexico to the United States?

THE DEFENDANT: I would just help my brother, [Arturo], sell it in Culiacán, with the knowledge that it would get to the United States.

THE COURT: All right.

So your organization was helping to finance those shipments from Colombia to Mexico for transshipment to the United States. Is that a fair description?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. And let me ask you one other question: During the same time period we've been talking about, would it be accurate to say that your organization also produced methamphetamine in Mexico for distribution, ultimately, in the United States? To your knowledge,  is that an accurate statement?

THE DEFENDANT: Yes, Your Honor, I did have knowledge of that as well.

THE COURT: Okay.

So you're pleading guilty today because you are, in fact, guilty; is that right?

THE DEFENDANT: Yes, Your Honor.[22]

In response to each of the Court's questions Mr. Beltrán Leyva knowingly and truthfully admitted the conduct comprising the offense of conviction and did not falsely deny any additional relevant conduct for which he is accountable under §1B1.3.[23]  Here, Mr. Beltrán Leyva has pled guilty to the one count of a "non-speaking" indictment that merely states the times of the conspiracy and statutory boilerplate language.  He is "not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a)."[24]  Furthermore, he is "may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection."[25]  Finally, there is no evidence on the record that he has falsely denied, or frivolously contested, relevant conduct that the court determines to be true or has acted in a manner inconsistent with acceptance of responsibility.[26]

The Guidelines further make clear that the adjustment for acceptance of responsibility is "not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly

---

[22]    Plea Hr'g Tr. At 17:16 – 20:13.

[23]    *See* U.S.S.G. §3E1.1 (Commentary).
[24]    *Id.*
[25]    *Id*.
[26]    *Id.*

demonstrate an acceptance of responsibility for his criminal conduct even though he. exercises his constitutional right to a trial."[27]

Here, although Mr. Beltrán Leyva initially intended to exercise his constitutional right to a trial, he ultimately did not do so immediately after the full scope of the government's case became clear and once the Court denied his motion relating to the Rule of Specialty.  He decided to enter a guilty plea *before* trial and did not put the government and the Court through the burden of an expected three-month trial.  In fact, he realized that he did not want to go to trial and face life in prison if convicted and decided that pleading guilty would at least give him the possibility of one day returning to his country and his family.  If the Guidelines contemplate a downward adjustment for acceptance of responsibility for a defendant who actually went to trial, there is no reason why the Court should not grant him the adjustment in this case where no trial occurred.[28]

The Guidelines do allow for the Court's consideration of the "timeliness of the defendant's conduct in manifesting the acceptance of responsibility."[29]  It is true that Mr. Beltrán Leyva pled guilty the week before trial was scheduled to begin.  However, that should not be the end of the Court's consideration.  As stated previously, the scope of the government's case was not evidence until the week before trial and the Court had not ruled upon his motion to Enforce the Rule of Specialty.  When the Court directed the government give a basic "proffer" of the expected evidence, Mr. Beltrán Leyva realized that the government's case was stronger than he initially believed.  It was at that point, when he actually knew what he was facing, that he decided to plead guilty and forgo his constitutional right to a trial.

---

[27]   U.S.S.G. §3E1.1 (Application Note 2).

[28]   *See United States v. Jones*, 997 F.2d 1475, 1478 (D.C. Cir. 1993) (*en banc*) (the reduction should normally be denied to the "defendant who does not plead guilty"; the *Jones* court granted a 2-level reduction to defendant who actually went to trial), *cert. denied*, 510 U.S. 1065 (1994)).

[29]   U.S.S.G. §3E1.1 (Application Note 1H).

