UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 99-804-Cr-Altonaga(s)(s)(s)(s)(s)

UNITED STATES OF AMERICA

v.

DIEGO MONTOYA SANCHEZ,
                        Defendant
_____/

## GOVERNMENT'S FACTUAL BASIS IN SUPPORT
## OF ENTRY OF GUILTY PLEA

Pursuant to Rule 11(b)(3) of the Federal Rules of Criminal Procedure, the United States of America submits the following factual basis in support of the entry of a guilty plea by defendant Diego Montoya Sanchez to Counts 1 and 10 of the Fifth Superseding Indictment.

Count 1 charges the defendant with conspiring to import into the United States five or more kilograms of cocaine, in violation of Title 21, United States Code, Sections 963 and 952(a); all in violation of Title 21, United States Code, Sections 963 and 960(b)(1)(B). Count 10 charges the defendant with obstruction of the due administration of justice in the case of *United States v. Diego Montoya, et al.*, Case No. 99-804-Cr-Altonaga, by threats and force, by knowingly and willfully, and with malice aforethought, aiding, abetting, inducing, and procuring the torture and killing of Jhon Jairo Garcia Giraldo, a/k/a "Dos Mil," in violation of Title 18, United States Code, Sections 1503(a), 1503(b)(1), 1111, and 2.

Page 1 (August 4, 2009)                                    Assistant United States Attorney
                                                           Attorney for Defendant
                                                           Defendant

This factual basis also will support the defendant's guilty plea to Count 2 of the superseding indictment out of the District of the District of Columbia in Case No. 04-126 (EGS), which has been transferred to this District for guilty plea and sentence, pursuant to Rule 20 of the Federal Rules of Criminal Procedure (and docketed as Case No. 09-20665-Cr). Count 2 in Case No. 04-126 (EGS) charges the defendant with conspiring to participate in conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of Title 18, United States Code, Section 1962(d).

The factual basis for the defendant's guilty pleas in the above-referenced cases is as follows:

1. The defendant, Diego Montoya Sanchez, was born January 11, 1961, in Trujillo, Valle del Cauca, Colombia. He is the brother of co-defendants Juan Carlos Montoya Sanchez and Eugenio Montoya Sanchez and is the cousin of co-defendant Carlos Felipe Toro Sanchez.

## A. INTRODUCTION: THE MONTOYA ORGANIZATION

2. Defendant Diego Montoya Sanchez was involved in the cocaine trafficking business for over two decades. From at least as early as the mid-1980s, through the time of his capture on September 10, 2007, defendant Diego Montoya Sanchez led a prominent Colombian cocaine trafficking organization in which members of his family also were high-ranking members. These family members included:

(a) the defendant's co-defendant and brother, Juan Carlos Montoya Sanchez, who was a prominent organization member starting from the days of the organization's inception and so remained through the time of his arrest on or about December 29, 2003;

(b) the defendant's co-defendant and brother, Eugenio Montoya Sanchez, who assumed a prominent role in the organization starting in or around 1991 or 1992, and so remained through the time of his arrest on or about January 15, 2007; and

Page 2 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

D.M.

(c)     the defendant's co-defendant and cousin, Carlos Felipe Toro Sanchez, who started assisting the organization in approximately 1993 or 1994 and over time ascended to a high managerial role within the organization, where he so remained through the time of his arrest on or about December 29, 2003.

3.     Where this document references the term "the Montoya organization," it references the cocaine trafficking organization led by defendant Diego Montoya Sanchez and in which co-defendants Juan Carlos Montoya Sanchez, Eugenio Montoya Sanchez, and Carlos Felipe Toro Sanchez all were high-ranking managers.

## B.     THE MONTOYA ORGANIZATION'S HISTORICAL COCAINE PRODUCTION AND TRANSPORTATION METHODS AND PRACTICES

### Colombia's "Norte del Valle" Region

4.     The Montoya organization's drug trafficking activities included operations conducted out of the Colombian department of Valle del Cauca. The largest city in Valle del Cauca is Cali, Colombia, which is in the southern portion of the department. Valle del Cauca also contains a region known as "Norte del Valle." Although the term "Norte del Valle" oftentimes has been translated into English as the "North Valley," Colombia's "Norte del Valle" refers to the northern portion of Valle del Cauca. The remainder of this factual statement will refer to that region by the term "North Valley," which although linguistically imprecise is the English language term most commonly used to refer to that region.

5.     The Montoya organization, along with other organizations operating in and around the North Valley, eventually became part of what has been termed as the "North Valley Cartel." During the time in which what was known as Colombia's "Cali Cartel" was active, traffickers based in Colombia's North Valley served as a source of supply to traffickers centered in Cali, Colombia.

Page 3 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

Following the decline of the Cali Cartel in the mid-1990s, traffickers based in the North Valley emerged to become Colombia's most prolific cocaine trafficking cartel. Within the trafficking world, the term "North Valley Cartel" has been used to describe the major cocaine trafficking organizations that operated in and around the North Valley. Members of the North Valley Cartel both processed cocaine and exported it to Mexico and the United States. During the course of his over two decade-long participation in cocaine trafficking trade, defendant Diego Montoya Sanchez was the leader of a major North Valley Cartel organization – *i.e.*, the Montoya organization – that produced and exported cocaine to locations in the United States that included the Southern District of Florida.