The Court itself recognized the benefits to the parties of the government providing early information to a defendant in order to make an educated decision about how to proceed.  At the February 20, 2015, hearing, the Court stated:

> It was always my experience that it was in the government's interest and the defense's interest, but in the government's interest for the defense to know what it was facing, *because when the defense knew what it was facing, that was when they were in the best position to evaluate whether it made sense to go to trial or made sense to enter a plea*. That's when they knew. So keeping the defense in the dark is actually not in the government's interest, it's actually not in the government's interest, if the Government wants a resolution short of a trial.
>
> I've never known a prosecutor who didn't want to get a plea if they could get one. I mean, that's -- *it saves a lot of time, expense and risk*. I mean, God knows, there are many judges, myself included, who love to have a trial every now and then. A three-month trial is a bit of a burden.[30]

The Court went on to state:

> THE COURT: Yeah, that's right.  And a three-month trial is not one you're running around dying to get a three-month trial every now and then, because that's a lot of – that's a lot of work, that's a lot of pressure and a lot of hard work for a long period of time. And I say that, you know, being exhausted after six weeks of what's looking like 10 to 12 -- 11-week trial right now that I'm in.
>
> *But be that as it may, I think it's in both sides' interest, both, for the government and the defense, for the government to make sure the defense is educated and knows what it's facing, and that means giving it detail.  You've got to give explanation to it. They have to know what they're facing here, because it's only in that process that they're in a position to really evaluate the realistic sense of going to trial or not going to trial and whether it makes sense to go to trial or not go to trial.*
>
> And I appreciate that there will be security concerns and the government has to be concerned about those, as does the Court, et cetera, but this is a balancing, this is a balancing.
>
> The government wants a successful prosecution, whether it comes in the form of a plea or a trial that results in a conviction; and the defense wants a successful resolution, however they define that, in the interest of their client. It could be through a trial that results in an acquittal possibly or a hung jury or it could be in a form of a plea.

---

[30]      Tr. 2/20/15 Hr'g at 49:23 – 50:13 (emphasis added).

*But each side has in it has its own interests, and the best way to discern how to resolve this is for the government to share, to the fullest extent possible, its knowledge of the strength of its case, not its evaluation of the case, but what the evidence is in its case against the defense.*

So I encourage, encourage the government to think that through and in that spirit share information with the defense that'll enable it to see what it's facing so that it can figure out how to proceed to resolve this case.

MR. BALAREZO: Thank you, Your Honor. Appreciate that.

THE COURT: Stating the obvious.

MR. BALAREZO: I agree, thank you.[31]

In considering the timing of Mr. Beltrán Leyva's plea, the Court should also consider the circumstances of this case.  As noted previously, Mr. Beltrán Leyva was actively litigating his assertion that he had been extradited from Mexico to face charges related to the drug seizures in Washington State and for a period of time shorter than the conspiracy charged in the indictment.  All of the discovery produced prior to the plea did not relate specifically to him. The government had filed some motions providing a glimpse into what witnesses might say, but did not identify them.  All he knew was that various cooperators were seeking to reduce their sentences at his peril.  Thus, when the panorama of what he was facing became clear, Mr. Beltrán Leyva wasted no time in entering a knowing guilty plea without the benefit of an agreement.  Put another way, since the government is now seeking a life sentence, Mr. Beltrán Leyva would have been no worse off had he gone to trial and been found.  Here, Mr. Beltrán Leyva has accepted responsibility and has not challenged factual guilt. Therefore, the Court should grant him a 3-level downward adjustment for acceptance of responsibility.

---

[31]     Tr. 2/20/15 Hr'g at 50:15 – 52:6 (emphasis added).

## SECTION 3553(a) FACTORS

The Supreme Court decided in *United States v. Booker,*[32] that the federal Sentencing Guidelines are advisory provisions that recommend a particular sentencing range, rather than require it.  When imposing sentences, a district court must "treat the Guidelines as the starting point and initial benchmark."[33] A district court must next consider the sentencing factors set forth in 18 U.S.C. § 3553(a).  But the Court should not presume a Guideline sentence will always satisfy § 3553(a), because the Guidelines are only "a rough approximation of sentences that might achieve § 3553(a)'s objectives."[34]

A district court has an independent duty to ensure that the § 3553(a) factors are met. A court is free to reject a Guidelines sentence, "perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps *because the case warrants a different sentence regardless*."[35] A sentencing judge also "may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines."[36]

In addition a sentence must honor the statutory Parsimony Clause's "overarching command" that courts "'impose a sentence sufficient, but not greater than necessary, to comply with' the basic aims of sentencing . . . ."[37]  This proscription was designed to ensure that sentencing reflects reasoned judgment that is reviewable on appeal.[38]

---

[32]     543 U.S. 220 (2005).