## The Start of the Montoya Organization
## as a Cocaine Production Organization

6.    Defendant Diego Montoya Sanchez grew up in the central portion of Valle del Cauca, where his family had successful businesses in coffee farming, cattle farming, and operating a regional bus line. As a youngster, defendant Diego Montoya Sanchez was interested in entering the seminary. Although at one time defendant Diego Montoya Sanchez's father had looked into seminary schools for him, defendant Diego Montoya Sanchez's career ultimately took a different path. In 1975, when defendant Diego Montoya Sanchez was 14 years-old, his father died. To fill the void left by his father's death, defendant Diego Montoya Sanchez began assisting his mother in managing the family businesses. Within a short time, defendant Diego Montoya Sanchez gravitated into the cocaine business.

7.    Some time after the death of the defendant Diego Montoya Sanchez's father, the region where the Montoyas lived began to experience problems with increased guerilla activity. Threats and extortion by local guerilla groups caused extreme financial hardships for many of the small

Page 4 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

businessmen and landowners in the region. Around this time, many landowners in the region became involved in the cocaine business, which provided both a more lucrative way to make money but also a means to raise capital to fight the guerillas encroaching on their lands.

8.    Defendant Diego Montoya Sanchez first became involved in the cocaine business in approximately the early 1980s, when he started working as a driver and messenger for an associate who operated a local cocaine laboratory. In approximately 1984, defendant Diego Montoya Sanchez enlisted a friend to introduce him to Ivan Urdinola Grajales, who by then was a well-known Colombian cocaine trafficker. After the friend vouched for defendant Diego Montoya Sanchez, Urdinola met with him and agreed to sponsor him in setting up and operating a cocaine laboratory. This started a long criminal relationship in which for a number of years Urdinola was defendant Diego Montoya Sanchez's primary patron within the cocaine trafficking world. Through that criminal relationship, defendant Diego Montoya Sanchez eventually rose to become one of the two leading kingpins in the North Valley Cartel.

9.    As with the other labs that his organization operated, defendant Diego Montoya Sanchez set up his first cocaine laboratory in the North Valley region. Defendant Diego Montoya Sanchez and his brother, Juan Carlos Montoya Sanchez, ran the laboratory and oversaw the different workers. During the decade-long period in which the Montoya organization operated cocaine laboratories, Juan Carlos Montoya Sanchez had primary responsibility for overseeing and operating the laboratories.

10.    In their laboratories, the Montoyas would process cocaine base into cocaine hydrochloride. The Montoyas quickly became proficient in producing cocaine. As a result, Urdinola soon began procuring ever-increasing amounts of his cocaine from them. Although Urdinola initially

Page 5 (August 4, 2009)                    Assistant United States Attorney
                                          Attorney for Defendant
                                          Defendant

ordered modest quantities of cocaine, such as 50 kilograms at a time, within a short time Urdinola was

placing orders of a 1,000 kilograms and more. Defendant Diego Montoya Sanchez and his brother,

Juan Carlos, became so productive that within less than a year they were able not only to meet

Urdinola's production demands, but also to start servicing production requests from other major

traffickers. By the late 1980s, the Montoya organization was producing multi-ton quantities of cocaine

for export from Colombia by serving as a significant source of supply for Ivan Urdinola Grajales and

other major Colombian drug traffickers Jose Orlando Henao Montoya, Efrain Hernandez, Nelson

Urrego, Oscar Uribe, and Juan Carlos Ramirez Abadia, a/k/a "Chupeta."

The Montoya Organization Expands into
Participation in Aviation Smuggling Routes to Mexico

11.     The Montoya organization owned and operated several airplanes to support its cocaine

laboratory operations. The Montoya organization would use the planes to fly cocaine base from Peru

and locations in Colombia to landing strips that they would operate. The cocaine base in turn would

be processed into cocaine hydrochloride at Montoya organization laboratories. Depending upon the

size of the plane, the Montoya organization could transport anywhere between 500 kilograms to 1,500

kilograms of cocaine base in a given flight.

12.     The organization's ownership of these airplanes also assisted defendant Diego Montoya

Sanchez in expanding into the transportation facet of the cocaine business. From the late 1980s

through the early 1990s, defendant Diego Montoya Sanchez would lease his planes to other traffickers

to fly loads of the processed cocaine from Colombia to Mexico. The Montoya organization and other

North Valley traffickers used airstrips in Valle del Cauca to send the cocaine-laden flights to Mexico.

Many of the Colombian airstrips utilized were located on ranches owned or controlled by the Montoya

Page 6 (August 4, 2009)

Assistant United States Attorney _Ad_
Attorney for Defendant      _WAC_
Defendant                   _D.M_

organization or other North Valley Cartel traffickers. The processed cocaine flown to Mexico subsequently was smuggled into the United States for further distribution. Once in Mexico, the cocaine generally was smuggled into the United States over land by Mexican smugglers.