[33]     *Kimbrough v. United States,* 552 U.S. 85, 108 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)) (internal quotations omitted).

[34]     *Rita v. United States,* 551 U.S. 338, 351 (2007); *Book*er, 543 U.S. at 245.

[35]     *Rita,* 551 U.S. at 350-51 (emphasis added).

[36]     *Kimbrough*, 552 U.S. at 101.

[37]     *Kimbrough*, 552 U.S.at 101 (2007); *Rita,* 551 U.S. at 348; 18 U.S.C. § 3553(a).

[38]     *United States v. Johnson,* 635 F.3d 983, 988 (7th Cir. 2011) (vacating); *United States v. Reyes-Hernandez,* 624 F.3d 405, 420 (7th Cir. 2010); *United States v.  Dorvee,* 616 F.3d 174, 182-84 (2nd Cir. 2010); *United States v. Olhovsky,* 562 F.3d 530, 547-48 (3rd Cir. 2009).

In imposing a sentence that is "sufficient, but not greater than necessary," the court should look to the seven statutory factors listed under Section 3553.  These factors include:

1.    **Nature and circumstances of the offense and history and characteristics of the defendant**

There is no denying that the offense of conviction is considered to be serious and dangerous.  However, the offense itself should not drive the sentence imposed in this case, at least not in the unbalanced way the Government seeks.

Mr. Beltrán Leyva is a 45-year old father of ten children, one of whom (Santiel) was kidnapped in 2010 and is now presumed dead.  He was born in abject poverty in La Palma, Sinaloa, Mexico.  La Palma is part of the "Golden Triangle," known as a major producer of opium and marijuana.  Since his childhood, Mr. Beltrán Leyva has been surrounded by narcotics trafficking.  Most people in his town grew marijuana and opium, as did his oldest brother, Arturo.  Arturo was the undisputed leader of what the government terms the Beltran-Leyva DTO until his death in 2009.  Arturo was the oldest brother and Mr. Beltrán Leyva the youngest.  In fact, Arturo was like a father figure for him and Mr. Beltrán Leyva did anything for his older brother.  Unfortunately, he got an early start in the family business.  With his guilty plea, Mr. Beltrán Leyva admitted that he had worked for his brother Arturo and conspired to commit the charged offense.

Mr. Beltrán Leyva's activities have not only caused him tremendous loss and pain (including loss of freedom and the deaths of his brother and son), but also have greatly affected his children and extended family and caused tremendous upheaval that would be exacerbated by a life sentence, especially since he also faces a lengthy prison sentence in Mexico, where he was

arrested in January 2008[39] for charges relating to his involvement in a narcotics conspiracy with his brother Arturo.

### 2.     Need for the sentence imposed

In addition to considering the above factors, the Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2."[40]  Section 3553(a)(2) states that such purposes are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

### A.     Seriousness of the offense, respect for the law, just punishment

At the time of sentencing, Mr. Beltrán Leyva will have been incarcerated for over 8 years.  The government seeks a life sentence mainly based on enhancements of 12 levels.  A defendant who has accepted responsibility for his actions, all of which took place in Mexico, does not merit a life sentence.

According to the Central Intelligence Ageny, a Mexican male has a life expectancy of 72.88 years at birth.[41]  Currently 45 years old, Mr. Beltrán Leyva would be approximately 71 years-old when released from a 25 year sentence.[42]  Given his life expectancy, a 25-year sentence will be effectively a life sentence, but he would at least have the hope of walking free someday.  That, Mr. Beltrán Leyva submits, would be more than sufficient to

---

[39]     Mr. Beltrán Leyva has been detained ever since his arrest.
[40]     18 U.S.C. § 3553(a)(2).
[41]     *See* https://www.cia.gov/library/publications/the-world-factbook/fields/2102.html
[42]     This does not take into account any good time credits. A 25-year sentence (300 months) minus a possible 15% reduction for good conduct, results in a sentence of approximately 21 years.  This calculation also does not take into account whether the Court grants him credit for the time he has already served.

compensate for the seriousness of the offense, to instill respect for the law and to impose just punishment.  A life sentence, as the government demands, should be reserved for the absolute worst offenders.  Here, the government has not demonstrated the need for such a sentence.