13. During the period of time when aircraft was the primary method of exporting cocaine from Colombia, the Montoya organization assisted several major drug traffickers in the air smuggling of cocaine to Mexico. From the late 1980s through the early 1990s, the Montoya organization was primarily a cocaine production organization. Consequently, other traffickers with more extensive experience and connections in the air smuggling facet of the cocaine business assumed greater operational responsibilities over the air smuggling efforts.

14. Because of the strength and quality of his connections with Mexican drug trafficking organizations and his extensive drug distribution network in the United States, North Valley trafficker Juan Carlos Ramirez Abadia, a/k/a "Chupeta," was one of the Montoya organization's primary associates in the smuggling of cocaine to Mexico by air. The Montoya organization also participated in flying cocaine loads into Mexico with major North Valley traffickers such as Eduardo Restrepo Victoria, a/k/a "El Socio," and Luis Hernando Gomez Bustamante, a/k/a "Rasguno," frequently using airstrips in Colombia controlled by these individuals. In participating with other traffickers in flying cocaine loads to Mexico, the Montoya organization oftentimes would receive payment in the form of a portion of the load on the plane. Depending upon the size of the plane used, the smuggled loads generally would range from between 1,000 and 1,500 kilograms of cocaine per load.

Page 7 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

The Montoya Organization Transitions from
Aviation Smuggling to Maritime Smuggling

15.    Because of the increased success of interdiction efforts against drug trafficking flights

from Colombia to Mexico (which included the seizure of several Montoya-owned planes), by the early

1990s most major Colombian drug trafficking organizations were moving away from air smuggling

and towards maritime routes. Consistent with this trend, in the early 1990s the Montoya organization

discontinued its use of air routes in favor of maritime drug shipments to Mexico and Central America.

From the early 1990s through the time of defendant Diego Montoya Sanchez's arrest in September

2007, the Montoya organization utilized both large ships and go-fast boats on an ongoing basis to

smuggle large amounts of cocaine through maritime routes

16.    Unlike its involvement in the air smuggling of cocaine, the Montoya organization had

much greater operational involvement in the maritime smuggling of cocaine. From the early 1990s

until approximately 1996, the Montoya organization had a maritime smuggling partnership with Juan

Carlos Ramirez Abadia, a/k/a "Chupeta." Ramirez Abadia's role in the partnership largely involved

utilizing his large network of contacts among transporters in Colombia and organizations in Mexico

that would purchase the cocaine. Defendant Diego Montoya Sanchez in turn was responsible for

supplying the cocaine; dealing with the transporters (who were responsible for getting the cocaine to

ports in Colombia and, from there, to ports in Mexico), and dealing with the Mexican organizations

that would receive the cocaine after it arrived. The ultimate destination of the majority of the cocaine

sent to Mexico was the United States.

17.    The Montoya organization would use maritime routes from both Colombia's northern

coast and Colombia's Pacific coast. The routes from Colombia's northern coast would go through the

Page 8 (August 4, 2009)                                Assistant United States Attorney
                                                       Attorney for Defendant
                                                       Defendant

Carribean, with the cocaine destined for ports on Mexico's Carribean coast, such as Cancun. Transporters on these northern routes generally would deploy go-fast boats (also known as "speed boats"). The go-fast boats on these northern routes generally would carry loads in the approximate amounts of 1,000 to 1,100 kilograms of cocaine per load.

18. The routes from Colombia's Pacific coast would be destined for the Mexican west coast. These routes generally were lengthier than the routes from the northern coast. For the Pacific routes, the Montoya organization frequently contracted for transportation services from the drug trafficking organization of Victor Patino Fomeque and his half-brother, Luis Alfonso Ocampo Fomeque, a/k/a "Tocayo Patino." During the early and mid-1990s, the Patino drug trafficking organization dominated the maritime trafficking of cocaine from the Colombian Pacific port city of Buenaventura to Mexico.

19. Montoya transporters used a variety of maritime transportation methods when smuggling cocaine out of the Pacific ports. These included larger, slower vessels that could carry between 4,000 and 6,000 kilograms of cocaine per shipment. They also would use larger go-fast boats that could carry as much as 2,500 kilograms of cocaine per shipment. Sometimes the go-fast boats would transfer the cocaine to larger boats part way through the trips. Other times, they would meet refueling boats at pre-set coordinates in the Pacific. Before reaching the Mexican coast, the go-fast boats would transfer the loads to Mexican fishing boats. The crew on the go-fast boats would board the fishing boats and then would abandon and sink the go-fast boats.

20. In approximately 1996, defendant Diego Montoya Sanchez's partner in these Mexican transportation routes – Juan Carlos Ramirez Abadia, a/k/a "Chupeta" – voluntarily surrendered to Colombian authorities. This required Ramirez Abadia to temporarily assume a lower profile in the

Page 9 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

drug trafficking world, which in turn necessitated that he discontinue his smuggling partnership with the Montoya organization. The Montoya organization, however, continued its smuggling activities.