This Court should also consider the financial costs of a sentence of the type suggested by the government.  At current rates, the cost to society of sentence of 25 years would cost taxpayers between $525,143 and $848,260.[43]  In these times of financial austerity and rather than having the United States foot the bill for his lengthy incarceration, the Court should sentence Mr. Beltrán Leyva to 25 years and send him back to Mexico where the Mexican taxpayer can pay for his expected subsequent incarceration when he returns.

The government's recommended sentence of life in prison is excessive and in our view, vindictive, considering the sentences that the government has agreed to for many other high-profile large-scale narcotics traffickers.

### B & C.        Deterrence to criminal conduct and protection from further crimes

As noted above, imposition of a 25-year sentence will incarcerate Mr. Beltrán Leyva for until he is 71.  Such a lengthy period will serve to deter further criminal activity and protect the public.  It is well recognized that recidivism rates decline relatively consistently as age increases.[44]  At 71-years-old, Mr. Beltrán Leyva would be approaching his life expectancy and American society would not be further served by an extreme sentence as suggested by the

---

[43]     *See* Exh. 4; U.S. Gov't Accountability Office, *Bureau of Prisons: Eligibility and Capacity Impact Use of Flexibilities to Reduce Inmates' Time in Prison* fig. 3 (2012) (excerpt).

[44]     United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 2 (May 2004) ( *available at* http://www.ussc.gov/Research/Research_Publications/publications.cfm); Miles D. Harer, "Recidivism among federal prisoners released in 1987, JOURNAL OF CORRECTIONAL EDUCATION (1994 ) (available at http://149.101.37.70/news/research_projects/published _reports/recidivism/oreprrecid87.pdf).

government.  Once he serves his sentence, Mr. Beltrán Leyva would be deported to Mexico,

where he would become Mexico's burden.

### D.        Provide treatment and training

Mr. Beltrán Leyva's education ended in the seventh grade.  He would greatly

benefit from educational training to broaden his horizons.  He has no history of substance abuse

or mental health issues.

### 3 & 4.        Kinds of sentences available and the sentencing ranges established

The Statutory and Guidelines Analysis section above discusses these factors.

### 5.        Pertinent policy statement

There does appear to exist any applicable pertinent policy considerations.

### 6.        Need to avoid sentencing disparities

The government alleges that Mr. Beltrán Leyva, as part of the Beltrán Leyva

DTO, was involved in trafficking of thousands kilos of cocaine to the United States.  While the

government's quantity estimates are conjectural, the sentence of life years urged by the

government would result in an inequitable and strikingly disparate sentence when compared to

other similar cases *actually tried* around the country and would be far greater than necessary to

comply with the basic aims of sentencing.  *See United States v. Carlos Patiño Restrepo*, 02-CR-

1188 (LDW) (E.D.N.Y. 2012), (alleged leader of Colombia's North Valley Cartel, charged with

conspiracy to import thousands kilos of cocain*e* to the United States and alleged to have been

involved in the murders of multiple individuals; *sentenced to 40 years after trial*);[45] *United*

*States v. Omar Garcia Varela*, 99-CR-0804 (CMA) (S.D. Fla. 2011) (major Colombian cocaine

trafficker, responsible for importation of thousands of kilos of cocaine and multiple murders

---

[45]        *See* Exh. 5; Judgment in a Criminal Case.