21.     Shortly after Ramirez Abadia's surrender to authorities, defendant Diego Montoya Sanchez decided to end his organization's operation of its cocaine producing laboratories. By this time, Montoya organization laboratories could produce as much as 4,000 kilograms per month. Notwithstanding the productivity of his laboratories, defendant Diego Montoya Sanchez decided that the organization would benefit by concentrating on a single speciality. Defendant Diego Montoya Sanchez determined that maritime smuggling, which both was more profitable and required management and oversight of far fewer workers, was the better area on which to focus his organization's resources and attention. As a result, from approximately 1996-97 through the time of defendant Diego Montoya Sanchez's arrest in September 2007, the Montoya organization no longer produced its own cocaine supply, but rather obtained it from third party sources.

22.     Following Ramirez Abadia's surrender, the Montoya organization continued to contract with the Patino organization for transportation services from the Pacific coast. The Montoya organization also worked with the transporters affiliated with the organization of Miguel Solano Duran. After Miguel Solano Duran was murdered in January 2003, several of his key associates continued to work with the Montoya organization. For a brief time starting in approximately 2000 and then starting again in late 2003, the Montoya organization also worked with Pedro Pineda Camargo, a/k/a "Pispi," who operated profitable smuggling routes out of Colombia and Ecuador. Because of deaths, arrests, and infighting between major Colombian organizations, the Montoya organization regularly had to establish relationships with different sets of transporters. Notwithstanding these challenges, through the time of defendant Diego Montoya Sanchez's arrest in September 2007, the

Page 10 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

Montoya organization continued to maintain a large and effective network of contacts in Colombia and Mexico to assist with the smuggling of large amounts of cocaine into Mexico, followed by delivery to Mexican traffickers, for ultimate importation into the United States.

23.     While large numbers of these loads were successfully smuggled into Mexico and elsewhere, law enforcement intercepted and seized a number of significant loads.  Among these seizures were: (a) two seizures in Spring of 2001 of 6,000 and 12,000 kilograms of cocaine, respectively; (b) a seizure in December 2001 of approximately 9,300 kilograms of cocaine; and (c) a seizure in July 2004 of approximately 2,200 kilograms of cocaine.  Part or all of the seized loads belonged to the Montoya organization.

### C.  MONTOYA ORGANIZATION MONEY LAUNDERING METHODS AND PRACTICES

24.     Another important component of the activities of the Montoya organization was laundering of the proceeds of its cocaine trafficking.  Until approximately 1991 or 1992, defendant Diego Montoya Sanchez and Juan Carlos Montoya Sanchez were responsible for handling the organization's finances.  However, as the profits from Montoya organization drug trafficking increased, the Montoya organization needed to enlist a trusted individual who would be responsible for overseeing the organization's drug finances.  In approximately 1991 or 1992, defendant Diego Montoya Sanchez recruited his brother, Eugenio Montoya Sanchez, to manage organization drug proceeds and oversee investments as part of the family cocaine trafficking business.

25.     As part of his role in overseeing organization financial activities, Eugenio Montoya Sanchez maintained and oversaw stash houses used to store cash drug proceeds on behalf of the Montoya organization.  The Montoya organization often maintained between $18 million and $20

Page 11 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

million in cash drug proceeds collectively in its different stash houses around Colombia, sometimes storing as much as between \$6 million and \$8 million in a single stash house. Cash drug proceeds stored in these stash houses included drug proceeds generated from the activities of the Montoya organization, as well as drug proceeds generated by the activities of other prominent Colombian drug traffickers and held on their behalf. Cash drug proceeds stored in these stash houses generally were in the form of United States currency. Eugenio Montoya Sanchez used organization drug proceeds to pay various expenses incurred by the organization. These included: (a) purchasing laboratory chemicals for Montoya organization cocaine laboratories, as well as laboratories operated by other North Valley Cartel traffickers; (b) purchasing cocaine paste to be processed at Montoya organization cocaine laboratories; (c) paying persons who worked in Montoya organization cocaine laboratories; (d) paying persons in Colombia responsible for transporting Montoya organization cocaine within Colombia, including to ports and other locations from which it was smuggled to Mexico and elsewhere; (e) paying persons who provided security and debt collection services to the Montoya organization; and (f) paying bribes to corrupt officials who assisted the Montoya organization.

26. In addition, Eugenio Montoya Sanchez used Montoya organization drug proceeds to invest heavily in land and other real estate. Rather than deal in currency or traceable financial instruments, the Montoya organization frequently bartered vehicles and property to settle debts with other drug traffickers. The Montoya organization purposely kept to a minimum financial transactions that involved banks accounts in its members' true names.