including government informant; *sentenced to 280 months (23.3 years) after trial*;[46] *United States v. Jorge Mario Paredes*, 03-CR-0987 (DAB) (S.D.N.Y. 2010) (large scale Guatemalan drug trafficker, alleged to have trafficked many thousands of kilos of cocaine to the United States; *sentenced to 31 years after trial*);[47] *United States v. Erminso Cuevas Cabrera*, 04-CR-446 (TFH) (D.D.C.) (FARC defendant alleged to have managed cocaine laboratories for the FARCS's 14th Front, oversaw production and distribution of hundreds of thousands of kilograms of cocaine and converted as much as 2.5 tons of cocaine paste into cocaine approximately several times per month; *sentenced to 29 years after trial*);[48] *United States v. Juan del Cid Morales*, 06-CR-0248 (JDB) (D.D.C. 2008) (Guatemalan official alleged to have conspired to trafficked thousands of kilos of cocaine to the United States; *sentenced to 220 months (18.3 years) after trial*);[49] *United States v. Fabio Ochoa*, 99-CR-06153 (SDFL 2003) (leader of Colombian Cali Cartel, alleged to have trafficked multiple tons of cocaine to the United States and to have directed the murder of a government informant; *sentenced to 35 years after trial*);[50] and *United States v. Samuel Santander Lopesierra*, 02-CR-0392(RJL) (DDC 2007) (large-scale Colombian drug trafficker alleged to have trafficked thousands of kilos of cocaine to the United States; *sentenced to 300 months (25 years) after trial*).[51]  If anything, Mr. Beltrán Leyva's crimes are equal or lesser in scope than that of these defendants *who went to trial* and this Court should sentence him accordingly.

In *United States v. Diego Montoya*, 09-CR-20665 (S.D. Fla. 2009) the defendant was the undisputed leader of Colombia's North Valley Cartel; was directly responsible for

---

[46]   *See* Exh. 6; Judgment in a Criminal Case.
[47]   *See* Exh. 7; Judgment in a Criminal Case.
[48]   *See* Exh. 8; Judgment in a Criminal Case; Exh. 9; Indictment ¶¶ 35(d), 35(d)(iii) (excerpts).
[49]   *See* Exh. 10; Judgment in a Criminal Case.
[50]   *See* Exh. 11; Judgment in a Criminal Case.
[51]   *See* Exh. 12; Judgment in a Criminal Case.  The government requested a sentence between 36 and 40 years.

importing innumerable tons of cocaine into the United States; was directly responsible for the deaths of hundreds in Colombia; was responsible for the death of at least one government informant and was charged in at least three separate indictments.[52]   Montoya pled guilty and was sentenced to a term of 45 years.[53]   Other high-profile Mexican traffickers have been sentenced to less time than the government requests.   For example: *United States v. Osiel Cardenas Guillen*, 00-CR-118 (S.D. Tex. 2010) (defendant was the leader of the Gulf Cartel that allied itself with the Zetas; was responsible for importing tons of cocaine into the United States and much violence in Mexico; sentenced to 25 years after a plea); *United States v. Hector Palma Salazar* (C.D. Cal. 1995) (defendant was a co-founder of the Sinaloa Cartel with Joaquin "Chapo" Guzman; was responsible for importing thousands of kilos of cocaine into the United States; sentenced to 26 years after a plea; released in June 2016); *United States v. Benjamin Arellano Felix*, 97-CR-2520 (S.D. Cal. 2012) (defendant was leader of the Tijuana Cartel; responsible for shipping thousands of kilos of cocaine to the United States; sentenced to 25 years after a guity plea).   These similarly-situated defendants who pled guilty were sentenced to less time than sought here by the government.   The Court must consider these sentences in fashioning a sentence for Mr. Beltrán Leyva.

### 7.    Need to provide restitution

Here, restitution is not an issue and there is no specific victim that incurred financial loss or suffered physical harm relating to Mr. Beltrán Leyva's offense conduct.

---

[52]    *See* Exh.13; Factual Proffer in Support of Guilty Plea.
[53]    *See* Exh 14; Judgment in a Criminal Case.