27. Eugenio Montoya Sanchez also used stored Montoya organization cash drug proceeds to fund outside businesses. These included a Montoya-funded business that obtained and sold computer equipment wholesale in Colombia and elsewhere in South America. In addition, Eugenio

Assistant United States Attorney
Attorney for Defendant
Defendant

Montoya Sanchez oversaw the laundering of cash drug proceeds through Colombian banks and money exchanges to convert them from United States currency to Colombia pesos on behalf of defendant Diego Montoya Sanchez to finance personal and lifestyle expenses.

## D. USE OF VIOLENCE BY THE MONTOYA ORGANIZATION TO OBSTRUCT JUSTICE AND TO PROTECT ORGANIZATION MEMBERS FROM LAW ENFORCEMENT EFFORTS

Background to the Murder of Jhon Jairo Garcia Giraldo, a/k/a "Dos Mil":
The Relocation of Montoya Family Members to South Florida and the
Subsequent Seizure of Montoya Family Property

28.     The Montoya organization also utilized its drug proceeds to support members of the Montoya family. In the late 1990s, the Montoya organization started moving family members to South Florida. Montoya family members who relocated to South Florida in the late 1990s or shortly thereafter included defendant Diego Montoya Sanchez's mother, his sister, his ex-wife, his two sons, an ex-sister-in-law, two nephews, and a niece. Eugenio Montoya Sanchez oversaw the laundering of millions of dollars of drug proceeds to help support the luxurious lifestyles of Montoya family members living in South Florida. The drug proceeds were laundered through shell corporations set up in the British Virgin Islands. Drug proceeds laundered through this method were used to purchase luxury cars and luxury homes for Montoya family members who had been relocated to South Florida.

29.     However, agents of the Federal Bureau of Investigation ("FBI") uncovered this scheme and identified properties funded by Montoya organization drug proceeds. In October 2002, FBI agents seized two luxury condominiums and luxury automobiles from Montoya family members residing in South Florida. Federal authorities subsequently forfeited these properties. The seizures and forfeitures of the Montoya family property, coupled with growing law enforcement pressure from the ongoing

Page 13 (August 4, 2009)                          Assistant United States Attorney
                                                  Attorney for Defendant
                                                  Defendant

the ongoing investigation of the Montoya organization, eventually prompted Montoya family members to flee South Florida and return to Colombia.

### The Murder of Jhon Jairo Garcia Giraldo, a/k/a "Dos Mil"

30.     Jhon Jairo Garcia Giraldo, a/k/a "Dos Mil," was a long time associate of the Montoya organization. His responsibilities included obtaining and distributing cell phones and pagers for Montoya organization. Garcia Giraldo continued in that role through the time of his death in August 2003.

31.     In June 2003, after learning that Garcia Giraldo was planning to take a trip from Colombia to South Florida, Eugenio Montoya tasked Garcia Giraldo to deliver money to a Montoya family member while Garcia Giraldo was in South Florida. Acting at Eugenio Montoya Sanchez's direction, in June 2003 Garcia Giraldo delivered drug proceeds to the Montoya family member at a location in South Florida.

32.     Sometime in or slightly prior to August 2003, defendant Diego Montoya Sanchez directed Eugenio Montoya Sanchez to meet with a Montoya organization member and instruct the organization member to kidnap and use violence to extract information from Jhon Jairo Garcia Giraldo. Defendant Diego Montoya Sanchez relied upon Eugenio Montoya Sanchez in this regard because of Eugenio Montoya Sanchez's position of trust within the organization.

33.     Defendant Diego Montoya Sanchez feared that Garcia Giraldo was cooperating with United States law enforcement. Defendant Diego Montoya Sanchez directed Eugenio Montoya Sanchez to instruct the organization enforcer to elicit from Garcia Giraldo whether he was cooperating and what he had told United States law enforcement. Defendant Diego Montoya Sanchez's concerns

Page 14 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

included whether Garcia Giraldo had been cooperating with United States law enforcement when Garcia Giraldo made the June 2003 delivery of drug proceeds to the Montoya family member.

34.    Eugenio Montoya Sanchez conducted the meeting, as directed by defendant Diego Montoya Sanchez. The subjects of the meeting were to convey defendant Diego Montoya Sanchez's instructions and to develop a strategy to lure Garcia Giraldo to a remote meeting location in such a way that Garcia Giraldo would not suspect that the purpose was to abduct and interrogate him.

35.    Following this meeting, a Montoya organization member contacted Garcia Giraldo and instructed him to meet at a farm in a rural area outside of Cali, Colombia. Garcia Giraldo agreed, believing that the purpose of the meeting was for him to deliver phones to be used by Montoya organization members.

36.    Garcia Giraldo went to the farm sometime in early August 2003. After Garcia Giraldo arrived, multiple Montoya organization members proceeded to interrogate and beat Garcia Giraldo. Methods used included hitting Garcia Giraldo with baseball bats in the shins and other parts of the body, holding his head under water, and asphyxiating him with a plastic bag over his head. At intervals, the beatings let up so that Garcia Giraldo would not go into shock and die before the questioning was over. During his questioning, Garcia Giraldo admitted only to being briefly detained when traveling to the United States and to being asked about his travel documents in the United States. Garcia Giraldo denied being an informant and insisted that he had not cooperated with United States law enforcement authorities. The beatings continued, and Garcia Giraldo died at the farm. After Garcia Giraldo died, the assailants at the farm dismembered his remains and disposed of them in a river.