**OTHER FACTORS**

*Consideration of status as deportable alien*

Mr. Beltrán Leyva's status as a deportable alien may warrant an additional reduction of

his sentence.  The United States Bureau of Prisons is authorized by statute[54] to assure that an

inmate must be afforded a reasonable opportunity to adjust to, and prepare for, re-entry into the

community.  However, in *Lartey v. Department of Justice*, [55] the court determined that the right

to participate in pre-release programs only applied to prisoners that were being released into the

community within the United States, thereby excluding deportable aliens.  And in *United States

v. Smith,*[56]  the District of Columbia Circuit ruled that a downward departure may be appropriate

where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the

severity of his sentence.  Thus, under a guideline sentence, Mr. Beltrán Leyva would be eligible

for a downward departure of up to six months as a result of his status as a deportable alien.

*Consideration of credit for time served*

Mr. Beltrán Leyva respectfully urges the Court to give him full credit for the time

he has been incarcerated since January 28, 2008.  The government has stated that his arrest was

"not related to the instant case."[57]  The government's assertion is without merit.  The Mexican

Ministry of Foreign Affairs, in its Extradition Order, specifically stated

> With regard to the previously described, in that appeal resolution dated June 10,
> 2008, noted in criminal matter 487/2008, initated by virtue of the appeal lodged

---

[54]   *See* 18 U.S.C. § 3624(c), which directs the Bureau of Prisons, to the extent practicable, to assure
that prisoners spend part of the last 10% of their sentences (but no more than six months) under
conditions -- possibly including home confinement -- that will "afford the prisoner a reasonable
opportunity to adjust to and prepare for his re-entry into the community."  Bureau of Prisons
regulations bars non-U.S. citizens from assignment to a Community Corrections Center except in
what appear to be rare circumstances.  *See* Federal Bureau of Prisons, Program Statement
5100.04: Security Designation and Custody Classification Manual, Ch. 2-9 (June 15, 1992).

[55]   790 F. Supp 130 (W.D. La. 1992).

[56]   27 F.3d 649 (D.C. Cir. 1994).

[57]   Gov. Sent. Memo. at 2.  The government also argues that the weapons he possessed at his arrest support an
enhancement for possession of a weapon because he was "an active member of the drug conspiracy."  *Id.*

against the consitucional deadline dated 29 January 2008, noted in criminal matter 387/2012-VI-A, before the Sixth District Judge for Penal Matters in the State of Jalisco against ALFREDO BELTRAN LEYVA alias "MOCHOMO", is which the *requested party is accused with respect to a criminal organization that is known since the year 1996 to January 2008, the date on which he was arrested by Mexican authorities*, in which he participated with his brother Arturo Beltran Leyva, alias Barbas or Barbitas and others, for which this Ministry considers that only the first part of the facts mentioned by the United States authorities in its request for extradition filed against ALFREDO BELTRAN LEYVA alias "MOCHOMO", refers to this criminal organization to point out the following:

> Investigation by law enforcement authorities revealed that ALFREDO BELTRAN LEYVA has been involved in the distribution and illegal importation of drugs from Colombia for the ultimate distribution in the United States since approximately 2000.

> ALFREDO BELTRAN LEYVA is a younger brother of Arturo Beltran Leyva, who until his death in 2009 was one of the most prolific drug traffickers in Mexico.  ALFREDO BELTRAN LEYVA started working in the Beltran Leyva drug trafficking organization created by his older brothers, Arturo and Hector.

> ALFREDO BELTRAN LEYVA initially was assigned to coordinate the offloading of ton-quantity shipments of cocaine from Colombia.  ALFREDO BELTRAN LEYVA was later promoted to one of Arturo Beltran Leyva's main assistants, in which role he oversaw the shipment of thousands of kilograms of cocaine into the United States and the subsequent distribution of the cocaine for sale in the United States.