Assistant United States Attorney
Attorney for Defendant
Defendant

37.     Over the course of its existence, the Montoya organization has used violence in order to protect itself against law enforcement investigations and initiatives. The Montoya organization, at the direction of defendant Diego Montoya Sanchez and other high-ranking organization members, has used violence in order to extract from individuals information that the Montoya organization believed these individuals may have provided to authorities. Also at the direction of defendant Diego Montoya Sanchez and other high-ranking organization members, the Montoya organization has killed individuals believed to be threats to the organization. The Montoya organization has used violence and murder to prevent individuals from passing on information to law enforcement, to punish those suspected of doing so, and to instill fear in others to deter them from doing the same.

38.     The form of violence and interrogation employed on Garcia Giraldo was a technique used by the Montoya organization against persons that the organization feared were cooperating with law enforcement. Defendant Diego Montoya Sanchez further was aware that once questioning was complete, the subjects of the violence and interrogation were rarely allowed to live. When defendant Diego Montoya Sanchez directed that Garcia Giraldo be abducted and interrogated for information, defendant Diego Montoya Sanchez understood that the likely consequence was that Garcia Giraldo would be killed.

39.     In 1999, defendant Diego Montoya Sanchez was indicted in the United States District Court for the Southern District of Florida in *United States v. Diego Montoya, et al.*, Case No. 99-804-Cr (hereinafter referred to as "Case No. 99-804"). The charges against defendant Diego Montoya Sanchez in Case No. 99-804 were made public in 2000 and were pending during the time period of the planning of the abduction of Garcia Giraldo and Garcia Giraldo's subsequent murder. At the time of the planning of Garcia Giraldo's abduction and Garcia Giraldo's subsequent murder, the existence

Page 16 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

of the charges against defendant Diego Montoya Sanchez in Case No. 99-804 was well-known within the Montoya organization – including by defendant Diego Montoya Sanchez and numerous other significant members of the Montoya organization. Defendant Diego Montoya Sanchez understood that the abduction and murder of Garcia Giraldo had the purpose of: (a) assisting defendant Diego Montoya Sanchez and the Montoya organization as a whole in tracking potential law enforcement activities against them in Case No. 99-804 and other potential prosecutions; (b) retaliating against Garcia Giraldo for his perceived cooperation with law enforcement; (c) preventing Garcia Giraldo from assisting United States law enforcement in the prosecution of defendant Diego Montoya Sanchez in Case No. 99-804, as well as in potential prosecutions of others members of the Montoya organization; (d) instilling fear in others as to the consequences of cooperating with United States law enforcement against defendant Diego Montoya Sanchez and others in the Montoya organization in Case No. 99-804, as well as other potential prosecutions; and (e) thereby deterring them from doing so.

### The Murder of the Brothers of Carlos Jose
### Robayo Escobar, a/k/a "Guacamayo"

40.     The 2005 murders of the brothers of Carlos Jose Robayo Escobar, a/k/a "Guacamayo," serve as another example of the Montoya organization's use of violence to impede cooperation with authorities. Carlos Jose Robayo Escobar was a debt collector and enforcer and long had been a close and trusted Montoya organization operative. In March 2005, Robayo Escobar was arrested by Colombian authorities, and in April 2005 he was indicted as a co-defendant in this case.

41.     Over the course of mid-2005, and while Robayo Escobar was in custody in Colombia pending extradition to the United States, Montoya loyalists started to develop suspicions that Robayo Escobar's brother, Nelson Robayo Escobar, a/k/a "Mamoncillo," was cooperating with authorities.

Page 17 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

In approximately September 2005, Montoya loyalists murdered Nelson Robayo Escobar, all as well as two other brothers, Diego Alberto Robayo Escobar, a/k/a "Puma," and Jaime Adrian Robayo Escobar, a/k/a "Micoseco." Participants in the killings included co-defendant Oscar Varela Garcia, a/k/a "Capachivo," and co-defendant Gildardo Rodriguez Herrera, a/k/a "Camisa."

### E. THE WAR BETWEEN THE VARELA AND MONTOYA ORGANIZATIONS

#### Background: The Rise to Power of Defendant Diego Montoya Sanchez and Wilber Varela Within the North Valley Cartel

42. Over the course of the 1990s, the two dominant wings within the North Valley Cartel were led by the Urdinola and Henao families. The Urdinola wing participated in all aspects of the drug trafficking business, including operating as significant producers of cocaine. The drug trafficking patriarch of the Urdinola family was Ivan Urdinola Grajales, who was defendant Diego Montoya Sanchez's long-time patron in the cocaine trafficking world.