*For this reason, the extradition of the requested party is not appropriate to be criminally prosecuted for having organized from 1996 to January 2008, in a criminal organization led by Joaquin Guzman Loera, alias El Chapo Guzman, Arturo Beltran Leyva, alias El Barbas or El Barbitas or Alfa, Hector Beltran Leyva, alias El H, Ismael Zambada Garcia, alias El Mayo Zambada, Juan Jose Esparragoza Moreno, alias El Azul,* who have ties to the Sinaloa and Juarez Cartels, dedicated to receive shipments of drugs from Colombia and if lost, coordinate their search and location to be recovered, guarding their transfer to the northern border of the Mexican Republic for later introduction into the United States of America, for its commercialization, by virtue that he is already being prosecuted for his participation in this criminal organization for the period of time indicated in the criminal case number 387/2012-VI-A, which is before the Sixth District Judge for Federal Criminal Proceedings in the State of Jalisco.[58]

Title 18 U.S.C. § 3585(b) states that "[a] defendant shall be given credit toward

---

[58] Exh. 3 at 155 – 156 (emphasis added).

the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences – (1) *as a result of the offense for which the sentence was imposed*; …" The Bureau of Prisons' (BOP) regulations state that "if the federal defendant has been in pre-sentence state or foreign custody on essentially the same charges as federal charges, credit shall also be given even though a federal detainer may not have been on file during that time."[59]

It is evident that the case for which he was arrested in Mexico in January 2008, pertains to his participation in a criminal organization involving Mr. Beltrán Leyva and his brother Arturo that was dedicated to drug trafficking since at least 1996. In fact, it also states that Mr. Beltrán Leyva had been involved in the distribution and illegal importation of drugs from Colombia for the ultimate distribution in the United States since approximately 2000, the same time of the charged conspiracy.[60] Therefore, Mr. Beltrán Leyva respectfully requests that the Court apply credit for the entire time that he has been in custody since January 28, 2008.

### *BOP Designation*

To the extent possible, Mr. he respectfully requests that the Court recommend that the Bureau of Prisons designate him to a facility in the Southern California area so that he could benefit from contact with relatives during his incarceration.

## FORFEITURE ALLEGATION

The indictment in this case included a forfeiture allegation against Mr. Beltrán Leyva and the government now argues that the Court should impose a money judgment in the amount of $10,000,000.00 (ten billion dollars). The government must prove the amount of the money judgment by a preponderance of the evidence. *See United States v. Roberts*, 660 F.3d

---

[59] *BOP Manual on foreign incarceration credit*, CN-03, June 30, 1997, Chapter 6, p.7.
[60] This was the basis of M. Beltrán Leyva's argument that the Mexican government had limited the scope of the conspiracy for which he could be tried in the United States. *See* Motion to Enforce Rule of Specialty or, Alternatively to Limit Scope of Conspiracy. (Doc. No. 59).

149, 166 (2nd Cir. 2011) (using a preponderance of the evidence standard to calculate the money judgment); *United States v. Pierre*, 484 F.3d 75, 86 (1st Cir. 2007) (holding that the government may use "either direct or circumstantial evidence" to establish the amount of the money judgment by a preponderance of the evidence); *United States v. Lewis*, 791 F. Supp. 2d 81, 94-95 (D.D.C. 2011) (court calculated money judgment based on a finding by a preponderance of the evidence).

In determining the amount of a money judgment, the Court may consider any evidence it deems reliable, including hearsay. *See United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) (holding that because forfeiture is part of sentencing, less stringent evidentiary standards apply in the forfeiture phase of the trial; the evidence need only be "reliable").  The amount sought by the government is pulled from thin air and bears no relation to reality.  Mr. Beltrán Leyva respectfully request the Court hold an evidentiary hearing where the government is made to offer reliable proof to substantiate this outlandish figure.

## CONCLUSION

Mr. Beltrán Leyva respectfully requests that the Court impose a sentence of 25 years.[61]  In light of *Booker* and *Hughes* such a sentence is reasonable and sufficient to serve the criteria laid down in 18 U.S.C. § 3553(a).

**Dated**: Washington, DC
   July 11, 2016        Respectfully submitted,

             **BALAREZO LAW**

                 /s/
      By:   _____
             A. Eduardo Balarezo
             D.C. Bar # 462659
             400 Fifth Street, NW
             Suite 300
             Washington, DC  20001

             *Counsel for Defendant Alfredo Beltrán Leyva*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 11th day of July 2016, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via E-Mail and ECF to the Parties in this case.

               /s/
            _____
            A. Eduardo Balarezo

---

[61]   *See* n.33.