43. As a trusted cocaine trafficking associate of Ivan Urdinola Grajales, defendant Diego Montoya Sanchez traditionally was most closely affiliated with the Urdinola wing of the North Valley Cartel. Over the course of the 1990s, as his success and prominence within the Colombian drug trafficking world grew, defendant Diego Montoya Sanchez climbed within the power structure of the Urdinola wing. By the time that Ivan Urdinola Grajales died in a Colombian prison in 2002, defendant Diego Montoya Sanchez had become the kingpin of what had been the Urdinola wing of the North Valley Cartel.

44. The Henao wing likewise participated in all aspects of the drug trafficking business. Throughout much of the 1990s, the Henao wing was led by Orlando Henao Montoya, with his brothers Fernando and Archangel also occupying significant roles. Orlando Henao Montoya's murder in 1998

Page 18 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

set in motion the rapid decline of the Henao brothers. In December 2001, Fernando Henao Montoya was arrested in Miami. The fall of the Henao brothers was completed in January 2004, when Archangel Henao Montoya was arrested in Panama, from where he was extradited to the United States several weeks later.

45.     As the Henao brothers started to decline from prominence in the late 1990s, Wilber Varela ascended to control over that wing of the North Valley Cartel. Varela was believed to be a former officer in the Colombian National Police. Varela's roots in the Colombian drug trafficking world were as an enforcer within the Henao wing. Over time, Varela rose within the power structure of the Henao wing. By the time that defendant Diego Montoya Sanchez took over what had been the Urdinola wing of the North Valley Cartel, Wilber Varela had elevated to the top of what had been the Henao wing of the North Valley Cartel. By the end of the 1990s, Wilber Varela and defendant Diego Montoya Sanchez were the two foremost kingpins within the North Valley Cartel.

## The Escalation of Tensions Between the Varela and Montoya Organizations

46.     For a long time, relations between Wilber Varela and defendant Diego Montoya Sanchez had been tense. These tensions dated back to the murder of Libardo Duque, a/k/a "Payaso," in the early 1990s. Until his death, Duque had been an enforcer for then-North Valley Cartel kingpin, Orlando Henao. Defendant Diego Montoya Sanchez and then-North Valley Cartel kingpin Ivan Urdinola Grajales believed that Duque had targeted defendant Diego Montoya Sanchez for murder. Over the course of its history, the Montoya organization has used violence against rival drug traffickers to prevent perceived threatened attacks and assassinations of organization members and members of their families. In order to preempt a possible attack on defendant Diego Montoya Sanchez, Ivan

Page 19 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

D.M.

Urdinola Grajales, with the knowledge and consent of defendant Diego Montoya Sanchez, directed Oscar Varela Garcia, a/k/a "Capachivo," to kill Duque. Oscar Varela Garcia was a long-time enforcer in the Urdinola wing of the North Valley Cartel and, through that association, developed a close relationship with defendant Diego Montoya Sanchez. Oscar Varela Garcia carried out the killing, as directed.

47. Tensions between the Montoya and Varela organizations started to escalate as the 1990s came to a close. North Valley Cartel traffickers who formerly would work freely with a variety of organizations increasingly were forced to pick sides. By way of example, in approximately 2000-01 the Varela organization ordered prominent North Valley Cartel cocaine transportation specialists Eduardo Restrepo Victoria, a/k/a "El Socio," Pedro Pineda Camargo, a/k/a "Pispi," and Jaime Alberto Marin, a/k/a "Beto Marin," to cease offering cocaine transportation services to the Montoya organization.

48. The animosity between the Varela and Montoya factions progressively spawned significant outbreaks of violence within the Colombian narcotics underworld. In December 2001, Montoya and Varela organization enforcers engaged in a widely publicized shoot-out in a discotheque north of Cali, Colombia. Within weeks, several Varela enforcers who had been arrested in connection with the incident were murdered in a Colombian jail. Starting sometime in 2002, a high-ranking Varela enforcer named Javier Antonio Calle Serna, a/k/a "Comba," mounted an extensive armed initiative in the traditional Urdinola family stronghold in Canon de Garrapatas. Through these efforts, Calle Serna's forces took over large portions Urdinola family land and forced Urdinola family members and loyalists out of Canon de Garrapatas.

Page 20 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

49.     On January 5, 2003, Varela operatives murdered Miguel Solano Duran at a nightclub in Cartagena, Colombia.  Solano Duran was a longtime and high-level trafficking partner of the Montoya organization, as well as a personal friend of defendant Diego Montoya Sanchez.  The murder of Solano Duran triggered an even further elevation of tensions between the rival organizations.

50.     In July 2003, prominent North Valley Cartel traffickers Juan Carlos Ramirez Abadia, a/k/a "Chupeta," and  Luis Hernando Gomez Bustamante, a/k/a "Rasguno," along with Gabriel Puerta Parra, who was a long-time counselor and facilitator within the Cartel, convened a summit to try to defuse the tensions between the Montoya and Varela factions.  The summit took place at Puerta's ranch in Colombia's Magdalena Medio region, southeast of Medellin and northwest of Bogota. Defendant Diego Montoya Sanchez and Wilber Varela both attended.  Both were accompanied by a number of their closest associates, as well as numerous armed bodyguards.  Although the summit lasted several hours, it made no progress in defusing tensions between the two factions.

### The War Between the Varela and Montoya Organizations

51.     By the fall of 2003, the hostilities had erupted into an all-out war in which the Varela and Montoya organizations targeted each other's members for murder.  The Varela-Montoya war may have had roots in personal animosities among the different participants that dated back many years. However, the war ultimately carried a far broader and more sweeping significance within the Colombian narcotics underworld.  The Varela-Montoya war functioned as a battle for dominance within the North Valley Cartel and over its most valued drug trafficking production and export routes.

52.     One of the most significant murders committed in the course of the Varela-Montoya war was the March 2004 assassination of retired Colombian National Police colonel Danilo Gonzalez. For years, Gonzalez had assisted prominent North Valley Cartel traffickers, including the Montoya

Page 21 (August 4, 2009)

Assistant United States Attorney
Attorney for Defendant
Defendant

organization, by managing an extensive corruption network within the Colombian National Police. As tensions between the Varela and Montoya organizations escalated, Gonzalez aligned himself with the Varela organization.

53.     On or about December 29, 2003, Colombian authorities captured Juan Carlos Montoya Sanchez, the brother of defendant Diego Montoya Sanchez. Gonzalez was blamed for the arrest and as a result was targeted for murder.

54.     On the day of the murder, a Montoya loyalist learned that Gonzalez had left a Bogota law office around lunchtime with a lawyer who worked in the building. A team of enforcers, including Gildardo Rodriguez Herrera, a/k/a "Camisa," positioned themselves at the building that housed the law office. When Gonzalez returned from lunch, enforcers stationed in the lobby ambushed Gonzalez, shooting him repeatedly and killing him.

55.     Another of the more significant murders committed in the course of the war was the murder in Mexico of prominent North Valley Cartel trafficker Pedro Pineda Camargo, a/k/a "Pispi." Prior to 2003, Pineda had been one of the top transporters servicing Varela. A series of events that concluded with Pineda switching loyalties to the Montoya organization resulted in Varela targeting Pineda for murder. In September 2005, Mexican drug traffickers working on Varela's behalf kidnaped and murdered both Pineda and his wife.

56.     The all-out war between the Varela and Montoya organizations continued until approximately October 2005, at which point the organizations entered into an uneasy "truce," with tensions continuing to spark thereafter. The war resulted in hundreds of deaths. Victims included not only members and associates of the two organizations, but also innocent civilians.

Page 22 (August 4, 2009)                                         Assistant United States Attorney
                                                                 Attorney for Defendant
                                                                 Defendant

57.     Over the course of the war between the rival organizations, the Montoya organization,

at the ultimate direction of defendant Diego Montoya Sanchez, continued exporting cocaine to Mexico,

to be further smuggled into the United States. The Montoya organization funded its war activities

through proceeds of cocaine trafficking.

## F.     THE CAPTURE OF DEFENDANT DIEGO MONTOYA SANCHEZ

58.     On September 10, 2007, Colombian authorities conducted a raid on a ranch in a rural

area outside of Zarzal, Valle del Cauca, Colombia. As the Colombian authorities approached the

location by helicopter, defendant Diego Montoya Sanchez spotted them and attempted to flee. The

arrest team descended by rope from helicopters and searched the ranch and nearby locations. Within

an hour, arrest team members found defendant Diego Montoya Sanchez hiding beneath leaves in a

creek-bed located approximately 700 yards from the ranch.

Respectfully submitted,

JEFFREY H. SLOMAN
ACTING UNITED STATES ATTORNEY

By:

MICHAEL S. DAVIS
ASSISTANT UNITED STATES ATTORNEY
FL BAR # 972274
99 N.E. 4th Street
Miami, Florida 33132
ph: (305) 961-9027; fax: (305) 530-6168
e-mail: Michael.Davis2@usdoj.gov

I, Diego Montoya Sanchez, agree that above-styled factual basis is true and correct to the best
of my knowledge. I confirm that this factual basis has been translated into my native language and
that I have read it or that it has been read to me. Because the factual basis set forth above has the
limited purpose of supporting my guilty plea to the charges in Counts 1 and 10 of the Fifth Superseding
Indictment, the factual basis set forth above does not purport to represent all facts and circumstances

Page 23 (August 4, 2009)                                    Assistant United States Attorney
                                                            Attorney for Defendant
                                                            Defendant

relating to my participation in these offenses. Similarly, it is my understanding that the factual basis contained above is not intended to identify all knowledge I have of the unlawful activity of other individuals. Accordingly, the facts set forth above do not purport to contain all I know of the unlawful conduct of others with whom I participated or the unlawful conduct of others of which I am otherwise aware.

Date: _AUGUST 10, 2009_    By: _____
                                 DIEGO MONTOYA SANCHEZ
                                 DEFENDANT

Date: _8-10-2009_           By: _____
                                 WILLIAM A. CLAY, ESQ.
                                 ATTORNEY FOR DEFENDANT

Assistant United States Attorney
Attorney for Defendant
Defendant